August 13, 2019

Hon. Michelle L. Peterson
Western District of Washington
United States Courthouse
700 Stewart Street, Suite 12132
Seattle, WA 98101-9906

       Re: United States v. Paige A. Thompson, No. MJ19-0344

Dear Judge Peterson:



National Office
125 Broad Street, 18th floor
New York NY 10004
(212) 549-2500
aclu.org

    I am writing in support of the bail application of the Defendant, Paige A. Thompson, in the above-referenced matter. I am an attorney and advocate specializing in the treatment of transgender individuals in confinement settings and am concerned for Ms. Thompson's safety and well-being should she remain incarcerated among men in pre-trial custody. As a transgender woman held in a men's facility, Ms. Thompson faces unique risks to her health and safety while in custody. These risks are heightened at a pre-trial facility because of the transient nature of the population, which exposes a young, traditionally feminine-presenting individual like Ms. Thompson to a particularly high risk of abuse.

    For the past ten years, the majority of my work has focused on the needs of transgender prisoners and detainees. I have been a Staff Attorney at the LGBT & HIV Project of the American Civil Liberties Union (ACLU) since 2013 where I regularly communicate with, advocate on behalf of, and directly represent transgender individuals incarcerated in prisons and jails across the country. Prior to that, between 2010 and 2012, I was a Staff Attorney and the Director of Prisoner Justice Initiatives at the Sylvia Rivera Law Project (SRLP). As an attorney at SRLP, I represented over 150 transgender individuals and provided advice and referrals to another 200 transgender individuals involved in the criminal justice system.

    Through my work at SRLP, and prior to the promulgation of the final Prison Rape Elimination Act (PREA) regulations in May of 2012, I solicited comments from over 60 transgender prisoners across New York State on the Department of Justice's proposed regulations. I also interviewed dozens of transgender individuals about the unique circumstances they faced while in custody to inform additional comments on the proposed PREA regulations concerning transgender prisoners and detainees. I am familiar with the impact of incarceration on transgender individuals as well as with the legal protections afforded to transgender prisoners under PREA and the United States Constitution.

    Research into sexual assault in confinement consistently documents the heightened vulnerability of transgender women to sexual victimization at the hands of facility staff and other prisoners in correctional settings.[1] The federal

---

[1] See, e.g., National Prison Rape Elimination Commission Report 73 (June 2009); A. Beck et al., Sexual Victimization in Jails and Prisons Reported by Inmates, 2008-09 at 14-15 (Bureau

government has recognized this vulnerability of transgender individuals. In 2009, pursuant to PREA, Congress convened the National Prison Rape Elimination Commission (NPREC), which released a 250-page report detailing the epidemic of sexual violence in custody. Recommending an end to placement decisions based on assigned sex at birth, the report emphasized that "most male-to-female transgender individuals who are incarcerated are placed in men's prisons, even if they have undergone surgery or hormone therapies to develop overtly feminine traits[, and t]heir obvious gender nonconformity puts them at extremely high risk for abuse."[2] Like those individuals identified in the NPREC report, Ms. Thompson faces an exceedingly high risk of sexual abuse and harassment while in custody.



Since the United States Supreme Court decided the seminal case of *Farmer v. Brennan*, 511 U.S. 825 (1994), twenty-five years ago, courts have also found that transgender women incarcerated in men's prisons remain among the most vulnerable class of prisoners. *See*, *e.g.*, Greene v. Bowles, 361 F.3d 290, 293-94 (6th Cir. 2004) (finding a transgender woman prisoner in a men's facility was vulnerable to both physical and sexual attacks); *R.W. v. United States*, 958 A.2d 259, 267 (D.C. 2008) (affirming lengthy sentence where a former prison guard sexually assaulted a transgender inmate and finding that the "sentence was intended to reflect his victim's particular vulnerability as a transgender inmate in an all-male prison unit"); *Green v. Hooks*, No. 6:13–cv–17, 2013 WL 4647493, at *4 (S.D. Ga. Aug. 29, 2013) (denying qualified immunity to officials in Eighth Amendment case of a transgender woman in a men's prison who was assaulted by a male prisoner).

Though all confinement poses these risks, a pre-trial facility poses particularly high risks. Whereas upon sentencing, Ms. Thompson could potentially be sent to a facility with the capacity to set up a system to protect her from abuse in the least restrictive setting, at a pre-trial facility the population is transient and any security is short-lived and disrupted by the regular influx of new detainees. For Ms. Thompson, a transgender woman who stands out among the male population, this also means that she has to regularly adapt to manage the inevitable threats to her bodily safety. This level of vigilance can only be sustained for so long before her health will deteriorate. The solution to this vulnerability is not protective custody, which will only increase her risk of assault and further jeopardize her health.

Often transgender individuals are placed in solitary confinement or other forms of segregation to protect them from the undeniably high risks of abuse they face in general population, but these measures cause significant harm themselves. As far back as the 1960s, studies of solitary confinement reported

---

of Justice Statistics Aug. 2010), http://bjs.ojp.usdoj.gov/content/pub/pdf/svpjri0809.pdf; V. Jenness et al., Violence in California Correctional Facilities:  An Empirical Examination of Sexual Assault (Ctr. for Evidence-Based Corrs. 2009).

[2] National Prison Rape Elimination Commission Report at 74, *available at* https://www.ncjrs.gov/pdffiles1/226680.pdf.

observable negative effects among prisoners subjected to such conditions.[3] As one prison staff psychiatrist stated in 2002, "[i]t's a standard psychiatric concept, if you put people in isolation, they will go insane… Most people in isolation will fall apart."[4] Additionally, isolation can cut transgender prisoners off from their limited support systems inside the facility, which can expose them to further abuse while in segregation.

The conditions that many transgender women face in prison result in lifelong trauma, adverse health consequences, and at times, death. I have witnessed first-hand the distress that transgender individuals endure when they are singled out for abuse in custody because of their gender. Too many end up being abused or engaging in self-harm in the midst of trauma and emotional crisis. I am concerned for Ms. Thompson's continued incarceration in a men's unit and support her application for bail in this matter. Seattle has resources to support transgender defendants, ensure they make it to court, and find health and healing in the process.

I respectfully urge the Court to consider bail for Ms. Thompson.

Very truly yours,

Chase Strangio, Esq.

---

[3] *See* Bruno M. Cormier & Paul J. Williams, *Excessive Deprivation of Liberty*, 11 CANADIAN PSYCHIATRIC ASS'N J. 470-484 (1966); Hans Toch, *Men in Crisis: Human Breakdowns in Prison* (1975); Craig Haney & Mona Lynch, *Regulating Prisons of the Future*: *A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. REV. L. & SOC. CHANGE 477 (1997).

[4] Human Rights Watch, *Ill-Equipped: U.S. Prisons and Offenders with Mental Illness* 149 & n.512 (2003), available at goo.gl/ZxgPRB (emphasis omitted) (last viewed Dec. 18, 2017).