THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR19-159-RSL |
| | ) | |
| Plaintiff, | ) | MOTION FOR REVIEW AND |
| | ) | REVOKE MAGISTRATE JUDGE'S |
| v. | ) | DETENTION ORDER AND |
| | ) | MEMORANDUM OF LAW IN |
| PAIGE THOMPSON, | ) | SUPPORT |
| | ) | |
| Defendant. | ) | Oral Argument Requested |
| | ) | |
| | ) | Noted for October 27, 2019 |

## I.    INTRODUCTION

Paige Thompson respectfully moves this Court to review and revoke the magistrate judge's detention order and promptly release her pending trial with a set of conditions this Court finds acceptable. *See* Dkt. 32; 18 U.S.C. § 3145(b); Local Rule W.D. Wash. MJR 11. This Court's review is *de novo*.

The Bail Reform Act requires a court to impose only the least restrictive conditions necessary to reasonably assure a defendant's appearance and the safety of the community. The magistrate judge misapplied the legal standard and relied on distorted and incomplete facts provided by the government to find Ms. Thompson a serious risk of flight and detain her. The magistrate court's decision was wrong and this Court should correct it.

Ms. Thompson is not a flight risk, let alone serious one. Rather, she is a 33-year-old Seattle resident with deep ties to this community, no prior criminal history or arrests, and the ability to obtain employment while on pretrial release. She also could benefit from specialized mental health treatment for her gender dysphoria and depression that can only be obtained in a non-custodial setting. Her alleged crimes, although serious if proven, are non-violent, and nothing about them, how she was arrested, or how she has conducted herself since her arrest indicates she is a significant flight risk. Because of the massive amount of media attention her case has received, the notion that she could flee anywhere and not be spotted and arrested instantly is not credible. Pretrial release gives her the best opportunity to prepare for trial, including reviewing the mountains of discovery the government is expected to produce shortly, and to seek and receive the support she needs during this very trying time.

This Court should promptly release Ms. Thompson on appropriate conditions, such as placement at the halfway house, electronic monitoring, and no computer access.

## II.   BACKGROUND AND PROCEDURAL HISTORY

On July 29, 2019, Ms. Thompson was arrested and charged by complaint with one count of computer fraud and abuse. Dkt. 1. She appeared before Magistrate Judge Theiler that day, and the government moved for a detention hearing on the ground that she posed a "serious risk of flight" under 18 U.S.C. § 3142(f). Dkt. 5. The Magistrate Judge remanded Ms. Thompson pending the detention hearing. Dkt. 4.

After briefing by both parties, Magistrate Judge Peterson held a detention hearing on August 23, 2019. Dkts. 13, 15, 19, 20, 24, 26, 27, 28; Ex. 1 (Transcript ("T")). At that hearing, the government argued Ms. Thompson was a "serious risk of flight" due to her lack of residential and employment stability, lack of family support, a history of drug use and mental health issues, and risk of self-harm. T at 6–11. Believing they had established grounds for a detention hearing, the government argued that no

conditions could assure her appearance or the safety of the community because of the seriousness of the offense, because she had the ability to commit further computer-related crimes, and because she posed a physical danger to the community based on alleged prior threatening statements. T at 13-20.

In response, counsel for Ms. Thompson argued that the case was not even eligible for a detention hearing given that the government failed to establish she posed a serious risk of flight. Dkt. 19 at 5–10; T at 29.  Even assuming a detention hearing was appropriate, the defense argued the least restrictive means of reasonably assuring Ms. Thompson's appearance and the protection of the community was to release her to the Residential Reentry Center (RRC) on conditions, such as prohibiting access to computers and requiring participation in mental health services. Dkts. 19 at 21; T at 32.

The defense pointed out that: (1) Ms. Thompson had strong ties to the community as evidenced by numerous support letters and individuals present in the courtroom; (2) she had longstanding relationships with uniquely-qualified service providers in the community; (3) her roommates welcomed her back to the house she previously shared; (4) she possessed the skills necessary to hold down a job; (5) she had been sober for over three years; and (6) she had no prior criminal history. *See generally* Dkt. 19; T at 31-33.

Although the government argued that Ms. Thompson's prior suicidal ideation made her a risk of flight, the defense presented a detailed report from a psychologist as well as her counselors, which concluded that, to the extent suicide was an issue, Ms. Thompson was at a much higher risk of suicide as a transgendered woman housed at the Federal Detention Center (FDC) in a male unit than if she were released to the halfway house and receiving ongoing mental health treatment. Dkt. 19 at 8–10; T at 33. Moreover, Ms. Thompson was not, and is not, on suicide watch at the FDC.

Despite the fact that Ms. Thompson has never before been arrested or spent a night in jail and was fully cooperative with law enforcement at the time of her arrest, as well as substantial evidence that she had a stable residence until her arrest and maintained a network of supportive friends and mental health providers in the community, the magistrate judge detained Ms. Thompson. In doing so, the magistrate judge ruled that the government had established by a preponderance of the evidence, rather than a clear preponderance of the evidence as required by law, that she was a serious risk of flight and that no combination of conditions could reasonably assure her appearance or the safety of the community. T at 37–40.[1]

On August 28, 2019, the grand jury returned an indictment charging Ms. Thompson with one count of wire fraud and one count of computer fraud and abuse, to which she has pleaded not guilty. Dkt. 33. This appeal follows.

## III.    MEMORANDUM OF LAW IN SUPPPORT OF MOTION

### A.    Standard of Review

This Court's review is *de novo*. *See* 18 U.S.C. § 3145(b); *United States v. Koenig*, 912 F.2d 1190, 1192–93 (9th Cir. 1990). This Court must review the evidence before the magistrate judge and any additional evidence proffered by the parties "and make its own independent determination whether the magistrate's findings are correct with no deference." *Koenig*, 912 F.2d at 1193.

---

[1] In a subsequent written order, the magistrate court failed to make a specific finding that Ms. Thompson posed a "serious risk of flight" but set forth factual findings in support of detention: (1) Ms. Thompson faces a substantial penalty if found guilty; (2) there was a large volume of data alleged to have been downloaded; (3) forensic evidence links Ms. Thompson to the offense; (4) Ms. Thompson's admissions to law enforcement; (5) Ms. Thompson's lack of ties to the community (employment, residence, family); (6) Ms. Thompson's mental health issues and threats of harm to herself and others; (7) Ms. Thompson's prior access to weapons; and (8) Ms. Thompson's computer abilities. Dkt. 32.

MOTION FOR REVIEW AND REVOCATION OF
MAGISTRATE JUDGE'S DETENTION ORDER
(*Paige Thompson*, CR19-159-RSL) - 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**B.     Legal Framework**

This Court's independent, non-deferential review of the detention order begins with a *de novo* determination as to whether the government met its burden to establish this case is eligible for a detention hearing under 18 U.S.C. § 3142(f). If the government failed to meet that burden, this Court should decline to hold a hearing and instead order Ms. Thompson released immediately.

 If this Court finds that a detention hearing is appropriate, however, the Court next must make a *de novo* assessment of whether the government met its burden to show there are no conditions or combination of conditions that reasonably assure Ms. Thompson's appearance in court and protect the community. For this assessment, the Bail Reform Act directs the Court to consider: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including the person's character, physical and mental condition, family and community ties, employment, financial resources, past criminal conduct, and history relating to drug or alcohol abuse; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *See* 18 U.S.C. § 3142(g).

At the August 23, 2019, detention hearing, the government failed to establish Ms. Thompson poses a serious risk of flight, and the magistrate judge relied on an incorrect legal standard to find that a detention hearing was justified. Because the government cannot meet its burden, this case really is not eligible for a detention hearing and Ms. Thompson should be released immediately.

Should this Court conclude that such hearing is warranted, however, *de novo* review of the statutory factors compels her prompt release because conditions exist that reasonably assure her appearance in court and the safety of the community.

**C.      This Case Is Not Eligible for a Detention Hearing Because the Government Cannot Show that Ms. Thompson Is a "Serious Risk of Flight" by a Clear Preponderance of the Evidence.**

The Bail Reform Act provides for detention hearings only in certain categories of cases. 18 U.S.C. § 3142(f); *United States v. Salerno*, 481 U.S. 739,747 (1987). The Act operates in this manner to protect a variety of constitutional rights of pretrial detainees. *Id., Stack v. Boyle*, 342 U.S. 1, 4 (1951); *see also Gerstein v. Pugh*, 420 U.S. 103, 114 (1975), *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). When the government cannot establish that a case falls within one of the categories listed in 18 U.S.C. § 3142(f), a court is not authorized to hold a detention hearing and release is mandatory. *Salerno,* 481 U.S. at 747.

Here, the government sought to detain Ms. Thompson on the grounds that she posed a "serious risk of flight" pursuant to 18 U.S.C. § 3142(f)(2)(A). Dkt. 24 at 2–4. To warrant a detention hearing, the government must establish a serious risk of flight "by a *clear* preponderance of the evidence," as opposed to the more ordinary preponderance standard. *Motamedi*, 767 F.2d at 1406 (emphasis added). *See also United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990(government has the burden of proving "serious risk of flight" by a clear preponderance of evidence)

This enhanced preponderance standard requires the government to demonstrate extreme and unusual circumstances in order to justify detaining a defendant as a risk of flight. The term "extreme and unusual circumstances" comes from case law cited to by Congress when they adopted § 3142(f)(2). *Compare* Bail Reform Act of 1983: Report of the Committee on the Judiciary, S Rep No 98-147, 98th Cong, 1st Sess. 48 (1983) *with United States v. Abrahams*, 575 F.2d 3 (1st Cir. 1978); *Gavino v. McMahon*, 499 F.2d 1191, 1995 (2d Cir. 1974); *United States v. Kirk*, 534 F.2d 1262, 1281 (8th Cir. 1976). The term reflects Congress's intent to ensure that only a certain class of persons be detained as a serious risk of flight, such as individuals with access to large amounts

1   of money and with no ties to the community. *Compare United States v. Jessup*, 757

2   F.2d 378, 395–98 (1st Cir. 1985) abrogated on other grounds in *United States v.*

3   *O'Brien,* 895 F.2d 810 (1st Cir. 1990) *with United States v. Townsend*, 897 F.2d 989,

4   993–94 (9th Cir. 1990).  Still, courts must err on the side of release even if the

5   individual has significant assets provided they have some ties to the community where

6   they are charged. *Compare United States v. Motamedi*, 767 F.2d at 1407–08 *with*

7   *United States v. Spangler*, 12-CR-00133-RSM, Dkt. 1 at 17; Dkt. 3 *and United States v.*

8   *Hansen*, 18-CR-00092-RAJ, Dkt. 1 at 10; Dkts. 12–13, 91–95). The magistrate judge

9   below did not apply the appropriate standard in detaining Ms. Thompson. T at 37. ("I'm

10   going to find that the Government has met its burden of showing a preponderance of the

11   evidence that you are a serious risk of flight."). This Court should fix that mistake.

12        Ms. Thompson has deep ties to this community and does not have access to cash

13   to flee the jurisdiction. The government's arguments as to Ms. Thompson's risk of

14   flight have centered on an alleged lack of community ties and her mental health issues,

15   including threats of self-harm. The government's contentions do not meet the rigorous

16   standard required.

17               *i.*    *Community Ties*

18        The magistrate court erroneously stated that Ms. Thompson "[doesn't] have ties

19   to this community."  T at 37. In its written order, the magistrate judge held "Defendant

20   also lacks familial connections to the community." Dkt. 32 at 3–4.

21        The Ninth Circuit has held "that 'community' in this section of the statute

22   embraces both the community "in which the charges are brought, and also community

23   in the United States to which defendant has ties." *United States v. Townsend*, 897 F.2d

24   989, 995 (9th Cir. 1990); *United States v. Himler*, 797 F.2d 156, 162 (3d Cir.1986)

25   (reversing order of pretrial detention because of defendant's "family ties to the area").

26

The term "family" as used by the magistrate would unnecessarily narrow the concept of "community."

Ms. Thompson has lived in the Western District of Washington since she was a teenager. Seattle is her community. She moved to Seattle for employment opportunities because there are no technology companies in rural Arkansas where she was raised. She also chose to live in Seattle because it provides a much more welcoming environment to transgendered persons. The pretrial services report demonstrated that Ms. Thompson had resided in this district for over a decade and that she had maintained employment and a stable residence throughout much of that time. Members of the community came to the detention hearing to support Ms. Thompson, and numerous individuals submitted declarations and letters or communicated directly with the pretrial services office. T at 31; Dkts. 19–1, 27–1. In addition, Ms. Thompson established ties to the community through her relationship with specialized treatment providers who aid and assist transgender persons in the Seattle area. Dkt. 20-1. Since the detention hearing, there has been an outpouring of support from Ms. Thompson's local community and her family from Arkansas has voiced their support as well. Ex. 2.

Ms. Thompson's strong community ties weigh heavily in favor of release.

### ii.   *Mental Health Issues and Threats of Self-Harm*

Ms. Thompson's history of mental-health issues and prior threats of self-harm do not render her a serious flight risk. Rather, they provide a strong incentive for Ms. Thompson to remain in the community where she has support from friends, colleagues, and mental health professionals.

None of the allegations presented by the government to show her instability actually demonstrate that Ms. Thompson presents a flight risk, let alone a serious one. *See, e.g.,* Dkt. 13-1. For example, an October 24, 2018 incident allegedly involves her sending a text and leaving a voice message. *Id.* at 2. The reports of that event say

nothing about Ms. Thompson running away from the police or making plans to flee. The *ex parte* petitions against harassment which relate to that incident accuse her of engaging in "annoy[ing]" and stalking behavior. *Id.* at 7. The fact that Ms. Thompson ceased contact with those individuals following the court proceedings shows that she has respect for the judicial system and will follow court orders.

The next purported incident the government relied on at the detention hearing similarly demonstrates that Ms. Thompson does *not* present a serious risk of flight. *Id.* at 28–30. It alleges that, on March 24, 2019, the police arrived at Ms. Thompson's house following a "report of a domestic disturbance." *Id.* at 28. Rather than flee or run away, Ms. Thompson remained present, cooperated with law enforcement, and waited with the police until an ambulance arrived to take her to Swedish Medical Center. *Id.* at 28–29. As Diane Eakes, the person involved in the incident, declares:

> This report does not accurately reflect what transpired on the night of March 24, 2019. Ms. Thompson has never made serious threats of 'suicide by cop.'. . . Ms. Thompson started to make a lot of noise and I found it irritating. I made Ms. Thompson leave the residence. Ms. Thompson was not 'banging' on the windows that evening. Ms. Thompson was not 'banging' on the walls that evening. The 'fake gun' that the police wrote about was a neon orange squirt gun. No one took her fake gun threat seriously because the 'gun' was a neon orange squirt gun. . . . I know what Ms. Thompson will and won't do, and she will not harm others. Ms. Thompson pushes people away and that is what she was trying to do on March 24, 2019.

Ex. 3 at 1.

The last allegation the government cited involves an alleged threat to a social media company, and similarly proves Ms. Thompson is not a serious risk of flight. Dkt. 13-1 at 31–34. When officers followed up to investigate the threat, they concluded she "had no monetary or transportation means to come to California." *Id.* at 34. The incidents cited by the government actually demonstrate that Ms. Thompson cooperates with law enforcement, does not flee, and has no means to leave the jurisdiction. The

circumstances of her arrest on the current charge suggest a similar pattern. Dkt. 13 at 9; Dkt. 15.

Defendants with prior criminal histories who are facing significant sentences, and who also live with mental health issues, are released in this district on bond on a regular basis. *See, e.g., United States v. Godsey*, 18-CR-115-RAJ, Dkt. 14; *United States v. Jones*, 18-CR-271-RSL, Dkt. 20; *United States v. Crawford*, 16-MJ-05106-DWC, Dkt. 12. The Pretrial Services Office is able to supervise such defendants by asking the court to impose appropriate conditions to help manage their illness, such as proposed here for Ms. Thompson. For example, this district often releases individuals with a history of mental illness on the condition they "[u]ndergo a mental health, psychiatric or psychological evaluation and follow all treatment recommendations in that evaluation...." § 3142(c)(1)(A).

Ms. Thompson has already undergone such an evaluation with Dr. Matt Goldenberg. Ex. 4. He recommends "that Paige be moved as soon as possible to a halfway house that will allow her to access her [clinical] care team...." *Id.* at 7. Dr. Goldenberg further states that "[i]n terms of optimal mental health care, Paige should be seen at an agency that is specifically suited to work effectively with transgender people because transgender people face a unique set of mental health challenges as well as quality of life impairments not seen in other populations." *Id.* Ms. Thompson already has access to such treatment in the community and her treatment provider concurs that "an interruption in her mental health therapy would be detrimental to her health and well-being." Ex. 5 at 1, 2.

The government further suggests Ms. Thompson is a serious flight risk because she has threatened to kill herself in the past, and that "there is no way of ensuring that Thompson … would not, in fact, harm herself." Dkt. 13 at 11. Ms. Thompson is not currently suicidal and she is not on suicide watch at the FDC. The pretrial services

report lists one prior attempt at suicide. That attempt was thwarted, however, by Ms. Thompson's own decision not to stop and call for assistance. It appears her suicidal ideation is more akin to a cry for assistance, and that assistance is fully available to her in the community.

Moreover, as this Court is aware, individuals charged with child pornography offenses are at a high risk for suicide. But this district releases them, in part, to participate in a crisis intervention group specifically tailored to address the needs of this population. *See United States v. Barnes,* 18-MJ-05048-TLF, Dkt. 10 at 2. Ms. Thompson's mental health providers in the community are similarly equipped to address her unique needs based on specific training and experience in treating transgendered individuals.

To the extent that self-harm is an issue, the factual evidence demonstrates that Ms. Thompson is at a greater risk of suicide at the FDC as opposed to the halfway house. As Dr. Goldenberg explains:

> The risk of being continuously misgendered and becoming a target for intimidation by other inmates is likely increased in a male facility. Long-term placement in a men's facility will likely increase Paige's gender dysphoria, depression, and risk of suicide. In addition, some changes that Paige has experienced from her use of feminizing hormones are permanent, such as breast growth. It is concerning that Paige may be at increased risk for sexual objectivity if placed long-term with men due to her feminine, secondary sex characteristics.

Ex. 4 at 6.

Based on well-documented trends in pretrial facilities, the American Civil Liberties Union (ACLU) is seriously concerned for Ms. Thompson's safety at the FDC and supports her release to a halfway house:

> Though all confinement poses these risks, a pre-trial facility poses particularly high risks. Whereas upon sentencing, Ms. Thompson could potentially be sent to a facility with the capacity to set up a system to protect her from abuse in the least restrictive setting, at a pre-trial facility

the population is transient and any security is short-lived and disrupted by the regular influx of new detainees. For Ms. Thompson, a transgender woman who stands out among the male population, this also means that she has to regularly adapt to manage the inevitable threats to her bodily safety. This level of vigilance can only be sustained for so long before her health will deteriorate. The solution to this vulnerability is not protective custody, which will only increase her risk of assault and further jeopardize her health.

Ex. 6 at 2.

Further, even assuming that Ms. Thompson were to become suicidal, the FDC does not have an unblemished track record of preventing harm. There have been suicides and attempted suicides at the FDC, at least one of which involved a defendant on suicide watch. Defense counsel received reports of a suicide attempt as recently as few weeks ago including an attempt by a transgender person. Also noteworthy is that Jeffrey Epstein was in protective custody when he recently committed suicide by hanging in a federal pretrial detention facility.[2]

Thus, whatever abstract of risk of suicide exists in this case, the mental health professionals agree that it is lessened to a significant degree if Ms. Thompson is placed at the halfway house where she will receive appropriate clinical care for her gender transition and depression.

Because the government has failed to meet its burden of showing Ms. Thompson is a serious flight risk, this case does not qualify for a detention hearing under 18 U.S.C. § 3142(f)(2)(A). Ms. Thompson must be released.

---

[2] Ali Watkins and Michael Gold, Jeffrey Epstein Autopsy Results Show He Hanged Himself in Suicide, N.Y. TIMES, Aug. 16, 2019, https://www.nytimes.com/2019/08/16/nyregion/jeffrey-epstein-autopsy-results.html.

**D.      The Least Restrictive Means of Reasonably Assuring Ms. Thompson's Appearance and Community Safety Is Release.**

Even if this Court concludes that this case is eligible for a detention hearing, there is a presumption of release in this case and the government bears the burden of showing by clear and convincing evidence that no combination of conditions will reasonably assure Ms. Thompson's appearance or protect the community. 18 U.S.C. § 3142(e). The government has not met, and cannot meet, its burden.

Release conditions need only provide "reasonable assurance" and it is reversible error to detain a defendant in order to "guarantee" community safety. *United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985). Further, "[t]o give effect to the principle that doubts regarding the propriety of release be resolved in favor of the defendant, the court is to rule against detention in close cases." *United States v. Chen*, 820 F. Supp. 1205, 1208 (N.D. Calif. June 18, 1992) (citing *United States v. Motamedi*, 767 F.2d 1403, 1405-06 (9th Cir. 1985)). A review of the relevant statutory factors makes clear that the government has not met its burden, and thus Ms. Thompson should be released.

>        i.      *Nature and Seriousness of the Offense*

The circumstances of this case, while serious, do not justify detention. The government argued that Ms. Thompson's placement anywhere else but the FDC would not reasonably assure the safety "of approximately 106 million customers"—Capital One customers. Dkt. 13 at 8. Yet, both Capital One and the government have made statements to the public to assure them that there is no threat of harm to these individuals stemming from this offense. *See* Information on the Capital One Cyber Incident, August 4, 2019, available at https://www.capitalone.com/facts2019/ ("Based on our analysis to date, we believe it is unlikely that the information was used for fraud or disseminated by this individual."); AUSA interview with NPR, available at https://www.npr.org/2019/07/30/746509206/capital-one-data-breach-exposes-over-100-

million-customers ("We don't have any information that Ms. Thompson used or monetized the data in any way.").

The same is true as to the other companies alleged to have been affected. Amazon Web Services (AWS) is the "Cloud Computing Company" referenced in the complaint. Dkt. 1 at 2. AWS wrote a letter to Congress and stated that it has contacted customers that may have been affected and "[t]o date, these customers have not reported any significant issues." Ex.7 at 2.

ii.    *Weight of the Evidence*

Although it is the least important factor under the law, even the weight of the evidence supports Ms. Thompson's release.

In assessing the weight of the evidence, the Court may not make a pretrial determination of guilt. *Motamedi*, 767 F.2d at 1408. Rather, the weight of the evidence "can be considered only in terms of the likelihood that the person will fail to appear or will pose a danger to any person or to the community." *Id.* Even when the evidence strongly weighs in favor of conviction, release is nevertheless appropriate if the community's safety can be "reasonably assured" by release conditions. *Id.*

To the extent the government has presented evidence of Ms. Thompson's involvement in the offense, it supports her release. According to the government, Ms. Thompson was fully cooperative with law enforcement at the time of her arrest, made statements accepting responsibility and made no attempt to flee or destroy evidence. Again, the government indicates that, although Ms. Thompson possessed confidential data belonging to Capital One, she did not use the information to commit fraud or disseminate it to others who might have done so. These actions contradict any attempt to flee, evade responsibility or cause further harm.

### iii.     Ms. Thompson's History and Characteristics

Ms. Thompson's history and characteristics favor release. This Court should not let the government's attempt to muddy up the record distract it from concluding as much.

The magistrate court's finding that Ms. Thompson did not have ties here in Seattle failed to appreciate her particular circumstances. As set forth in Section III (C)(i), she is a 33-year-old transgendered woman who has never before been arrested or charged with a crime. Her gender dysphoria was not well understood or accepted in her hometown in Arkansas so she made the prudent, if difficult, decision to seek out a more accepting and diverse community in Seattle. Also, because she is highly-skilled working with computers, the Seattle area offered her far greater career opportunities. Ms. Thompson left Arkansas, but her mother is clear that "the entire Thompson family is behind her." Ex. 2 at 1.

Ms. Thompson now has lived in Seattle for over a decade and has made Seattle her home. The attached letters establish that she has many friends and colleagues who remain supportive of her. She was particularly active in computer and transgendered communities where she still has a great deal of support.

Ms. Thompson's established relationship with her mental health providers likewise provides strong ties to Seattle. Ex. 5. She has had an ongoing trusted relationship with her providers and their care is unique in their ability to assist her in her gender transition process.

Finally, the magistrate court below relied on her purported lack of stable finances as grounds for detention, yet it actually demonstrates that she has no means to flee. Given Ms. Thompson's strong ties to Seattle (and nowhere else), release is warranted.

           *iv.*      *The Nature and Seriousness of the Danger Posed by Release*

Ms. Thompson does not pose a danger to the community if released.

The magistrate judge stated in its written order that Ms. Thompson "at least in part" had access to weapons because Park Quan, the owner of the home possessed weapons. Dkt. 32, p. 4. The magistrate judge erred based on the record:

> No one in this house has ever had access to Park Quan's firearms. Said firearms were always locked in Mr. Quan's safe in his room. Mr. Quan is the only person who had the key to the safe. The key to the firearm safe was locked in another lockbox where a key fob is needed to open it. Only Mr. Quan can open the lockbox that holds the firearm safe key. Ms. Thompson did not and would not enter Mr. Quan's room. Mr. Quan's bedroom is also my bedroom, and I am very knowledgeable about his locked gun safe.

Ex. 3, p. 2.

At the hearing, without presenting any evidence, the government vaguely stated that during the execution of the search warrant "[s]ome of the guns – at least one of the guns was out." T at 19. It is unclear whether the first search team at the house opened the safes and placed these firearms out or whether the firearm alluded to by the government is simply an airsoft gun. Regardless, Ms. Thompson did not have access to the firearms seized from Park Quan's two safes. She has never possessed a firearm or used a firearm.

Similarly, the government's assertions that Ms. Thompson would pose a threat of physical harm to others if released does not stand up to scrutiny. As discussed earlier, although Ms. Thompson has at times made threatening statements, she has never been known to follow through with those threats. It appears that she sometimes speaks out either in frustration or perhaps seeking attention, but those who know her best all verify that she has never been known to be violent or physically aggressive. Ex. 2. The proposed condition to require Ms. Thompson to participate in ongoing mental health

treatment will help to manage her depression and outbursts while reasonably assuring the safety of the community.

Ms. Thompson does not present a technological danger to the community. Despite the defense proposing a release condition that banned Ms. Thompson from accessing computers or the internet, the government argues that she would "pose a technological danger" if released. Dkt. 13 at 10. This argument ignores the fact that the government executed a search warrant and seized all of Ms. Thompson's electronic devices. Dkt. 1 at 12; Dkt. 15. As explained above, the government also seized all of the downloaded data in this case and AWS has informed Congress that there are no other breaches. Ex. 7.

This district routinely manages the potential for technological dangers with appropriate release conditions. In child pornography cases, for example, the practice is to release individuals on bond with conditions that restrict computer use. *See, e.g., United States v. Delateur*, 18-CR-05364-BHS, Dkts. 1, 10; *United States v. Benson*, 17-CR-05473-BHS, Dkts. 16, 20; *United States v. Giles*, 15-CR-05543-RBL, Dkts. 1, 13; *United States v. Giliam*, 13-CR-05028-RJB, Dkts. 1, 18; *United States v. Dwight*, 14-MJ-05257-DWC, Dkts. 1, 9; *United States v. Smith*, 13-MJ-05179-DWS, Dkts. 1, 11, 15; *United States v. Lobdell*, 15-CR-00394-TSZ, Dkts. 1, 13; *United States v. Brook*, 14-CR-00156-RAJ, Dkts. 1, 18–21; *United States v. Wood*, 18-CR-00190-RAJ, Dkts. 1, 13; *United States v. Morgenstern*, 18-CR-00285-RSM, Dkts. 9, 15-1; *United States v. Tippens*, 16-CR-05110-RJB, Dkt. 15; *United States v. Rockwell*, 19-CR-05294-BHS, Dkts. 1, 12; *United States v. Barnes*, 18-CR-05141-BHS, Dkts. 1, 10.

Moreover, in the above listed cases, the defendants used ordinary computers available to the public, including smart phones, to commit offenses. Ms. Thompson's computer, in contrast, was custom-built and contained unique software. Ms. Thompson's "technical sophistication," (Dkt. 13 at 10), to engage in the scenarios laid

out by the government is predicated on her ability to access a highly-sophisticated machine with similar software. Dkt. 15. No such computer would be available to her at the halfway house. Dkt. 15. As such, the proposed condition of not allowing Ms. Thompson access to computers will reasonably assuage any perceived risk.

> v.    *The Proposed Release Conditions that Reasonably Assure Ms. Thompson's Appearance and Community Safety*

The defense does not propose simply releasing Ms. Thompson without supervision. Instead, Ms. Thompson requests placement at the RRC given that the government objects to her returning to her prior home. There her comings and goings could be monitored through electronic monitoring, as well as by the staff. She would agree not to access computers or the internet and to engage in mental health treatment with her established providers. She would be in close contact with defense counsel who will need her ongoing assistance to review the massive amount of discovery in this case, which will further ensure her accountability and stability.

## IV.    CONCLUSION

This Court should reverse the magistrate judge's detention order and release Ms. Thompson.

DATED this 13th day of September, 2019.

Respectfully submitted,

s/ *Mohammad Ali Hamoudi*
s/ *Christopher Sanders*
s/ *Nancy Tenney*
Assistant Federal Public Defenders
s/ *Brian Klein*
Baker Marquart LLP

Attorneys for Paige Thompson

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## CERTIFICATE OF SERVICE

I certify that on September 13, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of filing to all registered parties.

s/ *Charlotte Ponikvar*
Paralegal
Office of the Federal Public Defender

MOTION FOR REVIEW AND REVOCATION OF
MAGISTRATE JUDGE'S DETENTION ORDER
(*Paige Thompson*, CR19-159-RSL) - 19