1                 THE UNITED STATES DISTRICT COURT

2                 WESTERN DISTRICT OF WASHINGTON

3                         AT SEATTLE

4    ----------------------------------------------------------------
                                   )
5    In the matter of:             )
                                   )
6    UNITED STATES OF AMERICA,     )   No. 2:19-mj-00344-MAT
                                   )
7            Plaintiff,            )   Case No. MJ19-344
                                   )
8    v.                            )
                                   )
9    PAIGE A. THOMPSON,            )
                                   )
10           Defendant.

11   ----------------------------------------------------------------

12                      DETENTION HEARING

13            Before the Honorable Michelle L. Peterson

14                       August 23, 2019

15   ----------------------------------------------------------------

16

17

18

19

20

21

22

23   Transcribed by:      Reed Jackson Watkins

24                        Court-Certified Transcription

25                        206.624.3005

```
 1                    A P P E A R A N C E S

 2

 3   On Behalf of Plaintiff:

 4   STEVEN T. MASADA

 5   ANDREW C. FRIEDMAN

 6   United States Attorney's Office, Western District

 7   700 Stewart Street

 8   Suite 5220

 9   Seattle, Washington  98101-4438

10

11   On Behalf of Defendant:

12   MOHAMMAD ALI HAMOUDI

13   Federal Public Defender's Office

14   1601 Fifth Avenue

15   Suite 700

16   Seattle, Washington 98101-1642

17

18   ALSO PRESENT:

19   SPECIAL AGENT JOEL MARTINI

20   BEN BEETHAM, PTS

21

22

23

24

25
```

```
 1                         August 23, 2019

 2                              -o0o-

 3

 4        THE CLERK:  All rise.  The United States District Court

 5        for the Western District of Washington is again in session.

 6        The Honorable Michelle L. Peterson presiding.

 7        THE COURT:  Good morning.  Please be seated.

 8        We are here on MJ19-344.

 9        Counsel, can you make your appearance for the record?

10        MR. FRIEDMAN:  Good morning, Your Honor.  Andrew Friedman

11        and Steven Masada for the United States.  With us at counsel

12        table is Special Agent Joel Martini from the FBI.

13        THE COURT:  Good morning.

14        SPECIAL AGENT MARTINI:  Good morning.

15        THE COURT:  Good morning, Mr. Martini.

16        MR. HAMOUDI:  And good morning, Your Honor.  Mohammad

17        Hamoudi, Federal Public Defender's Office, here on behalf of

18        Ms. Paige Thompson.  And seated to our left is an

19        investigator from our office, Ms. Stacey Brownstein.

20        THE COURT:  Good morning, Mr. Hamoudi; good morning,

21        Ms. Thompson; and good morning, Ms. Brownstein.

22        All right.  We are here on the Government's motion for

23        detention found at Docket No. 5.

24        Mr. Friedman, would you like to be heard?

25        MR. FRIEDMAN:  Yes, Your Honor, if I may.
```

1          Your Honor, the evidence in this case shows there's

2     abundant evidence that Ms. Thompson is both a risk of flight

3     and a danger to the community if she were released.  It also

4     shows there were no conditions of release that could

5     adequately mitigate those risks or ensure her appearance or

6     the safety of the community and the others.

7        The Pretrial Services Office has looked at the case and

8     conducted a thorough review.  And they are recommending

9     detention for that reason, and the Government joins in that

10     recommendation.

11       As the Court knows, there's been extensive briefing in the

12     case.

13       THE COURT:  Yes.  And, for the record, I have reviewed

14     Docket No. 5, the motion for detention.  I have reviewed the

15     complaint.  I have reviewed the Government's memorandum in

16     support of motion for detention and the exhibits attached

17     thereto.  The Government's sealed supplemental memorandum in

18     support for motion for detention.  The response to the

19     Government's memorandum and support of motion for detention

20     and the exhibits attached thereto.  Dr. Matthew Goldenberg's

21     report.  I have reviewed the United States' reply memorandum

22     in support of motion for detention and the exhibits attached

23     thereto.

24       And then this morning we received the United States'

25     supplemental filing and support of motion for detention and

1        the exhibits attached thereto.  And we also received an

2        investigative memorandum from Investigator Brownstein from

3        the defense, as well as a letter from Timothy Carstens.  And

4        I have reviewed it all.

5          Is there anything else?  And I have also reviewed the

6        Pretrial Service report in this case.

7          Is there anything else that I should have reviewed?

8          MR. FRIEDMAN:  I don't believe so, Your Honor.

9          THE COURT:  Okay.  So now you may proceed.

10         MR. FRIEDMAN:  Okay.  So, Your Honor, stepping -- having

11       gone through all of those pleadings, stepping out of the

12       weeds a little bit, I think the defense's argument in this

13       case is that the Court can only look at some of the evidence

14       in the case.  There are only certain things that the Court

15       should consider.

16         The Court should ignore evidence of danger, and, in

17       addition, in looking at the things that the defense, I think

18       doesn't contest that the Court can look at for risk of

19       flight, the defense basically picks those apart one by one

20       and addresses them as single factors instead of looking at

21       the totality of the circumstances in the case.

22         And the Government believes that the appropriate way for

23       the Court to approach, is the way the Court needs to

24       approach it under the law, is to look at all of the

25       evidence -- and I'll talk about why it's all appropriate --

1    and to look at the overall circumstances.  You can't look at

2    just one factor.  The Court has to look at the whole

3    circumstance presented by Ms. Thompson's case and decide,

4    based on that, whether detention is appropriate.  And when

5    the Court does that, the Government --

6        THE COURT:  Do you disagree, then, that the threshold

7    issue is whether or not there's a serious risk of flight?

8        MR. FRIEDMAN:  No.  I agree that there is that, that is a

9    threshold issue.  If that were not the case, we can't be

10   here for a hearing, so -- so let me start with that issue,

11   then.

12       The Government moved for a hearing based on risk of

13   flight.  And under the case law and under the statute, the

14   Government's supposed to -- it's required to show a serious

15   risk of flight by a preponderance of the evidence.  So that

16   doesn't mean the Government doesn't have to show that

17   Ms. Thompson definitely would flee, and it doesn't have to

18   show that it's absolutely the case 100 percent.  We have to

19   show a serious risk of flight by a preponderance, and when

20   you look at the facts in this case, they establish they

21   clearly meet that threshold.

22       First, Ms. Thompson has, I guess, a lack of the type of

23   ties to the community that are often presented in terms of

24   residence, her -- she doesn't have -- initially, her

25   housemates reported she would not be welcome back at her

1      residence.  There's been a letter filed in support of one of

2      the defendant's motion -- memoranda saying that she would be

3      welcomed back.  The other residents of the house are

4      witnesses, both to Ms. Thompson's case.  Ms. Thompson would

5      also be a witness to Mr. Kwan's case, and so I think that's

6      not a viable residence for her to return.  And it doesn't

7      seem to be really what the defense is proposing anyway, so

8      there's a lack of residential stability.

9         Employment, similarly.  Ms. Thompson hasn't been employed

10     since 2016, so she doesn't have a tie keeping her to --

11     tying her to this community.  And the family support that

12     she does have is not in this community.  It's elsewhere.

13        Coupled with that, Ms. Thompson has a long history of drug

14     abuse, stretching at least as late as 2017.  And it's laid

15     out in the Pretrial Services report, but it includes most of

16     the drugs that I can think of.  So methamphetamine, cocaine,

17     mushrooms, PCP, acid, research chemicals, and several other

18     drugs.

19        THE COURT:  But she's been clean since 2016; is that...

20        MR. FRIEDMAN:  As far as we know --

21        THE COURT:  We know?

22        MR. FRIEDMAN:  -- since 2017.

23        THE COURT:  2017?

24        MR. FRIEDMAN:  Yes, but there is that history.

25        There is also a long history of mental health issues that

1   goes back clearly for years, and that has resulted in a

2   string of incidences of erratic behavior.  And the Court's

3   aware of those.  There was the episode that led to a

4   restraining order.  There are threats to commit suicide,

5   there are threats to harm others, and so there's a lot of

6   erratic behavior tied to this mental health history.

7     And that mental health history goes back for years.  It's

8   resulted in at least one suicide attempt.  It's resulted in

9   hospitalization.  And it's continued to cause, apparently,

10   erratic behavior, even as Ms. Thompson has been under

11   treatment receiving counseling for that and receiving

12   medication.

13     So that mental health history is -- it's not something

14   that like, Oh, that can be fixed immediately, and it ceases

15   to be a concern.  It is a concern and a reason supporting

16   detention.

17     In addition, if released, Ms. Thompson would be in a much

18   more difficult situation than she's previously been in.

19   She's facing a very strong case.  I would say a near certain

20   conviction.

21     The Court is aware of the complaint, but the fact in this

22   case is, basically, the Government linked Ms. Thompson to

23   this crime forensically, obtained a search warrant for

24   Ms. Thompson's residence, and recovered at that residence

25   evidence of the crime, all of the evidence that had been

1    taken from Capital One and numerous other companies.

2        So it would appear to me that the case is very strong,

3    will result in conviction, and will have a long sentencing

4    range.  It's impossible to calculate that exactly at the

5    moment, but even taking -- if you take sort of the lowest

6    thing you could do in terms of loss amount, which is the

7    hundred million dollars that Capital One has said that this

8    is going to cost them in just the next six months, so long

9    before everything is resolved, that suggests the

10   guidelines -- a guidelines range of 121 to 151 months.

11       Now, the loss amount is going to go up substantially from

12   that, so that range is going to go up.  The Court also is

13   aware that people don't always receive a guideline sentence,

14   but, regardless, when the range is that long and the crime

15   that serious, she is facing a substantial sentence.

16       Finally, in terms of nonappearance, or flight of

17   nonappearance, Ms. Thompson is clearly a risk to harm

18   herself, and the case law says that that counts as the kind

19   of risk that the Court should look at, both in determining

20   whether that she is a flight risk to get to the hearing, and

21   in determining whether she's a risk of nonappearance.

22       And that history of suicidal threats go backs for years.

23   As the Pretrial Services report says, there was an episode

24   in 2013 that led to suicidal ideation that led to extended

25   hospitalization.  Ms. Thompson actually attempted suicide in

1     2016, and more recently in 2018 and '19, the record shows

2     repeated threats to commit suicide in various ways.

3        Ms. Thompson has communicated those threats to friends and

4     acquaintances.  One of them we referred to earlier was

5     someone, a company in California, the most recent one is one

6     we received yesterday.  Someone reading the news recognized

7     Ms. Thompson's name, and said, Hey, our company has been in

8     communication and received communication from her

9     threatening suicide.  So that's something, and her

10    housemates have also reported it.

11       And we have included in the record posts by Ms. Thompson

12    herself that are effectively threats of suicide, so it's a

13    threat that has lasted for years, including while

14    Ms. Thompson is on treatment.  And it is, obviously, a

15    serious threat because there's at least one actual suicide

16    attempt, so for that reason also, Ms. Thompson is a risk of

17    flight and a risk of nonappearance.

18       Focusing still just on the risk of flight, there are no

19    conditions that can stop that, that can adequately assure

20    Ms. Thompson's appearance if she were released.  And when I

21    look at the conditions that the defense has suggested, they

22    suggested placement into a halfway house.  Halfway houses

23    are -- I mean, they provide support, but they're not secure

24    facilities.  People can walk out of them, so she could --

25    she would be equally able to flee to harm herself in a

1       halfway house.

2         They have suggested use of electronic monitoring.  Courts

3       repeatedly have held that that doesn't actually prevent

4       flight.  It's not a protection against it.  It helps you

5       monitor someone if they're not trying to flee or fail to

6       appear.  But if you want to flee or fail to appear, you just

7       cut the bracelet.

8         And she suggested that treatment would mitigate these

9       threats, but as I've said, the crime in this case occurred

10      while she was under treatment.  The threats of violence to

11      herself, the threats of violence to others, all those have

12      occurred during the last year while she was on treatment,

13      and so I think that also is not a condition that would

14      prevent that.

15        So based merely on the risk of flight, the risk of

16      nonappearance, the record shows there are no conditions that

17      could ensure Ms. Thompson's appearance or that would justify

18      the Court releasing her.

19        This case is more serious because of a threat to others

20      than threat of harm and danger, and the defense argued in

21      their brief that the Court can't consider that.

22        THE COURT:  I don't think that's what they argued.

23        MR. FRIEDMAN:  I think...

24        THE COURT:  I think they argued that the Court can't get

25      there unless I find risk of flight.

**Ex. 1_ p. 11**

1        MR. FRIEDMAN:  Well, I would be happy to...

2        THE COURT:  Why don't you go ahead and address it.

3        MR. FRIEDMAN:  I think there are different sentences

4    that --

5        THE COURT:  Okay.

6        MR. FRIEDMAN:  -- yeah, that can be read different ways.

7    But I think we are entitled to -- I think that would -- if

8    the Court were to understand their argument that way, I

9    think that puts us in a stronger position because as soon as

10   we're entitled to the hearing, I think that would mean the

11   Court can look at all of this evidence and -- regardless of

12   what it ultimately concludes on risk of flight, so...

13       THE COURT:  Right.  That's my understanding.

14       MR. FRIEDMAN:  Okay.

15       THE COURT:  Once you have met that threshold burden, then

16   we can go to the G factors and the nature and circumstance

17   of the offense.

18       MR. FRIEDMAN:  Okay.

19       THE COURT:  Danger to the community.

20       MR. FRIEDMAN:  That's great, because that's our position,

21   too, on that issue, and I would say the structure of the

22   bail statute supports that conclusion.  The purpose behind

23   it, the fact that the sections all talk about doing that,

24   and so I won't address that any further.

25       But the record in this case, again, shows that

 1          Ms. Thompson is a danger.  She's a danger both in terms of

 2     the crime that she committed, which was a massive breach

 3     of -- Capital One is the company that so far has attracted

 4     attention because that was the first one found.  But she

 5     appears to have taken data from more than 30 companies, some

 6     of it more sensitive; some of it less sensitive.  Sometimes

 7     more; sometimes less.  So I don't mean to suggest they're

 8     all equal --

 9      THE COURT:  Mm-hm.

10      MR. FRIEDMAN:  -- or they all was (verbatim) big.  But

11     it's significant that there were that many, and it's caused

12     massive damage.  As I said a moment ago, you know, the

13     smallest estimate is the hundred million dollar estimate.

14     That's going to go up as time passes.

15      If you believe in efficient markets, we've talked about

16     how much the price went down of Capital One, what happens

17     long term, you know, and you'll never be able to really

18     piece it out.  But, clearly, people recognize, and the

19     market recognizes, that this is a significant factor.  And I

20     think if you look at the chart we put in, the price had --

21     Capital One's price has been drastically affected as opposed

22     to looking at an earlier time period where it rose first.

23      THE COURT:  What about danger to the community going

24     forward?  How do you articulate that?

25      MR. FRIEDMAN:  So Ms. Thompson would be a danger.  And

 1     just focusing on this first, the technological or economic

 2     aspect of it, she would be a danger for a couple of reasons.

 3       First, we believe and hope we have recovered all of the

 4     data in this case.  Ms. Thompson has represented that we

 5     have.  We have no evidence that that's not true, so if that

 6     is the case, then there's not a risk of that same data being

 7     disseminated.

 8       But Ms. Thompson, clearly, has a lot of technical skills.

 9     She's very good at, I guess, computer science, or this area

10     of computer science.  She could go back and do something

11     similar very easily.  It doesn't -- defense argued that she

12     had a super computer at home, and, actually, she had an

13     incredibly fancy computer at home, which is really sort of a

14     testament to how skilled she is that she put that together

15     herself.  But this crime doesn't take that kind of computer.

16     It could be done with a much simpler computer, so with any

17     computer access with her skills, she would be a danger to

18     repeat or do something similar.

19       So --

20     THE COURT:  Couldn't there be a condition that would

21     prevent her from accessing a computer?  I mean, we do that

22     in child pornography cases all the time.

23       MR. FRIEDMAN:  We do do that, so that would be -- you

24     would probably need to prevent access to cell phones and

25     computers.  We do do that, and that would be a way to

1      address this one risk if that were enforced.

2         So -- but that's only one aspect of the danger that she

3      presents also, so I don't disagree with the Court that you

4      could try and address this.  And if that computer is -- if

5      that condition is effectively enforceable -- and the Court

6      probably knows more than me about how successful that

7      is.  I see cases where people are subject to that condition,

8      and then we find them -- they're often child pornography

9      cases.  We find the person having access somewhere else at a

10     library, or doing something like that, and getting around

11     the condition.  So I think it's a hard condition to enforce;

12     in theory, great; perhaps not in practice.

13        But so that's -- the first danger, I would say, is the

14     economic or technical danger.  And I think in considering

15     that, it's also important, again, to remember the scope of

16     the crime here.  And this is an unusual crime because

17     Ms. Thompson may or may not have committed this for any

18     financial profit.  There's no evidence that she sold any of

19     the evidence that -- any of the data she had taken or did

20     anything.

21        But when you look not at what she gained from it, but what

22     the harm that was done is, it's massive.  I mean, if you

23     erased hundreds of millions or billions of dollars of value

24     or caused that cost to others, that's just a huge drain.

25        There are people -- it's -- you can't -- it's hard to look

1      at and say, Well, this one person suffered the following

2      consequence, but people are suffering consequences from

3      that.  People, investors, are losing money.  People may lose

4      jobs.  People are -- people are having serious impacts on

5      them, and the scope of it means that is a significant

6      broad-reaching danger.

7         Ms. Thompson is also a physical danger, though, and I base

8      that on the threats and the words that have been -- that we

9      see in this case.  I know that the defense disagrees, and

10     they filed something this morning saying, Everybody knows

11     that Ms. Thompson said something.  And that's really just a

12     cry for support, and she doesn't really mean it.

13        And I would say everyone doesn't know that.  If you know

14     Ms. Thompson, you may have an opinion.  But most people look

15     at words, and you have to take them at face value.  And we

16     know that some people who do know Ms. Thompson have done

17     that, for instance, the couple that obtained protective

18     orders against her felt threatened enough not to say, Hey,

19     she just needs some support, but to go to court and get an

20     order saying, You can't contact us for five years.  So some

21     people who know Ms. Thompson consider the threat serious.

22        The person at the company in California who received a

23     threat that Ms. Thompson was going to come down and -- and

24     shoot up the company --

25        THE COURT:  Mm-hm.

1          MR. FRIEDMAN:  -- took it seriously.  He knows

2      Ms. Thompson, and he took it seriously enough that he called

3      the police who called the police up here.

4          So people do -- people may have different views or a

5      different understanding, and to date, Ms. Thompson has not

6      followed through on a threat to shoot others.  But people

7      who know her are concerned about those, and people who don't

8      know her are rightly concerned about those threats.

9          Just over the course of the last year, those threats have

10     included the threats that led to a protective order sought

11     by the couple that knew her.  The call to California to --

12     that included a threat to shoot up that company.

13         There have also been two calls to police --

14         THE COURT:  How long ago was that threat?  It was like

15     three months?

16         MR. FRIEDMAN:  That was in, I believe, May of this year,

17     but it may have been March.  It was in 2019, Your Honor.

18     Yeah, it was in May of 2019.

19         THE COURT:  Okay.

20         MR. FRIEDMAN:  And, obviously, there have been two calls

21     to police up here.  I guess one was a response to that.  So

22     one call by housemates to police, so, again, people up here

23     who know Ms. Thompson reporting that.

24         So in this day and age, threats to kill other people, I

25     mean, I think that should always be taken seriously.  But

1      threats like this resonate particularly in this day in age.

2      We have seen tragedy after tragedy where people have carried

3      out threats like that, particularly, when you have someone

4      who has the mental health history that Ms. Thompson has, and

5      the history of instability.  Those threats are serious

6      threats to the danger of the public.

7        And I would also add that Ms. Thompson's threats to commit

8      suicide have included threats of suicide by cop.

9        THE COURT:  Mm-hm.

10       MR. FRIEDMAN:  That's an inherently dangerous situation

11      for anyone because the Court's aware we cited one case that

12      talks about the threat that it poses to others.  People who

13      respond to threats like that, officers, people caught up in

14      it, can also be hurt.  And so even the threat of suicide by

15      cop is a threat that endangers the safety of others.

16        Again, as with the threats of flight, there are no

17      conditions that can adequately deter these threats.  Even if

18      Ms. Thompson is placed at the halfway house and placed on

19      ankle monitor -- an ankle bracelet, that doesn't stop her

20      from being determined, leaving the halfway house, cutting

21      off the ankle bracelet, and following through on these

22      threats.

23        Similarly, the mental health treatment, she has made the

24      threats before while on that.  Obviously, she hasn't carried

25      them through before, but the mental health treatment hasn't

1      stopped the threats, which suggests concern about would it

2      be effective.

3        THE COURT:  What about the issue of the firearms that were

4      found in the residence that she was staying in?  I

5      understand there's some disagreement about whether she had

6      access to the AR-15 sniper rifles --

7        MR. FRIEDMAN:  Right.

8        THE COURT:  -- and bump stocks.

9        What can you tell me?

10       MR. FRIEDMAN:  So what I can tell you is that there are --

11     there were 14 firearms taken out of that room.  There were,

12     I believe, two gun safes in the room.

13       Ms. Thompson has filed a statement from one of her

14     housemates that said, the guns were always in the gun safe.

15     No one but Mr. Quan had access to them, and so no access.

16       I have spoken with one of the agents who participated in

17     the search who said, When we entered the room, they were --

18     some of them may have been in the safe.  I believe the safe

19     was not locked.  Some of the guns -- at least one of the

20     guns was out.  So, yes, there were gun safes, but they were

21     not gun safes that were always kept closed that prevented

22     someone from having access.

23       Now, I guess -- I mean, this cuts a little against us,

24     but, I mean, that's -- those guns are in the Government's

25     possession, but I think it's easy enough today to acquire

1   guns whether you're allowed them legally, whether you're not

2   allowed them legally.  But the threats still have to be

3   taken seriously, and so I think there are no conditions that

4   can mitigate against that.

5     One of the issues that the defense spoke a lot about in

6   their brief is the fact that Ms. Thompson is transgender --

7     THE COURT:  Mm-hm.

8     MR. FRIEDMAN:  -- and the complications that prevent --

9   presents to her in terms of being detained in the Bureau of

10   Prisons.  And what I would say on that front is the Bureau

11   of Prisons -- Ms. Thompson is not the first transgender

12   inmate in the Bureau of Prisons, or even in Sea-Tac.  This

13   is less of a rarer situation than you might think.

14     My understanding is that -- there was a point in time

15   about ten days ago where I had a conversation, and they said

16   there were actually several transgender inmates there on

17   that particular date.  So I can't tell you how many there

18   are today, but this is a situation that happens a lot.

19     THE COURT:  Do you have any information as to what the

20   criteria would be to have her housed in the female unit?

21     MR. FRIEDMAN:  I have some, but -- so can I get there

22   slightly a long way?

23     THE COURT:  Yeah.

24     MR. FRIEDMAN:  So the Bureau of Prisons had something

25   called a "transgender offender policy," and that policy,

1      which was written, I believe, in 2017 and updated in 2018,

2      governs different aspects of treatment of transgender

3      inmates.

4         Part of that policy calls for something called the

5      "Transgender Executive Committee," which is in D.C., to

6      monitor certain decisions, including placement decisions and

7      housing decisions between wings.  And so that is an issue

8      that, obviously, comes up regularly.

9         In this case -- all decisions that have been made in this

10      case, BOP is taking this very seriously.  FDC SeaTac here is

11      looking at it seriously.  They are consulting closely with

12      D.C. because they want to make sure they're doing what they

13      think they're supposed to do and what others think they're

14      supposed to do.

15         That policy is designed to do a couple things to support

16      inmates as best BOP can in terms of their needs, their

17      safety, their health, and also to maintain security and

18      protect other inmates.  So BOP is trying to balance a lot of

19      things as they deal with transgender inmates.

20         You know, one is the safety of the inmates and making sure

21      that they're not subject -- in a position that's bad for

22      them.  The other is making sure you don't put an inmate

23      somewhere where they are threatening or harming other

24      inmates.

25         So if you placed a -- someone transitioning from being

1    male to female into the female wing, you probably have

2    female inmates there who might raise concerns.  So they're

3    balancing a lot of different things as they do that.

4       I can tell you that in this case, BOP has been assuring

5    that Ms. Thompson receives the medications that she's taking

6    or is going to take in connection with her transition.  They

7    have placed her in the male wing, and under the BOP policy,

8    inmates are typically placed in -- initially placed based on

9    biology, and then BOP looks and studies their adjustment,

10   how they're doing, and how they're living.  And it,

11   typically, would take a substantial amount of time,

12   certainly, a period of months for BOP to say, Okay.  We

13   would move someone from the -- if they were initially placed

14   in the male to the female wing.

15      And so I can't tell you about this case specifically, but

16   the typical expectation would be multiple months before BOP

17   would say, Yes, you should be in the other place.

18      And one of the factors is -- one of the big factors in

19   that, I mean, apart from safety and people's well-being, is

20   how far along someone is in their transition as they make

21   that decision.

22      THE COURT:  Okay.

23      MR. FRIEDMAN:  So what I would say is BOP is doing

24   everything they can in this case to make sure that the

25   conditions of confinement are as good as they can be.  They

1          are providing the medications that Ms. Thompson needs.  BOP

2          staff psychologists have been meeting with her every few

3          days.  They report that her condition is generally good;

4          that her adjustment has been generally good as far as they

5          can tell.  All of that is self-reported, obviously, but as

6          far as they can tell, Ms. Thompson is reporting that she

7          generally feels safe; that she -- I think she has not --

8          it's possibly, within the last couple days, but not

9          expressed a desire to be housed in the other wing, although

10         I think that may be an open issue as to what she's saying or

11         what she would be saying through Counsel.

12           But their perception of her adjustment is that it has been

13         successful so far, particularly, compared to when

14         Ms. Thompson began when she was sort of actively having

15         suicidal ideations, making threats to harm herself,

16         including in court.

17           THE COURT:  Is she still on -- I mean, what's the status

18         of the suicide watch?

19           MR. FRIEDMAN:  She is not on suicide watch.  She was for

20         several days when she arrived.  I believe she was taken off

21         since then.  If circumstance -- I mean, if they saw

22         something that suggested to them that she should be placed

23         back on suicide watch, that would be restarted, but not

24         currently.

25           THE COURT:  Okay.

1          MR. FRIEDMAN:  So BOP is doing whatever they can to make

2     the conditions of confinement as sort of -- as accommodative

3     as they can be to Ms. Thompson, and the Government wants

4     Ms. Thompson's conditions of confinement to be as

5     accommodative as they can be.  I mean, we -- we want -- we

6     don't want there to be problems, but that's not really the

7     issue for the Court today.

8          The Court is looking at this case under the Bail Reform

9     Act under the detention statute.  And Ms. Thompson is in

10    this situation because of the crime that she committed and

11    that she was arrested for, and the Court has to apply the

12    Bail Reform Act to say, When I apply those standards, when I

13    look at those, what's the appropriate thing to do in terms

14    of detention or release?

15         And the Bail Reform Act doesn't say what -- you know, what

16    is the best, what is the most helpful thing, or where's the

17    best place for somebody to be.  It talks about the Court has

18    to find whether someone is a risk of flight, whether they're

19    a danger to others, and whether there are conditions that

20    can mitigate that.

21         THE COURT:  Aren't I also looking at the defendant's

22    history and characteristics?

23         MR. FRIEDMAN:  You are.

24         THE COURT:  And wouldn't that include --

25         MR. FRIEDMAN:  That would include...

1        THE COURT:   -- her transitioning status right now, and
2        whether or not that can be adequately addressed at the
3        Federal Detention Center?
4        MR. FRIEDMAN:   The Court is certainly looking at history
5        and characteristics, but the ultimate test is not based on
6        the history and characteristics what's the best thing for
7        the person.   It is factoring the history and characteristics
8        in can risk of flight and danger be adequately -- can
9        conditions be made that will mitigate or prevent those, and
10       so I think the answer to that is -- that answer, ultimately,
11       to the Court's question is no, and that issues like that
12       would -- if there were really issues about, Hey, I'm -- the
13       treatment here is unacceptable, that's probably a hearing
14       for a motion or a request for a separate hearing or in a
15       separate litigation, as opposed to this Court's
16       determination today whether detention or release is the
17       appropriate thing.
18        As the Court knows in deciding whether there are
19       conditions that can mitigate the risk of flight or the risk
20       of nonappearance, there are four factors the Court's
21       supposed to look at.   We have laid out the evidence of why
22       we believe each of those factors weighs in favor of
23       detention in this case.   I'm not going to go through that in
24       detail, but the first is the nature and circumstances of the
25       crime, which is, obviously, very serious.   Second is the

1       strength of the evidence, which is very strong.

2           THE COURT:  Which is the least important factor.

3           MR. FRIEDMAN:  It is the least important, but all four

4       point in the same direction, I believe, Your Honor.

5           The third is history and characteristics of the defendant.

6       And, yes, as the Court says, those go -- those are relevant

7       considerations for the Court for how BOP, ultimately, deals

8       with the situation.  But for purposes of release or

9       detention, it's just what do they say about whether a person

10      will be a danger or a flight risk.  And in this case, what

11      they say, given mental health history, history of drug

12      abuse, lack of ties, threats, threats of violence, history

13      and characteristics in this case say that Ms. Thompson would

14      be a risk of flight and a danger.

15          And then, finally, the nature and circumstances of the

16      danger, and we have pointed out both the economic danger.

17      How big that is.  How serious the physical threats are, at

18      least.

19          Based on all of that, there are no conditions that could

20      mitigate either the risk of flight or the dangers of

21      community, and Ms. Thompson should be detained.

22          THE COURT:  Thank you, Mr. Friedman.

23          MR. FRIEDMAN:  Thank you.

24          THE COURT:  Mr. Hamoudi?

25          MR. HAMOUDI:  Thank you, Your Honor.  Respectfully, we do

1    not detain individuals with no criminal history, not even a

2    speeding ticket charged, not a violent offense, simply

3    because they have mental health issues.

4        It is important to appreciate what it is like to be a

5    transgender person, and, especially, what it is like to be a

6    transgender person with no criminal history with female

7    morphology housed at the men's unit in a prison.

8        It is also important to appreciate the empirical and

9    expert evidence that has not been disputed that Ms. Thompson

10   is at a greater risk of harm inside this facility as opposed

11   to outside.

12   THE COURT:  Mr. Hamoudi, in your proposed conditions, you

13   wanted to have her reside at the residential reentry center,

14   which is governed by the Bureau of Prisons, and it's my

15   understanding that she would be in a male unit there as

16   well.  I believe that was in the Pretrial Service report.  I

17   don't know if you have different information on that.

18   MR. HAMOUDI:  We take the position that even if she's

19   placed in the men's unit that -- like individuals who are

20   sex offenders -- that we would request that she get her own

21   room.  She would have a private bathroom.

22       But more important, she would have access to a type of

23   care unique to her needs at Seattle Counseling Services, and

24   two counselors at that facility have said her not having

25   access to that care, it's detrimental to her health.  And

1       Dr. Goldenberg opines, it's not disputed, that she needs to

2       get out and get that type of care.

3        The Federal Detention Center is not equipped to treat

4       gender dysphoria.

5        THE COURT:  I think what Mr. Friedman was saying is that

6       she was getting this type of care since 2018, and we have

7       all these acts of threats and then also the alleged crime

8       charged in this case during the time that she's getting that

9       treatment.

10       MR. HAMOUDI:  I'm not going to address the alleged crime.

11        THE COURT:  Of course not.

12       MR. HAMOUDI:  But just because people talk about the fact

13       that they want to hurt themselves and they're open about it

14       in a community that they trust, doesn't make them -- doesn't

15       mean that you can detain them under the Bail Reform Act,

16       Your Honor.  What you do is you have to look to the history

17       of the person.  You have to look at some evidence that this

18       person's left the jurisdiction.

19        THE COURT:  Can I just stop you for a minute?

20       MR. HAMOUDI:  Yes, Your Honor.

21        THE COURT:  Our recording system is going to do a software

22       update at 11:38.  And we've got the IT coming up, but,

23       obviously, this has to be recorded, so we will stop the

24       proceedings if it does shut down.

25       MR. HAMOUDI:  Okay.  Thank you, Your Honor.

1          THE COURT:  I'm sorry to interrupt you, Mr. Hamoudi.

2          MR. HAMOUDI:  I can't recall where we were at.

3          THE COURT:  You were not going to address the nature of

4      the crime charged, but...

5          MR. HAMOUDI:  No, I'm not going to address the nature of

6      the crime charged, but I'd just refer to the Court to the

7      record, including Docket 15.  I would also refer to the

8      Court to the fact that there was nothing in this person's

9      history that shows that she will flee the jurisdiction.

10     That's the focus of the Court.

11         We are not conceding that under the law a risk of suicide

12     can be relied on to detain somebody with no criminal

13     history.  With no prior history of flight.  As a --

14                    (Audio interruption)

15         MR. HAMOUDI:  -- suicide.  But the law, as I understand

16     it, does not allow the Court to consider that, so the first

17     thing that Court has to do is find that the law does

18     recognize that as a factor of serious risk of flight.

19         And I want to refer back to the three Ninth Circuit cases

20     that talk about serious risk of flight.  The serious risk of

21     flight is a demanding standard.  Congress intended it to

22     apply in rare and unusual circumstances.  This is because

23     the Supreme Court avoided a constitutional challenge raised

24     against the Act by carefully interpreting the words of the

25     Act.  If we expand this interpretation, we're going to

1    create due process problems as apply to Ms. Thompson, and

2    precedent before the Court illustrates what these

3    circumstances are.  The following facts exist in the three

4    cases that we have found before the Court:  Motamedi,

5    Townsend, and Winson (phonetic).

6      None of those facts exist in this case.  Foreign

7    citizenship.  No ties to the Western District of Washington.

8    Sentences ranging from 35 to 70 years.  Foreign residences.

9    Access to large amounts of cash.  Criminal history.  Limited

10   residential presence in the community.  Parole or probation

11   status.  Record of nonappearance.  The only factor that is

12   present in any of these cases was a lack of long-term

13   employment, which was a factor in the Winson case, and but

14   that case also involved a violent offense.

15     THE COURT:  What about ties to the community?

16     MR. HAMOUDI:  So the Government says in their argument --

17   so I'm specific, in the briefing they filed last night, the

18   Court should detain her for multiple reasons --

19     THE COURT:  What page are you on?

20     MR. HAMOUDI:  I'm on page 3 of 16.

21     THE COURT:  Of 16?

22     MR. HAMOUDI:  Of Docket 24.

23     THE COURT:  24.  Okay.  Go ahead.

24     MR. HAMOUDI:  They say, quote, She has a lack of local

25   familial connections, close quote.

1    With respect, Your Honor, that's inconsistent with Ninth

2    Circuit law.  Under Townsend, the Ninth Circuit has held

3    (as read):  "We hold that community in this section of the

4    statute embraces both the community in which the

5    defendant" -- "in which the charges are brought, and also

6    community in the United States to which defendant has ties."

7    She has multiple ties in Arkansas with her family, and,

8    factually, there's evidence before the Court that she has

9    additional ties.

10   Today, present in the courtroom are Mr. Tim Carstens, who

11   has presented a letter to the Court.

12   THE COURT:  Mm-hm.

13   MR. HAMOUDI:  Mr. Robert Walker, who has presented a

14   letter to the Court.  Or has not -- who spoke to the Court's

15   Pretrial Services officer.  There are ties in this community

16   and more important, Your Honor, there are other types of

17   ties.  Her mental health history deeply connects her to this

18   community.  She has ties to institutions that provide a

19   specific type of care unique to her.  That's a community.

20   Just because your blood family isn't located somewhere

21   doesn't mean you don't have community.  She has me, Your

22   Honor.  She has her co-counsel.  She has two -- four

23   paralegals.  Two investigators.  Oh, she's got a large

24   community, so I dispute that.  I don't think that that's an

25   issue.

1          To go back to some of those points that the Government has

2      raised about her circumstances that make her a serious risk

3      of leaving this jurisdiction, they say she has no stable

4      residence.  Well, there's evidence that disputes that.  We

5      have not a letter, but a declaration signed under penalty of

6      perjury, that she can have access to housing.  And I just

7      want to add Dr. Goldenberg says Seattle Counseling Service's

8      has programs to authorize the housing assistance.

9          So upon her release to the halfway house, she can submit

10     applications with the assistance of our office and Social

11     Services to transition her out into more a permanent

12     residence.

13         They say, Oh, she's not employed.

14         Well, Your Honor, she employable, and she's only been

15     unemployed for a short period of time.  And like other

16     defendants who are on pretrial release, with the assistance

17     of our services, she can find suitable employment.

18         I dispute that she is -- has a drug problem.  She has

19     overcome that.  She has been successful in overcoming a

20     challenge that grapples many defendants that come before

21     this Court, and I'm proud of her of that.

22         The Government talks about the guideline range that she

23     faces.  I am not going to get into that, but I'm going to

24     dispute what the guidelines are at this time.  And I'm going

25     to add that as far as we're concerned, the record before the

1    Court, she is charged with an offense with a statutory

2    maximum of five years, and she has no criminal history.

3    She's never been arrested.  And I think that we are just

4    speculating about what's going to happen as far as the

5    charging decisions, the outcome at sentencing, and I think

6    we're getting ahead of ourselves.  That's why it's the least

7    important factor.  That's why the Court doesn't want a

8    magistrate judge to put weight on it as much as these other

9    issues.

10      Ultimately, the Government does not bring any precedent to

11   the Court's attention to argue that risk of suicide can be

12   used to detain a person in a case under 3142(f) where

13   there's no presumption, and a person has no criminal

14   history.  Never been arrested by the police.

15      The Government suggests that they can adequately care for

16   her at the Federal Detention Center, and they cite to this

17   program statement, 5200.4.  And we dispute that program

18   statement, which was adopted on May 11, 2018, rolled back

19   existing protections for transgender persons.  The

20   Government has turned back the clock as to how it perceives

21   a transgender person in their care.

22      Your Honor --

23      THE COURT:  What do you make of Mr. Friedman's argument

24   that that's not something that I can consider at a detention

25   hearing as the type of care that she will receive at the

**Ex. 1_ p. 33**

1      Federal Detention Center?

2        MR. HAMOUDI:  They raised a risk of suicide as a risk of

3      flight, and we rebutted that with evidence saying that she's

4      at a greater risk inside as opposed to outside.  So they put

5      that into issue, Your Honor.

6        The Bail Reform Act prohibits a defendant's detention for

7      more than three days.  Your Honor, this is about

8      Ms. Thompson's constitutionally guaranteed liberty interest.

9        The Bail Reform Act was passed by Congress to protect

10     people like Paige Thompson.  To protect her constitutional

11     right to pretrial release.  To protect her -- and I mean

12     this with the greatest amount of respect to both counsel

13     over there -- from the Government's discomfort and

14     unsupported assumptions about what it means to be a

15     transgender person living with mental illness.

16       THE COURT:  I don't think that they're seeking to detain

17     her for that reason.  I think it's the fact that she was

18     able to cause so much damage and -- I mean, I read somewhere

19     like the second largest data breach in the U.S.

20       MR. HAMOUDI:  And, Your Honor, what's happening right now

21     is that the ambiance of the case is infecting what's

22     important here; that the Act was passed to protect people

23     from pretrial punishment.

24       I'm going to quote her, what she told Dr. Goldenberg:

25     "I'm trying to put all my feelings on hold until this is

1     over.  Like I'm out of this place.  I think the damage is

2     subjective.  Like I tolerate being misgendered because

3     that's what I have to do to survive."

4       The Constitution, Your Honor, demands Paige Thompson's

5     release.  The statute demands it and circuit precedent

6     certainly demands it.  Thank you.

7       THE COURT:  Thank you, Mr. Hamoudi.

8       Mr. Friedman, would you like to be heard --

9       MR. FRIEDMAN:  Okay.  Very briefly, Your Honor.

10      THE COURT:  -- briefly, yeah.

11      MR. FRIEDMAN:  Your Honor, I just wanted to address a

12    couple of things that Mr. Hamoudi said.

13      In terms of looking at other cases where there has been

14    detention or not, every case presents its own array of

15    circumstances.  I mean, there are a lot of dimensions and a

16    lot of factors, so there is no case that will have exactly

17    the same factors present or not.  You can't pick them apart.

18    The Court has to look at them in aggregate, and in

19    aggregate, those factors count all for detention.

20      I did want to address one thing which Mr. Hamoudi said

21    that there are no cases where someone's detained as a risk

22    of flight who doesn't have criminal history.  I don't think

23    that's the case.  I do large fraud cases.  Successful large

24    fraudsters don't have a criminal history, and I can think of

25    cases where those people have been detained.

1        So, certainly, criminal history is an aspect that the

2    Court should consider, but it's not a talisman where if you

3    don't have criminal history, you're not detained.

4        Second, on the risk of -- on whether risk of self-harm can

5    count as a risk of flight, Mr. Hamoudi said all of the cases

6    we cited are presumption cases.  The main case we cited, the

7    first one is submitted, is Madsen.  I think it's important

8    to note that the Court was looking.  In that case they are

9    looking at whether risk of suicide counts as risk of flight

10   under section (f)(2) of 3142.

11       THE COURT:  (f)(1)?

12       MR. FRIEDMAN:  No.  (f)(1) is the list of sort of

13   terrorism and violence.

14       THE COURT:  Oh, (f)(2).  Okay.  Mm-hm.

15       MR. FRIEDMAN:  (f)(2) is risk of flight.

16       THE COURT:  Okay.

17       MR. FRIEDMAN:  So the Court there was looking at -- it

18   doesn't matter that it's a presumption case.  What the Court

19   was doing -- and it was very clear, and the language says --

20   Section 3142(f)(2)(A) authorizes a detention hearing upon

21   the judicial officer's own motion in a case that involves a

22   serious risk the defendant will flee.

23       Although defendant argues the risk of suicide is not risk

24   of flight, I disagree, so it doesn't matter that it is a

25   presumption case.  That case is squarely holding, and that

1      is relevant and a relevant consideration.

2        That's all I have, unless the Court has questions.   Thank

3      you.

4        THE COURT:   Thank you.

5        Officer Beetham, do you have anything that you would like

6      to add?

7        OFFICER BEETHAM:   Nothing further, Your Honor, unless the

8      Court has specific questions.

9        THE COURT:   No.   I thought your report was very detailed

10      and thorough, and I appreciate it.

11        OFFICER BEETHAM:   Thank you, Your Honor.

12        THE COURT:   Ms. Thompson, you've heard a lot of back and

13      forth about the standards and the threshold issues of how

14      we're going to decide this.   I'm going to find that the

15      Government has met its burden of showing a preponderance of

16      the evidence that you are a serious risk of flight.   I base

17      that decision on the fact that you don't have stable

18      employment; you don't have a stable residence; you currently

19      don't have a source of income; and, really, you don't have

20      ties to this community.   And from what I read in

21      Dr. Goldberg's (verbatim) report, you don't even have strong

22      ties with your mother in Arkansas, and so I just -- I don't

23      see anything that's going to keep you in our jurisdiction.

24        And while I would never consider mental illness by itself

25      as a basis for detaining somebody, I do think that your

```
 1        mental illness has manifested itself in erratic and somewhat

 2        bizarre behavior and also suicide ideation and at least one

 3        attempt.  Your social media posts have indicated that you're

 4        ready to check out; that you don't care if it's death or

 5        jail, and you would prefer death.

 6          And I went back, and I listened to the recording from the

 7        initial appearance.  And you said multiple times that you

 8        just wanted to die, and so given that, and given your lack

 9        of ties to the community, I do find that I do have severe

10        concerns that if you are released, you will not appear at

11        your next court hearing.

12          But once I determine risk of flight, I need to look at the

13        other factors that we've been talking about:  the nature and

14        circumstance of the offense; your history and

15        characteristics; the weight of the evidence; and also the

16        dangerousness to the community.

17          With respect to the nature and seriousness of the offense,

18        whether or not it's going to change the markets or not, it

19        was a large data breach with over approximately 106 million

20        people potentially affected.  And as the Government has

21        expressed, at least in their view, you are facing a very

22        lengthy, lengthy sentence if found guilty.

23          Now, the weight of the evidence is the least important,

24        but here, it's my understanding that you, in post-arrest

25        interviews, admitted to committing the crime.  So both the
```

1    nature and seriousness of the charge and the weight of the

2    evidence weigh in favor of detention.

3        Now, your history and characteristics.  Although we don't

4    know very much about you, what we do know is that you

5    need -- you need treatment, and that you are currently going

6    through a transition which is -- makes it very difficult for

7    you to be at the Federal Detention Center.  And I wish that

8    there was a better place for you to go, and I wish I could

9    order the Federal Detention Center to put you in the female

10   unit.  But the Court doesn't have that power.

11       So I actually think your history and your characteristics,

12   the fact that you don't have any criminal history, weigh in

13   favor of release.  But then we get to the nature and

14   seriousness of the danger posed by your crime, or your

15   alleged crime, and to begin, I do think that there is a

16   physical danger to the community based on some of your

17   threats to commit suicide by cop; to shoot up a social media

18   office.

19       And you've also made threats on social media to kill

20   yourself, to kill law enforcement, and other unnamed

21   individuals, and at some point, you did have access to carry

22   out some of your threats to shoot up the social media office

23   because you did have access to some significant firearms.

24   And I can't ignore the fact that there were assault rifles,

25   sniper rifles, and bump stocks in the -- in the house where

1    you were living, and, at least, arguably, accessible.  But I

2    also find that there is a financial and economic danger to

3    the community if you are released.

4       You are highly talented, and you have the means and the

5    ability to create additional havoc in our banking system.

6    And I just don't think that there are conditions that would

7    be sufficient to prevent you access to any device or cell

8    phones or something that would allow you to potentially

9    cause financial danger to the community, so I will find that

10   you are a risk of nonappearance and a risk of danger to this

11   community and that there are no conditions or combination of

12   conditions that will reasonably assure your appearance and

13   assure the safety of the community.

14      It's important to know that with changed circumstances,

15   you can reopen the detention hearing.  But at this time, I

16   am going to remand you to the custody of the U.S. Marshals,

17   and I will have a written order to follow.

18      Is there anything further from the Government?

19      MR. FRIEDMAN:  No, Your Honor.  Thank you.

20      THE COURT:  Anything further from the defense?

21      MR. FRIEDMAN:  Nothing else, Your Honor.  Thank you.

22      THE COURT:  Okay.  We'll be in recess.

23      THE CLERK:  All rise.  Court is in recess.

24             (August 23, 2019 hearing concluded.)

25

1   /s/ Shelby Kay K. Fukushima, CCR#2028/ August 30, 2019

2   Certified Court Reporter

3   Reed Jackson Watkins, LLC

4   Court Approved Transcription Company

5   1326 Fifth Avenue, Suite 710

6   Seattle, Washington 98101

7   206.624.3005

8   jackson@rjwtranscripts.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25