```
               UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

UNITED STATES OF AMERICA,        )
                                 )
              Plaintiff,          ) CASE NO. CR19-00159-RSL
                                 )
v.                               ) Seattle, Washington
                                 )
PAIGE A. THOMPSON,               ) June 7, 2022
                                 ) 9:20 a.m.
              Defendant.          )
                                 ) JURY TRIAL, Vol. 1 of 9
_____


               VERBATIM REPORT OF PROCEEDINGS
         BEFORE THE HONORABLE ROBERT S. LASNIK
              UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:


  For the Plaintiff:      ANDREW C. FRIEDMAN
                          JESSICA M. MANCA
                          TANIA M. CULBERTSON
                          United States Attorney's Office
                          700 Stewart Street, Suite 5220
                          Seattle, WA 98101


  For the Defendant:      MOHAMMAD ALI HAMOUDI
                          NANCY TENNEY
                          Federal Public Defender's Office
                          1601 5th Avenue, Suite 700
                          Seattle, WA 98101

                          BRIAN E. KLEIN
                          MELISSA A. MEISTER
                          Waymaker LLP
                          515 S Flower Street, Suite 3500
                          Los Angeles, CA 90071


  Reported by:            Nancy L. Bauer, CRR, RPR
                          Official Federal Court Reporter
                          700 Stewart Street, Suite 17205
                          Seattle, WA 98101
                          nancy_bauer@wawd.uscourts.gov
```

```
 1                            PROCEEDINGS
 2     _____

 3              THE FOLLOWING PROCEEDINGS WERE HELD
               OUTSIDE THE PRESENCE OF THE JURY POOL:

 4              THE CLERK:  We're commencing a jury trial in the

 5     matter of the United States versus Paige Thompson, Cause No.

 6     CR19-159, assigned to this court.

 7          Counsel, please make your appearances for the record.

 8              MR. FRIEDMAN:  Good morning, Your Honor.  Andrew

 9     Friedman, Jessica Manca, and Tania Culbertson for the United

10     States, and with us at counsel table is Special Agent Joel

11     Martini from the FBI.

12              THE COURT:  Welcome.  Thank you.

13              MR. HAMOUDI:  Good morning, Your Honor.  Mo Hamoudi

14     and Brian Klein, and Stacey Brownstein and Luz Vargas is here on

15     behalf of Ms. Thompson, who is here as well.

16              THE COURT:  And you have some attorneys in the front

17     row.  Are they going to be in the front row?

18              MR. HAMOUDI:  Yes, Your Honor.  Joining us is

19     Ms. Meister and Ms. Stierwalt, Ms. Tenney, and we have some law

20     clerks and Mr. Sanders and Ms. Ponikvar, just for the voir dire

21     session, but not throughout the trial.

22              THE COURT:  And, of course, we probably don't want

23     them right there, just because it affects the line of sight for

24     the jurors during jury selection.

25              MR. HAMOUDI:  We can make arrangements, Your Honor.
```

1              THE COURT:  Yeah.  I'm trying to social distance as

2    much as we can in the courtroom.  So I think the whole back row

3    is probably externs and things like that.  Give yourself some

4    space, is what I'm saying.

5              MR. HAMOUDI:  We'll do that, Your Honor.

6              THE COURT:  All right.

7         So I think what I'll do, when we bring the jurors in, I'll

8    say something very general about the case, and then I will

9    introduce Mr. Friedman to introduce his counsel and the special

10   agent, and then, Mr. Hamoudi, for you to introduce yourself and

11   whoever else you want, and -- of course, Ms. Thompson, and

12   whoever else you want.

13        So, Victoria, we're bringing in Jurors 1 through what?

14             THE CLERK:  1 through 30.

15             THE COURT:  And just a quick look through here.

16        Juror No. 4 indicated that it would have an impact on

17   fairness.

18        Juror No. 5 didn't get the same form, Victoria?

19             THE CLERK:  I'm not sure.

20             THE COURT:  Yeah, because there is no question about

21   transgender on there.  So I might just ask it at the time.

22        And then Juror No. 29 said, "I find the concept of

23   transgender very confusing."  Of course, she's my age, so of

24   course she finds it confusing.  But as long as it's not about

25   transgender rights, she said she wouldn't have a problem

 1    considering the evidence.  So I don't think that one is a

 2    problem, but certainly somebody who has a problem, No. 4 in the

 3    morning batch, I think should probably go.  And then on the

 4    second batch, No. 53, "I do not believe I'd be able to be fair,

 5    I believe I would show bias," I think we'll probably let both of

 6    those people go.

 7        Are you okay with that, Mr. Hamoudi?

 8            MR. HAMOUDI:  Yes, Your Honor.  And I think

 9    Juror No. 9 as well.

10            THE COURT:  Did I miss that one?  You know, I agree

11    with you, that, if that's the real answer.  Sometimes get

12    confused.  I mean, this person is a registered nurse.  I didn't

13    think that kind of person would have a problem with this.  But

14    I'll ask, and if the answer is truly "yes," I'll truly dismiss.

15            MR. HAMOUDI:  And 15, Your Honor, it just says, "It

16    depends," so I'll let the court inquire.

17            THE COURT:  Right.  Good enough.

18            MR. HAMOUDI:  Thank you, Your Honor.

19            THE COURT:  So we've had a lot of motion practice in

20    the last few days over terminology and things like that, and

21    we're not going to deal with those things before jury selection.

22        But you've got to be realistic.  If this were a case

23    involving the Spanish language, we'd have interpreters, and

24    interpreters would tell us what the words mean.

25        For some people, this case is going to be in a foreign

1   language.  There are terms that they may have heard, but they

2   have no idea what it means; there are terms they may never have

3   heard, and they have no idea what it means; and then there will

4   be some people who have familiarity with some of the concepts

5   but not all of them; and then there will be some who are truly

6   tech people who understand everything.

7        And so walking this fine line is going to be a difficult

8   job for a trial judge.  And my tendency, in approaching this, is

9   going to be to let people talk and use terminology, and not get

10  hung up on hacking is too prejudicial or cyberhacking is too

11  prejudicial or crypto-this is too prejudicial.

12       You know, people use terminology all the time.  They say,

13  "Yes, we got robbed last night.  Somebody got into our garage

14  and took things."  Well, you know what?  That's not a robbery;

15  that's a burglary or it's a theft.  Nobody cares.

16       Let them use the terms that they're used to using, and when

17  it comes time for jury instructions, we'll instruct on what the

18  legal terms mean.  But I don't want to tie people's hands from

19  using the kind of language that Ms. Thompson used herself in all

20  these text messages and things like that.

21       So that's where we're going to err on the side of

22  explaining it to people and not tying people's hands about, "Oh,

23  I've got to watch out about what I say about this or that, or

24  I'll be in violation of a court order. "

25       Now, that's also going to be why I allow a little more

1    leeway for the government's experts to put things in context.  I

2    mean, I just started list: cloud computing, misconfigured web

3    application firewalls, cryptocurrency, scalability, identity and

4    access management, IAM Roles, metadata services, hypervisor,

5    reverse proxy, server-side request forgery, Linux, doxing,

6    GitHub, buckets, Reddit, gists, The Onion Router.

7         This is going to be a challenge for a lot of people, so

8    we've got to be mindful of the fact that the people who are

9    going to be sitting in this case are not as tech savvy as some

10   and have not been living with this case as long as some.  Okay?

11   All right.

12        So we are going to bring up 30, put them in the jury box

13   and in the -- we decided not to do one side, right?  We did the

14   first few rows, and spread them out.  And you've already got

15   people organized there, but I might ask, again, just maybe the

16   defender row to push over.

17             MR. HAMOUDI:  Yes, Your Honor.  Whatever instructions

18   you have, we'll abide by them.  Would you like us to reduce the

19   number of people up here?

20             THE COURT:  At least the ones to the west of

21   Ms. Tenney.

22             MR. HAMOUDI:  Okay.

23             THE COURT:  She's okay there, but I'd like to keep the

24   line of sight open.

25             MR. HAMOUDI:  Okay.  Thank you, Your Honor.

1          THE COURT:  Great.  Thank you.

2      Anything else before Victoria brings the jurors up?  All

3   right.  Let's bring the jurors in, and we'll see where we have

4   openings for some of our defender interns to get seated;

5   otherwise, we'll kick people out, starting with Coughenour

6   interns.

7      All right.  So I'll get off the bench for a few minutes

8   while you do this, so you have time, and then when you're all

9   set up, give me a call.

10      Great.  Thanks.

11          (Court in recess 9:22 a.m. to 9:27 a.m.)

12
          THE FOLLOWING PROCEEDINGS WERE HELD
13           IN THE PRESENCE OF THE JURY POOL:

14                    JURY VOIR DIRE

15          THE COURT:  Good morning.  Thank you.  Please be

16   seated.

17      My name is Robert Lasnik.  I'm a United States District

18   Court judge here in Seattle.  I've been wearing the black for 32

19   years, first as a King County Superior Court judge in the state

20   system, and since 1998 as a United States District Court judge.

21      I'm used to wearing the black.  I am not used to wearing

22   the white.  The masks are awful to me, but we've got to keep

23   ourselves safe, and so I'm going to require people in the

24   courtroom to wear masks.

25      When you're actually speaking, if you want to drop your

1    mask, that's okay.  But this whole COVID overlay makes it more

2    different and difficult to pick a jury.  Normally, I'd have 50

3    people in here, and we'd do the questioning once, and get our

4    jury, but we've had to break it up into two.  And we've had to

5    ask you some private questions about vaccinations and things

6    like that, but we're going to do the best we can to do what we

7    need to do in order to have a fair trial here today in this

8    criminal case, the United States of America versus Paige

9    Thompson.

10        The United States is represented by a number of Assistant

11   United States Attorneys, and I'm going to introduce and ask

12   Andrew Friedman to introduce himself, his co-counsel, and the

13   government agent who will be assisting them at counsel table.

14        Mr. Friedman?

15            MR. FRIEDMAN:  Good morning.  My name is Andrew

16   Friedman, and I'm a federal prosecutor.  With me at counsel

17   table are Jessica Manca and Tania Culbertson, who are also

18   prosecutors in this case.  Also with us is Special Agent Joel

19   Martini from the FBI.

20            THE COURT:  Okay.  Thank you.

21        Now, I like to give a little dig to the special agents with

22   the FBI, because they're all entitled "special agents," which

23   means none of them is really special.  It's like soccer, you

24   know, where everyone gets a trophy.  But that's just a title, so

25   we'll refer to him as his proper title, "special agent."

1       Paige Thompson is at counsel table and is represented by a

2    number of lawyers.  I'm going to ask Mo Hamoudi, from the

3    Federal Public Defender's Office, to introduce himself, to

4    introduce Ms. Thompson and his co-counsel.

5           MR. HAMOUDI:  Good morning, everyone.  I'm Mo Hamoudi,

6    and this is Paige, and this is my colleague, Mr. Brian Klein.

7    I'm also joined at counsel table by our investigator, Stacey

8    Brownstein, and our paralegal, Luz Vargas.  And we have

9    colleagues here as well -- they're all attorneys -- Nancy

10   Tenney, Emily Stierwalt, and Melissa Meister.

11          THE COURT:  All right.  Now, we're going to ask you a

12   series of questions that go to your qualifications to be jurors

13   in this case.  But before you answer any of those questions, I

14   need you all to stand, raise your right hand, and listen to the

15   oath that my courtroom deputy, Victoria, will read to you.  So

16   everybody please stand and raise your right hand.

17               (The jury panel is sworn.)

18          THE COURT:  All right.  Everyone affirmed that they

19   do.  Thank you.

20      Okay.  A couple of years ago -- a couple of months in 2019,

21   pre-pandemic, you may have recalled hearing about the fact that

22   someone got into the Capital One computers and was able to

23   access, like, 100 million personal information files, some

24   including social security numbers, some including other

25   identifiable information.  That's what this case is about.

 1      And the United States has charged Paige Thompson with being

 2  the individual who accessed that personal information, and she's

 3  charged with a number of crimes related to that and related to

 4  other acts of accessing data in a system that is run by Amazon

 5  Web Services, AWS, which involves cloud computing.

 6      Now, some of you are super techie and will understand a lot

 7  of this case, and some of you are going to be like me, you know,

 8  saying, "Oh, come on, what are you talking about?"  So we're

 9  going to try do things slowly and define things for you.  But

10  it's going to be a challenge, and there's no doubt about it,

11  because it is a language that not all of us use on an everyday

12  basis.

13      But I just wanted to give you that general background.

14  That's why we're going to be asking some of the questions that

15  we're going to be asking.

16      Now, one of the items that was in the questionnaire that

17  you filled out, although for some reason, it was not in the

18  questionnaire of Mr. XXXXXXXXXXX, Juror No. 4.

19      Yeah, you didn't get the question about -- well, maybe you

20  did.  You said that you could not be fair to Ms. Thompson as a

21  transgender person.  Is that based on religious beliefs?

22          JUROR NO. 4:  Yes, sir.

23          THE COURT:  I'll excuse you, then.  Thank you so much

24  for being so candid with us.  You may go back to the jury room

25  on the first floor.

1          And then Juror No. 5, Mr. XXXXXXXXX, you didn't get the

2   question for some reason.  Your questionnaire didn't ask that.

3   Would you have any difficulty being fair and impartial and

4   reaching a verdict if you understood that Ms. Thompson was a

5   transgender person?

6          JUROR NO. 5:  No, I would not.

7          THE COURT:  Okay.  Thank you.

8          THE COURT:  And Juror No. 15, Mr. XXXXXXXXXX.

9          JUROR NO. 15:  Yes?

10         THE COURT:  You said, "It depends."  Could you be a

11   little more...

12         JUROR NO. 15:  Yeah.  Growing up, I was raised in a

13   really religious home, and I have engrained Catholic beliefs.

14         THE COURT:  Another juror wrote, "As a practicing

15   Catholic, transgender persons are viewed as being out of order

16   with nature, but we are called upon to be fair and loving to all

17   people."

18       So, I mean, do you think you could be fair and apply the

19   law objectively to Ms. Thompson, or would it make you feel, if

20   she's transgender, "I don't care, she's going to be guilty"?

21         JUROR NO. 15:  No.  She's human.  I believe in human

22   rights, but I do have underlying Catholic beliefs.

23         THE COURT:  You don't have to approve of someone being

24   transgender, as long as you can be fair and impartial.  Can you

25   be fair and impartial here?

1          JUROR NO. 15:  I believe I can.

2          THE COURT:  All right.  That's what I need to know for

3     now.  Thank you.  Counsel will have more questions in that area.

4          And then Juror No. 29, Ms. XXXX?  You're my age, so you're,

5     like, "This whole thing with transgender is so confusing,"

6     right?  "When we were in elementary school, there were no

7     transgender people."  Yeah, there were, but they weren't out and

8     we didn't know any.

9          Again, we're not asking you to approve of the lifestyle,

10    but could you treat Ms. Thompson fairly and impartially, despite

11    your confusion about transgender?

12         JUROR NO. 29:  Yes.  Because it is a criminal case,

13    you know, what I would have trouble with is if it was like those

14    cases with transgender folks that are males that want to be on a

15    female swim team, and I, basically, would have trouble with that

16    because of the physical qualities.

17         THE COURT:  I have trouble with that, too, you know,

18    and I'd have to be fair and impartial with that, but this has

19    nothing to do with that.

20         JUROR NO. 29:  Right.

21         THE COURT:  Yeah, it's a challenge sometimes for us to

22    put our heads around things that we never had to deal with.  But

23    it's important, in general, to be fair and impartial to

24    everyone, and in this case, specifically, it is essential that

25    everyone can be fair and impartial to Ms. Thompson, because the

 1  case has nothing to do with transgender issues or transgender

 2  rights.

 3       Is there anyone who recalls reading or hearing about the

 4  Capital One hack -- and I use that term in a generic sense --

 5  and the personal, private information of 100 million people had

 6  been accessed by someone?  Juror No. 7?

 7            JUROR NO. 7:  I just read the headlines.

 8            THE COURT:  You remember seeing a headline about it?

 9            JUROR NO. 7:  Yes.

10            THE COURT:  And Juror No. 20?

11            JUROR NO. 20:  Same.

12            THE COURT:  Okay.  Does anybody actually have a

13  "what's in your wallet" Capital One credit card and was

14  contacted by them that there'd been a breach?  It would be okay

15  if you did, as long as you weren't going to be unfair.

16       How many of you have ever had your personal identity stolen

17  in the sense of your bank said, Hey, somebody did something or

18  tried to access your account?  My son got a $900,000 deduction

19  from his bank account the other day.  He was able to get it

20  straightened out, but, you know, it happens to lots of people.

21       Can I see a show of hands if you've ever been in that

22  situation where somebody accessed your information?

23       Juror No. 6, Juror No. 9, No. 14, 18, 17, 18, 20, 23, 24,

24  27, 26, 29, 30, 28 and 21.

25       Okay.  Great.

1        How many of you have ever served on a criminal jury before

2   in prior jury service?

3        Jurors 14, 26, and 29.

4        How about civil case previously?  23.  Okay.  And No. 1.

5   Sorry.  I missed you there.

6        All right.  So this case, we believe we can do it in --

7   today is June 7th.  I would like a commitment for people to be

8   here through three weeks from today, so Tuesday, June 28th.

9   Now, I believe we will do this case faster than that.  I have a

10  reputation for moving people along quickly, and so I think we

11  have a good shot at being out in two weeks rather than three

12  weeks, but you never know what could happen to slow us down.

13  And then there's also time to deliberate and reach a verdict.

14  So I'll need a commitment through Tuesday, June 28th.

15       Now, before I ask who has an issue or a problem with that,

16  let me just do a little speech that I sometimes do.

17       You know, your government comes calling for your money a

18  lot, but it doesn't come calling for your time and for your

19  common sense and for your service.  It does sometimes in times

20  of war, but even now we don't have a draft.  We have a volunteer

21  army.

22       But jury duty is the one time you're asked as an American

23  citizen to dedicate a few days or weeks to putting meaning into

24  the concepts of the presumption of innocence.  Ms. Thompson sits

25  there presumed innocent.  The concept of proof beyond a

1    reasonable doubt, the government bears the burden of proving

2    each element of the crime beyond a reasonable doubt.

3         And to make sure that fairness is done, the government

4    can't just come in and say, "We think you did it.  You're going

5    to be punished.  Judge, do it on our say-so."  And the

6    government also is not in a position to say, "Judge, you're a

7    smart guy.  You've been to law school.  You've been a judge.

8    You try the case."  No.  She has an absolute right to a jury of

9    her peers deciding the question of guilt or innocence.

10        So I understand that some people may have nonrefundable

11   tickets for a vacation, they may have a business meeting that's

12   been planned that can't be done by Zoom, although there are

13   fewer and fewer of those, aren't there?

14        I really want you to think this jury duty is not an

15   inconvenience, it is an opportunity for you to be part of what

16   makes this country so great.  And we've seen our institutions of

17   democracy be threatened in ways that never have I seen it

18   before.  But in this circumstance, you have an opportunity to be

19   part of one of the institutions of our democratic society that

20   separates it out from almost every other country in the world.

21   So I ask you to not look at this as some sort of pain in the

22   neck, but look at it as the one time where your government comes

23   asking for your personal service to give meaning to the concept

24   of freedom and liberty.

25        So having said that, are there any people for whom staying

 1  in this case Monday through Friday, through June 28th, it will

 2  be an extreme hardship?  1, 2, 10, 14, 16, 19.

 3          THE CLERK:  Juror No. 6, Your Honor.

 4          THE COURT:  And 6.  Thanks, Victoria.

 5      June 20 is a new federal holiday, Juneteenth, and so the

 6  federal courts will be closed on that day.  It looks like you're

 7  surprised to hear that, Mo.

 8          MR. HAMOUDI:  Yes.

 9          THE COURT:  I thought maybe it was for Father's Day,

10  which is the day before, but, no, that's not it.

11      So, again, without me judging, I'm going to just go around

12  and ask for your reasons.  Sometimes people say to me, "Well,

13  Judge, you know, I have a really important job at Microsoft, and

14  I have to be there."  And I'm, like, "Microsoft, they're in

15  court all the time taking up my time.  You need to be here, and

16  I'll take up a little bit of your time."  Or, "I'm a doctor and

17  I just can't reschedule people," stuff like that.

18      Yeah, when doctors get sued for malpractice, they sit right

19  there for the whole trial, and they cancel everything.  I'm just

20  saying I'm not necessarily going to grant these, but I'll listen

21  to them.

22      Juror No. 1, Ms. XXXXXX?

23          JUROR NO. 1:  Well, I've got my grandkids coming next

24  week, and they're six and eight, and we were planning a little

25  vacation; otherwise, my husband is going to do it, and I don't

 1  think it's going to work out.

 2          THE COURT:  Okay.

 3          JUROR NO. 1:  Okay?

 4          THE COURT:  Got it.  Thanks.  Let me think on that.

 5      Juror No. 2?

 6          JUROR NO. 2:  I would love to serve, but the next two

 7  weeks are the last two weeks of the quarter.  I have classes on

 8  Tuesday and Thursday from 7:30 a.m. to 9:30 a.m.

 9          THE COURT:  Where do you go to school?

10          JUROR NO. 2:  Bellevue College.

11          THE COURT:  You'd learn so much more here.

12          JUROR NO. 2:  I'd love to serve.  I'll talk to my

13  professor.

14          THE COURT:  Okay.  Thanks, I appreciate it.

15      Juror No. 6?

16          JUROR NO. 6:  I have five children at home, and two

17  are special needs, and I think I could do it if it wasn't three

18  weeks.  We also have a family trip starting on June 24th, so

19  three weeks seems a little extra.

20          THE COURT:  Okay.  Got it.

21      Juror No. 10?

22          JUROR NO. 10:  Your Honor, the last couple of years

23  have been a hardship, with COVID, of course.  I'm a retail

24  optical shop owner, and my staff is gone, so I'm -- it doesn't

25  run without me.  I'll have to be closed for the entire time if

 1    I'm in service.

 2            THE COURT:  Yeah, it's tough to find people now, isn't

 3    it?

 4            JUROR NO. 10:  It's been rough.

 5            THE COURT:  Juror No. 14?

 6            JUROR NO. 14:  I just have vacation scheduled, and it

 7    is considered our prime time, so it's really hard to get

 8    vacation, and it's scheduled for next week.

 9            THE COURT:  So what you're saying is, the vacation

10    needs to be now because there's a little bit of a lull in the

11    work?

12            JUROR NO. 14:  No, everyone wants it off, so it's

13    really hard to get it off during that time.  I planned this

14    months and months in advance, in January.

15            THE COURT:  And you're leaving town?

16            JUROR NO. 14:  Yes.  We are going to the San Juans.

17            THE COURT:  Uh-huh.  Okay.  Thank you.

18        Juror No. 16?

19            JUROR NO. 16:  Hi.  I've had some very severe stomach

20    issues going on, and I was finally able to get -- I understand

21    that you have doctors here in court all the time, but I've

22    finally been able to get an appointment.  I mean, I haven't been

23    sleeping well because of it, and I just don't think my head

24    would be in the game.

25            THE COURT:  When is that appointment?

1       JUROR NO. 16:  It's next Tuesday.

2       THE COURT:  What time?

3       JUROR NO. 16:  10:00 in the morning.

4       THE COURT:  Okay.  Thank you.

5   Juror No. 19?

6       JUROR NO. 19:  Your Honor, I'm a middle-school school

7   counselor and, as you know, there is two weeks left in school,

8   and there is only two school counselors, me and my co-worker,

9   serving 700 students, and the last two weeks of school is filled

10  with activities that, I think, I would be vital to.

11      And, also, on June 30th, I have a planned vacation to visit

12  my girlfriend in South Korea.

13      THE COURT:  Well, we'll be done by June 30th, but the

14  issue is, really, you've got a lot of kids at the Federal Way

15  Public Schools who are having issues, aren't they?

16      JUROR NO. 19:  Yes, Your Honor.

17      THE COURT:  Yep.  Okay.  We're going to do the jury

18  selection with everyone here, and then we'll see about where our

19  numbers are as we go forward.

20      I'll definitely let some of you go, but you came all the

21  way here, you may as well participate in the jury selection and

22  see how it works, and we'll take it from there.

23      Have any of you ever been convicted of a crime?  Something

24  like drunk driving, shoplifting, all the way up to more serious

25  things.  Anyone?

 1        Anyone have close friends or family members convicted of a

 2   crime?

 3        Could you hold up your numbers, please?

 4        21, 28, 25 and 19.

 5             JUROR NO. 21:  I got a driving without incident, I

 6   believe.  This was 2003 for driving under the influence.

 7             THE COURT:  Okay.  Is there anything about any of your

 8   prior contact with law enforcement that would make you feel you

 9   couldn't be fair and impartial in this case?

10             JUROR NO. 21:  No.

11             THE COURT:  Okay.  How many of you have ever testified

12   as a witness in a courtroom?  You came in, raised your hand,

13   taken an oath, and given some testimony in any kind of case,

14   civil or criminal?

15        Juror No. 27 and Juror No. 1 and Juror No. 9.  Thanks.

16        When I say something like web application firewall, how

17   many of you know what I'm talking about?  2, 5, 6, 8, 10, 15, 20

18   through 25, 26 and 29.

19        How about The Onion Router?  Okay.

20        Reverse proxy?  All right.

21        I'm just trying to get a gauge for where we are with some

22   of the language that we're going to have and how deep into

23   describing what's happening we're going to have go.

24        Okay.  So do any of you feel that you'll have difficulty

25   being fair to Ms. Thompson and giving her the benefit of the

 1   presumption of innocence and the requirement that the government

 2   prove their case beyond a reasonable doubt?  All right.

 3        So we have a chart up here -- very old-school, not high

 4   tech at all -- that asks your name and residence.  If you live

 5   in the city of Seattle, you know, say "Wedgewood" or "West

 6   Seattle."  If you live in Blaine, I don't need to know the

 7   neighborhood.  I don't even know if Blaine has neighborhoods.

 8        Your residence, your occupation, any places in which you've

 9   served as a juror, and what your favorite leisure activities

10   are.  And we're going to go through all 20-something of you.

11        Juror No. 1?

12        JUROR NO. 1:  XXXXXXXXXXXXXXXXXXXX.

13        THE COURT:  Yeah, nice Italian name, but sometimes the

14   "E" gets pronounced, and sometimes it doesn't.

15        JUROR NO. 1:  I married into it.

16        THE COURT:  Can you stand up?

17        JUROR NO. 1:  And I live in Federal Way.  I'm a

18   retired real estate broker.  My husband -- it's just my husband

19   and I in our house, and he's retired.  I just served on a

20   traffic case.  My favorite leisure time is taking care of

21   people's dogs and my grandkids.

22        THE COURT:  Great.  Thank you.

23        Juror No. 2?

24        JUROR NO. 2:  My name is XXXXXXXXXXXXXXXXXXXXXXXXXX.  I

25   live in Renton.  I'm a behavior technician.  My husband is a

 1   software engineer.  I've never served as a juror before.  My

 2   favorite leisure activities are reading and studying German.

 3              THE COURT:  So your father was a police officer.  Did

 4   he come home and talk about cases much, or did he leave it at

 5   office?

 6              JUROR NO. 2:  My mother made him leave it at the

 7   office.

 8              THE COURT:  Is there anything about knowing that he

 9   was in law enforcement that would make you feel you couldn't be

10   fair and impartial to the defense in this case?

11              JUROR NO. 2:  No.  He served most of his time at an

12   international airport.

13              THE COURT:  Okay.  Thank you.

14        Juror No. 3, XXXXXXXXXXXXXXXXX.

15              JUROR NO. 3:  My name is XXXXXXXXXXXXXXXXXX.  I

16   currently live in Lower Queen Anne.  I'm a receptionist.  I do

17   work at Amazon.  I don't know if that is a problem.  I don't

18   live with anyone else.  I've never been a juror before.  I like

19   creative writing.

20              THE COURT:  Thank you for telling us about that.  Is

21   there anyone else that works at Amazon?  22 and 27.

22        Amazon is a big company, and they do a lot of things.

23   Cloud computing is a big part of their revenue and where they

24   make a lot of money.  Amazon is technically not a victim in this

25   case, but there will be testimony about Amazon Web Services and

 1   cloud computing.

 2       Do you feel like you can be fair?

 3           JUROR NO. 3:  I think so.

 4           THE COURT:  How about Juror 22 and 27?

 5           JUROR NO. 22:  Yeah.  I work on Euro, which is a mesh

 6   Wi-Fi company, so I don't know the technicalities behind all the

 7   matters, but I think I could be fair.

 8           THE COURT:  Great.  And 27?

 9           JUROR NO. 27:  Yes, I believe I can be fair.

10           THE COURT:  Okay.  Thanks for letting us know.  Great.

11       Yes, sir?

12           JUROR NO. 5:  I'm XXXXXXXXXXXXXXXXX.  I live in

13   Auburn.  I'm a project engineer for Blue Origin.  I live in

14   alone.  I have not served as a juror before.  I enjoy various

15   outdoors activities, traveling, photography.

16       I have one quick thing to mention:  I might have gotten an

17   email about the breach.  It could have been another credit card,

18   but I do not recall.

19           THE COURT:  Okay.  If you did, it's not going to

20   affect your fairness here?  And what is Blue Origin?

21           JUROR NO. 5:  It is a company that does rockets.  We

22   just launched one this weekend, on Saturday.

23           THE COURT:  That's what I thought.  I was, like, isn't

24   that one of the rocket companies?  Is that a Jeff Bezos company?

25           JUROR NO. 5:  Yes, it is.

1          THE COURT:  Victoria, why don't we start a rocket

2    company?

3       Ms. XXXXX?

4          JUROR NO. 6:  XXXXXXXXXXXXXXX.  I live in Redmond.

5    I'm a homemaker and a homeschool mom and summer school.  My

6    husband works for Microsoft, never for Amazon.  I've not ever

7    been on a jury.  I don't have a lot of leisure time, so when I

8    do, I read.

9          THE COURT:  Great.  Thank you so much.

10      Ms. XXXXXXXXXXX?

11         JUROR NO. 7:  My name is XXXXXXXXXXX.  I live in

12   Everett --

13         THE COURT:  Could you belt it out?

14         JUROR NO. 7:  I'm sorry.

15         THE COURT:  Give me your loudest shout voice.

16         JUROR NO. 7:  Okay.  Start over?

17         THE COURT:  Yes, please.

18         JUROR NO. 7:  My name is XXXXXXXXXXX.  I live in

19   Everett.  My occupation is human resources.  It's just my

20   husband and I in our home, and he is a structural analysis

21   engineer at Boeing.  I have never served as a juror before, and

22   my favorite leisure activities are reading and watching family

23   movies and adventures, and sleeping, when I can.

24         THE COURT:  Okay.  Thank you very much.

25      Juror No. 8, Mr. XXXXX?

1              JUROR NO. 8:  XXXXXXXXXX.  I live in Bellevue,

2    Washington.  I'm a retired teacher.  My wife is a retired urban

3    planner.  I've never served as juror before.  My favorite

4    activities are skiing and hiking.

5              THE COURT:  Okay.  Thank you very much.

6         Mr. XX?

7              JUROR NO. 9:  XXXXXXXXXX.  I'm a registered nurse.  I

8    live in Auburn, Washington.  I'm married to my wife, who is also

9    a registered nurse.  I've never served as a juror, and I like

10   doing outdoor things with my wife, like hiking and taking our

11   dogs out.

12             THE COURT:  Now, you also indicated you might have a

13   problem with Ms. Thompson being transgender?

14             JUROR NO. 9:  It was a similar thing as a prior juror

15   said.  I was raised as a Roman Catholic, and I'm constantly

16   working against this unconscious-bias component.  I detest that

17   part about my religion.

18             THE COURT:  This unconscious is something that is

19   important to consider.  You don't necessarily even need to be

20   aware of, "Oh, I hate those people."  It's just you make some

21   assumptions about those people.

22        Do you think you could be fair to Ms. Thompson here?

23             JUROR NO. 9:  I think so.  I'd have some difficulty,

24   but I think so.

25             THE COURT:  Thank you for telling us about that.  It's

 1   important that we think about that long and hard.  And part of

 2   the way to deal with unconscious bias is to slow down your

 3   reactions and think it through, and this will be important if

 4   you sit on this jury.  Wonderful.

 5        Mr. XXXXXXXX.

 6             JUROR NO. 10:  Your Honor, my name is XXXXXXXXXXXX.  I

 7   live in Lower Queen Anne.  Like I said before, I'm a retail

 8   optical shop owner, self-employed.  My partner is a Microsoft

 9   industrial designer.  I've never served as a juror, and I enjoy

10   running and exercise.

11             THE COURT:  Okay.  Thank you.

12        Mr. XXXXXXXXX?

13             JUROR NO. 11:  Good morning.  XXXXXXXXXXXXXXX.  I'm an

14   attorney.  I live in Lake Forest Park with my wife.  I've never

15   sat on a jury before.  I'm trying to do more leisure activities,

16   like water skiing, snow skiing, motorcycles, bicycles, and

17   reading.

18             THE COURT:  So what type of law do you practice?

19             JUROR NO. 11:  Thirty-nine years of personal-injury

20   work.

21             THE COURT:  Have you ever appeared before Judge

22   Lasnik?

23             JUROR NO. 11:  I came that close.

24             THE COURT:  Okay.  But you know that he's, like, one

25   of the finest trial judges?

 1              JUROR NO. 11:  No question.  I came down and watched

 2    many trials to make sure I knew what I was doing.

 3              THE COURT:  And, Mr. Hamoudi, you agree, right?  It

 4    doesn't get any better than Judge Lasnik.

 5              MR. HAMOUDI:  Best judge in the district.

 6              THE COURT:  I didn't put him under oath like I did

 7    Mr. XXXXXXXXX.  I knew he was going to say that.

 8         So you're a trial lawyer?  You get into court?  Have you

 9    done a bunch of jury trials?

10              JUROR NO. 11:  I did over the years.  I don't anymore.

11              THE COURT:  Why?  Just turning the page?

12              JUROR NO. 11:  Many reasons.  We could go on a long

13    time about that one.  I'm trying to cut back.  I still do

14    arbitrations.

15              THE COURT:  Thank you.

16         Juror No. 12?

17              JUROR NO. 12:  Yes.  My name is XXXXXXXXXXXXX.  I live

18    here in Seattle, in Queen Anne.  My former occupation -- I'm

19    retired now -- is a horticulturist.  I live alone, and I've

20    never served as a juror.  My favorite leisure activities is long

21    walks in my neighborhood, because it is so beautiful.

22              THE COURT:  Are you in Upper Queen Anne?

23              JUROR NO. 12:  Halfway down the hill.

24              THE COURT:  It's a very nice neighborhood.

25              JUROR NO. 12:  It's a good place to live.

```
 1            THE COURT:  Mr. XXXXXX?

 2            JUROR NO. 13:  XXXXXXXXXXXXX.  I live in Bothell.  I'm

 3   a pastor.  My wife is a music teacher.  My oldest daughter is

 4   18, she works as a childcare worker.  I've never served as a

 5   juror.  And I enjoy golfing and travel.

 6            THE COURT:  Great.  Thank you.

 7        Juror No. 14, Ms. XXXXXX?

 8            JUROR NO. 14:  I'm XXXXXXXXXXXXXX, and I live in

 9   Federal Way, Washington.  I do CT, or CAT scans, at the

10   hospital.  I live with my boyfriend, who is a garbage man.  I

11   served on a criminal case before, and my favorite leisure

12   activity is knitting.

13            THE COURT:  I wanted to be a garbage man when I was a

14   kid.  I used to watch them come and go when I was growing up in

15   New York.  In those days, they used to pick up the garbage every

16   day, Monday through Friday.  How ridiculous was that, right?

17   But now aren't they called "sanitation"?

18            JUROR NO. 14:  Yes.

19            THE COURT:  I love that you say that, "garbage man,"

20   that's what they are, and there's nothing to be ashamed of at

21   all.

22            JUROR NO. 15:  I'm XXXXXXXXXXX.  I live in Renton,

23   Washington.  I'm a procurement manager.  My wife works as a

24   civil engineer.  I've not served on a jury before.  My favorite

25   leisure activity is motorcycles.
```

1          THE COURT:  All right.  Thank you.

2      Okay.  Out into the audience for XXXXXXXXX.

3          JUROR NO. 16:  XXXXXXXXXXXXXXX.  I live in Seattle.

4  I'm a lab technician.  My husband is an industrial painter.  I

5  was on a jury way back when, in Kent, a domestic violence case.

6  I just enjoy getting outside.

7          THE COURT:  Yeah, great.  Thank you.  Can everyone see

8  that?  Maybe we should move that so people can see.

9      Juror No. 17?

10         JUROR NO. 17:  My name is XXXXXXXXXXXXXX.  I live in

11 Renton, Washington.  I'm an architect.  My husband is an

12 affordable housing developer.  I've never served as a juror.  My

13 favorite leisure activities are Ultimate Frisbee and walking.

14         THE COURT:  Thank you.

15     Juror No. 18?

16         JUROR NO. 18:  XXXXXXXXXXXXXX.  I live in Burien.  I'm

17 in furniture assembly.  My partner is a teacher.  I've never

18 been on a jury.  I like pickleball.

19         THE COURT:  Do you do Task Rabbit?

20         JUROR NO. 18:  That's some of what I do.

21         THE COURT:  See how hip I am?  Task Rabbit, I have the

22 app on my phone.

23     Mr. XXXXXXXXXX?

24         JUROR NO. 19:  I'm XXXXXXXXXXXXXXXXXX.  I live in

25 Kent, Washington.  I'm a school counselor.  No, I don't live

 1   with anybody, never served as a juror, and I like hiking,

 2   watching movies, and watching TV shows.

 3              THE COURT:  Great.

 4        Ms. XXX?

 5              JUROR NO. 20:  XXXXXXXXXX.  I live in Sammamish,

 6   Washington.  My husband and I are both retired.  I've never

 7   served as a juror.  I feel I should say that my cousin is a

 8   retired United States Attorney in Eastern Washington, and I love

 9   gardening.

10              THE COURT:  Is there anything about having a cousin

11   who was a U.S. Attorney that would make you lean towards the

12   government?

13              JUROR NO. 20:  No.

14              THE COURT:  Okay.  Thank you.

15        Juror No. 21?

16              JUROR NO. 21:  XXXXXXXXXXXXXXXXX.  I live on Capitol

17   Hill/Central District area.  I'm self-employed, own my own

18   business.  My wife works at Fred Hutch as a scientist lab tech

19   project manager.  We have a three-year-old and an 11-month-old.

20   I've never served as a juror before.  My favorite leisure

21   activities are fishing, hiking, camping, reading, whenever I

22   find the time to do that with two little kids.

23              THE COURT:  It's nice to hear anyone say they enjoy

24   reading.

25              JUROR NO. 21:  Well, reading is good for the brain.

```
1           THE COURT:  Thank you.

2           JUROR NO. 22:  XXXXXXXXXXXX.  I live in Mukilteo.  I'm

3  a marketing manager for Amazon.  My husband is a director of

4  operations at Horizon House, an assisted living facility.  I've

5  never been a juror.  We like to go camping and skiing.

6      I want to note:  I thought the case started on the 28th,

7  but I am out of town next week, Thursday, Friday, in a wedding

8  in California.

9           THE COURT:  So you're not available next Thursday or

10 Friday?

11          JUROR NO. 22:  No, not on Thursday or Friday.

12          THE COURT:  Okay.  Juror No. 23?

13          JUROR NO. 23:  XXXXXXXXXXXXX.  I live in Seattle,

14 between Ravenna and Maple Leaf.  I am retired.  My last job was

15 as a retail sales associate.  My husband is also retired.  I was

16 on a civil case as a juror, and my favorite leisure activities

17 are biking, swimming, sewing, piano.

18          THE COURT:  Wonderful.

19     Mr. XXX?

20          JUROR NO. 24:  I'm XXXXXXXXX.  I live in Queen Anne.

21 I'm a scientist at a biotech company.  I'm the only one that

22 works in my home, currently.  I have not served on any cases.  I

23 like to rock climb and snowboard.

24          THE COURT:  Thank you.

25     Ms. XXXXXX?
```

1          JUROR NO. 25:  I'm XXXXXXXXXXXXXXX.  I live in

2    Bellevue, Washington.  I am a caterer and a full-time student at

3    Bellevue College.  I live with my grandmother, and she's

4    retired.  I've never been a juror before, and I really like

5    soccer so I have a lot of those participation trophies.

6          THE COURT:  Great.  Thank you.

7       Mr. XXXXXXXXXXX?

8          JUROR NO. 26:  XXXXXXXXXXXXXXXXX.  I live in Bothell,

9    Washington.  I work for the City of Seattle as a small business

10   permit facilitator.  My wife works as a constituent relations.

11   I've been on one jury in a criminal case.  I have a two-year-old

12   at home, so there's not much leisure time.

13          THE COURT:  Thank you.

14       Mr. XXX?

15          JUROR NO. 27:  My name is XXXXXXXXXXX, and I live in

16   Lynnwood, Washington.  I'm a business planning manager at

17   Amazon.  I live with my wife and two daughters.  My wife is

18   currently a stay-at-home mom, but she had been in quality

19   assurance, as well as preschool teacher.  I've never been a

20   juror on a case.  My favorite leisure activities are spending

21   time with my daughter at her soccer matches, and reading

22   stories.

23          THE COURT:  Great.  Thank you.

24          JUROR NO. 28:  XXXXXXXXXXXXX.  I'm a real estate agent

25   and a broker at REMAX Select/One.7.  I served in a jury in Kent.

1    My favorite things are being with my grandbabies and traveling

2    with my husband.

3            THE COURT:  And you served on a criminal jury before?

4    Did you have the experience of actually deliberating and

5    reaching a verdict?

6            JUROR NO. 28:  Yes.

7            THE COURT:  Okay.  Thank you.

8        Ms. XXXX?

9            JUROR NO. 29:  My name is XXXXXXXXXX, and I live in

10   Woodinville.  I'm an RN care manager per diem at Overlake

11   Hospital.  My husband is a retired engineer.  I did serve on a

12   jury for domestic violence case.  I like to read, and I also

13   like to gamble.

14           THE COURT:  Not too much people admit that.

15       Ms. XXXXXXX?

16           JUROR NO. 30:  Hard to follow that.

17       I'm XXXXXXXXXX.  I live in Phinney Ridge in Seattle.  I'm

18   a product design director at Square, which is a Block company.

19   My husband is a stay-at-home dad with our three-year-old and our

20   ten-month-old.  I have not served as a juror before, and I like

21   to enjoy the outdoors and remodel our house.

22           THE COURT:  Phinney Ridge is a nice neighborhood.

23           JUROR NO. 30:  Uh-huh.

24           THE COURT:  For those of you who don't get up there,

25   there are lots of nice, little shops.

 1          JUROR NO. 30:  Yeah, we live right there.

 2          THE COURT:  Very nice.

 3      That's everyone, right?  Okay.

 4      So I think what we're going to do is give people a bathroom

 5  break.  Let's have everyone come back to your same seats.  Kind

 6  of look at who is on your left and right.  You can leave your

 7  numbers on the seats as long as you remember your numbers.

 8  Please go back to the first-floor jury room.  You can use the

 9  restrooms down there.  I'd ask everybody to be back here by --

10  come back -- we're on the 15th floor, Judge Lasnik's courtroom,

11  so when you get off the elevator, turn west.

12      Don't talk about the case with anyone, but be back at 20

13  of, and then we will do some questioning of you by the lawyers,

14  first Mr. Friedman and his team, and then Mr. Hamoudi and his

15  team, and then we will send you to lunch.  Okay?

16      We'll see you all in 20 minutes at 10:40.  Thank you.

17                  THE FOLLOWING PROCEEDINGS WERE HELD
                    OUTSIDE THE PRESENCE OF THE JURY:
18

19          THE COURT:  Some of these people who have the

20  grandkids and the college, I'm going to keep them around.  We

21  can see where our numbers are, and when our numbers are good

22  enough, I'll let them go, okay, because they've got some good

23  excuses.

24      We'll be back at 20 of.  Thank you.

25              (Court in recess 10:33 a.m. to 10:42 a.m.)

1      THE FOLLOWING PROCEEDINGS WERE HELD
           IN THE PRESENCE OF THE JURY POOL:
2

3

4           THE COURT:  Would you now please give your attention

5    to Assistant United States Attorney Jessica Manca, and she will

6    ask questions, and she'll be turning around.  It's okay for her

7    to turn her back to me, because she needs to talk to all of you.

8        Ms. Manca, you have a half hour.

9           MS. MANCA:  Thank you, Your Honor.  Is it okay if I

10   move around to the other side?

11          THE COURT:  Yes.

12          MS. MANCA:  Thank you very much.

13       Thank you all for being here today on this beautiful, sunny

14   day.  We appreciate your time today.

15       As you've heard, the right to a jury trial, and,

16   specifically, the right to a jury trial is the foundation of our

17   legal system.  So that's the spirit that we're asking these

18   questions of you, and we appreciate, so much, your willingness

19   to volunteer the information that will help us get to that

20   level, being that "I don't know how I feel about this, that, or

21   the other thing."

22       Can I see a show of hands from people who opened up their

23   mail and saw the jury summons and thought, yes, a chance to

24   serve my country.  I'm seeing 1, 2, 8.

25       Juror No. 8, can you tell me about that.

1          JUROR NO. 8:  I've never served on a jury before, and

2  I was always curious why, after all these years and decades.  So

3  when I got the letter and it was from the U.S. District Court, I

4  thought this is kind of interesting because it's not the city,

5  it's not the county, and I thought that it would be really

6  interesting to experience this.  It's an opportunity to

7  participate.

8          MS. MANCA:  Absolutely.  Have you been called to serve

9  on a jury before?

10          JUROR NO. 8:  No.

11          MS. MANCA:  First one?

12      You mentioned you are a teacher.  Where do you teach, or

13  are you retired?

14          JUROR NO. 8:  I retired from Bellevue High School;

15  taught in Seattle for almost 20 years, Garfield High School and

16  K-12 development for the school district for eight years.  I

17  retired in 2018, went back during COVID, and then retired again

18  the last school year.

19          MS. MANCA:  Teaching government?

20          JUROR NO. 8:  No.  I was responsible for teaching the

21  American government with the George Lucas Foundation.  That's

22  one of the things I did with the University of Washington, and a

23  lot of different people implement that.

24          MS. MANCA:  You were probably teaching your students

25  about the importance of the American jury system.

1          JUROR NO. 8:  That came out, especially, when we

2    studied the Magna Carta.

3          MS. MANCA:  Thank you very much.  I appreciate your

4    contribution.

5       Juror No. 2, you were talking about your excitement to

6    serve -- excitement to serve, notwithstanding your college

7    classes.  You said that you were a behavioral technician.  Can

8    you explain what that is?

9          JUROR NO. 2:  Yes.  I work with young children who

10   have developmental disabilities who engage in aggression and

11   injury.

12         MS. MANCA:  How do you work with them?

13         JUROR NO. 2:  We do one-on-one therapy with them.

14         MS. MANCA:  What are you going to school for?  It

15   sounds like you have classes coming up.

16         JUROR NO. 2:  As a behavioral technician, your pay

17   tops out at $20, $22 an hour, so I'm going to get my RN.

18         MS. MANCA:  Did I see you have some technology

19   experience?

20         JUROR NO. 2:  No, but my husband is a software

21   engineer.

22         MS. MANCA:  And where does your husband work?

23         JUROR NO. 2:  He works at Querty, a company in Santa

24   Barbara, California.

25         MS. MANCA:  Is that remote work?

1            JUROR NO. 2:  Yes.

2            MS. MANCA:  Do you two talk about his job?

3            JUROR NO. 2:  Sometimes, but he, basically, makes it

4    possible for people to pay their rent online.

5            MS. MANCA:  All right.  Thank you.

6        Did I get everyone?

7        The next category are, of course, people who opened up

8    their mailbox, saw the summons, and thought, "Oh, no."  How many

9    did that?

10       Thank you, ma'am.  Is that related to the health issues

11   that you've been experiencing?

12           UNIDENTIFIED JUROR:  You know, I've been summoned for

13   jury duty four times.  I just am -- I'm a creature of habit.  I

14   mean, I don't like to sway from my normal everyday.

15           MS. MANCA:  I understand.  This is a disruption.

16           UNIDENTIFIED JUROR:  Yeah, as bad as it was this

17   morning, I'm driving, trying to park.  I ran over the curb.  I

18   have a flat tire and my car is sitting in the garage.

19           MS. MANCA:  Did that happen today?

20           UNIDENTIFIED JUROR:  Yes.  When it rains, it pours.

21           MS. MANCA:  The flat tire is the big one.  Thank you

22   for being so candid with us about that.

23       Anyone who agrees -- I'm losing track of my numbers --

24   Juror 16, about this feeling about jury duty?

25           JUROR NO. 16:  I typically would be happy about it,

 1    but I have something to do in two weeks.  But I typically would

 2    be excited.

 3              MS. MANCA:  It's just the stresses of life coming to

 4    bear?

 5              JUROR NO. 16:  Yeah, yeah.  Like, everybody is

 6    supposed to meet up for the first time ever, and I'm supposed to

 7    lead, and I'm nervous about what might happen with that.

 8              MS. MANCA:  Okay.  Thank you for sharing that.  I

 9    appreciate that.

10        Yes, Juror No. 27?

11              JUROR NO. 27:  Apprehensive.  I do see the solemn

12    duty, but you lose control over what happens next, with the

13    schedule and all.

14              MS. MANCA:  What happens next to your personal life?

15              JUROR NO. 27:  Yes.

16              MS. MANCA:  We recognize the inconvenience, and we

17    appreciate everyone being here, notwithstanding those

18    apprehensions.

19        Anyone else?

20              UNIDENTIFIED JUROR:  My daughter is getting married in

21    25 days.

22              MS. MANCA:  Are you one of the people who raised your

23    hand for a hardship?

24              UNIDENTIFIED JUROR:  No.

25              MS. MANCA:  A lot of people have hardship.  Judge

1   Lasnik's speech right, right?

2            UNIDENTIFIED JUROR:  Yeah.

3            MS. MANCA:  Is there anyone who would describe

4   themselves as loving education?  Juror No. 24?

5            JUROR NO. 24:  I'm a scientist at a biotech company.

6   I got my bachelor's in medical engineering.  I basically try to

7   figure out things, and do I get paid for it.

8            MS. MANCA:  Thank you very much sharing that.

9        Juror No. 8, since we just heard from you, I'm going to ask

10  you -- thank you for answering, 13.

11           JUROR NO. 8:  Yeah, I've done lots of schooling as

12  well, always enjoyed it.  I'm a reader.  My master's degree is

13  in ancient languages.  So it's interesting to enjoy the learning

14  process.

15           MS. MANCA:  I saw from your bio that you currently

16  work as a pastor?

17           JUROR NO. 8:  Yes.

18           MS. MANCA:  Did you have another career?

19           JUROR NO. 8:  Yes.  I thought about going into

20  teaching.

21           MS. MANCA:  Have you always been a pastor, or did you

22  have another job?

23           JUROR NO. 8:  Yes, yes, for 21 years now.

24           MS. MANCA:  Some people, their religious beliefs

25  prevent them from passing judgment on other people.  Do you

1    think you would have trouble reaching a verdict in this case if

2    the evidence proved beyond a reasonable doubt that someone was

3    guilty?

4              JUROR NO. 8:  No, I'll do my best to be impartial.

5              MS. MANCA:  Anyone else -- a show of hands -- who

6    likes to learn?  Is there anyone else?  Juror No. 20?

7              JUROR NO. 20:  I'm an avid reader, reading newspapers.

8    I love to learn.

9              MS. MANCA:  Thank you for volunteering that.  I

10   appreciate it.

11        Thank you for keeping those cards up.

12        What kind of things do you love to learn about?

13             JUROR:  History, plants, biology, trees, architecture,

14   gardening; a wide range of interests; American and European

15   history.

16             MS. MANCA:  Are you a person, like Juror No. 8 over

17   here, who likes to learn about American systems of government?

18   Well, we have one system of government, but the history of that,

19   or different kinds of history?

20             JUROR:  I think more human history.  A lot of people

21   deal with challenges in their lives, how to move forward.

22             MS. MANCA:  Is there a book or topic of interest to

23   you about that topic?

24             JUROR:  I'm reading *The Overstory*.

25             MS. MANCA:  What is that about?

1              JUROR:  It explores our relationship with nature, the

2    psychology of why we're so bad at acting on climate change, our

3    perception of time, the meaning of hope, and so much more.

4              MS. MANCA:  Thank you so much for sharing.

5         Juror No. 26, were you raising your hand?

6              JUROR NO. 26:  Yes.

7              MS. MANCA:  Can you just describe what that feels

8    like?

9              JUROR NO. 26:  Yeah.  I got my undergraduate in United

10   States history, and I bounced around in careers, but, generally,

11   I just kind of pick up what I'm doing.  I'm lucky to get my

12   master's degree public education, and just picking up odds and

13   ends, trying to learn.

14             MS. MANCA:  Thank you for sharing that.  I have on

15   here that you are a small business owner?

16             JUROR NO. 26:  No.  I'm a small business permitting

17   liaison with the City of Seattle.  I help small businesses in

18   the city of Seattle with their construction permits, going

19   through the bureaucracy of what they need to do to get their

20   business up and running.

21             MS. MANCA:  What is your masters in?

22             JUROR NO. 26:  Part of my job is learning about my

23   clients.  We do a lot of housing, so learning about different

24   kinds of underserved communities and cultures, how people live

25   and how they operate and gather and interact with one another

1   and how fate decides that or doesn't.  So whoever my client is

2   at the time, really delving into their social habits and how I

3   can serve them best.

4          MS. MANCA:  It sounds like your spouse also works in

5   affordable housing.

6          JUROR NO. 26:  Yes.

7          MS. MANCA:  That's probably a unification of interest.

8   He is an architect?

9          JUROR NO. 26:  Now he is a trooper.

10          MS. MANCA:  It's sort of social justice through

11   architecture and planning in phases.

12          JUROR NO. 26:  Yes, a lot of public communities we get

13   ideas from, like a group at a community center, we'll help them

14   go through that.  We don't work together, but he'd help them get

15   the money.

16          MS. MANCA:  Is that how you met?

17          JUROR NO. 26:  No.  We just have a common interest.

18          MS. MANCA:  What kind of buildings have you built?

19          JUROR NO. 26:  More recently, family housing here in

20   Seattle and Tacoma.  Also women's shelters and childcare

21   centers.  A lot of community centers.

22          MS. MANCA:  I'm a court reporter's nightmare, so I'll

23   do my best to slow it down for Nancy, our court reporter.

24       Can I see a show of hands for any more people?

25          UNIDENTIFIED JUROR:  I appreciate different skill sets

```
 1    and different levels of education and courses of education, so I

 2    try to surround myself with people that are doing things very

 3    differently than I do so can I learn by proxy, whether that's

 4    carpentry, science, lab work, human rights, geography.  I absorb

 5    it all.  I take an interest in anything that anyone else is

 6    doing.

 7              MS. MANCA:  That's great.  Are you also a small

 8    business owner?

 9              UNIDENTIFIED JUROR:  Yes.

10              MS. MANCA:  What kind of business?

11              UNIDENTIFIED JUROR:  I own a liquor company.

12              MS. MANCA:  Distributing to stores?

13              UNIDENTIFIED JUROR:  Actually, I handle all sorts of

14    manufacturing, outsource manufacturing, and then we farm out the

15    production aspects and we handle all the business development

16    and then procurement and make sure it ships out.

17              MS. MANCA:  Okay.  Thank you.

18         Anyone else want to weigh in on this topic?

19         Yes, ma'am?  This is Juror No. 25.

20              JUROR NO. 25:  I'm a student.  I'm very young, so I

21    know that I have a lot to learn, and it doesn't hurt to learn

22    more, so I always try to ask questions if I don't know

23    something.  I always try to look into things and understand why

24    it is what it is.  Yeah.  Looking into the why behind things.

25              MS. MANCA:  Looking into?
```

1           THE COURT:  Can I ask you to stand when you're

2    answering your questions?  It will make it easier for the court

3    reporter.

4           JUROR NO. 25:  So I work on rockets.  I'm always

5    investigating things.  I do a little bit of background in cosmo

6    analysis.

7           MS. MANCA:  Can you slow down?

8           JUROR NO. 25:  I have a little bit of background in

9    cosmo analysis, solving problems.

10          MS. MANCA:  Who is a reader of mystery novels, true

11   crime stuff, who really likes to dig into that?

12       Juror No. 6, what kind of novels?

13          JUROR NO. 6:  So books, usually mysteries that aren't

14   too weighty, but I read.  As a busy mom, I just read sort of

15   lesser cerebral subjects.

16          MS. MANCA:  Sounds like you don't have a lot of time

17   on your hands.

18          JUROR NO. 6:  Yeah.  And if I happen to have Netflix

19   on in the background.

20          MS. MANCA:  Who really loves crime shows?

21       And then Juror No. 20 was talking about human interest

22   stories, people who like human interest stories, things like

23   that.

24       Is there anyone who is willing to say "my brain is full,

25   I'm not interested in learning today or at other times"?

1          Anyone who feels like, "My inclination is not to trust the

2    government.  I see you up here as a prosecutor.  I'm feeling a

3    little wary about what you might be showing me today"?

4          Yes, sir, can you explain that?  Thank you for raising your

5    hand.

6               UNIDENTIFIED JUROR:  It's more just how I take in

7    information.  I'm always questioning the cause and effect, what

8    causes it, why did it happen.  I ask why.

9               MS. MANCA:  So am I understanding you to say, "I'm not

10   going to believe it at face value.  I need you to prove it to

11   me"?

12              UNIDENTIFIED JUROR:  Yes.  I'm technical.

13              MS. MANCA:  Juror 3?

14              JUROR NO. 3:  I just think, "be skeptical of

15   especially people in power."

16              MS. MANCA:  Tell me about that.

17              JUROR NO. 3:  I don't know.  The government lies

18   sometimes.

19              MS. MANCA:  Actually, that's true, right?  And how do

20   you feel that might affect the way that you view evidence in the

21   case if the government is presenting evidence?

22              JUROR NO. 3:  I guess it would make me more skeptical

23   of evidence they present.

24              MS. MANCA:  And have you heard about things in the

25   news that have made you skeptical?

 1              JUROR NO. 3:  I don't know.  Like invading Iraq and

 2    stuff like that.

 3              MS. MANCA:  Of course, yeah.  So when the government

 4    is presenting evidence, do you feel like you can be fair to the

 5    evidence presented?

 6              JUROR NO. 3:  Yeah.

 7              MS. MANCA:  Thank you so much.

 8              JUROR NO. 3:  Sorry I yawned.

 9              MS. MANCA:  It's okay.  Thank you for sharing that.

10         Does everyone agree with Juror No. 3?  Right, you heard

11    about the war in Iraq and some of the mistakes that were made

12    that led us to that place.

13         Are you concerned about that, Juror No. 8?

14              JUROR NO. 8:  I served in the Army, active duty for 17

15    years, in Army Reserve.  I'm a Vietnam veteran, and I know the

16    stories that go beyond there.  But overall, I trust the

17    government until I'm shown otherwise.

18              MS. MANCA:  That's the flip side of the coin.  Do you

19    feel like that affects your ability to listen to the evidence

20    and hear it impartially and reach an impartial verdict?

21              JUROR NO. 3:  No, not at all.

22              MS. MANCA:  Thank you, 3 and 8.

23         Anyone else who wants to weigh in on the feelings about the

24    government?

25         Juror 21?

1          JUROR NO. 21:  I subscribe to the belief that a lot of

2     the problems that happen within the government are individual

3     issues that there are systemic issues at play with our justice

4     system.  I believe a lot of those things can be explained away

5     by personal human error and greed and power and those kind of

6     things that I don't -- I think the system is easy to look at and

7     blame, but a lot of that is just (inaudible).

8          MS. MANCA:  Thank you very much, yeah.  That's a tough

9     perspective, what is the system and what is the individual, and

10     I appreciate your nuanced perspective on that.

11          Anyone else who would like to volunteer information?  We

12     appreciate all the hands going up and people talking.

13          Next is sort of related.  You've heard that Amazon is

14     involved in this case, in some respect.  Is there anyone that

15     has really strong feelings about Amazon, either positive or

16     negative?

17          Yes, sir, Juror No. 27.

18          JUROR NO. 27:  I'm positive toward Amazon.

19          MS. MANCA:  Because they deliver on time?

20          JUROR NO. 27:  Yeah.

21          MS. MANCA:  And you work for Amazon, right?  How do

22     you feel that working for Amazon and being positive towards

23     Amazon might affect your ability to be fair and impartial?

24          JUROR NO. 27:  It sounds like it's only peripherally

25     involved, so I don't feel like it will have that much effect.

1          MS. MANCA:  Thank you, sir.  That was Juror No. 27.

2     Anyone else?  We've heard positives about Amazon.  I'm not

3     seeing a lot of hands.  Anyone strongly negative towards Amazon?

4     Okay.

5          What about banks?  Does anyone feel negative towards banks?

6     We came out of a recession, and there was a lot in the news

7     about banks and their involvement in that.  Any hands for not

8     liking banks?  Yes, sir?  This is Juror 24.

9          JUROR NO. 24:  I feel banks aren't fulfilling their

10    community purpose that they were originally founded for.

11    They're all about the money instead of community.

12         MS. MANCA:  Thank you for being so candid about that.

13    Anyone else who has this feeling that they're just

14    accumulating money?

15         UNIDENTIFIED JUROR:  I work at Square, and Square

16    recently became a bank, so we're trying to be a bank for the

17    underrepresented.  It's not necessarily a deep-seated issue with

18    the bank, but we're trying to create a different type of bank.

19         MS. MANCA:  That's all it is.  It just popped into my

20    head, something I wanted to say.  Were you trying to create a

21    different kind of bank because you felt like there was a gap in

22    banking?

23         UNIDENTIFIED JUROR:  Yes.

24         MS. MANCA:  What kind of gap?

25         UNIDENTIFIED JUROR:  Gaps for minorities and not the

1    majority.

2         MS. MANCA:  Anyone else agrees with that perspective?

3    Anyone else feeling the same way?  Okay.

4         JUROR NO. 27:  I guess maybe not as strong, but, yeah,

5    I definitely agree that folks willingly underserve.

6         MS. MANCA:  Yeah, bias in banking.  Tell me about bias

7    in banking.

8         JUROR NO. 27:  Discriminatory practices in lending.

9         MS. MANCA:  What about credit card companies?

10        JUROR NO. 3:  I just think they're kind of negative

11   overall.  They send you all these ads for credit cards, and

12   they're, like, "Hey, everybody, get in debt," and they're really

13   just serving themselves.  I don't trust them.

14        MS. MANCA:  Yes, the credit card industry is serving

15   itself.  If you heard a credit card company was involved in this

16   case, how does that affect the way you look at this case?

17        JUROR NO. 3:  I guess I have an assumption that the

18   credit card company is a negative party, like they're doing

19   negative things, like Wells Fargo ripping their customers off

20   and stuff like that.  I don't trust them.

21        MS. MANCA:  Do you feel like you would be able to set

22   those feelings aside if you heard from a witness who worked for

23   a credit card company?

24        JUROR NO. 3:  I think so, yes.

25        MS. MANCA:  Other people having feelings abut credit

 1  cards?  Jury 17.

 2          JUROR NO. 17:  Well, I feel like they're a cloud

 3  identity, but at the same time we live in a society where big

 4  companies, such as Amazon and credit companies, so many people

 5  are dependent on them for their livelihood, and we're in this

 6  whirlpool of where we're dependent on Amazon in our everyday

 7  lives.  And then you need a credit card so it is inevitable.

 8  But the company, as a whole, is this big nonidentity thing, so

 9  it's something that's kind of necessary for us to use.  But at

10  the same time, in an ideal situation, everything would be

11  perfectly laid out and transparent, and everybody would

12  understand what you're getting into when you get a credit card.

13  That's mixed feelings.

14          MS. MANCA:  So it could be better, is what I'm

15  understanding?

16          JUROR NO. 17:  Yes.

17          MS. MANCA:  If you heard testimony from witnesses

18  about credit cards, and even banks that made mistakes, how would

19  you view that information?

20          JUROR NO. 17:  I would want to see what the

21  information was, because there's multiple sides.  So I would

22  kind of want to take it all in before I had an opinion, I guess.

23          MS. MANCA:  Do you feel like you could be fair and

24  impartial about banks and companies and what they did or didn't

25  do wrong?

1              JUROR NO. 17:  Yes.

2              MS. MANCA:  Juror No. 21?

3              JUROR NO. 21:  One of my first jobs was at Wells

4    Fargo, and I enjoyed it and I feel good about it.  Also,

5    regarding credit card companies, I don't believe in predatory

6    practices with students, especially so many students who get

7    credit cards at a low rate, spend money on pizza left and right,

8    and then they're $10,000 in debt and they're a freshman in

9    school.  I think the deregulation is a problem and should be

10   looked at.

11             MS. MANCA:  Anyone else have strong or negative

12   feelings or positive feelings about that?

13        I'm going to see if I can talk to some people I haven't

14   talked to.

15        Juror No. 9, you work as a nurse?

16             JUROR NO. 9:  Yes.

17             MS. MANCA:  Do you have any thoughts or gut feelings

18   about the conversation we've been having, you know, banks,

19   Amazon?

20             JUROR NO. 9:  I have similar feelings as some of these

21   other people.  There was a housing bubble that happened because

22   of the banks and all the bad things that happened at them.  The

23   credit card companies that sort of act as a middleman just for

24   the convenience to be able to live your life, and it's almost

25   like watered-down usury, in my opinion.  But it is necessary for

 1    how we judge people based on how well they're able to keep their

 2    credit scores up.

 3         But with that aside, I mean, like one of the other people

 4    said, I would withhold judgment until I have all the information

 5    in.

 6              MS. MANCA:  Okay.  And sort of related to this idea,

 7    like this isn't a case about predatory lending practices or

 8    anything like that.  Do you feel like you could set any feelings

 9    aside and judge the witnesses by --

10              JUROR NO. 9:  I believe so.

11              MS. MANCA:  Juror No. 11, it's sort of related to this

12    banking topic.  When you were a personal injury lawyer, did you

13    ever put an attorney on your jury?

14              JUROR NO. 11:  Often.

15              MS. MANCA:  Really?  Why?

16              JUROR NO. 11:  The first time I did it in Snohomish

17    County Superior Court.  She got lost in the back row, and we

18    didn't ask her questions.  She turned out to be a great juror,

19    and I could go on and on about it.

20         Now there are so many attorneys and paralegals in the jury

21    pool, it's almost inevitable.

22              MS. MANCA:  One of the things that people get

23    concerned about attorneys on jury panels is the idea that your

24    voice is larger than anyone else in the jury room.  How do you

25    think you might navigate that issue?

1       JUROR NO. 11:  You know, with the Zoom trials, we've

2   watched a lot of trials lately, and a friend of mine from the

3   same law firm that this juror was on my case was on my

4   daughter's case recently, and he did a great job, I think, of

5   staying kind of out of the mix.  It is easier on Zoom,

6   obviously.  But I think that I have no trouble being part of the

7   group rather than trying to lead.

8       MS. MANCA:  Not that I'm saying you couldn't lead, but

9   that is a common thought that people have.

10      JUROR NO. 11:  Right.

11      MS. MANCA:  And also your legal background.  If you're

12  instructed about the law in this area, and it's different than

13  what you understood the law to be, would you be able to follow

14  that instruction?

15      JUROR NO. 11:  Absolutely.  I think we use the two

16  from either side as examples, not beyond a reasonable doubt,

17  just a preponderance.  So it's just a flip of the other side of

18  the coin.

19      MS. MANCA:  Thank you very much.

20    Juror No. 12, you're a retired horticulturist?

21      JUROR NO. 12:  Yes.

22      MS. MANCA:  Can you describe what that is?

23      JUROR NO. 12:  Horticulture is just plant care.  I

24  work for an international company that has branches all over the

25  world, and we take care of the plants you see in offices,

 1   inside.

 2       I didn't care about the outside ones.  I like to look at

 3   them, but I don't care about them.  So we took care of the

 4   inside plants.  I managed people who went out in the field and

 5   watered them and made them look good.

 6           MS. MANCA:  How many years did you do that?

 7           JUROR NO. 12:  Twenty-five.

 8           MS. MANCA:  Do you have strong feelings about the

 9   discussion we've been having?

10           JUROR NO. 12:  No.  I think I could be impartial.  I

11   have opinions, of course, about all this stuff, but nothing out

12   of the norm.

13           MS. MANCA:  Thank you very much, and thank you for

14   explaining horticulture.

15           JUROR NO. 12:  That's okay.  Nobody knows what it is.

16           MS. MANCA:  Juror No. 14, you work in CAT scans?

17           JUROR NO. 14:  Yes.

18           MS. MANCA:  And you've been on a jury before?

19           JUROR NO. 14:  Yes.

20           MS. MANCA:  How did you like that?

21           JUROR NO. 14:  It was interesting.  It was good to be

22   part of it.

23           MS. MANCA:  Did you get along with the other people

24   you were on a jury with?

25           JUROR NO. 14:  Yes.  I'm third shift.

1          MS. MANCA:  What hours?

2          JUROR NO. 14:  6:30 to 7 p.m. so I feel like...

3          MS. MANCA:  Like you're on the wrong side?  Thank you

4   for telling me that.  I hadn't noticed, but that does make it

5   hard to follow along.  Thank you for sharing that with us.

6       Juror No. 15, you work as a procurement manager for

7   Bellevue College and you have tech experience?

8          JUROR NO. 15:  Yeah.  I dabbled in tech while I was

9   getting my undergraduate and my computer science degree, but by

10  no means am I an expert.

11         MS. MANCA:  Any strong feelings?

12         JUROR NO. 15:  People have their opinions, so I

13  respect their opinions.

14         MS. MANCA:  That's a good point.  Everybody has

15  opinions and nobody asked you to set your opinions aside.  We

16  ask you to set them aside, but we don't ask you not to have

17  them.

18      Thank you, sir.

19      Your Honor, I'm about five more minutes?

20         THE COURT:  You're a little beyond.

21         MS. MANCA:  I'm done.

22         THE COURT:  How about two more minutes?

23         MS. MANCA:  All right.  Two more minutes.

24      Juror No. 18, you work in furniture assembly?  And Judge

25  Lasnik was familiar with what you were saying, but I was not.

1              JUROR NO. 18:  What is the question?

2              MS. MANCA:  You work in furniture assembly?

3              JUROR NO. 18:  Yes.

4              MS. MANCA:  Can you explain?

5              JUROR NO. 18:  I travel to people's homes and assemble

6    furniture that they buy online.

7              MS. MANCA:  And there was a company that Judge Lasnik

8    mentioned.

9              JUROR NO. 18:  There's Task Rabbit.

10             MS. MANCA:  Oh, Task Rabbit.

11        Do you have technology experience?

12             JUROR NO. 18:  Not really.  I use an app, but I don't

13   consider myself to be tech savvy.

14             MS. MANCA:  Thank you.  That's my time for now.  Thank

15   you so much for your time and attention.

16             THE COURT:  Later, I'll show you how to get Task

17   Rabbit on your phone.  And then there's Lugg, L-u-g-g, that will

18   deliver your stuff for you.  It's a good app to have.

19        Okay, ladies and gentlemen, now please give your attention

20   to Mr. Mo Hamoudi, who will do about a half hour of questions.

21             MR. HAMOUDI:  Hi, everyone.  I tell you, I get nervous

22   when I talk sometimes, so if I stumble on my words, I apologize

23   in advance.

24        I want to ask a question.  I want to ask if someone is

25   willing to talk about something they're passionate about, and

 1    not so much your profession or avocation.  Is anyone willing to

 2    speak about their passion?  No one?

 3              THE COURT:  That's a loaded word.

 4              MR. HAMOUDI:  The follow-up question is:  I'm

 5    passionate about criminal defense, and maybe, Mr. XXXXXXXXX, if

 6    you could help me with this.

 7         I believe in the Constitution, and I'm a criminal defense

 8    lawyer, and I believe in the presumption of innocence.

 9         And the other day I'm driving down Highway 99, and I see a

10    car pulled over and I see two police vehicles behind it, and my

11    initial instinct is, what did that person do?  And that's

12    absolutely inconsistent with the presumption of innocence.  And

13    what I started to reflect on is that this thing I'm passionate

14    about, which is criminal defense, it asks me to do an unnatural

15    thing, which is think about the presumption of innocence through

16    this lens.

17         And if you had advice, since you're a lawyer of many years'

18    experience, how do you deal with that?

19              JUROR NO. 11:  Wow, that's a big one.

20         So I think that what we are learning today about the bias

21    or biases, you've got this lens that you're looking through, and

22    I wouldn't be looking through that same lens because I don't do

23    criminal defense.  I would be seeing if there was somebody there

24    that was injured or that needed my help or needed me to call

25    911.

 1          So it's kind of what am I looking through here, what are my

 2    experiences that bring me to this stop on the road or in the

 3    courtroom listening to a witness that -- how can I take all that

 4    in?

 5          As Judge Lasnik just pointed out, you slow it down and you

 6    think about it so that you're not using biases to analyze

 7    something or jump to a conclusion that's not going to be

 8    verified later on.

 9               MR. HAMOUDI:  So if you're doing that in a collective

10    group, right, and you're trying to process information, maybe

11    you're in a jury room deliberating, what ideas would you have

12    about doing that?

13               JUROR NO. 11:  I would listen to the other people.

14    There are people here I would love to hear from, and it is

15    fascinating to me all the different perspectives in this

16    courtroom.  So that's what I would do.

17               MR. HAMOUDI:  That's a good answer.  I appreciate it.

18          Does anybody else have any follow-up with what

19    Mr. XXXXXXXXX said?  Feedback, how to process the information

20    when you walk into it?  Anybody?  Juror No. 21?

21               JUROR NO. 21:  One of the things I love about problem

22    solving, in general, is hearing the different perspectives.

23    Both my parents are immigrants, so I've always been interested

24    in multicultural studies and the adoption of different

25    languages.  One of the things I heard about, people who are

1    bilingual or trilingual, identifying multiple languages gives

2    you the perspective of how that fits into the culture or the

3    language background.  So just hearing different perspectives on

4    any sort of issue at hand, I think, is valuable.

5              MR. HAMOUDI:  And anybody else want to share their

6    views on this very point?  Yes, sir?

7              JUROR NO. 8:  I'm a pastor, and that makes me alien to

8    most people, but I wasn't raised in the church, so one of the

9    things I've done in my church, I appreciate the video on

10   unconscious bias because we just recently ran a workshop for my

11   church called Justice and Race, and the whole idea was how you

12   get to the presuppositions.  Church people, to be honest with

13   you, are the worst with presuppositions.  I think it was a

14   really good exercise for our community to figure out how to talk

15   to each other, how to treat people of color.  People are

16   different than you, and we're trying to figure out a way to go

17   forward without hurting each other.  So, yeah, I appreciate what

18   you're saying there.

19             MR. HAMOUDI:  Thank you so much.  Anybody else have an

20   opinion on that?  Juror No. 8?

21             JUROR NO. 8:  You know, as a teacher in history

22   courses, and students are given a number of different documents

23   and they have to go through and look at the different

24   perspectives and points of view to be able to answer the

25   questions.  So one of the things that I tried to do in teaching

 1    my students is how to look at the different points of view and

 2    then be able to come to some conclusion without just relying on

 3    any one particular judgment.

 4         MR. HAMOUDI:  Anyone else?  So Judge Lasnik talked

 5    about hard conflicts, like people who have really significant

 6    commitments that might make it difficult for them to serve on

 7    this jury.

 8         I want to talk about a slightly different type of conflict.

 9    One is, this case is going to require you to pay attention to

10    technical details, and it's going to be very challenging.  It's

11    been challenging for myself, as a lawyer who is not a technical

12    person, to understand the case.  So sometimes you have

13    professional and personal obligations that are outside

14    legitimate obligations that you're dealing with in your lives,

15    and though they're not a hard conflict, they might be something

16    that are pressing in your mind, and if something like that

17    exists in your life, would you mind sharing it with us so we

18    know?  Because we really need you to make this case a priority,

19    because it's such an important case.  Anyone willing to share?

20         Yes, sir?

21         JUROR NO. 25:  So I go to Bellevue College, and I

22    believe it's Juror 3 that also goes to Bellevue College, and

23    finals are coming up the week of the 23rd.  So my last quarter

24    before I get my associate's, it's just very worrisome for me

25    that spending time here, I might not be able to study and get

 1    those assignments done.  But this seems like a very interesting

 2    case.  I would love the opportunity to serve.  But it's just

 3    something that might be in the back of my mind.

 4              MR. HAMOUDI:  Anyone else?  Juror No. 15?

 5              JUROR NO. 15:  Yes.  I work at Bellevue College in the

 6    financial department, and this month is our fiscal month end.

 7    So I have to be closing, and we migrated to a new ERP system.

 8    So the burden is, all my direct reports are left doing all the

 9    closing, all the work, and I will face disgruntled employees

10    when I return, because they were given the burden to close, and

11    I should be assisting them.

12         As well, I have two small children.  So if selected now, my

13    wife, who adamantly does not want me to serve, has the duty now

14    of dropping them off at school and picking them up and taking

15    them to their extracurricular activities.  So it would be a

16    hardship later because my wife would have a grudge for having to

17    do all that work, and my staff will have a grudge that they had

18    to do all the work to close.

19         But I was raised in a military family, and I believe in

20    self-service.  So I will do it, if selected, but it is a fantasy

21    world if I think that two weeks that I'm not either at work or

22    assisting with the drop-off, delivery of my kids, that I won't

23    face any repercussions.

24              MR. HAMOUDI:  I appreciate your honesty, and I

25    empathize with your obligations.

 1        Do you think these obligations would make it very difficult

 2   to pay attention to the witnesses who are going to be talking

 3   about very detailed technical matters?

 4              JUROR NO. 15:  I don't think it would be difficult to

 5   pay attention.  I would be thinking about my responsibilities

 6   outside this courtroom, to be honest, thinking about my staff or

 7   obligations that I already had precommitted to before coming

 8   here.

 9              MR. HAMOUDI:  Thank you.

10        One of the subject matters that's going to come up during

11   this trial is called "cryptocurrency."  Does anyone have any

12   familiarity with cryptocurrency?

13              UNIDENTIFIED JUROR:  I own cryptocurrency.  I follow

14   it.

15              MR. HAMOUDI:  Anybody else?  Juror No. 21?  And then

16   I'll come to Juror No. 17.

17              JUROR NO. 21:  It's something that I'm generally

18   interested in.  I probably have some bias against it in that I

19   just think it's one of the main unhealthy kind of things.  I'm

20   certainly interested in knowing more about it.  I don't know

21   anything about it, but I have friends who are interested.

22              UNIDENTIFIED JUROR:  I've heard of it and seen it

23   around.  I've tried to understand what it is, but I haven't, and

24   I'm trying to learn and trying to understand it, but aside from

25   having heard of it, I don't know much about it.

1              MR. HAMOUDI:  Juror No. 8?

2              JUROR NO. 8:  I have a limited knowledge of

3     cryptocurrency, and I'm skeptical at the same time.

4              JUROR NO. 13:  I own some Bitcoin and Dogecoin.

5              MR. HAMOUDI:  What is your number?

6              JUROR NO. 13:  Thirteen.

7              MR. HAMOUDI:  How about social media?  How many people

8     have positive experiences with social media?  We have some

9     hands.

10         Juror No. 23, what are your positive experiences with

11    social media?

12             JUROR NO. 23:  So I have both positive and negative

13    experience, but my positive experiences are that I'm in a lot of

14    groups on Facebook, and it gives me a way to be involved with my

15    bicycling group.  I'm in several different clubs with bicycles

16    and swimming, and it's our major way of communication.

17             MR. HAMOUDI:  Do you mind sharing your negative

18    experiences?

19             JUROR NO. 23:  Oh, I just kind of -- otherwise, I kind

20    of despise Facebook.  If it weren't for that positive stuff, I

21    would be like, no, don't take any more of my information.  I try

22    to keep all of my information as secure as possible, and I go

23    into all those back rooms and keep it as private as I can.  But

24    I don't trust it.

25             MR. HAMOUDI:  Okay.

1        Juror No. 28, you raised your hand?

2              JUROR NO. 28:  I'm a founder of a nonprofit, so I use

3    it for that, for all the stuff that we do on a regular basis.

4    And then I'm a realtor, and my husband and I have a company

5    together, so we use it as well.

6              MR. HAMOUDI:  Juror No. 6, what are your positive

7    experiences with social media?

8              JUROR NO. 6:  I run a home-based business primarily on

9    social media, and I make pretty good money.  So in that regard,

10   it is positive.

11       On the other side, I have four daughters, ages 11, 13, 14,

12   16.  None of them have social media at all because I just don't

13   think it's good for people's mental health to follow, in

14   general.

15             MR. HAMOUDI:  Why it isn't good for people with mental

16   health?

17             JUROR NO. 6:  I feel that so much social media is

18   photographs and comparisons, and getting that mental hit of

19   dopamine when people like their posts.  That's why.  "Aren't my

20   kids so cute" instead of, "oh, my God, look at the loads of

21   laundry I need to fold," and "let me clear this off in the

22   background for my photo."

23             MR. HAMOUDI:  That is something I had trouble

24   understanding.  You said a dopamine thing, and maybe you can

25   help me understand what that means.

1           JUROR NO. 6:  So I think that's the word.  It's sort

2      of just a mental endorphin-type thing that is pleasant.  That's

3      what you get from using drugs, too, I think.  But when people

4      like your social media posts, it's enjoyment, and you get

5      addicted to it, and you go back and check because you want to

6      see if people responded positively.

7           MR. HAMOUDI:  Juror No. 1, you were nodding your head.

8      Do you have anything to share about what this juror was just

9      sharing about the process of dopamine?

10          JUROR NO. 1:  I was on social media before, and I can

11     relate to wanting that reward system when people approve of what

12     you post, or having insecurities when people don't respond well

13     or disapprove.  The thing she said, the dopamine hit is your

14     brain's way of rewarding you.

15          MR. HAMOUDI:  Anybody else have similar experience or

16     know people who like to use social media for this process of

17     getting that positive reinforcement of the dopamine hit and

18     getting in that cycle?

19     Juror No. 25?

20          JUROR NO. 25:  So I'm actually going to school for

21     marketing with a specialty in social media marketing, so I'm a

22     little sensitive to the psychology of social media.  There are

23     positive experiences as well, businesses entrepreneurs that are

24     creating their own businesses from the ground, up.  So there is

25     positives and negatives, but the psychology of the dopamine,

 1   it's very true.  It's been tested.

 2        MR. HAMOUDI:  Does anybody have a negative experience

 3   with social media?  Yes, sir, Juror No. 19?

 4        JUROR NO. 19:  I'm a middle school counselor, and so

 5   social media is a constant battle.  We have, like, a confessions

 6   page that a student created, and, basically, kids can post to it

 7   anonymously.  They can spread rumors.  There is an Instagram

 8   page that people post fights to, and then they bring it to

 9   administrators or me, and we don't know who posted it.  So it's

10   like fighting an invisible monster.

11       I worry about the social media impact, particularly on our

12   teenaged girls.  I have two nieces, and we wonder when it's

13   appropriate to have social media for any child.

14       I think social media is more negative than positive.  Like

15   this juror said, there are some benefits for social media, like

16   businesses and promoting things.  But you can spread something

17   very quickly, positive or negative.

18        MR. HAMOUDI:  So as a school counselor, you see

19   something on a social media post, and it brings you concern;

20   what's the process that you go through to confront that

21   information?

22        JUROR NO. 19:  Usually, I'd bring it to my

23   administrators.  And we've had some instances where there will

24   be, like, a threat at our school and our administrators know and

25   I think they walk through their process, I'm not particularly

1   involved in that, but they, nonetheless, have to let law

2   enforcement know if it's a particular threat, let parents know.

3   But if they don't know who posted it, it's kind of just

4   notifying everyone to be on alert.

5              MR. HAMOUDI:  Anybody else have a negative experience

6   or opinion about social media?

7        Anybody have a Twitter account?  Mr. XXXXXXXXXXXXX, can you

8   talk to us a little bit about your experiences with Twitter?

9              JUROR NO. 26:  I had a Twitter account to post social

10  media posts that have to do with my work to get programs and

11  stuff we have out there.  Generally, I don't tweet about my

12  personal life or anything else.

13             MR. HAMOUDI:  Is your Twitter account private or

14  public?

15             JUROR NO. 26:  Private.

16             MR. HAMOUDI:  So you get to decide who accesses your

17  account and who doesn't?

18             JUROR NO. 26:  Yes.

19             MR. HAMOUDI:  Who else has a social media account

20  that's private?  Somebody we haven't heard from.

21        Juror No. 20, do you have a social media account that's

22  private?

23             JUROR NO. 20:  I do have a private account.  I keep

24  track of my grandchildren.  My distant children post pictures of

25  their children so that I can see my grandchildren.  So that's

 1    private, and only family can see it.

 2          MR. HAMOUDI:  All right.  Anybody else have a public

 3    social media account, which they don't mind if anybody looks at

 4    it?  Juror No. 22?

 5          JUROR NO. 22:  I just post friends and family.  So I

 6    don't really care.  Nobody really looks at it or sees it.

 7          MR. HAMOUDI:  How much time do I have, Your Honor?

 8          THE COURT:  About ten more minutes.

 9          MR. HAMOUDI:  I want to ask a question about privacy.

10    A very succinct question.

11       Who owns your identity?  Does anybody know the answer to

12    that question, or can anybody surmise an answer to that

13    question?  Can you venture a guess, Juror No. 22?

14          JUROR NO. 22:  Working in tech, I feel like we're

15    getting better as a society, at least within the digital space,

16    of allowing consumers to let companies know if you want them to

17    use your information, which allows people to be more engaged

18    with who owns their personal information, because then they have

19    the ability to allow that personal information to be shared.

20       Historically, I feel like companies have been a little more

21    anonymous in the fact of owning that information, because they

22    don't tell customers what they're holding on to on the back end.

23       So, for example, to put this into context:  You go to a

24    site and you sign up saying you want to engage in mortgages and

25    get their rates; that mortgage company is taking your

1   information and selling it, and then they sell it.

2       As a society, we're getting better about not sharing the

3   information, like Google, and it ends up with the policies we

4   have today.

5           MR. HAMOUDI:  This has happened to me, but I almost

6   think somebody is listening to what I'm doing.

7       I get an ad for a shoe, and I recently searched for that

8   shoe.  Has that ever happened to anybody?  Someone I haven't

9   heard from yet.  Yes, sir?

10          JUROR NO. 24:  It happens all the time.  You look for

11  a particular piece of gear, and then it starts popping up.

12  That's the nature of cookies.

13          MR. HAMOUDI:  You said something about cookies?

14          JUROR NO. 24:  Yes.

15          MR. HAMOUDI:  What is a cookie?

16          JUROR NO. 24:  It is a tracking bit of data that the

17  website uses to say that person looked for Item A, and they can

18  share that, and then that person might be interested in

19  receiving ads for Item A.

20          MR. HAMOUDI:  Anybody else have an experience like

21  that?

22          UNIDENTIFIED JUROR:  I've been in Costco and looking

23  at appliances, and by the time I get to my car, I got ads about

24  LG appliances or Whirlpool or whatever, and I've done nothing.

25          MR. HAMOUDI:  You, sir, were nodding your head.  Juror

1   No. 10, what is your experience?

2           JUROR NO. 10:  It just seems like sometimes maybe

3   Alexa is listening to your conversation, and you get ads for

4   things you're talking about.  Maybe it's coincidence, but it

5   seems like it happens more often than not.

6           MR. HAMOUDI:  I almost feel like we've come to an

7   agreement that this is just the world we live in.  Are people

8   okay with that?  Yes, sir, Juror No. 3?

9           JUROR NO. 3:  I think it's kind of weird, because we

10  live in a world where we need, like, a smart phone to do,

11  basically, anything.  I need it for my job to do stuff, like

12  when I hang new government posters, they want me to take a

13  picture of it on my smart phone.  It's like we're giving away

14  all our information and signing agreements that none of us have

15  read.  When you get an iPhone, is everybody reading that 30-page

16  mumbo-jumbo agreement?  You just sign it away, and they can do

17  whatever they want with it.  It's weird.

18          MR. HAMOUDI:  Anybody else want to talk along those

19  lines?  These agreements are long, and you're signing because

20  you need to use this service, right, they're an integral part of

21  your life, and you say, okay, this is just the way the world is.

22  Does anybody share that view?  Anybody have thoughts on it?

23  Juror No. 21?

24          JUROR NO. 21:  I feel like to some degree the cat is

25  out of the bag.  It's going to be very difficult, I think,

1    whether it be government regulators or companies to self-manage

2    that or consumers to push back against that and change it.

3         I see the function of it as a business owner of targeted

4    advertising and how important it is for businesses to be able to

5    target consumers that are looking for that information, but, at

6    the same time, as a consumer, as just an individual living his

7    life, it makes it problematic.

8         But, again, the cat is out of the bag, and good luck to

9    whoever can turn that corner.

10        MR. HAMOUDI:  Thank you.  I really appreciate

11   everybody being very forthright.

12        This question is super important, and I don't like to talk

13   about bias or prejudice.  I try to reframe those topics to be

14   preconceived opinions, quick to judge because, at least in my

15   perception, "bias," "prejudice" suggests something very strong,

16   and I tend to give people the benefit of the doubt.

17        Does anybody have strong opinions or quick to judge a

18   public defender, a criminal defense lawyer?  Does anybody feel

19   those feelings because we represent people that are accused of

20   crimes and are willing to share?  Yes, Juror No. 25?

21        JUROR NO. 25:  So my aunt is a criminal defense

22   attorney in New York, and I got to go to, like, the courthouse

23   with her and see cases, and a lot of the times, like, there

24   would be cases where she had all the evidence lined up,

25   everything is great, and she loses the case and the person is,

 1   actually, innocent.

 2        And there are times when she has the right evidence and

 3   they get set free.  So those kinds of things happen with

 4   prosecutors and defense attorneys, and I -- I kind of lean more

 5   towards I want to see if the person really is innocent, innocent

 6   until proven guilty.

 7            MR. HAMOUDI:  Anybody else have opinions on that?  I

 8   think that's it.  I thank you for your time, and I thank you for

 9   listening to my questions and answering them.

10            THE COURT:  Thank you, Mr. Hamoudi.  You all did a

11   really good job of answering tough questions.  I hope you

12   enjoyed the discussion this morning.

13        I'm going to definitely tell Ms. XXXXX, go take care of

14   your car and go take care of yourself.  So don't worry about

15   coming back.  Okay?

16        Some of the other jurors, Juror No. 22, yeah, you've got a

17   wedding to go to.  You're going to go.

18        The rest of the people, I'm still mulling it over.  I want

19   to see what my numbers are after the second group, but this is

20   what we're going to do now.

21        There is another 30 of people downstairs.  They are going

22   to come up at one o'clock, and they will go through what you

23   just went through.  Normally, I would do it all at once, but

24   we're trying to do social distancing.

25        You guys are free until three o'clock.  Go to the jury room

1    at three o'clock, and Victoria will bring you up here.  There

2    will be some changes in your seats because we'll have another

3    group of people coming in, but the people in the jury box will

4    still be in the jury box, and then we'll take it from there.

5         When I tell you you have three hours to explore Downtown

6    Seattle, and it's pouring and freezing and windy, I'd feel bad,

7    but it is a really nice day.  If you walk west on Stewart

8    Street, you'll get to the Pike Place Market.  You can go down

9    there or you can head up north Westlake to South Lake Union

10   where the Whole Foods is and restaurants and the like.  Take

11   advantage of the chance of being Downtown Seattle.

12        Don't talk about the case or do any research about the

13   case.  Don't look at any newspaper articles.  Do keep your mind

14   free from any outside influences.  I ask you to be back at three

15   o'clock.  By three o'clock, we'll have a real good idea of our

16   numbers so people who want to leave can go, and then we'll take

17   what are called peremptory challenges, challenges for which a

18   reason not need be given, and by the end of today we'll seat a

19   jury of 15, 12 who will be the jurors and three alternates.

20        The lawyers stay here, but you are all excused.  Thank you.

21              THE FOLLOWING PROCEEDINGS WERE HELD
                OUTSIDE THE PRESENCE OF THE JURY:
22

23        THE COURT:  I screwed up at the very beginning.  I

24   should have had you and Ms. Thompson pick three alternate seats

25   before bodies were in there.  So go ahead, pick the three seats

 1    you want to be the alternates.

 2              MR. HAMOUDI:  From this pool?

 3              THE COURT:  Well, I should have done it before there

 4    was anybody there.  Just pick, 1, 7, whatever.  You can let me

 5    know later, if you want to talk about it as a team.

 6              MR. HAMOUDI:  If that would be okay?

 7              THE COURT:  Yeah, just let Victoria know when we come

 8    back.

 9              MR. HAMOUDI:  Yes.

10              THE COURT:  We have the other jurors coming in at one,

11    so we'll take a one-hour lunch hour.

12         Anything, Mr. Friedman, that you want to raise about jury

13    selection so far or going forward?

14              MR. FRIEDMAN:  One point on jury selection and one

15    going forward.

16         Your Honor, since the choice of the alternates is really

17    supposed to be totally random, I think having an hour to

18    strategize, it seems to me it would be reasonable to ask the

19    defense to just pick the seats at this point.

20              THE COURT:  You want me to just pick numbers at

21    random?

22              MR. FRIEDMAN:  Yes, I do.

23              THE COURT:  I guess that makes sense.

24              MR. HAMOUDI:  I can pick them now, Your Honor.  We

25    would pick 15, 9, and 12.

```
 1              THE COURT:  Okay.  I understand what you're saying,

 2   Mr. Friedman.  Go ahead, in that order, first, second, third.

 3              MR. FRIEDMAN:  And the other point, Your Honor, some

 4   of the motions in limine are very important to what we would say

 5   in opening or not say in opening.

 6              THE COURT:  We're not going to do openings today.

 7   When we pick the jury, hopefully by 3:30, we'll deal with

 8   motions in limine and other things, so you'll have guidance for

 9   tomorrow morning.

10         Are you doing the opening?

11              MR. FRIEDMAN:  I am not.

12              THE COURT:  Ms. Manca.

13         Who is doing opening there?

14              MR. KLEIN:  I will.

15              THE COURT:  And you're going to do your opening right

16   after the government's?

17              MR. KLEIN:  Yes, Your Honor.

18              THE COURT:  If you can get me, by tomorrow, a list of

19   what witnesses, what days, and give it to them, and who's got

20   the witness for both direct and cross, I'd appreciate it.  Okay?

21              MR. FRIEDMAN:  Your Honor, the only thing I would say

22   on that is the -- we, basically, intend to call all of our

23   witnesses, so that's easy to do.  The defense has a list of,

24   roughly, 40, so we may not allocate crosses at this point.

25              THE COURT:  I'm just talking about the government's
```

 1    case and the sequence in which you're going to call them, is

 2    what I'd like.  Which ones are scheduled for Wednesday,

 3    Thursday, Friday, etc.  Okay?

 4         Mr. Hamoudi, anything else you want to bring to my

 5    attention?

 6              MR. HAMOUDI:  No, Your Honor.

 7              THE COURT:  Thank you so much.  I'll see you at one

 8    o'clock.  We're adjourned.

 9              (Court in recess 11:56 a.m. to 1:15 p.m.)

10              THE FOLLOWING PROCEEDINGS WERE HELD
                IN THE PRESENCE OF THE JURY POOL:
11

12              THE COURT:  This is kind of déjà vu all over again,

13    because we did this at nine o'clock with 30 people.  That's why

14    you guys are in a seat, which would normally be 12 through 8, 7

15    through 15, but you've got your numbers.  And keep your numbers

16    with you, that's good, and flash them when you can.

17         My name is Robert Lasnik.  I'm a United States District

18    Court judge.  You've been summoned here today for jury selection

19    in a criminal case entitled the United States of America versus

20    Paige Thompson, and the United States is represented by a number

21    of Assistant United States Attorneys.  I'm going to introduce

22    Andrew Friedman, who will introduce his fellow U.S Attorneys and

23    the agent at counsel table.

24              MR. FRIEDMAN:  Good afternoon.  My name is Andrew

25    Friedman.  I'm a federal prosecutor, and with me at counsel

 1    table are Jessica Manca and Tania Culbertson, who are also

 2    federal prosecutors, and we're also joined by Joel Martini, who

 3    is a special agent with the FBI.

 4          THE COURT:  And Paige Thompson is seated at counsel

 5    table, in the middle, and she is represented by a number of

 6    attorneys, and I'm going to introduce you to Federal Public

 7    Defender Mo Hamoudi, who will introduce counsel with him on that

 8    side of the courtroom.

 9          MR. HAMOUDI:  Good afternoon, everyone.  My name is Mo

10    Hamoudi.  I'm a Federal Public Defender.  I'm joined here by my

11    co-counsel, Brian Klein.  We represent Paige Thompson.  And we

12    are also joined by Stacey Brownstein.  She's an investigator in

13    our office.  We also have Luce Vegas, she is a paralegal in our

14    office.  And we have attorneys here, also, some colleagues,

15    Melissa Meister, Emily Stierwalt, and Nancy Tenney.

16          THE COURT:  Thanks, Mr. Hamoudi.  That's a lot of

17    lawyers, right, and just one judge up here.  I still get the

18    last word, so it's going to be okay.

19          This is a case that you might have read about back in 2019

20    when the files of Capital One, the credit card company, someone

21    got access to those files and was able to take 100 million files

22    of personal information, such as Social Security numbers, credit

23    card numbers, birth dates, et cetera, et cetera.  That's what

24    this case is about.

25          The government has made an allegation that it was Paige

1   Thompson who accessed that information, they claim, illegally,

2   and that's what we're going to be doing in the trial.

3        But today what we're doing is just selecting whether you

4   can be a fair and impartial juror in that trial.

5        Now, you all filled out forms ahead of time, and some of

6   you indicated, to the question, "Can you be fair to a

7   transgender woman?"  Juror No. 53, you indicated you didn't

8   think you could be fair; is that right?

9            JUROR NO. 53:  Yes, that is correct.

10           THE COURT:  Is that because of religious beliefs, or?

11           JUROR NO. 53:  No, just my personal beliefs.

12           THE COURT:  Okay.  If you can't be fair, you shouldn't

13  be here, so you're excused.

14       Thank you.  You can go back to the jury room.

15       And Juror No. 40, Mr. XXXXX, you said, "I'm a practicing

16  Catholic so it's inconsistent with my beliefs, but I believe in

17  being fair and impartial and treating everyone well."

18       Do you feel you could be fair and impartial to Paige

19  Thompson in this case?

20           JUROR NO. 40:  I have questions about that.

21           THE COURT:  Okay.  And when you say you have questions

22  about it, tell me about that.

23           JUROR NO. 40:  Well, I don't know if -- I know the

24  teachings of the Catholic church, and the Catholic church says

25  that changing your gender -- while I can't judge somebody else,

 1   but if I did it, I would be guilty of mortal sin.

 2            THE COURT:  Sure.

 3            JUROR NO. 40:  So I would judge that how I would

 4   judge.  That's where I land.

 5            THE COURT:  So and no one is asking you to bless

 6   Ms. Thompson's choice.

 7            JUROR NO. 40:  Right.

 8            THE COURT:  What we're asking you is, can you be fair

 9   and impartial knowing that she's a transgender person, or do you

10   think that will, in some way, take away your ability to give her

11   the presumption of innocence or put the burden of proof beyond a

12   reasonable doubt on the government?

13            JUROR NO. 40:  It might.

14            THE COURT:  Okay.  Then I'll excuse you.  Thanks very

15   much for your candor.  Juror No. 40, Mr. XXXXX, is excused.

16        Now, the other factor I need to inquire about is the length

17   of the trial and how it might have an impact on people's

18   business plans, vacations, life in general.

19        So I think we're going to do the case in about two weeks,

20   but we do have a holiday on June 20th.  Juneteenth is now a

21   federal holiday.

22        You know, when I went to school, we still had Lincoln's

23   birthday and Washington's birthday separate.  There was no

24   Presidents Day.  And we used to have the holidays on the

25   birthdays.  I think it was a lot better that way.  But, anyway,

1   I don't get to make that decision.  But Monday, June 20, will be

2   a holiday.  And I think we better add another week to cover

3   anything that could go wrong, and deliberations.  So I'm going

4   to ask you to please answer this questions with the

5   understanding I might need you through Tuesday, June 28th, which

6   is three weeks from today.

7        But before I ask the question, I want to give you "the

8   speech," and the speech is, when you think about it, your

9   government, very rarely, comes and asks for your service.

10       There was a time when you got drafted.  I went through that

11  experience of getting a number to know when you were going to be

12  drafted.  But now it's a volunteer army.

13       You can vote if you want to, but you don't have to.

14       The only time, really, the government says we need you to

15  perform a service is when you're summoned for jury duty.  And

16  it's called "jury duty" for a reason.  It is a duty.  It is a

17  responsibility.

18       And our system of government, which says, Judge Lasnik, you

19  may be super smart, but you're not going to be the one who

20  decides this, and United States attorneys, you may be highly

21  ethical and principled, but you don't get to just decide who

22  gets charged and who gets convicted.  That's a matter for a jury

23  of Ms. Thompson's peers, and that means we have to summon people

24  and ask them to inconvenience themselves, for a couple of weeks,

25  to give life to what it means to have the presumption of

1   innocence, proof beyond a reasonable doubt, due process, and

2   fairness in our society.

3        So when you stop and think about the sacrifices that so

4   many people have made for this country -- and yesterday was

5   D-Day, and do you know how many people died on that day?  I

6   mean, it's just shocking.  I read a statistic that still haunts

7   me about the number of people who died in that invasion of

8   Normandy, including siblings.  Can you imagine what parents went

9   through to hear that both of your children have been killed at

10  the Battle of Normandy, D-Day.

11       What we're asking you to do here is not in that category,

12  but it is something that I ask you to think about from the

13  perspective of your citizenship and your obligations with that

14  citizenship.

15       Now, having said that, some of you have nonrefundable

16  tickets to fly to Europe or Asia.  Some of you have medical

17  situations or family situations.  I'm not saying there's

18  something wrong with you if you ask to be opted out here, but

19  I'm just asking you -- sometimes I get, "Oh, I'm too important

20  to sit in a courtroom for three weeks," or "I have other things

21  I want to do."  I'm asking you to look at this from the

22  perspective of this is something that you owe to your country.

23       Okay.  Having said that, is there anyone for whom this

24  would be an extreme hardship to do the jury duty for the three

25  weeks?  Hold up your numbers.

1          33, 34, 36, 39, 44, 45, 46, 54, 55, 50, and 51 and 59.

2     That's 12.  We had eight on the first one, yes.

3               UNIDENTIFIED JUROR:  I just have a question.

4          Can you reiterate when the trial is going to begin?  When

5     do we have to have service?

6               THE COURT:  The trial begins tomorrow morning, and it

7     will go Monday through Friday this week, next week, and into the

8     next week.

9               UNIDENTIFIED JUROR:  Okay.  I thought you said it was

10    starting in three weeks.

11              THE COURT:  No, it takes three weeks.

12              UNIDENTIFIED JUROR:  It would last three weeks?

13              THE COURT:  Yes.

14              UNIDENTIFIED JUROR:  Okay.  Thank you.

15              THE COURT:  Juror No. 33, tell me why.

16              JUROR NO. 33:  We have a family vacation planned

17    starting on Friday the 17th, with lodging booked.

18              THE COURT:  Okay.  No. 34?

19              JUROR NO. 34:  I have a family vacation with my wife

20    and children starting on the 20th, that whole week.

21              THE COURT:  Juror No. 36?

22              JUROR NO. 36:  I have a family vacation booked

23    starting on the 26th, including flight and lodging.  In

24    addition, I'm CEO of a software company, and before that

25    happens, I have meetings that I need to line up so I can pay my

 1   employees.

 2              THE COURT:  39?

 3              JUROR NO. 39:  I work for a small nonprofit

 4   organization, and I'm one of the third persons to close the

 5   fiscal year and during an audit month in June.

 6              THE COURT:  Okay.  No. 44?

 7              JUROR NO. 44:  My wife is an artist and will be

 8   attending an art festival in Utah June 23rd to 26th, departing

 9   Washington on the 20th.

10              THE COURT:  Juror 45?

11              JUROR NO. 45:  I have dental surgery on Wednesday,

12   June 15th.

13              THE COURT:  Juror 46?

14              JUROR NO. 46:  I have plans in a couple of weeks.

15              THE COURT:  Say that again.

16              JUROR NO. 46:  I have a vacation coming up in a couple

17   of weeks.  I didn't use the option to postpone my service

18   because I misunderstood the months.  So if I have a chance to

19   postpone, I would very much like to do that.

20              THE COURT:  Okay.  No. 50?

21              JUROR NO. 50:  I'm a general contractor.  I run a

22   business, so day-to-day operations.  I'm going to be in Canada

23   from the 17th until the 23rd.

24              THE COURT:  Juror 51?

25              JUROR NO. 51:  Your Honor, I've got a vacation to

1   Mexico, I think, Saturday the 25th.  Technically, I could just

2   fly a few days later and miss the first three days of that

3   vacation with my family, if you need me to be here.

4              THE COURT:  Okay.  Thank you.

5         Juror 54?

6              JUROR NO. 54:  I'm supposed to be going out of town on

7   the 20th of June, so, also, I'm happy to postpone my jury duty

8   to another time, but I'm going to be gone for the week of June

9   20 to the 25th.

10             THE COURT:  All right.  Juror 55?

11             JUROR NO. 55:  I'm self-employed and I'm the primary

12  source of income for my wife and 11-month-old baby, as well as

13  sharing responsibilities with my wife for childcare.

14             THE COURT:  And finally, 59?

15             JUROR NO. 59:  A friend of mine is having surgery, and

16  I agreed to travel to Eastern Washington to watch her animals

17  next week, and then I also have a trip to Hawaii, departing on

18  the 25th.

19             THE COURT:  Okay.  Thanks.

20             JUROR NO. 35:  Your Honor, I just want to add, I think

21  I misunderstood the definition of "extreme hardship."  But if

22  trips out of town qualify, I also had one of those planned, and

23  I am starting a new job, yesterday, but I postponed it for this.

24             THE COURT:  And are you 35?

25             JUROR NO. 35:  I'm No. 35.  I didn't initially

1   consider that extreme hardship.

2          THE COURT:  You're right.  It isn't an extreme

3   hardship, but it is a hardship.  Okay.

4       Well, I'm going to let 33, 34, 35, and 36 go.  Thank you

5   very much.  44, you can go; 45, you can go; 46 and 50, you can

6   go.

7       Okay.  The rest of you stay for now.  I'll check my numbers

8   and see where we are at the end of this.

9       Okay.  How many of you have heard about this supposed

10  hacking of Capital One at any point?  It happened in mid 2019.

11  Okay.  41, 42, 48, 51, 54, 52, 56, 32.

12      Are any of you Capital One customers and might have been

13  even notified by Capital One that there'd been this breach?  55

14  and 49.

15      All right.  Do any of you think you could not be fair and

16  impartial in this case, considering that you're Capital One

17  customers?  Why would you think you couldn't be fair and

18  impartial?

19          JUROR NO. 49:  I've been the victim of identity theft

20  at least four times, and it's going to be difficult for me to

21  keep an open mind.

22          THE COURT:  Yeah, okay.  Any other people have been

23  victim of identity theft?  I mean, we all have, let's face it.

24  Mr. Upside-Down 55?

25          JUROR NO. 55:  Yeah, I've also been a victim of

1    identity theft as well.  I find it very hard to believe and

2    pinpoint how that really is carried out.  In my mind, it is

3    completely absurd.

4          THE COURT:  Let's go through the jury selection

5    process.  You stay around, and then we'll take it from there,

6    but I'm likely to grant your dismissal due to your situation.

7        Okay.  Is there anyone who feels they can't be fair and

8    impartial to the government because, you know, the government

9    doesn't always tell the truth?  When this crime happened, the

10   President of the United States wasn't always telling the truth.

11   Does anyone not want to be a part of this.  Anyone?

12         JUROR NO. 55:  That's what I mean.  Your last

13   statement.

14         THE COURT:  Okay.  You can go.  Thank you, 55.

15       He didn't want to be here.  We're not going to force him to

16   be here.  Everyone else I will force to be here.  He did not

17   seem like he had an open mind to anything, except getting the

18   heck out of here.

19       Okay.  Ordinarily, we would have picked a jury all in one

20   fell swoop.  We're trying to keep yourselves safe and ourselves

21   safe.  Please keep your mask on, but when you're talking, please

22   stand and project, because my poor court reporter here has to

23   write everything down, and it's especially hard for her when you

24   are masked and not speaking up.  We would appreciate that.

25       All right.  Up here on the board it asks your name so we

 1  can hear it pronounced correctly.  This will not stop the

 2  lawyers from mispronouncing it, but so be it.

 3       We're asking where you live.  And if you live in Seattle,

 4  tell me Seward Park, West Seattle, Blue Ridge.  If you live in

 5  Mount Vernon, I don't need to know the neighborhood.  No offense

 6  to Mount Vernon.

 7       And if you're from Whatcom County, you don't have to tell

 8  me your leisure activities.  I know it's kayaking.

 9       So we'll start with Ms. XXXXXXXXX.  Please stand up and

10  tell us about yourself.

11       JUROR NO. 31:  My name is XXXXXXXXXXXXXXXX.  I live in

12  Woodinville.  My occupation, I was a commercial electrician.

13  I'm now retired; occupancy of household, my husband is a

14  commercial electrician and my daughter works in the IT

15  department at a community bank.  And I don't remember the years,

16  but they were early 2000, I was on a

17  possession-with-intent-to-distribute-marijuana case.

18       THE COURT:  Down at the Maleng Regional Center?

19       JUROR NO. 31:  Yes, in Kent.  And I was also on a DUI

20  charge.

21       THE COURT:  Did you have any experience deliberating

22  and reaching verdicts in those cases?

23       JUROR NO. 31:  Yes.

24       THE COURT:  And your leisure activities?

25       JUROR NO. 31:  I'm doing a lot of gardening right now.

 1    Now that I'm retired, I'm plucking weeds and gardening and just

 2    running around with my new little dog.

 3                THE COURT:  Great.  Thank you.

 4        Mr. XXXXX?

 5                JUROR NO. 32:  XXXXXXXXXXXX.  I live in Mill Creek.

 6    My occupation, I am an engineer; others in my household, my wife

 7    is a homemaker and my kids are students in school.  I've been on

 8    one case as a juror over 30 years ago.  I believe it was

 9    superior court here in Seattle, a criminal case.

10                THE COURT:  It says a child molestation.

11                JUROR NO. 32:  Right.

12                THE COURT:  Did you have the experience of

13    deliberating and reaching a verdict?

14                JUROR NO. 32:  Yes.

15                THE COURT:  Were you the presiding juror?

16                JUROR NO. 32:  No.

17                THE COURT:  And your leisure activities?

18                JUROR NO. 32:  I love to get up into the mountains.

19                THE COURT:  That says it all.

20        Juror No. 37, Ms. XXXXX?

21                JUROR NO. 37:  My name is XXXXXXXXXXXX, and I live in

22    Maple Valley.  I was a para educator for the last ten years, and

23    I just stopped this last week, so I guess I'm really retired.

24    My husband is an IT programmer.  We do have a son who lives at

25    home, and he's in manufacturing, 3D printing.  I was on one

 1  other jury in Seattle.  I think it was the King County court.

 2  It was a drug-dealer case.

 3          THE COURT:  Did you deliberate and reach a verdict in

 4  that case?

 5          JUROR NO. 37:  Yes.

 6          THE COURT:  And were you the presiding juror?

 7          JUROR NO. 37:  No.

 8          THE COURT:  And your leisure activities?

 9          JUROR NO. 37:  Hiking, kayaking, gardening.

10          THE COURT:  Very Northwest.

11          JUROR NO. 37:  Yes.

12          THE COURT:  Thank you.

13      Juror No. 38, Mr. XXXXXXXX?

14          JUROR NO. 38:  XXXXXXXXXXXXX, and I live Seattle.  I'm

15  an architect.  My wife is a teacher to high school students, who

16  are living at home with us.  I have not served on a jury before.

17  My favorite activities are camping with the family and

18  bicycling.

19          THE COURT:  And your neighborhood is Seattle?

20          JUROR NO. 38:  The neighborhood?  The Mount Baker

21  neighborhood.

22          THE COURT:  Okay.  Ms. XXXXXXX?

23          JUROR NO. 39:  My name is XXXXXXXXXXX, and I live in

24  the Shoreline area, in Washington.  My occupation is, I'm an

25  accountant for a non-profit organization.  My husband is a

 1    landscaper.  I have a son who is a college student right now.  I

 2    haven't attended any jury duties here or anywhere.  My leisure

 3    times are spent playing Pickleball and keeping myself active,

 4    and gardening.

 5              THE COURT:  Pickleball is the new sport of the state

 6    of Washington, right?

 7              JUROR NO. 39:  Yes.

 8              THE COURT:  The official sport.

 9              JUROR NO. 39:  Yes.

10              THE COURT:  Which is terribly embarrassing.

11              JUROR NO. 39:  We need more of it.

12              THE COURT:  One time I was doing, this picking a jury,

13    and we ask who your employer is, and the person I'm asking says,

14    "I'm a fundraiser for a nonprofit organization," and I looked

15    down, and it says he works for the IRS.  I think that's

16    stretching things.  But your nonprofit organization is KUOW?

17              JUROR NO. 39:  Yes.

18              THE COURT:  Why don't you say that?  Everybody loves

19    public radio.

20              JUROR NO. 39:  KOUW.

21              THE COURT:  Mr. XXXXXXX?

22              JUROR NO. 41:  My name is XXXXXXXXXXXX.  I live in

23    West Seattle.  I'm a continuous improvement manager.  I live

24    alone.  I wish I didn't.  I need the income.  I served on a jury

25    about eight years ago.  It was an auto-theft case.  My hobbies:

1    working in the yard, hiking, biking, running.

2            THE COURT:  And did you have the experience of

3    deliberating and reaching a verdict?

4            JUROR NO. 41:  Yes.

5            THE COURT:  Were you the presiding juror?

6            JUROR NO. 41:  No.

7            THE COURT:  Thank you so much.

8        Mr. XXXXXXX?

9            JUROR NO. 42:  My name is XXXXXXXXXXXX.  I'm a project

10   manager for Puget Sound Energy.  My wife is a teacher and a

11   squash instructor.  I have served on a King County case,

12   criminal, and we did reach a verdict, and I was not the foreman.

13           THE COURT:  Good anticipating.  Thank you.

14           JUROR NO. 42:  And just like everybody else, I like

15   the outdoors:  Bicycling, swimming, you name it.

16           THE COURT:  Excellent.  Thank you so much.

17       Mr. XXXXX?

18           JUROR NO. 43:  My name is Jesse Smith.  I currently

19   reside in Ballard.  I'm a software engineer.  I have one

20   roommate who is a budtender.  I never served as a juror before.

21   A couple of my favorite leisure activities would be hiking and

22   playing music.

23           THE COURT:  This is, obviously, going to be a

24   computer-techie case, because we're talking about getting into

25   places that most people don't get into, right?  So I want to ask

 1   you, misconfigured web application firewalls, does that mean

 2   something to you?

 3              JUROR NO. 43:  I'm not super familiar with firewalls,

 4   no.

 5              THE COURT:  I'm just giving people an idea; these are

 6   the kinds of things we're going to be dealing with.  Identity

 7   and access management, IAM.

 8              JUROR NO. 43:  I'm not really familiar with those

 9   terms.

10              THE COURT:  Okay.  The Onion Router?

11              JUROR NO. 43:  No.

12              THE COURT:  Reverse proxy?

13              JUROR NO. 43:  Yeah.

14              THE COURT:  Hypervisor?

15              JUROR NO. 43:  No.

16              THE COURT:  Gists?

17              JUROR NO. 43:  No.

18              THE COURT:  And this is a guy who works in the

19   business.  It's going to be a challenge.  I'm not picking on

20   you.  I'm telling everyone this case is going to be a challenge.

21        You know, sometimes we have interpreters who help us out

22   when we have a witness who speaks a foreign language.  We don't

23   have interpreters for tech.  It's going to be a struggle.  It's

24   been a struggle for me, it's been a struggle for some of the

25   lawyers, but we'll get through this.  We'll get through this

1    together, but it is not going to be your typical criminal case.

2    I just want people to know that.

3         Okay.  Moving out into the audience, could you help me out?

4    No. 47, Mr. XXXXXXXX?

5              JUROR NO. 47:  XXXXXXXXXXXXXX.  I live in Snoqualmie

6    Ridge.  I'm a product manager for a wireless company here in the

7    Seattle area.  My wife is a teacher.

8              THE COURT:  You sat on a jury before?

9              JUROR NO. 47:  Once before, probably 20-something

10   years ago.  I think it was a drug case.  I was the foreperson.

11             THE COURT:  You reached a verdict?

12             JUROR NO. 47:  We did reach a verdict, yes.

13             THE COURT:  And your leisure activities?

14             JUROR NO. 47:  I'm a big fisherman, and I coach my

15   kids in sports.

16             THE COURT:  Mr. XXXXXX?

17             JUROR NO. 48:  XXXXXXXXXXXXX.  I live in Edmonds.  My

18   wife and I are part owners of a very small software company in

19   Spokane.  We're mostly retired now, but we do provide some

20   backup for our company when people are on vacation and such.

21             THE COURT:  And you sat on a jury in Spokane County?

22             JUROR NO. 48:  I did, about 15 years ago.

23             THE COURT:  A drive-by shooting.  I didn't think those

24   things happened in Spokane.

25             JUROR NO. 48:  Well, this was a gang out of L.A.  They

```
 1   travel.

 2             THE COURT:  Did you deliberate and reach a verdict?

 3             JUROR NO. 48:  Yes, we did.

 4             THE COURT:  Were you the presiding juror?

 5             JUROR NO. 48:  I was the foreman, yes.

 6             THE COURT:  Are you tech savvy?

 7             JUROR NO. 48:  A little bit.  The software I support

 8   is accounting software.

 9             THE COURT:  So it is a specialty area?

10             JUROR NO. 48:  Very much so.

11             THE COURT:  And you look marvelous for 80 years old.

12             JUROR NO. 48:  Now you've told people how old I am.

13             THE COURT:  Well, I told the morning group I'm 71, and

14   that's considered middle aged in the federal judge profession.

15   We have lifetime appointments, so we have judges that are way

16   past your age.  Thank you.

17        Ms. XXXXXXXXXXXXX?

18             JUROR NO. 49:  XXXXXXXXXXXXXXXX.  I live in Snohomish.

19   I am a commercial insurance broker.  My husband is a chef.  I

20   have not served as a juror, and I enjoy running and going to

21   musical concerts.

22             THE COURT:  Okay.  Thank you.

23        Help me out.  Who is next?

24             JUROR NO. 51:  I'm XXXXXXXXXXXXXX.  I moved back to

25   Sammamish three years ago from the San Francisco Bay Area.  I
```

1    recently moved in with my girlfriend in Bellevue, Washington.

2    I'm a senior software engineer at Apple.  I've been there for

3    five and a half years, so firewalls and The Onion Router are

4    familiar to me.

5              THE COURT:  You understand all that stuff?

6              JUROR NO. 51:  Yeah, some of it.  I'm not an expert.

7    I've heard about them and read about them on Wikipedia.

8              THE COURT:  Did you hear about this situation with

9    Capital One?

10              JUROR NO. 51:  I remember the hack, and there was,

11   like, a series of stuff around that time, credit unions also

12   getting attacked.  But I don't know the specifics of the case,

13   so I think that's good.

14        But in terms of, like, being a juror for the case, yeah,

15   other than that I just know about the hack.

16              THE COURT:  And the word "hack" is going to appear in

17   this case, and there are certain words that, in business, mean

18   one thing, and in the law, they can mean something else.  We're

19   going to throw around "cryptomining" and "hacking" and

20   "cryptocurrency" and other terms.  But when you need to know the

21   legal term, I will define it for you in the jury instructions.

22   So we all have these vernaculars, where we say, "Yeah, the

23   neighbor across the street, they were robbed.  Someone broke

24   into their garage and stole their lawn mower."  That's not a

25   robbery, technically, in the law, because a robbery is off the

 1  person.  No, it's a burglary, or something like that.  But

 2  people use a vernacular and say, "I got robbed."

 3      So we'll have some of that with certain phrases.  Don't get

 4  one way or the other about them.  But "hack" is a perfect

 5  example of it, so I wanted to go over it with you.

 6      Mr. XXXXXXX, you were in the Bay Area, and then you came up

 7  here.  Does Apple have a campus here?

 8          JUROR NO. 51:  Yes.  They were in the Two Union Square

 9  building, but they just built a new building on Dexter that's

10  solely Apple.

11          THE COURT:  South Lake Union.  I thought I saw an

12  "Apple" sign.

13          JUROR NO. 51:  During COVID.

14          THE COURT:  Do you like it here, or do you prefer the

15  Bay Area?

16          JUROR NO. 51:  I miss the weather a lot, but I moved

17  up here to be with my now-girlfriend, so I'm very happy to be

18  with her.

19          THE COURT:  Yeah.  I always say June is one of our

20  best winter months.

21          UNIDENTIFIED JUROR:  I should mention, my wife, she's

22  a campaign manager for an elected congresswoman for Washington

23  State.

24          THE COURT:  Which one?

25          UNIDENTIFIED JUROR:  Kim Schrier.

 1          THE COURT:  Dr. Kim Schrier.  That's perfectly fine.

 2   We like her.

 3       Ms. XXXXX?

 4          JUROR NO. 52:  I'm XXXXXXXXXXXX, and I live in

 5   Kirkland, Washington.  I'm in corporate investment banking for a

 6   large, national bank, specializing in the technology industry,

 7   early startups and growth companies in the Pacific Northwest.

 8       My husband is retired.  He was formerly in the

 9   telecommunications business.  I served on a jury in the last ten

10   years; both came to a decision.  I was the foreperson on one of

11   them.  One of them was more like a domestic restraining order.

12   I'm a banker, so I golf.  I love golfing, and pretty much that

13   involves my family.  I seem to be spending a lot of time at my

14   three grandchildren's baseball games.

15          THE COURT:  In the morning session, there was a lot of

16   Wells Fargo bashing going on.

17          JUROR NO. 52:  I'm used to that.

18          THE COURT:  They definitely have sins to atone for, as

19   does Washington Mutual, et cetera.

20       How do you feel about the banking business?  The

21   reputation, is that fair or unfair?

22          JUROR NO. 52:  I think commercial banking is a

23   difficult industry to be in.  There is a lot of regulations on

24   it, especially Wells Fargo since we've had our mistakes.  I

25   think there is a lot of really good and smart people at Wells

 1  Fargo, and then there are a few that took advantage of a

 2  situation that I wish wouldn't have happened.  But, in general,

 3  we need our banks.  The banks are the background for the small

 4  companies that seem to be getting up and going.

 5          THE COURT:  Thank you.

 6          JUROR NO. 54:  XXXXXXXXXXXXXXX.  I live in Burien.

 7  I'm a homemaker for the last 30 years, since I married my

 8  husband.  Prior to that, I was an administrative assistant and

 9  legal secretary for a corporate law firm.  My husband owned a

10  chain of secondhand stores in Chicago, but was originally from

11  Seattle, so we came back here.  I did serve on a jury about 40

12  years ago.  It was a civil case.  I don't really remember what

13  it was.  Possibly a domestic dispute.  We came to a verdict, and

14  I was the foreman.

15          THE COURT:  A lot of jury foremen out there.

16          JUROR NO. 54:  My favorite leisure activities:  I

17  golf, play pickleball.  And I want everyone to know I'm a friend

18  of Frank Pritchard, and pickleball was not named after the dog.

19  Anyway, I dance hula, and I garden.

20          THE COURT:  Thank you very much.

21      The next person, is that Mr. XXXXXXX?

22      Oh, 56 would be Ms. XXXXXXX.

23          JUROR NO. 56:  My name is XXXXXXXXXXXXXXX.  I live in

24  Renton, Washington.  I'm an IT project manager at a wireless

25  company.

1          THE COURT:  Could you project your voice, please?

2          JUROR NO. 56:  I'm an IT project manager at a wireless

3     company.  My boyfriend works at Microsoft as a technical writer,

4     and I was on a jury maybe 10, 15 years ago.  We did deliberate

5     and come to a verdict.  I was not the foreman.  I like to garden

6     and exercise and spend time with my granddaughter.

7          THE COURT:  Okay.  Thank you.

8       Ms. XXXXXXXXXX?

9          JUROR NO. 57:  I'm XXXXXXXXXXXXXX.  I live in Seattle,

10    in Wallingford, and I work at Fred Hutch Cancer Center.  I study

11    evolution.  My husband is also a scientist.  I cannot read that

12    board.

13         THE COURT:  Have you ever sat on a jury?

14         JUROR NO. 57:  I never sat as a juror, never.

15         THE COURT:  And your favorite leisure activities?

16         JUROR NO. 57:  I also golf, and I just fell in love

17    with pottery, so I'm a fanatic now.  Jury service isn't a huge

18    hardship for me, but my family reunion is the 27th through the

19    30th.

20         THE COURT:  Thank you.

21       Ms. XXXXXXXX?

22         JUROR NO. 58:  I'm XXXXXXXXXXXXXXX.  I live on this

23    block, at Denny Triangle-ish.  I'm moving June 15th to about

24    another block away, which is on the 15th.  I know I didn't bring

25    that up in the hardship because I didn't think it was extreme,

```
 1   but that would be wonderful.  Others in my home are my son.  He

 2   just got accepted to Cornish, which is also on this block.  I

 3   just served as a juror, postponed this jury service for that

 4   continued jury service that started in February, and I finished

 5   last Thursday.  It was a long haul.

 6            THE COURT:  Please, soak that up.  Okay?  She just sat

 7   on a four-month civil trial.  Was it on Zoom?

 8            JUROR NO. 58:  It was hybrid, and then for closing

 9   arguments and deliberations, we were at the King County

10   Courthouse.  So for about eight days it was in person down on

11   Third Avenue.

12            THE COURT:  And this was an asbestos case?

13            JUROR NO. 58:  PCBs in Monroe.

14            THE COURT:  Monsanto was the defendant, and they were

15   polluting Puget Sound?

16            JUROR NO. 58:  No.  It was Sky Valley, a school

17   district harmed by PCBs in their school.

18            THE COURT:  I see.  And you just finished that up?

19            JUROR NO. 58:  Yes.

20            THE COURT:  And you reached a verdict?

21            JUROR NO. 58:  Yes, we reached a verdict.  I was not

22   the foreperson.

23            THE COURT:  This is not going to be hybrid or Zoom.

24   This is going to be in person the entire time, which you only

25   had for opening statements, closing arguments, and deliberations
```

```
 1    in the trial you just finished.

 2              JUROR NO. 58:  Yes, I know.

 3        My leisure activities are watching Storm basketball, and

 4    I'm in a book club.

 5              THE COURT:  And you're willing to serve on another

 6    jury?

 7              JUROR NO. 58:  I asked the judge if I got a free pass,

 8    and she said, no, that's a whole different court.

 9              THE COURT:  Would you like to skip this one?

10              JUROR NO. 58:  Yes.

11              THE COURT:  Go ahead.  We really appreciate that you

12    didn't kick and scream and everything.  Really, I commend you

13    for your service.

14              JUROR NO. 58:  Thank you.

15              THE COURT:  Okay.  Lastly, Ms. XXXXXXX -- oh, no,

16    there's Mr. XXXXXXXXXXX, too.

17              JUROR NO. 59:  XXXXXXXXXXXXX.  I live on Vashon

18    Island.  I work at a museum as curator.  I'm the only one in my

19    household.  I did serve on a jury in 2017, in the Okanogan

20    County, a case was regarding breach of a restraining order and

21    domestic violence.  We deliberated and reached a verdict.  And

22    I, like everyone else, I enjoy anything outside: rock climbing

23    snowboarding, backpacking, anything.

24              THE COURT:  A museum is in Wenatchee?

25              JUROR NO. 59:  Yes.
```

 1            THE COURT:  And you're in Vashon?

 2            JUROR NO. 59:  Yes.  I commute a couple of times a

 3   month and Zoom.

 4            THE COURT:  And, finally, Mr. XXXXXXXXXXX.

 5            JUROR NO. 60:  XXXXXXXXXXXXXXX.  I live in Renton.

 6   I'm an IT recruiter for Amazon.  My wife is a product project

 7   manager for an educational consulting company.  I've not ever

 8   been on a jury.  I golf.  I live on a golf course, and it's

 9   heartbreaking to be here when it's sunny outside.

10            THE COURT:  Okay.  Thank you very much.

11       All right.  Ms. Manca?

12            MS. MANCA:  Your Honor, would it be all right to take

13   a break?

14            THE COURT:  Let's take ten minutes rather than 15.

15   Come back at 17 minutes after 2:00.  Please go back to the seats

16   that you're in, and you can either go downstairs to the

17   restrooms there, or we have restrooms on this floor.  Okay.

18   Great.  We're adjourned.

19              (Court in recess 2:02 p.m. to 2:16 p.m.)

20            THE FOLLOWING PROCEEDINGS WERE HELD
              IN THE PRESENCE OF THE JURY POOL:
21

22            THE COURT:  Ms. Manca, go ahead.

23            MS. MANCA:  Good afternoon.  This is a tough time

24   slot, after lunch, to be having this conversation, and thanks

25   for being with us on this beautiful, sunny day.

1          I'm going to follow up on some of these questions.  We were

2    talking about service to our country, through jury service, one

3    of the foundations of our judicial system is a fair and

4    impartial jury, and so that's the spirit that I'm asking you

5    these questions.  It is really to get at anything that is in

6    your gut about why you think you may not be a fair and impartial

7    juror to either side.  What we're looking for is just anything

8    that pops into your head.  So thank you for taking the time

9    today.

10         Is there anyone that got the jury summons in the mail and

11   was like, "Yes, service to my country"?  A show of hands.  Okay.

12   This is Juror 51.  Can you tell us about that?

13              JUROR NO. 51:  So my dad is a criminal defense

14   attorney, and so I when I was a kid, I saw some of the cases,

15   and it's always kind of interested me, but I've never been

16   selected for jury service before.

17              MS. MANCA:  Have you been in a panel where people have

18   asked you questions?

19              JUROR NO. 51:  No.

20              MS. MANCA:  This is your first time?

21              JUROR NO. 51:  The last time I was in a courtroom was

22   when I was nine years old.

23              MS. MANCA:  Your dad is a criminal defense attorney?

24              JUROR NO. 51:  Yes.

25              MS. MANCA:  And do you talk with him about his work?

1          JUROR NO. 51:  Yeah, he talks to me about the cases.

2   So, yeah, we talk about, like, cases he's won and lost and what

3   happened in the courtroom.

4          MS. MANCA:  Okay.  Obviously, I'm a prosecutor.  Is

5   there anything I should be concerned about in your ability to be

6   fair, if your dad is a defense attorney?

7          JUROR NO. 51:  That's a really good question.  For me,

8   I feel like he's really close with a lot of prosecutors and

9   stuff, so I'm kind of seeing both sides.  And I've got friends

10  who hate attorneys and have bad things to say about them.

11  "Well, that's my dad."  But it is kind of difficult because I'd

12  like to say, "Oh, yeah, I think I would be fair," I think it's

13  hard because I've never been a juror before, and I don't have

14  any kind of fundamental, like, belief that, oh, you know, the

15  prosecution is the enemy, or anything like that.

16         MS. MANCA:  Yeah.  And also, if you came home and said

17  there was a guilty verdict, would your dad be, like, "gasp"?

18         JUROR NO. 51:  No.

19         MS. MANCA:  Was anybody else excited to have jury

20  service?

21         UNIDENTIFIED JUROR:  I, actually, was a little bit

22  excited, because when I was on the juries before, I was

23  working -- I wasn't working in the field, I was in the office --

24  so it was long days doing jury, and then doing your real work at

25  night.  And so this is like, well, I'm not working now, it might

 1    be more leisurely and enjoyable.

 2              MS. MANCA:  So you were previously a juror?

 3              UNIDENTIFIED JUROR:  Yes.

 4              MS. MANCA:  And you how did you find that jury

 5    service?

 6              UNIDENTIFIED JUROR:  Oh, it was fine.

 7              MS. MANCA:  Did you get along with the jurors, and it

 8    was a good experience?

 9              UNIDENTIFIED JUROR:  Yes.

10              MS. MANCA:  Who are the people who opened up the jury

11    summons and were, like, "Oh, no, jury summons"?

12         Juror No. 60, in the back, can you tell me about that

13    apprehension?

14              JUROR NO. 60:  Yes.  I haven't been working in my

15    office, right down the road, since the beginning of the

16    pandemic.  This is the first time I've been back to my office in

17    two and a half years.  I did not miss driving to Seattle every

18    day.

19              MS. MANCA:  Yeah, Downtown Seattle.  So it was the

20    location?

21              JUROR NO. 60:  Mostly.

22              MS. MANCA:  I'm sure a lot of people are like,

23    "Downtown Seattle?  How do I get there?"  Anyone else?

24              UNIDENTIFIED JUROR:  This is my fourth or fifth time.

25    I've got to go through the effort and clear my schedule, but

1    it's not an inconvenience.  I can do it.  A jury summons is not

2    a pleasant thing to get, because you have to clear your schedule

3    and make arrangements and everything.

4          MS. MANCA:  Absolutely.  And we totally recognize the

5    "duty" part of jury duty.  I appreciate you sharing that

6    perspective.

7        Anyone else?

8        Is there anyone who feels like they'd describe themselves

9    as someone who loves to learn?  Great, some hands.

10       Sir, what is your number?  41.  Thank you, sir.

11       You like to learn?  What do you like to learn?

12         JUROR NO. 41:  My job is continuous improvement, so

13   I'm always looking for opportunities to learn about what's going

14   on.  I look for opportunities to improve things, both for people

15   who are involved and people who are recipients or customers.

16         MS. MANCA:  What kind of company?

17         JUROR NO. 41:  F5.

18         MS. MANCA:  What is that?

19         JUROR NO. 41:  Network data trafficking and security.

20         MS. MANCA:  Are you comfortable with technology?

21         JUROR NO. 41:  No.

22         MS. MANCA:  No?

23         JUROR NO. 41:  When the judge asked, Have you heard of

24   this and this, I've heard of things, but I'm not a technical

25   person.  My background is in organizational performance, so it's

 1   about what goes on between people and the operation, not really

 2   the technical works.

 3            MS. MANCA:  Got it.  Thank you for that.

 4       Juror No. 43, would you mind telling me about how you feel

 5   about learning?

 6            JUROR NO. 43:  Yeah.  I love learning.  That's why I'm

 7   a software engineer.  I've taught myself how to play guitar and

 8   piano.  I really believe in constantly learning.  It is

 9   important to me.

10            MS. MANCA:  Thank you very much.

11       Juror No. 49?

12            JUROR NO. 49:  I just think continuing your education

13   throughout your entire life should be a baseline, I guess.  My

14   mom was a big advocate; if you're not learning something, you're

15   dying.  I think that's really an important piece for growth.

16   Like, I'm not the same person today as I was five years ago.

17            MS. MANCA:  What do you like to learn?

18            JUROR NO. 49:  Everything.  I thought I was going to

19   be a teacher, but I just landed somewhere else and forgot to

20   leave.  I love math.  I love music, but I'm not musical at all.

21   I have no skill set.

22            MS. MANCA:  The insurance broker.  I should know what

23   that is, but can you explain?

24            JUROR NO. 49:  I'm a middleman.  I specialize in large

25   construction firms, and so I help large construction companies

```
 1   place the insurance for their business.  I don't work for a

 2   carrier; I work for construction clients, finding the best

 3   product for them.

 4             MS. MANCA:  Thank you.  That clarifies.

 5        Anyone else?  Juror No. 57?

 6             JUROR NO. 57:  What is the exact question?

 7             MS. MANCA:  You raised your hand for loving to learn,

 8   and I was interested about that.

 9             JUROR NO. 57:  Well, my job is to learn as much as

10   possible, but I mean...

11             MS. MANCA:  You work at Fred Hutch?

12             JUROR NO. 57:  Yeah, and every day you learn something

13   new from your colleagues or through yourself.

14        The other day I learned that certain insects are males if

15   they have one copy of the chromosome or they are female if they

16   have two.  They don't have X, Y.  Little things like that are

17   exciting to me.

18             MS. MANCA:  Absolutely.  Great.  Thank you.

19             MS. MANCA:  Juror No. 56?

20             JUROR NO. 56:  I love to learn.  I focus on health and

21   longevity.

22             MS. MANCA:  And you are a tech project manager at

23   AT&T?

24             JUROR NO. 56:  Yes.

25             MS. MANCA:  The technology terms, were those familiar
```

1    to you?

2            JUROR NO. 56:  I was aware of them, working as a

3    software developer in IT for quite a number of years.

4        Thank you very much.  Anyone else?

5            JUROR NO. 59:  I have been a teacher for over 20

6    years, and now I'm a curator of education in a museum.  Learning

7    is my thing, absolutely.

8            MS. MANCA:  Who do you typically teach?

9            JUROR NO. 59:  I don't teach anymore.  I used to teach

10   elementary school.  I developed an alternative program, so I've

11   had a huge range of teaching.  Now I direct educators in the

12   museum, and I'm not involved in teaching.

13           MS. MANCA:  What kind of museum?

14           JUROR NO. 59:  A small-town museum and cultural

15   center.

16           MS. MANCA:  Juror 52?

17           JUROR NO. 52:  My job as a commercial banker is to

18   learn the businesses, and I learn the financial aspect and the

19   technology aspect, and to know the risk to the company and the

20   bank.

21       Last year, I put in 200 hours in order to get my banking

22   license.  So I'm used to testing and the learning and the

23   cramming.

24           MS. MANCA:  Anyone else?

25       It's a smaller group because we've lost so many.

1          We're living in a time of historic distrust in

2     institutions.  When I say that, I see nods from people who feel

3     that way.  Give me a show of hands if you feel like we're in a

4     situation of extreme distrust these days.  I'm seeing a little

5     bit of hands.  All right.

6          Juror No. 48, can you tell me what you feel when I said

7     that about distrust of institutions?

8               JUROR NO. 48:  When I got the email for jury duty, I

9     thought it was fake.  I did the usual mouse-over-the-link.  Then

10    I actually went to the court's website itself to find out.  So I

11    came through the back door, but came to the same place.  I

12    decided it was legitimate.  So whatever can be done to make it

13    more legitimate-looking would be beneficial.  Any of us in the

14    IT deal with a lot of fake stuff.

15              MS. MANCA:  Thank you for saying that.  I thought

16    summons came in the mail.

17         Did anyone else share Juror 48's experience of not wanting

18    to click on the link?  Juror 42?  Juror 57?

19              JUROR NO. 57:  I totally thought it was phishing for

20    my identity.  I did the same thing.

21              MS. MANCA:  Went around to see if it was legitimate?

22    That's interesting.  I wonder about that.

23         Anyone else feel like even sometimes we hear things about

24    conspiracy theories, ideas regarding -- I don't want to touch

25    third rails on things like vaccinations and the pandemic

 1 | response, but does anyone have any strong feelings about the

 2 | government or conspiracy theories you're interested in sharing?

 3 | Juror No. 43?

 4 |             JUROR NO. 47:  Me?  47.

 5 |             MS. MANCA:  Sorry.  Thank you for standing as well.

 6 |     You are a product manager at T-Mobile?

 7 |             JUROR NO. 47:  Correct.

 8 |             MS. MANCA:  How do you feel about technology?

 9 |             JUROR NO. 47:  I work on the IT side of the business,

10 | so I'm familiar with many of the terms that were brought up.  I

11 | straddle the line between the business and the technology side.

12 | I work closely with some of the more technical people, but I'm

13 | not necessarily one of them.  I kind of try to bridge the gap

14 | between what a business needs and how technology can help us

15 | meet those needs.

16 |     As far as what you were saying, I don't have any conspiracy

17 | theories or believe in any of those things.  I relate to how the

18 | government -- anything that happens with the government over the

19 | last few years.

20 |             MS. MANCA:  Thank you so much.

21 |     Juror No. 39, can I ask you, I don't know what pickleball

22 | is.

23 |             JUROR NO. 39:  Have you played tennis?

24 |             MS. MANCA:  I have.

25 |             JUROR NO. 39:  It's like tennis, but the course is a

 1    lot smaller so it makes it less harder for you to run and reach

 2    the ball.  It's still hard, but I think it's more fun because

 3    you have a small course that you can run.

 4              MS. MANCA:  How big are your rackets?

 5              JUROR NO. 39:  They're completely different than

 6    regular tennis rackets.  I can't describe.

 7              THE COURT:  If ping-pong and tennis had a baby, it

 8    would be pickleball.

 9              MS. MANCA:  Thank you.  That's a good analogy.

10       How do you feel about these topics of distrust of

11    institutions and conspiracy theories or anything like that

12    regarding the government?

13              JUROR NO. 39:  I don't know a lot about it.  I do know

14    there is talk about people not trusting, you know, certain

15    sources.  I never had the experience, so I don't have anything

16    against the government or institutions, you know, knock on wood.

17              MS. MANCA:  Yeah, right.

18              JUROR NO. 39:  But I think you always have to be aware

19    and have an open mind on different sources, because just like

20    the government, there are other countries that should be doing

21    things like that, too.

22              MS. MANCA:  Absolutely.  Would you describe -- am I

23    hearing that you feel like you have an open mind as to what the

24    evidence is and not coming in with any preconceived ideas?

25              JUROR NO. 39:  Yes.

1          MS. MANCA:  Thank you very much.

2      Juror No. 32, I haven't spoken to you yet.

3      You worked at Boeing.  How was your experience at Boeing?

4  You're retired now?

5          JUROR NO. 32:  No, I'm still there.  It's been good.

6  That's why I'm still there.

7          MS. MANCA:  How long have you worked at Boeing?

8          JUROR NO. 32:  Thirty-six years.

9          MS. MANCA:  How do you feel about historic distrust of

10  institutions?

11          JUROR NO. 32:  I don't have distrust in institutions,

12  but it is run by people, and people make mistakes, right?

13          MS. MANCA:  Absolutely.  I think we're at a time when

14  institutions are not being trusted.  Do you agree with that or

15  disagree with that?

16          JUROR NO. 32:  Well, I don't know.  It seems to be

17  maybe, yeah, a lot of people maybe have a little less faith in

18  the government making decisions and maybe Congress passing laws

19  and legislation, so forth.  Maybe these people will see less

20  productive activity out of Congress, but that seems to be kind

21  of a player that's been going on for a few years.

22          THE COURT:  How about the Boeing Company?  I mean,

23  this is a formerly trusted institution that has gone through a

24  lot of turmoil over one of their planes.  And did the government

25  cover it up?  Did Boeing cover it up?  How do you feel about

1    that in terms of working at Boeing?

2              JUROR NO. 32:  That's an interesting one; the 737 Max,

3    the two crashes?

4              THE COURT:  Yes.

5              JUROR NO. 32:  Certainly I think that put a lot of

6    doubt in people's minds about how Boeing goes through the

7    process of designing and producing an airplane and getting it

8    certified.  And also on the FAA side, I think that put a lot of

9    questions in a lot of people's minds about what FAA's oversight

10   really is.

11             MS. MANCA:  Thank you very much.

12             JUROR NO. 32:  You're welcome.

13             MS. MANCA:  Juror No. 37, can you tell me about your

14   work as a para educator?

15             JUROR NO. 37:  I was working with older students for a

16   couple of years, and then I did eight years in preschool working

17   with a preschoolers program.

18             MS. MANCA:  About ten years in that role?

19             JUROR NO. 37:  A total of ten years.

20             MS. MANCA:  And you're retired now?

21             JUROR NO. 37:  Yeah.  Basically, I raised kids,

22   home-schooled all my kids, and then I'd visit schools, working

23   with the kids in developing skills.

24             MS. MANCA:  And your husband or partner is a software

25   systems engineer?

1          JUROR NO. 37:  Yeah, like a software developer.

2          MS. MANCA:  So in talking about being fair to the

3   government and thinking about things, do you feel like you bring

4   any preconceived notions into the courtroom today?

5          JUROR NO. 37:  Until recently, my daughter was working

6   for Wells Fargo, and one of the reasons she left is the general

7   value of their reputation from the recent scandal.

8          MS. MANCA:  So that's a great pivot to talk about

9   banking.  You heard of Capital One is going to be involved in

10  this case.  Do you feel like any of your experience that your

11  husband had on the banking side would affect the way that you

12  listen to the evidence?

13         JUROR NO. 37:  I don't know.  I mean, he's complained

14  an awful lot in the past.  I would try to keep an open mind.

15         MS. MANCA:  Do you feel it would be hard to do that?

16         JUROR NO. 37:  There's a lot of things that go on.

17  Upper management, I think those -- yeah, I was saying a lot of

18  upper management's decisions weren't good in the past, but I

19  think they're pretty much gone now.

20         MS. MANCA:  All right.  Thank you.  I appreciate so

21  much your honesty, because this is like we know what happened,

22  right?

23         JUROR NO. 37:  Right.

24         MS. MANCA:  Thank you very much for sharing that.

25      Do you have any perspective on something Juror No. 37 said

 1  or anything else that's been said that resonated with you?

 2          UNIDENTIFIED JUROR:  Well, I have a healthy distrust

 3  of institutions, but I don't think there are government

 4  conspiracies or anything like that.  I don't have any personal

 5  negative experiences with banks or anything like that.

 6          MS. MANCA:  Okay.  You said a healthy distrust of

 7  institutions.  Can you describe what you mean by that?

 8          UNIDENTIFIED JUROR:  Well, I mean, I worked for a

 9  large architecture firm for a long time, and I eventually just

10  got tired of that, the corporate world, I guess, and went out on

11  my own 20 years ago.

12          MS. MANCA:  So it was the corporateness of it and the

13  politics of it as opposed to the government or --

14          UNIDENTIFIED JUROR:  Yes.

15          MS. MANCA:  Anyone else feel that distrust of

16  institutions?  What about banks?  We have Juror 52, who works

17  for a bank.  It sounds like you've heard a lot of this banking

18  stuff happening in the world, and people talk to you as a

19  banker.  Can you tell us about that experience?

20          JUROR NO. 52:  I can talk about Wells Fargo.  I've

21  work for Wells Fargo since 2009, and I've been in commercial

22  banking for 30 years, 33 years in four major banks.  Like I said

23  earlier in my introduction, I'm not the person that was

24  dishonest.  I worked with a lot of really great, honest people,

25  and I think a few bad apples shouldn't spoil the whole

1   institution.

2       We've gone through a really tough time in recent years, and

3   I just -- I don't know what to say, except we are a trustworthy

4   organization and I'm a trustworthy individual.  That's how I

5   sell myself to my clients to fulfill that relationship with them

6   individually.

7           MS. MANCA:  And here I am putting you on the spot in

8   this voir dire.

9       Is there anyone else?

10      Another topic in the case will be about credit cards or

11  credit card information.  Do people have strong feelings about

12  credit card companies?  Again, thinking of Capital One.

13      Is there anyone who feels that, for whatever reason at all,

14  they would not feel comfortable judging the conduct of another

15  person?  Sometimes that could be for religious beliefs or "I

16  don't feel comfortable looking at the facts in evidence and

17  making a decision about something like that."  Anyone for whom

18  that rings true?  I don't see any hands.

19          JUROR NO. 37:  Can you explain that more in detail?

20          MS. MANCA:  Yes.

21      At the end of the case, the judge is going to instruct you

22  on the law that applies in this case, and you'll consider the

23  facts and you'll decide if the government has met its burden of

24  proof beyond a reasonable doubt.  But sometimes people think,

25  even though the government's proved its case beyond a reasonable

1    doubt, "I just can't reach a verdict because that

2    decision-making process is too hard."

3        Some people might feel that way, and I just want to see if

4    that probability applies to any of you; that "I have trouble

5    making decisions or trouble looking at evidence or making those

6    decisions."

7            JUROR NO. 37:  I think I might have trouble with that.

8    I'm a sensitive person, and sometimes, even though there could

9    be the evidence, I'm afraid that I couldn't be impartial because

10   I'm looking at the person's history, who they are, and so I

11   don't know how -- how well, you know, trying to be fair in the

12   judgment on that.

13           MS. MANCA:  Thank you for sharing that perspective.

14       Is there anyone else who agrees with Juror 37 on the

15   difficulty of that kind of process?

16       I'm not seeing any hands, so I'm going to sit down.  It is

17   the end of my time.  Thank you very much.

18           THE COURT:  Thanks, Ms. Manca.

19       Mr. Hamoudi?

20           MR. HAMOUDI:  Hello everyone, and thank you for your

21   patience.  I'm going to go to Ms. XXXXXX.  I'd like to follow up

22   with the answer you gave.

23       You talked about the sensitivity of reaching decisions.  If

24   the judge instructs you to be fair and impartial, do you agree

25   to follow the law as instructed?

1              JUROR NO. 39:  Yes.

2              MR. HAMOUDI:  So if he tells you you have to set aside

3    your emotions and your passions and your prejudices and focus on

4    the evidence, are you willing to do that?

5              JUROR NO. 39:  Yes, but, at the same time, you can

6    analyze the person, why did the person do that, why -- what

7    drove the person to act in a different way?  So even though

8    there's the evidence, then I feel like sometimes I would be

9    looking at the person as a human.

10             MR. HAMOUDI:  And if you're looking at the person as a

11   human because, naturally, you're a human yourself, could you

12   follow the laws anyway and judge the evidence impartially?

13             JUROR NO. 39:  Yeah, I'd have to do that.  I'm just

14   saying I don't think it would be easy.

15             MR. HAMOUDI:  A lot of people served on juries.  This

16   is the first panel that I've been on where all these people were

17   on juries.

18        But one question I think would be helpful to listen to you

19   about is the concept of the Fifth Amendment.  We should be

20   skeptical of our government, and it's been that way for many,

21   many, many years, and part of that design instilled into it is

22   this concept that I don't have to talk or defend myself when I'm

23   accused, and nobody can count that against me, nobody can even

24   think about that.  And it's kind of an unnatural thing to do,

25   because a lot of people get accused of things in our

 1    professional and family lives, and people tend to get defensive.

 2         Jurors who have been on juries, how did you set aside that?

 3         Mr. XXXXXXXXX, you served on a jury.  What was that like?

 4              JUROR NO. 41:  Well, I think I've been in situations

 5    where you're kind of put on the spot, like I am right now, you

 6    don't always say what you intend to say.  So I think the Fifth

 7    Amendment makes sure that if you're not 100 percent certain on

 8    the words that you need to use to get your message across, you

 9    shouldn't have to speak and incriminate yourself by accident.

10              MR. HAMOUDI:  Could you imagine a variety of reasons

11    why someone wouldn't want to get on the stand and testify?

12              JUROR NO. 41:  Sure.

13              MR. HAMOUDI:  What would they be?

14              JUROR NO. 41:  Not being able to find the right words

15    to articulate what you mean to say.

16         I also think the questioning can be a little bit deceptive,

17    and so you may respond to questions that you don't really have

18    the answer to but you feel like you have to respond.

19         And I also think that sometimes it's just an

20    interpretation.  You may hear things differently or express it

21    in a different way, and so it comes across as something that

22    it's not.

23              MR. HAMOUDI:  That's a very good answer.

24         Ms. XXXX, you've been on a jury, correct?

25              JUROR NO. 37:  Yes.

1          MR. HAMOUDI:  And bringing your experience as a para

2    educator, is there any reason why somebody would not want to get

3    up on the stand and testify?

4          JUROR NO. 37:  I know I wouldn't want to get up on the

5    stand and testify, because I would be nervous, not wanting to

6    talk.

7          MR. HAMOUDI:  Okay.  Yes, ma'am?

8          UNIDENTIFIED JUROR:  When a defendant testifies, it

9    would be only if the defendant has something to offer.  A lot of

10   times there could be cases where the prosecution is coming up

11   fact, fact, fact, fact, fact, and if the defendant doesn't have

12   anything in addition to offer it with the facts, then I wouldn't

13   expect them to testify.

14         MR. HAMOUDI:  Okay.  To follow up on that:  They don't

15   have something to offer, but what if they choose not to do that,

16   and you can't even think about their reasoning?  Do you see what

17   I'm saying?

18         UNIDENTIFIED JUROR:  Sure.

19         MR. HAMOUDI:  They don't have to get up and offer

20   anything.

21         UNIDENTIFIED JUROR:  Well, the case is decided on the

22   facts that have been presented to the jury.

23         MR. HAMOUDI:  Okay.

24      And Mr. XXXXXXX, you were a foreperson?

25         JUROR NO. 47:  Correct.

1              MR. HAMOUDI:  How did you manage the Fifth Amendment?

2              JUROR NO. 47:  Well, the burden of proof is with the

3    prosecution, right?  They have to put forth the case and the

4    facts they believe prove the defendant did what they said they

5    did, and it's up to the jury to discuss and deliberate the facts

6    that were presented to them to try to come up with a consensus,

7    right?

8              MR. HAMOUDI:  And then so a flip side to that is this

9    idea of presumption of innocence, right?  This is also another

10   unnatural instinct.  I'd given an example to the first group

11   that I was driving down Highway 99 and saw two police vehicles,

12   and my first instinct is, what happened?  What did they do?  In

13   the context of the presumption of innocence, I didn't think that

14   person is presumed innocent.

15      So does anybody have anything to share about how to manage

16   that presumption?   Mr. XXXXXXX, the foreperson, how do you deal

17   with that?

18             JUROR NO. 47:  Can you restate that?

19             MR. HAMOUDI:  How do you deal with the presumption of

20   innocence?  It's such an unnatural instinct.  I'm going to look

21   at the facts the prosecutor is presenting and assume you're

22   innocent through that presumption of innocence lens.  How do you

23   do that?

24             JUROR NO. 47:  You can't come in with any preconceived

25   notions that the individual did what the prosecution said they

1   did.  The case lies in the facts that are represented, and those

2   facts ultimately determine the decision that the jury makes.

3            MR. HAMOUDI:  I'm going to flip subjects now.

4       Social media, do people have positive experiences with

5   social media in here and are willing to share it?  Let me talk

6   to Mr. XXXXXXXXX.  Can you stand and talk to us about social

7   media and your experiences with it?

8            JUROR NO. 51:  I mean, I have three siblings.  My

9   sister is 17, and my brother is going to be 14 this August, and

10  seeing my childhood compared to seeing their childhoods has been

11  a really good comparison of what I think social media does on

12  the mental health of children.  And I'm just thinking it

13  destroys children's lives in terms of their mental health, and

14  they're just sucked in and can't get out of bed.

15      And there is a lot of studies about social network stuff,

16  and documentaries that have come out on Netflix.  I watch a lot

17  of documentaries about the negative impacts of social media and

18  what the impact of "likes" does to people and curving algorithms

19  for social media to influence the thinking of people and to

20  radicalize them, and I think that's affected our ability to have

21  a functioning, healthy democracy.  It's not legitimate anymore

22  just sharing from the trustworthy sources.  It's damaging our

23  mental health and democracy in general.

24            MR. HAMOUDI:  Anybody else they'd like to share about

25  social media?

1           UNIDENTIFIED JUROR:  Just that I agree 100 percent

2    with what he said.  I have a 16-year-old and a 14-year-old, and

3    I watch the amount of time they spend on social media, and I see

4    the impacts on them.  I don't see any positives.

5           MR. HAMOUDI:  Ms. XXXXXXXXXX, the scientist, can you

6    talk about to me about the scientific algorithms and how you

7    solve this problem?

8           JUROR NO. 57:  Well, you identify what the question

9    is, which is, whatever you're interested in, and you try to

10   figure out ways to test your ideas.  And you have to do it

11   rigorously.  You have to have replicas and in different ways.

12   So rigorousness and replicates, and just really analyzing data

13   properly.

14          MR. HAMOUDI:  Are you familiar with the idea of proof

15   of concept?

16          JUROR NO. 57:  Yes.

17          MR. HAMOUDI:  What is that?

18          JUROR NO. 57:  Well, I mean, you have to show,

19   unequivocally, that the concept or the idea is true.  So -- you

20   put me on the spot.

21          MR. HAMOUDI:  I apologize.

22          JUROR NO. 57:  Essentially, you have to show,

23   unequivocally, that something is true.

24          MR. HAMOUDI:  Is it true or not?  Okay.

25       Are there any engineers that are on this jury?  What is

 1    your name, sir?

 2              JUROR NO. 32:  XXXXXXXXXXXX, No. 32.

 3              MR. HAMOUDI:  Mr. XXXXXXXXXX, how are you doing?

 4              JUROR NO. 32:  Good.

 5              MR. HAMOUDI:  There is an engineering concept

 6    called -- and maybe I got it wrong -- it's called garbage in,

 7    garbage out.  Is that an engineering process?

 8              JUROR NO. 32:  I think it's beyond engineering.  It's

 9    lots of places.

10              MR. HAMOUDI:  So help me understand this idea of

11    engineering the front end and the back end.  Maybe you know it

12    better than I do.

13              JUROR NO. 32:  Related to garbage in, garbage out?

14              MR. HAMOUDI:  Yeah.

15              JUROR NO. 32:  I think of that as a computer program.

16    If you don't give good data, like a database, you're not going

17    to get useful data out.  That's how I look at it.

18              MR. HAMOUDI:  If you were going to learn something,

19    what's the best way for an engineer like yourself to process

20    information?

21              JUROR NO. 32:  That's a big question.

22              MR. HAMOUDI:  I'll narrow it down.

23         I learn best audio-wise, so I listen to a lot of books on

24    audio.  Some people learn visually, some people learn better

25    looking at things.

1              JUROR NO. 32:  Well, my field, engineering, the best

2     way is to look at the numbers, the analysis, and see what the

3     analysis tells us.  That's how I view it.

4              MR. HAMOUDI:  Who works best in that way, the analysis

5     approach?  Raise your hand, if you can with jury numbers, so we

6     can see it.  Just looking at the analysis of the data.

7         Juror No. 43, you're a software engineer.

8              JUROR NO. 43:  I am.

9              MR. HAMOUDI:  Can you tell me a little bit about the

10    type of software engineering that you work on?

11             JUROR NO. 43:  I am a web developer for a company

12    called Minted.  They're an upscale Etsy.  I primarily work on

13    the front end, and so I kind of design web pages and stuff like

14    that.

15             MR. HAMOUDI:  And do you rely on Amazon technology?

16             JUROR NO. 43:  We use AWS.

17             MR. HAMOUDI:  You do?  And what aspect?

18             JUROR NO. 43:  We use it for EC2 instances, another

19    way to, essentially, have you store stuff on a server.

20             MR. HAMOUDI:  And what familiarity do you have with

21    the -- what is an EC2 instance?

22             JUROR NO. 43:  It is a machine you use.  You can

23    replicate this machine to direct traffic across various machines

24    to ease the flow of traffic.

25             MR. HAMOUDI:  Is that something that your company

 1   configured, or does AWS do it for you?

 2          JUROR NO. 43:  You can configure it to how you want,

 3   but AWS leases to us.

 4          MR. HAMOUDI:  So you lease it from them, and then you

 5   configure it yourself?

 6          JUROR NO. 43:  Yes.

 7          MR. HAMOUDI:  And I think somebody here works for --

 8   Mr. XXXXXXXXXX, you work for Amazon, sir?

 9          JUROR NO. 60:  Yes.

10          MR. HAMOUDI:  And Amazon Web Services is going to be

11   discussed during this trial.  I'm just going to ask you

12   directly:  Would you be able to serve as a juror in this case

13   and treat the defense fairly and impartially?  The company is

14   going to be discussed fairly extensively throughout the trial.

15          JUROR NO. 60:  Yes.

16          MR. HAMOUDI:  Okay.  And do you have any experience,

17   Mr. XXXXXXXXX, with Amazon Web Services?

18          JUROR NO. 60:  AWS, we all use it every day but we

19   just don't know it.  We're not hands on with the server.

20          MR. HAMOUDI:  You said "we all use it every day."

21   What do you mean?

22          JUROR NO. 60:  If you have Netflix, they're using

23   Amazon Web Services.  Most of the technology people use on the

24   Internet is hosted by Amazon Web Services, the biggest web

25   server.

1          MR. HAMOUDI:  Okay.  Thank you very much for that

2    information.

3          Mr. XXXXXXXXXX, you talked about the The Onion Router.

4    What is the The Onion Router?

5               JUROR NO. 51:  That's one I read about in the

6    Wikipedia articles.  I'm interested in foreign networks, and I

7    was reading about the dark web when I was in college.  That was

8    super interesting when a show called *Mr. Robot* came out.  But

9    the only way I could describe it is, it is a series of machines.

10   They're anonymous, which I think are in a directed system,

11   things like -- you kind of think of them as anonymous machines

12   everywhere, and the goal of it, I think, is to route traffic

13   between those machines in a way so that you can't know who, if

14   you were to intercept it, like, at the other end, or see the

15   traffic at hand on one of the servers.  You wouldn't know where

16   the source of that traffic came from.  So I think it's usually a

17   way to anonymize transactions that are happening, and it's

18   primarily used for dark-web stuff.

19              MR. HAMOUDI:  Do you use a Virtual Private Network?

20              JUROR NO. 51:  At home I use one that's given to me by

21   company.

22              MR. HAMOUDI:  What are those?

23              JUROR NO. 51:  A VPN is something that a company will

24   offer to you, or you can get yourself, that all of your web

25   traffic is actually routed through that VPN.  So in a way, it

1    kind of masks the traffic in a similar way as The Onion Router,

2    because you're going through that VPN set of servers, and then

3    those servers are the things that are actually accessing the

4    content that you want, so from the destination side, it will

5    look like the traffic is coming from your VPN that's in

6    California, even though you're in Washington State.

7              MR. HAMOUDI:  That's really helpful.

8         Do you think that there are legitimate uses to anonymize

9    your identity on the Internet?

10             JUROR NO. 51:  Yeah.  I work for Apple, so I strongly

11   believe in the right to privacy.  I have a personal belief that

12   we've done -- like the U.S. or the world has done a really bad

13   job of having legislation keep up with that.  So I think private

14   companies like Apple have done a good job of -- like, because

15   there's not really good laws surrounding data privacy coming up

16   with tech knowledge to protect and anonymize.  For example, IP

17   data, encrypting data is a way of anonymizing.  So just having

18   really strong security practices so that if that data is

19   breached in some way, you're not able to relay those pieces

20   together to identify the individual and learning everything

21   about them, because all of our lives are on the Internet.

22             MR. HAMOUDI:  A little discussion about privacy.  Do

23   people think it's difficult now to have a private life because

24   of the Internet, and do any of you have views you'd like to

25   share about that?  No.

1        I want to thank you for your time, and I appreciate you

2  being forthright and talking to us, and that's it.

3              THE COURT:  Okay.  So, Victoria, we've got the morning

4  group downstairs.  Let's send the afternoon group downstairs,

5  too.  We'll take about 20 minutes to get organized here, and

6  then I'll have you bring everybody back up and put them in their

7  new seats.  And how far back are we going to go?

8              THE CLERK:  In the courtroom?

9              THE COURT:  Yes.

10             THE CLERK:  Probably four rows.

11             THE COURT:  Does that mean the back row should

12 disappear?

13             THE CLERK:  The back row is okay for spectators.

14             THE COURT:  Okay.  Thank you, all, for answering the

15 questions.  We're going to send you back to where you started

16 the day, and then Victoria is going to come get you when we're

17 ready to do the next phase, which will be peremptory challenges.

18       Peremptory challenges are challenges for which a reason

19 need not be given, as long as it is not being used to eliminate

20 from the jury a race or a gender.  The court doesn't even

21 second-guess why the lawyers are doing what they're doing.  It's

22 just a way that we make sure that the juries are selected in a

23 manner that makes the parties feel is totally fair and

24 impartial.

25       I'll take a look at my numbers.  There are a couple of you

 1    who also, I think, indicated they would like to not be here

 2    because of the job.  Juror No. 39, do you still want to be

 3    excused?

 4              JUROR NO. 39:  Yes.

 5              THE COURT:  Because of your job?

 6              JUROR NO. 39:  Yes.

 7              THE COURT:  All right.  I'll excuse Juror No. 39.  You

 8    don't need to come back up.

 9              JUROR NO. 39:  Thank you.

10              THE COURT:  Was there anyone else who said they wanted

11    to leave?  51 and 59?

12              JUROR NO. 51:  I've just got a Cancun trip on the

13    27th.

14              THE COURT:  We'll be done by then.  And 59?

15              JUROR NO. 59:  My friend is having surgery next week,

16    and she needs someone to watch her animals.

17              THE COURT:  We're going to fill the seats as they open

18    in numerical order.  We still have something like 47 jurors.

19    The chance of it getting to the end is getting slim, and Slim

20    just left town.  We'll take 20 minutes.  Please take your

21    numbers with you.

22                      THE FOLLOWING PROCEEDINGS WERE HELD
                         OUTSIDE THE PRESENCE OF THE JURY:
23

24              THE COURT:  Please be seated.  Take your time, but be

25    ready to go.

 1          MR. HAMOUDI:  Your Honor, may I ask, how do you do the

 2   peremptories?

 3          THE COURT:  Victoria has a sheet that has numbers; for

 4   the government, numbers one through eight, and for the defense,

 5   numbers one through 12.

 6          MR. HAMOUDI:  Okay.  And for-causes?

 7          THE COURT:  Do those now.

 8          MR. HAMOUDI:  Okay.

 9          THE COURT:  And she'll go first, first, second,

10   second, third, third.  That way you see who the other side is

11   challenging.  Are you ready?  Do you have some for cause?

12          MR. HAMOUDI:  I do have three for cause.

13          THE COURT:  Okay.

14          MR. HAMOUDI:  I have a for-cause challenge for Juror

15   No. 9 that raised difficulties about working on a case involving

16   a transgender person.

17      I have a for-cause challenge for Juror No. 27.  They said

18   that they were positively biased towards Amazon and thought that

19   Amazon was a peripheral party in the case, but, in fact, they're

20   not.  They're fairly an integral part of the case.  And the

21   first government witness, in fact, is Mr. Steve Schuster.

22      And then Mr. XXXXXXXXXXXXXX, Juror No. 42, had fairly

23   strong beliefs about transgender persons -- ID theft.  I

24   apologize, Your Honor -- identity theft, and I think the court

25   commented that you were inclined to --

1           THE COURT:  Okay.  Yeah, I get it.  All right.

2       So 9, 27 and 42, I will grant the challenges on those

3    three.  It is a close call on a couple, but I think our numbers

4    are going to be okay.

5           MR. HAMOUDI:  Thank you, Your Honor.

6           THE COURT:  Government, any challenges for cause?  I

7    took care of No. 39 for you.

8           MS. MANCA:  We have a challenge for cause as to

9    Juror No. 37, who has the husband who worked for Wells Fargo and

10   talked to her about his experience with Wells Fargo, and she was

11   not sure that she could set that aside, because he was really

12   upset about --

13          THE COURT:  Are you talking about Ms. XXXXXX?

14          MS. MANCA:  Yes, Juror No. 37, Ms. XXXXX.

15          THE COURT:  I don't remember that.  Use a peremptory

16   on her.  I'm going to deny the challenge for cause.

17      Okay.  So other than that, we're good to go?

18          MR. HAMOUDI:  Yes, Your Honor.

19          THE COURT:  Okay.  We'll bring all the jurors back up

20   at 25 after, and then we'll start doing the peremptories, boom

21   boom, boom, boom, and we'll be done by four o'clock, and then

22   we'll send you home after I give you the oral rulings on the

23   motion in limine.

24          MR. HAMOUDI:  I don't suspect, Your Honor, this may

25   come up, but if there is a *Batson* challenge, would you like us

```
 1   to just write it next to the peremptory and let the Court --

 2              THE COURT:  *Batson* challenge?

 3              MR. HAMOUDI:  Just being a trial lawyer, Your Honor.

 4   But I don't know.

 5              THE COURT:  What's the group that's being excluded?

 6              MR. HAMOUDI:  We don't know.  There's Asian-Americans,

 7   there's...

 8              THE COURT:  Didn't you just challenge one of the

 9   Asian-Americans?

10              MR. HAMOUDI:  I did.  I didn't know that.  Well, then,

11   it should be a reverse *Batson*.

12              THE COURT:  If there is a *Batson* challenge, you say,

13   "Your Honor, I have a matter to take up outside the presence of

14   the jury."

15              MR. HAMOUDI:  Thanks.

16              THE COURT:  But I thought you were going to say, you

17   know, we're going to -- if they try to bump any techies or

18   something, that they're a protected class, and I was going to

19   say, no, that's not happening.

20              MS. MANCA:  Your Honor, we're also looking at

21   hardships that the Court deferred ruling on.  Does the Court

22   have an instinct on what we're going to do about those

23   hardships, or are we leaving them, based on --

24              THE COURT:  That's more of the morning crowd, right?

25   That's a good point, Ms. Manca.
```

 1         I think that I should let go No. 1 with the grandkids, and

 2   No. 6 with the kids and the trip, No. 14 with a hard-to-get

 3   vacation.  The tough one is 10, the shop owner, and 19, the

 4   counselor.  I think the counselor is probably a juror -- well, I

 5   don't know.  I'm going to leave 10 and 19 on the group, because

 6   they're unique people in a lot of ways.  But I'll let 1, 6, 14

 7   go, and then No. 2, she kind of went back and forth, the college

 8   student, did she want to stay or did she want to go, I'll ask

 9   her one more time.

10         Okay?  Great.  I'll see you all at 3:30.

11             (Court in recess 3:11 p.m. to 3:41 p.m.)

12               THE FOLLOWING PROCEEDINGS WERE HELD
                 IN THE PRESENCE OF THE JURY POOL:
13

14         THE COURT:  The revisiting some of our morning people,

15   Ms. XXXXXXXXXX, I must have let her go, right?

16         THE CLERK:  Yes, Your Honor.

17         THE COURT:  And Juror No. 6, Ms. XXXXX.  No. 3, you're

18   excused, thank you.  You can go.

19         MS. MANCA:  Your Honor, why is Juror No. 3 excused?

20         THE COURT:  He indicated he had a hardship after all,

21   so I relieved him.  He went up to Victoria later and said, "I

22   didn't wanted to say it in open court, but I have a hardship."

23   That's all I have to say about that.  If you can't follow those

24   instructions, I don't want you around, frankly.

25         Juror No. 2, what do you think?  Do you want stay around,

1  we'll try and work it out?

2           JUROR NO. 2:  (Nods.)

3           THE COURT:  Great.  I appreciate that.

4      Juror No. 10, do you want to stay and try and work it out,

5  or is it too much of a hardship?

6           JUROR NO. 10:  To be honest, it really is a hardship.

7           THE COURT:  I know it's a hardship, but is it too much

8  of a hardship?

9           JUROR NO. 10:  Well, I have to close my business for

10  the duration of the trial.  Is that too much of a hardship?  For

11  me, it is.

12           THE COURT:  If you want to go, you can go.  I thought

13  maybe you would think it was a once-in-a-lifetime experience.

14           JUROR NO. 10:  I would like to leave.

15           THE COURT:  Okay.  You can go.  Thanks for

16  participating.

17      And Juror No. 15, Mr. XXXXXXXXXX, what do you think?

18           JUROR NO. 15:  I can stay.

19           THE COURT:  Yeah.  You could get a peremptory

20  challenge for either side, but we've got enough jurors that I'm

21  comfortable letting a few of you on the margin go.

22      No. 19, my counselor, I totally understand where you're

23  coming from, but I'm going to ask you to stay, and we'll see

24  what happens.

25           JUROR NO. 19:  Thank you, Your Honor.

1          THE COURT:  Okay.  We're putting 15 in the box because

2    three of you are going to be alternates, and you don't know who

3    you are and don't worry about it.  But this process of taking

4    peremptory challenges -- as I said, a peremptory challenge is a

5    challenge for which a reason need not be given.  And why do we

6    do that?  Because you've all been passed for cause.  There are

7    no more challenges for cause, so you all can be fair and

8    impartial.

9          Oh, we go a step further to make sure that both sides feel

10   the jury, not only is it fair and impartial, but even if they

11   just thought, well, you know, it's not anything that person said

12   but they looked kind of funny at me, or maybe I'm imagining it

13   but I thought they were this or that, remember, this is not an

14   audition for a part in a big Hollywood movie.  It is not a

15   referendum on whether you're a good and decent person -- you all

16   are -- it's just a process that we go through to make sure a

17   jury is selected and the parties feel it's been done in a fair

18   and impartial manner.

19         Victoria is taking a sheet of paper over to the government,

20   and they are going to fill out their first peremptory challenge.

21   She will then pick up that piece of paper, take it to the

22   defense table, where they will do their first peremptory

23   challenge.  And this will go on back and forth, back and forth.

24   Eventually, they will run out of peremptory challenges, or stop

25   challenges.  And they can challenge people not just in the box

1    but on the benches.

2         The sheet of paper will be brought up to me, and I move the

3    chess pieces around to try to end up with the 15 people who will

4    be the jury in this case.

5         If I mess up, Victoria will correct me.  But this process

6    takes a few minutes.  So we'll all kind of just sit here.

7                    (Off the record 3:46 p.m. to 4:01 p.m.)

8              THE COURT:  The jurors in the box, let me thank and

9    excuse Jurors 7 and 10 and Juror No. 11.

10        Mr. Pastor, do you do weddings?

11             JUROR NO. 8:  Yes.

12             THE COURT:  Well, go do one, because you're excused.

13             JUROR NO. 8:  Thanks, Your Honor.

14             THE COURT:  And Juror No. 15, you are excused also.

15   Thank you so much for your willingness to stay.

16        Ms. XXXXXXXXXXXXXX, you get to stay.  Mr. XXXXXXXXX, you

17   get to stay.  Mr. XXXXXXX, you get to stay.  And Juror No. 12,

18   Ms. XXXXXXXX, you are excused.  Thank you.

19        Is that what you have among the people there?

20        Okay.  So now we're going to fill chairs.  This could be a

21   little complicated.

22        Juror No. 17, do you want to come forward?  Victoria will

23   guide you to your seat.

24        And Juror No. 18, Mr. XXXXXXX, you can follow.

25        Juror No. 21, XXXXXXXXX.

```
 1           Juror No. 23.

 2           Ms. XXXXXX, Juror No. 26, Mr. XXXXXXXXXXXXX.  That's a good

 3      German name, right?  What does it mean?

 4                JUROR NO. 26:  Bringer of fire.

 5                THE COURT:  Can I just call you "Thor"?

 6           And Mr. XXX, Juror No. 27 -- he's gone.

 7           Ms. XXXX, No. 29 -- is she gone?

 8                JUROR NO. 29:  I'm here.  Am I gone?

 9                THE COURT:  No, I think you're in the box.  I think if

10      someone made a bet, though, because I know you're a betting

11      woman, they might have said you'd be gone.  What were the odds

12      on that?  Never mind.

13           And Juror No. 30, Ms. XXXXXX, come on up.

14           Is the next one Juror No. 38, Mr. XXXXXXXX?

15                THE CLERK:  Correct, Your Honor.

16                THE COURT:  Mr. XXXXXXXX?

17           And then Mr. XXXXXXXXXXXX, Juror No. 41; XXXXXXXXXXXXXXX,

18      No. 43; Juror No. 54, XXXXXXXXXXXXXXX.

19                UNIDENTIFIED JUROR:  Can I say something?

20                THE COURT:  Sure.

21                UNIDENTIFIED JUROR:  I have a little bit of trouble

22      hearing.  I can understand you, but any time anyone talks with a

23      mask on, I can't hear.

24                THE COURT:  The witnesses will have microphones, and

25      the lawyers will be at the podium with a microphone.  So this is
```

1    the worst part right here.

2        Do you utilize a hearing aid at all?

3            UNIDENTIFIED JUROR:  No, it's not that bad.  I just

4    can't hear them --

5            THE COURT:  Yes, and with masks it's doubly hard,

6    absolutely.

7        And the last person would be Ms. XXXXXXXXXXXXXXX.

8        Whoa, we ended up using just about everyone.  Some of you

9    have been challenged out there.  The only person that didn't get

10   in the box or challenged is Mr. XXXXXXXXXXX.

11       All right?  Everybody got it?

12       So thank you, all, to the people out in the cheap seats.

13   You are excused.  You can return your jury badge down on the

14   first floor, and tell them you have finished service to the

15   United States of America.  Thank you so much.

16       So Victoria will make new juror charts for tomorrow.  Is it

17   okay to wait until then?  Okay.

18       So you took an oath at the beginning of the case to answer

19   the questions.  Now you have a new oath that will be read to you

20   in a booming voice by my courtroom deputy for the trial of the

21   case.  So would you all please stand, once again, and raise your

22   right hand and listen to the oath.

23                       (The jury is sworn.)

24           THE COURT:  You are now the jury that will decide this

25   case.  It's very, very important that everything you hear and

1    learn about the case happens here in the courtroom.

2         Do not go on the Internet and try to do any research on

3    this case, don't look up any articles about the Capital One

4    breach or anything to do with it.  Everything you need to know

5    about the case will come to you in the courtroom, and it just

6    would not be fair for any of you to consult any outside matters.

7    It's either going to be inaccurate, which you know the media

8    makes mistakes all the time, or there may be other reasons why

9    you shouldn't be exposed to this.  So please, please, resist the

10   temptation.

11        And don't even tell your loved ones, when you get home,

12   what the case is about.  If they bug you and say, "We promised

13   we'd never have secrets from each other," just tell them, "I can

14   tell you about this really great trial judge we have," and go

15   ahead, Google me, and then tell them that as soon as you're

16   finished with your service, you can bore them with every detail,

17   but not now.

18        Tomorrow morning, again, the case will go, where we'll be

19   in court from 9:00 to noon, with a lunch break of about an hour

20   and 15 minutes; then 1:15 to 4:00.  We take a mid-morning break

21   and a mid-afternoon break.

22        We have a jury room over here that we put the jury in, but

23   it's pretty cramped.  One of our judges is not using her

24   courtroom, so Victoria will take you there and show you where to

25   go in the morning and show you where you will be on your breaks

1    so that you can socially distance more than you do in here.

2         And that's on the 14th floor, so there will be some travel

3    time in there, but it's much safer, all the way around, and

4    we're going to always do what keeps you safe over everything

5    else.

6         I need to talk to the lawyers and work on a couple of

7    things with them, but you can leave now.  Victoria, will you

8    take them to Judge Pechman's courtroom, and then show them where

9    to go in the morning.

10        And always wear your juror ID.  If you end up in the

11   elevator with any of the prosecutors or the lawyers, that's

12   okay; just don't talk about the case.  And if they're talking

13   about the case and they don't see you, say, "Excuse me, I'm a

14   juror," and they'll stop right away.  Okay?

15        And that applies to Ms. Thompson, too, who is out of

16   custody, of course.

17        We will start tomorrow morning with opening statements,

18   first from Jessica Manca for the United States, and then we're

19   going to have opening statement from Mr. Klein on behalf of

20   Ms. Thompson.  So please be here by about 8:45 so we can get

21   started promptly at nine o'clock.

22        Victoria, you can take the jury downstairs now.

23                  THE FOLLOWING PROCEEDINGS WERE HELD
                     OUTSIDE THE PRESENCE OF THE JURY:

24

25             THE COURT:  Now, all the motions to seal, the motions

 1    to file things late, they're granted.  Not a problem there.

 2         The motion in limine to exclude certain terms, I'm going to

 3    deny, for the reasons that I gave during jury selection.

 4    There's no way to avoid using terms like "hack" or "cyber" this

 5    or that, but I will definitely tell the jury, "These are

 6    colloquial terms, they're not indicative of any guilt, and I'll

 7    have a written order for that.

 8         The United States' motion in limine regarding excluding

 9    evidence of other security vulnerabilities, that's granted in

10    part.  But for the Computer Fraud Act, you may not use, for wire

11    fraud, any victim negligence.  So we'll get -- as we get closer

12    to that, I'll give a specific instruction about that.

13         I'm going to deny the motion to exclude the OCC consent

14    order.  I think that's relevant, and I think it's not hearsay.

15         I'm going to grant the motion to exclude the defendant's

16    mental health evidence, unless offered for mens rea, and you'll

17    give me a heads-up if you're going in that area.

18         And then in regard to the note passed, that's a little bit

19    dicey, but I'm going to deny the motion to exclude the note, but

20    I'm going to explain it a little more in a written order, but

21    for opening statement purposes, assume it's going to be in

22    evidence.

23         The motion to compel the unredacted emails is denied.  I

24    trust the government to turn over what they need to turn over.

25         And the motion to quash the trial subpoena for AWS is not

 1   fully briefed yet, so I'm not going to go there on that one.

 2        What I want in these motions in limine, just to give you an

 3   overview, is I want people to be able to talk about this the way

 4   it happened.  It was a breach of security.  It was a hack, in

 5   that sense.  The breach of security was used to do some

 6   cryptomining that cost people some property in terms of the use

 7   of their Amazon Web Services.

 8        Ms. Thompson's defense is she didn't go anywhere that she

 9   was denied access because of mistakes done in how the firewalls

10   were set up, et cetera, et cetera -- I'm not using all the right

11   terms -- but I want her to have the opportunity to make that

12   argument through cross-examination of the witnesses.

13        In regard to allowing the government experts to testify in

14   general about white hat hacker, black hat hacker, et cetera, et

15   cetera, I'm going to allow that to go forward, because, to me,

16   they are like interpreters.

17        But what I don't want from the government is anyone who I

18   let testify, in general like that, to say, "and, therefore,

19   Ms. Thompson is not a white hat hacker," or "she is a black hat

20   hacker."

21        It's a little bit like when the government would want to

22   present testimony about how the drug cartels work, because it's

23   not within the knowledge of most people, and we would allow some

24   general testimony about burner phones, about code words, about

25   things like that.  So in that regard, I will give the government

 1   leeway to put on experts to explain what these terms mean,

 2   explain, either through Capital One or through government

 3   agents, the concept of white hat hacking and how companies will

 4   pay money to have security breaches pointed out to them.

 5        The ultimate bottom line here is did Ms. Thompson act with

 6   criminal intent?  If she acted with criminal intent, then she's

 7   guilty.  If she did not, she's not, and that's where we're going

 8   on this.

 9        So for purposes of opening statement, I hope that's

10   guidance enough for you.  I will try to have written orders

11   done.

12        Class-action settlements I'm keeping out.  That is

13   different to me than -- different to me than the sanction that

14   was imposed, because that's over with and done.  Class action is

15   still in process, and it raises more issues than it solves.

16        So the motion in limine from the government to keep that

17   out is granted.

18        OCC consent order denied.

19        Okay.  Any questions, Mr. Friedman?

20            MR. FRIEDMAN:  Your Honor, I'm not sure -- if the

21   Court could explain a little more the ruling on the other

22   vulnerabilities?  You say it was granted in part, and I'm just

23   trying to understand where the line is as we prepare for opening

24   and witnesses.

25            THE COURT:  I have a written order.  Let me send

 1    that -- can you still post it today?  Just get Mr. Friedman and

 2    Mr. Hamoudi's email addresses, and we'll just send it to them,

 3    because it is a little complicated, but I'll do it right now.

 4    I'll get off the bench, review it again -- my head is kind of

 5    spinning right now.

 6              MR. FRIEDMAN:  That's fine, Your Honor.

 7              THE COURT:  Mr. Klein?

 8              MR. KLEIN:  One question with the testimony of the

 9    government's proposed expert John Strand.  You're going to allow

10    in terms.  The government had also proposed talking about what's

11    ethical or these ethical obligations.  You're saying that's out?

12              THE COURT:  Well, as it applies to Ms. Thompson, to

13    say that she was not a white hat hacker or she was not ethical,

14    that's out.  But to describe in general what happens in the

15    industry, that if you detect a defect and you alert a company to

16    it and you don't attempt to monetize it or use it in any way,

17    then you're not committing a crime, I would allow him to testify

18    about that.  But he's not tomorrow, is he?

19              MR. FRIEDMAN:  No, Your Honor, next week.

20              MR. KLEIN:  So we'll get a chance to review the order,

21    and if we have an issue...

22              THE COURT:  Uh-huh.

23         Who are the witnesses tomorrow?

24              MR. FRIEDMAN:  Your Honor, Mr. Stephen Schuster from

25    Amazon, Kat Valentine, Michael Fisk from Capital One, and maybe

1    one or two more.

2            THE COURT:  Great.  Well, it's been a long day -- yes,

3    Mr. Klein?

4            MR. KLEIN:  Sorry.  You'd asked the government -- are

5    they giving us a list for the rest of the week?

6            THE COURT:  Yes.

7            MR. KLEIN:  Your Honor, we thought it would speed

8    things up for us if we could get a list of exhibits to match up

9    with the witness.  There's a lot of exhibits.  Your Honor has

10   seen it, and there is a lot.

11           THE COURT:  Sure.  If you have time to do it.  You

12   don't have to do it right now, but as soon as you get it done,

13   say, "We anticipate introducing these exhibits through this

14   witness, these exhibits through that witness."

15       Again, we're not going to hold you to it, but it might be

16   helpful.

17           MR. FRIEDMAN:  And, Your Honor, I assume the same rule

18   will apply to the defense?

19           THE COURT:  Of course it would.  Sauce for the goose,

20   yes, absolutely.

21       Can we go home now?  Okay.  We're adjourned.

22               (Proceedings adjourned at 4:23 p.m.)

23

24

25

C E R T I F I C A T E


        I, Nancy L. Bauer, CCR, RPR, Court Reporter for
the United States District Court in the Western District of
Washington at Seattle, do hereby certify that I was present in
court during the foregoing matter and reported said proceedings
stenographically.

        I further certify that thereafter, I have caused
said stenographic notes to be transcribed under my direction and
that the foregoing pages are a true and accurate transcription
to the best of my ability.



        Dated this 11th day of June 2022.


                        /S/  Nancy L. Bauer

                        Nancy L. Bauer, CCR, RPR
                        Official Court Reporter