UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

UNITED STATES OF AMERICA,           )
                                    )
                  Plaintiff,        ) CASE NO. CR19-00159-RSL
                                    )
v.                                  ) Seattle, Washington
                                    )
PAIGE A. THOMPSON,                  ) June 9, 2022
                                    ) 9:00 a.m.
                  Defendant.        )
                                    ) JURY TRIAL, Vol. 3 of 9

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT S. LASNIK
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:


  For the Plaintiff:       ANDREW C. FRIEDMAN
                           JESSICA M. MANCA
                           TANIA M. CULBERTSON
                           United States Attorney's Office
                           700 Stewart Street, Suite 5220
                           Seattle, WA 98101


  For the Defendant:       MOHAMMAD ALI HAMOUDI
                           NANCY TENNEY
                           Federal Public Defender's Office
                           1601 5th Avenue, Suite 700
                           Seattle, WA 98101

                           BRIAN E. KLEIN
                           MELISSA A. MEISTER
                           Waymaker LLP
                           515 S Flower Street, Suite 3500
                           Los Angeles, CA 90071


  Reported by:             Nancy Bauer and Marci Chatelain
                           Official Federal Court Reporters
                           700 Stewart Street, Suite 17205
                           Seattle, WA 98101

INDEX

EXAMINATION OF                                              PAGE

MICHAEL FISK          DIRECT EXAMINATION cont.   6
                      BY MR. FRIEDMAN

                      CROSS-EXAMINATION            71
                      BY MR. HAMOUDI

                      REDIRECT EXAMINATION         98
                      BY MR. FRIEDMAN

                      RECROSS-EXAMINATION         103
                      BY MR. HAMOUDI

                      REDIRECT EXAMINATION        105
                      BY MR. FRIEDMAN

ZACHAREY HANSEN       DIRECT EXAMINATION          108
                      BY MS. MANCA

                      CROSS-EXAMINATION           120
                      BY MR. KLEIN

                      REDIRECT EXAMINATION        127
                      BY MS. MANCA

JOEL MARTINI          DIRECT EXAMINATION          129
                      BY MR. FRIEDMAN

                      CROSS-EXAMINATION           178
                      BY MR. HAMOUDI

JOSEPH ADAM BALEDA    DIRECT EXAMINATION          198
                      BY MS. CULBERTSON

                      CROSS-EXAMINATION           204
                      BY MR. KLEIN

GOVERNMENT EXHIBITS

| EXHIBIT | ADMITTED | WITHDRAWN |
|---------|----------|-----------|
| 111 | 18 | |
| 205 | 25 | |
| 206 | 16 | |
| 207 | 35 | |
| 210 | 43 | |
| 251 and 252 | 147 | |
| 301 | 133 | |
| 302 | 134 | |
| 303 | 134 | |
| 304 | 135 | |
| 305 | 135 | |
| 306 | 136 | |
| 307 | 140 | |
| 308 | 138 | |
| 309 | 138 | |
| 310 | 139 | |
| 401 | 148 | |
| 402 | 115 | |
| 403 | 148 | |
| 404 | 115 | |

GOVERNMENT EXHIBITS

| EXHIBIT | ADMITTED | WITHDRAWN |
|---------|----------|-----------|
| 405 | 148 | |
| 406 | 115 | |
| 407 | 148 | |
| 408 | 115 | |
| 409 | 148 | |
| 410 | 115 | |
| 411 | 115 | |
| 412 | 148 | |
| 413 | 115 | |
| 414 | 115 | |
| 415 | 148 | |
| 416 | 115 | |
| 417 | 148 | |
| 418 | 115 | |
| 419 | 115 | |
| 420 | 148 | |
| 431 | 151 | |
| 433 | 151 | |
| 434 | 151 | |
| 435 | 151 | |
| 436 | 151 | |
| 437 | 112 | |
| 438 | 151 | |

GOVERNMENT EXHIBITS

| EXHIBIT | ADMITTED | WITHDRAWN |
|---|---|---|
| 439 | 151 | |
| 450-462 | 117 | |
| 501 through 506 | 164 | |
| 521 to 525 | 156 | |
| 711 | 59 | |
| 712 | 60 | |
| 713 | 62 | |

DEFENSE EXHIBITS

| EXHIBITS | ADMITTED | WITHDRAWN |
|---|---|---|
| 1008 | 96 | |
| 1009 | 94 | |
| 1013 | 106 | |

1            PROCEEDINGS
                _____

2

3            THE FOLLOWING PROCEEDINGS WERE HELD
                IN THE PRESENCE OF THE JURY:

4

5            THE COURT:  So we still have Mr. Fisk up here,

6    formerly from Capital One, now with Meta, and Andrew Friedman is

7    doing the direct examination.

8                        MICHAEL FISK,
            having been previously sworn, testified as follows:

9                    DIRECT EXAMINATION continued

10   BY MR. FRIEDMAN:

11   Q.    When did Capital One first receive what they recognized as

12   notice of this breach?

13   A.    We received the tip on July 17th, 2019.

14   Q.    And do you recall in what form you received that tip?

15   A.    Yes.  It was an email from Kat Valentine.

16   Q.    Would you take a look at Exhibit 201 and tell me if you

17   recognize that?

18   A.    Yes, that's the email.

19   Q.    When did you learn about this email?

20   A.    I learned on the morning of the 18th, in the morning

21   standup.

22   Q.    What is a "morning standup"?

23   A.    It's where the security team gets together every morning to

24   discuss any sort of hot topics.

25   Q.    And in terms of your work schedule, once you learned about

Michael Fisk - Direct continued by Mr. Friedman

1   this, what impact did it have on you?

2   A.   I told my admin to clear my calendar and that I was going

3   down to the operations center.

4   Q.   Was that something that happened broadly within the Cyber

5   Organization?

6   A.   There was already a fair number of folks from our

7   operations and intelligence team that were down there, but,

8   yeah, a few of us, like me, also joined them that morning.

9   Q.   In general terms, when Capital One, or maybe any company,

10  receives an alert that appears to be real, are there a series of

11  goals or steps that you're trying to take?

12  A.   Yes.   The first thing you want to do is just confirm the

13  veracity.   Can we tell what the vulnerability was, for example,

14  that's being leveraged here, and can we close the vulnerability,

15  is the first thing.

16  Q.   What is the second thing?

17  A.   You want to understand, you know, was there a successful

18  compromise, you know; just understand if this -- you know, the

19  tip reported, you know, one compromise, but has the same thing

20  been used before or after.

21  Q.   And if you confirm that, what's the next step that you

22  take?

23  A.   You want to understand the extent of -- was any information

24  taken, was there any damage done, and what is the extent of

25  that.

1    Q.    Before you fully understand the extent of the damage, are

2    there other things you want to do?

3    A.    Like I said, when you find the vulnerability, you

4    definitely want to close that, is the first thing that you do.

5    Q.    Okay.  Got it.  And then full analysis and understanding

6    after that?

7    A.    Yeah.

8    Q.    Did Capital One, basically, follow that set of steps or

9    procedures in addressing this?

10   A.    Yes.

11   Q.    In order to understand the vulnerability, what was the

12   first thing Capital One did?

13   A.    Well, in this case, we were provided with, you know, a

14   command line that purported to give access, and so it was

15   reasonably straightforward to try to reproduce that, you know,

16   same action, and confirm that it worked.

17   Q.    Did you go to the link?

18   A.    Yes.

19   Q.    Okay.  And this is on a particular website; is that

20   correct?

21   A.    Yes.

22   Q.    What is that website?

23   A.    The site is called GitHub.

24   Q.    And what is GitHub?

25   A.    It's primarily a source code repository site that's used

1  for open-source projects.  Basically, it's a place where

2  computer programmers store computer code.

3  Q.    Is it supposed to be collaborative or sharing?

4  A.    Most -- a lot of what's on there is open to the world

5  intentionally, yes.

6  Q.    In what form do you put information on GitHub?

7  A.    There's multiple forums.  Some is sourcebit files, and then

8  relevant to this, there is another thing that they call a gist,

9  g-i-s-t, pronounced "*jist*."

10  Q.    What is that?

11  A.    It's sort of a scratch pad, text file, sort of open

12  note-taking mechanism.  It's a place to post freeform text.

13  Q.    Are gists public or private?

14  A.    I think they can be either.  This one was public.

15  Q.    But would you know -- it has a complicated -- the link is

16  not easily memorizable; it is not your dog's name?

17  A.    Yes.  In this case, there was a direct link to it that gave

18  us access.

19  Q.    If you didn't have that link, is there an easier, obvious

20  way to get there?

21  A.    You can search for gists as well.

22  Q.    Would you have to know what you were searching for, though?

23  A.    Yes.

24  Q.    When you went to the gist and saw the gist, what was it?

25  A.    It was a command being executed, and then the output of

1    that command.

2    Q.    Okay.  And let's look at Exhibit 204.

3          Is that the gist?

4    A.    Yes.

5    Q.    And if we look at the second page of that, what do you see

6    there?

7    A.    Those are a list of Capital One buckets from AWS, places

8    where data are stored.

9    Q.    Okay.  We'll come back to the details of it, but was there

10   also code in this gist?

11   A.    There was command lines that were executed.

12   Q.    And did that contribute to how you tried to replicate the

13   vulnerability?

14   A.    Yes.

15   Q.    Were you able to replicate what those command lines

16   indicated was the vulnerability?

17   A.    Yes.

18   Q.    Once Capital One had confirmed -- did that confirm the

19   vulnerability for you?

20   A.    Yes.

21   Q.    Once Capital One had confirmed that vulnerability, what did

22   it do?

23   A.    We needed to understand what made that command work.  We

24   confirmed vulnerability was there, but you need to understand

25   the nature for the vulnerability and how to fix it, and then fix

1    it.

2    Q.    And was Capital One able to do that?

3    A.    Yes.

4    Q.    By when had you confirmed the vulnerability and fixed it?

5    A.    The 18th.

6    Q.    So the day after this email came in?

7    A.    Yes.

8    Q.    And how did Capital One fix the vulnerability?

9    A.    In this case, we -- well, identified that there was a

10   misconfiguration on a WAF, a web application firewall, and we,

11   actually, just replaced that WAF with a new one, which was a

12   project that was under way anyway.

13   Q.    When you say "a new one," is this like my air conditioner

14   gets old and stops working, or is it more complicated than that?

15   A.    I mean, it's software, so it doesn't necessarily stop

16   working like your air conditioner.  But it was a different make

17   and model that we had selected and were in the process of

18   rolling out, and so we just went to that upgrade.

19   Q.    More quickly than it would have happened?

20   A.    Yes.

21   Q.    Okay.

22         In addition to -- we've gone partway through the thing, and

23   stopping this, was Capital One continuing to communicate with

24   Kat Valentine?

25   A.    Yes.

1  Q.    Would you take a look at Exhibit 202 and tell me if you

2  recognize that?

3  A.    Yes.

4  Q.    That's another email from Ms. Valentine?

5  A.    Yes.

6  Q.    When did this one come to Capital One?

7  A.    On the 19th.

8  Q.    Okay.  And there are some attachments to it; is that fair

9  to say?

10  A.    Yes.

11  Q.    Did you look at those attachments?

12  A.    Yes.

13  Q.    Would you look at Exhibit 203 and tell me if you recognize

14  that?

15  A.    Yes.

16  Q.    It is a multipage exhibit.

17  A.    Yes.

18  Q.    Were those attached to this email?

19  A.    Yes.

20  Q.    In general terms, what were these attachments?

21  A.    They were, I believe, Twitter posts from the handle

22  Erratic.

23  Q.    Do you recall one of them referring to Capital One?

24  A.    Yes.

25  Q.    Turning to page 5, is this the Twitter post to which you

1  were referring?

2  A.    Yes.

3  Q.    Okay.  There seems to be three separate lines or --

4  probably, perhaps, two posts, but three lines; is that accurate?

5  A.    Yes.

6  Q.    What does the first one -- what's the reference to Capital

7  One there?

8  A.    It's referring to Capital One documents, and stating that

9  they will be dropped.

10  Q.    What are dox, d-o-x?

11  A.    "Documents" is how I interpret that.

12  Q.    Okay.  So how do you interpret "Capital One dox"?

13  A.    Documents that belong to Capital One.

14  Q.    And what do you understand "dropping" to mean?

15  A.    Probably making it public.

16  Q.    And then the next line says, "I wanna distribute those

17  buckets first I think"?

18  A.    Yes.

19  Q.    Do you link "buckets" to Capital One dox?

20  A.    Yes.

21  Q.    And can you explain how and why?

22  A.    I interpret "dox" to not, you know, necessarily be just a

23  paper document or a Word document but sort of data in general.

24  And so I interpret that as referring to buckets of Capital One

25  data and potentially releasing them to the public.

1  Q.   And what does the last line, the next Tweet say?

2  A.   Well, it says, "Their SSNs with full name and DOB," which I

3  interpret to mean there are Social Security numbers with full

4  names and date of births.

5  Q.   Was Capital One concerned when it received this attachment?

6  A.   Yes, very.

7  Q.   And why is that?

8  A.   Well, it indicates that there could be an exposure of our

9  customers' private data to the public.

10  Q.   As part of your investigation, was Capital One able to

11  confirm whether data had, in fact, been taken out of Capital

12  One?

13  A.   Yes.

14  Q.   And what was the answer?

15  A.   It was taken, yes.

16  Q.   By when did Capital One confirm that?

17  A.   On the 18th, I believe, we confirmed -- or the 19th, I

18  think, we confirmed that data was successfully taken, and then

19  on the 20th, we had identified that there were things like

20  customer privacy information in the data.

21  Q.   What did Capital One do once it had confirmed that?

22  A.   Well, several things, but one was to notify law

23  enforcement.

24  Q.   Do you recall, generally, what law enforcement you

25  notified?

1    A.    The FBI, I believe.

2    Q.    Okay.  By the time that Capital One notified law

3    enforcement on the 20th, did you believe you had identified the

4    person responsible for this?

5    A.    Yes; since the initial tip provided some strong

6    indications, yes.

7    Q.    Let's go to Exhibit 201, and tell me what you're calling an

8    "indication."

9    A.    So the URL, the link there to GitHub, the thing after

10   "GitHub.com" says "Paige Adele Thompson," and then, in GitHub,

11   posts are owned by a user, and that part of that URL is what has

12   the user name for the person who posted the information.

13   Q.    So did you believe it was someone named Paige Adele

14   Thompson?

15   A.    Certainly that was the hypothesis, given the name, yes.

16   Q.    Okay.  Did you or people working with you go to linked

17   sites, sites that were linked or connected to this GitHub site?

18   A.    Yes.

19   Q.    Where did you go?

20   A.    One of them was a link to GitLab, which is a similar sort

21   of publishing site.

22   Q.    Okay.  And from GitLab, was there anywhere particular that

23   you went?

24   A.    Yeah.  On that site, we found a resumé for Paige Thompson.

25   Q.    Would you take a look at Exhibit 206 and tell me if you

1    recognize that?

2    A.    Yes.

3    Q.    Is that the resumé?

4    A.    Yes.

5            MR. FRIEDMAN:  Your Honor, this has not been offered,

6    so government offers Exhibit 206.

7            MR. HAMOUDI:  I don't have an objection.

8            THE COURT:  206 is admitted and may be displayed.

9                (Government Exhibit 206 admitted.)

10   Q.    (By Mr. Friedman)  Whose resumé is that that you found?

11   A.    Paige Thompson's.

12   Q.    Does it list a variety of jobs?

13   A.    Yes.

14   Q.    What is the most recent job listed?

15   A.    It was with Amazon.

16   Q.    And a specific part of Amazon?

17   A.    It says, "Simple Storage Services," which is part of the

18   AWS cloud service.

19   Q.    Is that S3 when we talk about S3 and S3 buckets?

20   A.    Yes.

21   Q.    When had Ms. Thompson worked at Amazon or AWS?

22   A.    In 2015 and 2016.

23   Q.    And so when you were looking at this, how long since her

24   employment terminated?

25   A.    Well, it was 2019, so it was two and a half, going on three

1  years.

2  Q.   And then above that, do you see the top section that talks,

3  I guess, about skills or proficiencies?

4  A.   Yes.

5  Q.   Let's look at the section related to AWS.  What are the

6  first three proficiencies listed there?

7  A.   S3, the Simple Storage Service; EC2, which is the elastic

8  computer virtual server service; and IAM, which is Identity and

9  Access Management service.

10  Q.   Okay.  Mr. Fisk, do you have an understanding, from your

11  work with the breach, of how this breach took place?

12  A.   Yes.

13  Q.   And in general terms, did it relate to misconfigurations or

14  configurations of different things at Capital One?

15  A.   Yes.

16  Q.   Were there two principal ones?

17  A.   Yes.

18  Q.   Would looking at Exhibit 111 -- this has not been offered

19  so it will just be on your screen -- would that help explain

20  your understanding?

21  A.   Yes.

22        MR. FRIEDMAN:  Government offers Exhibit 111.

23        THE COURT:  Any objection?

24        MR. HAMOUDI:  No, Your Honor.

25        THE COURT:  It is admitted and can be published.

Michael Fisk - Direct continued by Mr. Friedman

1        (Government Exhibit 111 admitted.)

2   Q.   (By Mr. Friedman)  Mr. Fisk, this is titled "Web

3   Application Firewall."  What is a -- well, let's start with:

4   What's a firewall?

5   A.   A firewall is something that sits in the network and

6   screens traffic going across it and decides to permit traffic

7   that is meant to be delivered to what's behind the firewall and

8   to block traffic that could be malicious traffic or undesired

9   traffic.

10  Q.   And in this case, it says not just firewall but "web

11  application firewall."  Why is that?

12  A.   Web application firewall is a type of firewall that focuses

13  on web application.  So it looks at web traffic, specifically,

14  and decides to selectively forward web requests.

15  Q.   Okay.  So this diagram depicts two things between an

16  external device and the internal server or cloud.  Can you tell

17  us what each of those is and what its role is?

18  A.   Yes.

19        In front of the firewall, as we say, or to the left on the

20  diagram, is a thing called an elastic load balancer, which is

21  another AWS service that is used when you need to support a lot

22  of traffic for a popular site; for example.  You actually have

23  more than one internal server, they're identical, and more than

24  one WAF that are identical, and the load balancer just kind of

25  steers traffic evenly to the different WAFs and servers so that

1    they can keep up.

2    Q.    And then behind that, we see the web-facing server and WAF?

3    A.    Yes.

4    Q.    And how does the purpose of that differ from the load

5    balancer?

6    A.    So the load balancer just sort of directs the traffic to

7    the WAF.  The WAF makes that filtering/screening decision I

8    described, and then if it permits the traffic, it delivers it to

9    the internal server.

10   Q.    I'm going to ask you to look at Exhibit 107, and this has

11   been admitted.  Do you recognize that?

12   A.    Yes.

13   Q.    And does that explain what actually happened in this case?

14   A.    Yes.

15   Q.    Okay.  Can you walk me through that, step by step?

16   A.    Yeah.  So the firewall here, which is the same as the WAF

17   in the previous picture, is what had the configuration issue,

18   and it allowed a specially formed request from the client, on

19   the left here, to go through the firewall and be proxied or

20   relayed to the Instance Metadata Service on the lower right.

21   Q.    Okay.  Can I stop you there for a second and ask, are you

22   familiar with something called a port?

23   A.    Yes.

24   Q.    Is what is a port?

25   A.    So computers are identified on the Internet by IP

1    addresses, and then on an individual computer, you can have

2    multiple ports or services running.  And so the port is what

3    lets you direct traffic to a particular piece of software or

4    service on a computer.

5    Q.    Okay.  You said you can have multiple ports on an IP

6    address; is that correct?

7    A.    Yes.  A computer can be both a web server and an email

8    server, for example.

9    Q.    So how would being both a web server and an email server,

10   how does relate to the concept of ports?

11   A.    So the web server listens on one port; for example, 443 is

12   the port used for encrypted web traffic, customarily.  And an

13   email server would listen on port 25, which is the standard port

14   for email delivery.

15   Q.    So the same computer but listening in two different

16   directions or ways?

17   A.    Yes.

18   Q.    How many different ports can there been on a computer?

19   A.    65,000, roughly.

20   Q.    64,000 --

21   A.    64,000, yeah.

22   Q.    All right.  In this case, did the misconfiguration relate

23   to a particular port?

24   A.    Yes.

25   Q.    And to which port did it relate?

1  A.    443.

2  Q.    To your knowledge, were the other ports on this server --

3  or firewall configured correctly?

4  A.    Yes.

5  Q.    And port 443, I think you said it relates to web traffic.

6  Does it relate to some, or all web traffic?

7  A.    It is the primary port used for encrypted web traffic, so

8  if you ever see "https" in the URL, it's likely going over port

9  443.

10  Q.    Is there a different port for unencrypted web traffic?

11  A.    Yes.  Port DD is the standard port for that.

12  Q.    What was the effect of misconfiguration?

13  A.    The effect was that a specially formed request to the

14  firewall would get proxied or relayed, on the requester's

15  behalf, to a destination of the requester's choosing.

16  Q.    Okay.  And in this case, what destination was that?

17  A.    The Instance Metadata Service.

18  Q.    Are external computers supposed to be able to communicate

19  to the Instance Metadata Service?

20  A.    No.

21  Q.    What happened when the communication reached the Instance

22  Metadata Service?

23  A.    It was delivered as a web protocol request, and the

24  Instance Metadata Service responded.

25  Q.    And why did the Instance Metadata Service respond?

1  A.   It viewed the request as coming from the local system, from

2  the firewall, and that is -- the one and only kind of request

3  the Metadata Service will answer to is a request from the local

4  computer.

5  Q.   So it misinterpreted the source of the request?

6  A.   Yes.

7  Q.   Once it did that, what did the Instance Metadata Service

8  do?

9  A.   It fulfilled the request.

10 Q.   Okay.  And can you tell us what fulfilling the request

11 meant?

12 A.   Well, in this case, the first request was to return the

13 name of the role being used by the firewall, and so it did.

14 Q.   Okay.  And after it did that, what happened next?

15 A.   Well, there was a subsequent request that asked for a copy

16 of the key, the credential used to authenticate that role.

17 Q.   And when that information was returned, first the name of

18 the role and then the credentials, where did those go?

19 A.   Those went back to the client computer, on the left here,

20 under Ms. Thompson's control.

21 Q.   Okay.  So that's one configuration, the configuration of

22 the firewall.

23      To what did the second configuration relate?

24 A.   It relates to what information the key that was stolen had

25 access to.

1    Q.    When you say "key," to what are you referring?

2    A.    The role credential.  So the way the computer will identify

3    itself as being the firewall, in this case, is a key or a

4    credential.

5    Q.    To what kind of data does a firewall normally need to have

6    access?

7    A.    It would be to have access to its own configuration

8    information and ability to write logs for what it sees.

9    Q.    Do firewalls generally need access to bank customer credit

10   information?

11   A.    No.

12   Q.    Did this credential have permission to read, at least, some

13   customer and credit information?

14   A.    Yes.

15   Q.    Would you look at Exhibit 108, which has been admitted, and

16   tell me if that helps explain what happened next?

17   A.    Yes.

18   Q.    How is that?

19   A.    So once Ms. Thompson had the key for the WAF and could

20   impersonate the WAF, she could use that key directly to access

21   the AWS S3 service -- AWS makes that service available on the

22   Internet to anyone with the right key -- and could access, and

23   she did access the data directly from S3 at that point.

24   Q.    Okay.  I'm going to refer -- the gist that you saw,

25   originally, on the Internet.  I'm going to refer to that as the

1  "April 21 gist," if that's okay.

2  A.   Okay.

3  Q.   Did the April 21 gist contain, in addition to a list of

4  buckets, did it contain code or things created by the execution

5  of code that are consistent with what you just explained?

6  A.   Yes.

7  Q.   So let's go to that, if we could, Exhibit 204.

8       So this is one version, straight off the web.  Have you

9  looked at another version that has slightly larger type and is

10  easier to read?

11  A.   Yeah.  This one sort of cuts off the lines at the side, but

12  I've seen the version that has the full text.

13  Q.   And would you look at Exhibit 205, which is not admitted,

14  but is that the other version at which you looked?

15  A.   Yes.

16  Q.   Is the information in here the same as the, I guess, the

17  vast majority of the Exhibit 204?

18  A.   Yes.

19  Q.   Does Exhibit 204 contain one slight additional piece of

20  information?

21  A.   Yeah, it has an additional comment at the end.

22       THE COURT:  You said "204," but you meant 205?

23       MR. FRIEDMAN:  That's quite possible.  Thank you, Your

24  Honor.

25  Q.   (By Mr. Friedman)  Everything in Exhibit 205 is part of

1    Exhibit 204?

2    A.    Yes.

3              MR. FRIEDMAN:  The government offers Exhibit 205.

4              MR. HAMOUDI:  No objection.

5              THE COURT:  205 is admitted.

6                   (Government Exhibit 205 admitted.)

7    Q.    (By Mr. Friedman)  Mr. Fisk, I'm going to ask you to relate

8    some of the things in this document to the methodology you just

9    described with those diagrams.

10   A.    Okay.

11   Q.    And if we could focus on the top, say, eight to ten lines.

12         In the top right-hand corner, do you see a date?

13   A.    Yes.

14   Q.    And can you tell us what that date is that you see?

15   A.    Yeah.  The 21st of April 2019.

16   Q.    Okay.  And then if we drop down a couple lines to the first

17   full line, there is a line that has the second word "CURL"?

18   A.    Yes.

19   Q.    What does "CURL" mean?

20   A.    CURL is a command line tool that you can use to submit web

21   requests.

22   Q.    And when you say "web requests," what does a "web request"

23   mean?

24   A.    You probably would think of a web browser, where you make a

25   web request.  This is a command line tool that lets you sort of

1  do that a little bit more manually.  But, basically, submit

2  something to the web server asking it to return something.

3  Q.    The next line starts with the word "proxy."

4  A.    Yes.

5  Q.    And then "https," and then a whole bunch of digits.  Can

6  you tell us what -- what does "proxy" mean there, first?

7  A.    Yeah.  This is an option in the curl command that says send

8  your traffic through a proxy.

9  Q.    Okay.  And does this line tell you where the traffic is

10  going first?

11  A.    Yes.  The statement right after "dash, dash, proxy" is the

12  system to be used as the proxy.

13  Q.    Okay.  And are you familiar with -- this, basically, the

14  first four numbers there, 35.162.65.136, are you familiar with

15  what that is?

16  A.    Yes.

17  Q.    What is that?

18  A.    That was an IP address that belonged to AWS but was used by

19  Capital One at the time for one of our web applications, and it

20  relayed the load balancer and WAF in front of it.

21  Q.    Okay.  And is that the one that has the misconfiguration?

22  A.    Yes.

23  Q.    And then there's a colon and the number 443.  What does

24  that mean?

25  A.    That is saying that the proxy is on port 443.

1    Q.    Okay.  To use that channel to communicate?

2    A.    Yeah, to use port 443 to talk to the proxy.

3    Q.    So if this command is asking or instructing it to go to

4    that web address at that channel as a proxy, does it say where

5    it wants to go after that?

6    A.    Yeah, that's the line after that.

7    Q.    Can you explain, I guess, the beginning of that line?

8    A.    Yeah.  So that line and a little bit of the fourth line is

9    a URL, like you would see in a web browser, that is being

10   requested.  In this case, the server that's being accessed is

11   the 169.254.169.254 address.

12   Q.    Do you know what 169.254.169.254 is?

13   A.    Yeah.  In an AWS environment, that is how you talk to the

14   Instance Metadata Service.

15   Q.    Okay.  Does this command also say or instruct what is to be

16   done when it gets to the Instance Metadata Service?

17   A.    Yes.  The rest of the line describes the action being

18   requested.

19   Q.    Okay.  Before we go into that:  Should an external computer

20   be able to get to the Instance Metadata Service in this way?

21   A.    No.

22   Q.    And why is that?

23   A.    Well, it enables attacks like this, so the Instance

24   Metadata Service only accepts traffic locally, and you work hard

25   to ensure that there is no way to relay traffic to a Metadata

1    Service.

2    Q.    What command of this code instruct to happen when the

3    traffic gets to the Instance Metadata Service?

4    A.    In this case, it is requesting a copy for the security

5    credential for the ISRM-WAF-Role.

6    Q.    What is the ISRM-WAF-Role?

7    A.    Well, I'll explain the acronym first, I guess.

8          "ISRM" is the old name for the Cyber Organization at

9    Capital One, Information Security Risk Management team.  "WAF,"

10   as we've described, is Web Application Firewall.  So this is a

11   role that was designed to be used exclusively by the WAFs.

12   Q.    By firewalls?

13   A.    Yes.

14   Q.    Now, can you tell anything from the fact that this command

15   includes the name of that role?

16   A.    Yes.  You would need to have done something before this to

17   identify the name of that role.

18   Q.    So already to have internal access?

19   A.    Yes.

20   Q.    Is the name of that role even something that was generally

21   public at the time?

22   A.    No.

23   Q.    And I think you said this command asks for the credentials

24   for that role; is that correct?

25   A.    Yes.

1    Q.    And once it gets those credentials, does it have an

2    instruction for what to do with them?

3    A.    Well, it is sending them to a thing called awssession.sh.

4    Q.    What is awssession.sh?

5    A.    It was a script on Ms. Thompson's computer.  It appears to,

6    essentially, log you in, so to speak, with that credential.

7    Q.    But that's computer code or script written by Ms. Thompson?

8    A.    Written by her or obtained by her, yeah.

9    Q.    And when you say it "appears" to do something, what are you

10   drawing that inference on?  How are you saying that?

11   A.    Further down in the document, you can see use of that

12   credential.

13   Q.    So you're seeing what happened and saying that must be --

14   A.    Yeah.

15   Q.    -- what it asked to have happen?

16   A.    Inference, yeah.

17   Q.    When you say "further down," are you talking about a

18   section that starts with the word "GET," in capital letters?

19   A.    Yes.

20   Q.    So highlighting that, what is the line that starts with the

21   word "GET"?

22   A.    So this is the CURL tool showing what it's doing, based on

23   the arguments that it was given, the parameters it was given.

24   And so "get" is how an http web protocol, you ask for URL, and

25   then it is requesting that same URL that we saw earlier.

1  Q.   So is it fair to say, sort of, output or an intermediate --

2  it's a translation of the same request?

3  A.   Yes, it's showing you what's going on behind the scenes to

4  fulfill your request.

5  Q.   How do you know it's asking for the same role and

6  credential information that we saw earlier?

7  A.   Well, so it's got the same IP address for the Instance

8  Metadata Service, and it's asking for the ISRM-WAF-Role.

9  Q.   Okay.  Are you able to tell if this request was successful?

10 A.   Yeah.  In the second half of the highlighted part, where

11 the line starts with "http" but then ends in "200 OK" means

12 there was not an error, and the server responded to the request.

13 Q.   And then do we need to go to the next page to see what

14 happened when it responded?

15 A.   Yes.

16 Q.   Going to page 2, and we'll highlight the top third.

17      What do you see here that tells you what happened?

18 A.   Well, so here I see a list-buckets command being issued to

19 the S3 service in this "aws s3api" line.

20 Q.   So how is this list-buckets command being issued?

21 A.   It was probably typed by Ms. Thompson.

22 Q.   Can you tell if it's manual or part of that pause-session

23 script?

24 A.   I can't really tell if it was part of the script or manual.

25 Q.   But somehow typed or coming from Ms. Thompson?

1    A.    Yes.

2    Q.    What is "list-buckets"?  What is that command?  What is it

3    asking someone to do?

4    A.    So it is an AWS command that, for the credential that you

5    have, will return the set of storage buckets that that

6    credential can see.

7    Q.    Sort of like a file directory of what it can see?

8    A.    Yeah.

9    Q.    And what happened when that command was issued?

10   A.    It returned a long list of buckets.

11   Q.    Do we see the first three of those here?

12   A.    Yes.

13   Q.    And do you recognize those buckets?

14   A.    Yes.  These are Capital One buckets.

15   Q.    Okay.  Everything we've just looked at, the code, all

16   relates to something that took place on one day; is that

17   correct?

18   A.    Yes.

19   Q.    And what day is that?

20   A.    The 21st.

21   Q.    Of April?

22   A.    Of April, yeah.

23   Q.    Okay.  Did the attack in this case take place just on one

24   day, or did it span a longer period of time?

25   A.    It spanned a longer period.

1  Q.  For how long did it continue, that you can tell?

2  A.  We saw activity from March through May.

3  Q.  Of 2019?

4  A.  Yes.

5  Q.  How did you see activity?  Where did you look to see that?

6  A.  In our event logs that we record.

7  Q.  And when you say "event logs," are you familiar with the

8  term "CloudTrail logs"?

9  A.  Yes.

10 Q.  What are CloudTrail logs?

11 A.  CloudTrail is an AWS logging service where they log a lot

12 of events for things that take place in AWS.

13 Q.  Okay.  And do these logs show the commands that are issued,

14 or do they show what happens based on those commands?

15 A.  They show the -- not necessarily the command line that

16 someone types or that initiates the request, but they log the

17 actual requests made to the AWS service, which sometimes match

18 one for one, and sometimes one command may result in multiple

19 events that are logged.

20 Q.  Okay.  So it's not what -- if we think really old-school

21 and typing, it's not what was typed, necessarily; it's something

22 a little downstream of that?

23 A.  Correct.

24 Q.  Does Capital One receive a large number of lines of logs

25 per day?

1    A.    Yes.

2    Q.    In the millions?

3    A.    At least.

4    Q.    How did you decide what logs to look at?

5    A.    We had several indicators that we searched our logs for

6    based on the information we had in the investigation, so we

7    certainly had the ISRM-WAF-Role indication, and so one of the

8    things we looked for was everything involving that role.

9    Q.    Okay.  And did you look across all your accounts, or at

10   particular accounts?

11   A.    We looked across everything.

12   Q.    Were there other indicators you used to narrow the search

13   of what you were looking for?

14   A.    Yeah.  We could see IP addresses that traffic was

15   originating from for this activity, and so we also looked for

16   additional traffic -- any additional traffic from those IP

17   addresses, and there were some other indicators in the traffic,

18   and we used those as well.

19   Q.    Is the other indicator something called "a user agent

20   string"?

21   A.    Yes.

22   Q.    What is a user agent string?

23   A.    So in client-server communications, it's customary to have

24   a field called a "user agent" that is submitted with a request

25   that describes the kind of software you're using.  So if you're

Michael Fisk - Direct continued by Mr. Friedman

1  using your normal Chrome web browser, it would say something

2  that identified what version of Chrome you had, maybe what kind

3  of computer you had; just a bunch of details about the client

4  making the request.

5  Q.   Is it a little like a fingerprint for a computer?

6  A.   It can be, yeah.

7  Q.   More or less accurate, depending upon of what you think of

8  this and what you think of fingerprints?

9  A.   Yes.

10  Q.   Some form of identifier?

11  A.   Yes.

12  Q.   When you looked at the ISRM-WAF-Role and you looked for

13  particular IP addresses and you looked for User-Agent strings,

14  how big of a universe were you able to narrow -- how much were

15  you able to narrow down what you believed were relevant logs?

16  A.   In the CloudTrail logs, there were around 60 entries that

17  matched.

18        MR. FRIEDMAN:  Your Honor, we're about to introduce an

19  exhibit that, if I could turn off the computer for the gallery,

20  if that's okay?  We're going to file it redacted, ultimately.

21        THE COURT:  Yes.  The government has permission from

22  the court for this exhibit to not be displayed to the public,

23  and with agreement of defense.

24     Go ahead.

25        MR. FRIEDMAN:  Thank you, Your Honor.

1  Q.    (By Mr. Friedman)  Would you look at Exhibit 207, and tell

2  me if you recognize that.

3  A.    Yes.

4  Q.    Do you recognize that?

5  A.    Yes.

6  Q.    Is that the smaller set of, I guess, roughly, 60 lines of

7  logs that we just talked about?

8  A.    Yes.

9          MR. FRIEDMAN:  The government offers Exhibit 207.

10         MR. HAMOUDI:  No objection.

11         THE COURT:  207 is admitted into evidence.

12             (Government Exhibit 207 admitted.)

13  Q.    (By Mr. Friedman)  Mr. Fisk, if we could go over --

14  first off, how long -- can you look at how many lines there are

15  in this spreadsheet?  How many lines do you see?

16  A.    There are 60 rows, including the header, so 59 log entries.

17  Q.    Fifty-nine lines of data?

18  A.    Yes.

19  Q.    And if we go back to the top and move over to the right, do

20  you see column N?

21  A.    Yes.

22  Q.    What is column N?

23  A.    It is source IP address, so the IP address on the Internet

24  that issued the request to AWS.

25  Q.    Is that one of the pieces of data that you looked at in

Michael Fisk - Direct continued by Mr. Friedman

1    identifying the relevant lines?

2    A.    Yes.

3    Q.    And when we look down, the first ten or fifteen, there

4    seems to be some variation?

5    A.    Yes.

6    Q.    Do you see where we start to see the name number on every

7    line?

8    A.    Yeah, the "46" addresses.

9    Q.    Do you have an idea what the address starting with 46 is?

10   A.    I believe that was owned by a VPN service in Europe,

11   iPredator, I think.

12   Q.    A virtual private network?

13   A.    Yes.

14   Q.    And then two columns to the right, there's a column labeled

15   "user agent."

16   A.    Yes.

17   Q.    Do you recognize that?

18   A.    Yes.

19   Q.    Okay.  Without going into detail, in general, what is the

20   information on each line?

21   A.    It's describing the client being used, the AWS command line

22   interface and the specific major and minor version for that

23   client, and then some things about where that client was built

24   or is running; things about what kind of Linux computer it was,

25   for example.

Michael Fisk - Direct continued by Mr. Friedman

1   Q.   And was that one of the things you also looked at in terms

2   of narrowing the pool to relevant lines?

3   A.   Yes.

4   Q.   Okay.  Although you approached this in that way of, you

5   know, applying these different streams to get to here, kind of,

6   just general confirmation, was there an easy double-check that

7   said, Yep, we've got the right lines?

8   A.   Well, we found lines that matched the information provided

9   on GitHub.

10  Q.   More generally, were there other lines in your logs where

11  this role was being used externally -- by an external user to

12  execute commands?

13  A.   No.  This was the entirety of the external use of that

14  role.

15  Q.   Okay.  And so your search, that kind of double-check, did

16  that contribute to you thinking, Okay, we've got the right

17  lines?

18  A.   Yes.  Part of the investigation was to see if any other

19  roles were used, but we didn't identify any others.  So this was

20  the full set, all had the same role.

21  Q.   And so what does this universe of lines from the logs

22  reflect?

23  A.   It is a series of activities over that March through May

24  time period, and requests made using the stolen WAF identity.

25  Q.   Okay.  And if we go back to column A, let's get the first

1  page and then the second page.

2      What is the date range for this group of 59 events?

3  A.   At the top, it starts on March 12th of 2019, and ends on

4  May 26th of 2019.

5  Q.   Is that why you say the conduct of the attack continued for

6  two and a half months?

7  A.   Yes.

8  Q.   If we could go up to the first line, there's a column,

9  column K, towards the right, labeled "event name."  What was

10  that column?

11  A.   This is the request that was made to the AWS service.

12  Q.   Okay.  And so what does -- the first request says "describe

13  instance," correct?

14  A.   Yes.

15  Q.   What is "describe instance" -- what does that command ask

16  for?

17  A.   It's just asking for some information about an AWS

18  resource.

19  Q.   Okay.  Could you issue that command without knowing the

20  name of the resource already?

21  A.   I don't think so, no.

22  Q.   So this line happened on March 12th.  What does that tell

23  you about the date that Ms. Thompson first obtained access to

24  AWS computers?

25  A.   Well, it was at least this day, if not earlier.

Michael Fisk - Direct continued by Mr. Friedman

1  Q.   And then are you aware if this particular command
2  succeeded?

3  A.   I think if you scroll to the right, you can see an error
4  column that will tell you whether or not it succeeded, and this
5  one did not.

6  Q.   Why do you say that?

7  A.   In the error message column, you can see the response, "You
8  are not authorized to perform this operation."

9  Q.   When you say that was the response, was that a response
10 that would have been sent to Ms. Thompson?

11 A.   Yes.

12 Q.   So she would have received that text saying, "You are not
13 authorized"?

14 A.   I believe so.

15 Q.   If we go back to column Q and scroll down, are you able to
16 tell from that whether the majority of the commands that
17 Ms. Thompson entered failed or succeeded?

18 A.   Yes.  It looks like the majority failed.

19 Q.   And I see the message, "You are not authorized to perform
20 this operation," in a lot of these rows.

21 A.   Yes.

22 Q.   Are there some rows, specifically, the bottom one, and then
23 the rows that follow, that have slightly different text?

24 A.   Yes.

25 Q.   Scrolling to the right, what is that text?

1  A.   Well, rows 48 through 53 is just a different form of

2  not-authorized message.

3  Q.   Okay.  And would that be text that would have gone to

4  Ms. Thompson?

5  A.   I believe so.

6  Q.   Okay.  The language that this role is not authorized to

7  perform whatever the command is?

8  A.   Yeah.  That's meant to be an error message delivered to the

9  user.

10  Q.   Can we go back and look at the dates in column A, and I

11  want to focus on the period from March 22nd to March 23rd.

12  There should be ten rows.

13      Do you see that list of ten rows that took place between

14  March 22nd and March 23rd?

15  A.   Yes.

16  Q.   What commands was Ms. Thompson issuing during that period?

17  A.   Get caller identity, describe instance, several list-bucket

18  commands.

19  Q.   What does "get caller identity" ask a computer to do?

20  A.   It tells you the name that corresponds to the credential

21  that you have, sort of a who-am-I command.

22  Q.   Okay.  Is that information as having the ability -- let's

23  go to the right and see if those commands succeeded.

24  A.   The lack of an error message tells me the get caller

25  identity, for example, succeeded.

1    Q.    Would that be enough information that Capital One would be

2    interested in having a responsible disclosure, that someone had

3    been able to do this and get this information?

4    A.    Yes.  Just getting a credential stolen outside of our

5    environment alone would be definitely something that we'd want

6    to know about and act on.

7    Q.    Did Capital One receive a reasonable disclosure about this

8    in March of 2019?

9    A.    No.

10   Q.    The other commands here listed in that two-day window are

11   list-buckets primarily; is that correct?

12   A.    Yes.

13   Q.    And what does list-buckets do, again?

14   A.    This corresponds to things like we saw before, where it

15   will just return a list of the Capital One buckets that can be

16   seen by that role and credential.

17   Q.    And did those commands succeed?

18   A.    Yes.

19   Q.    Now, does Capital One have other logs that tell what was

20   going on during this period, things that are not reflected in

21   this particular chart?

22   A.    Yes.  There's a second type of log that AWS provides that's

23   higher in volume, and so it's provided separately, called

24   "CloudTrail data event logs," and we used those in the

25   investigation as well.

1    Q.    Did you look at the CloudTrail data event logs for

2    March 22nd and 23rd?

3    A.    Yes.

4    Q.    And what did you see, in general terms, when you looked at

5    that?

6    A.    A lot of successful and unsuccessful requests to get files,

7    "GetObject" is the actual "Get" name, essentially, to download a

8    file.

9    Q.    Okay.  And would you take a look at Exhibit 210, and tell

10   me if you recognize that.

11          THE COURT:  We're now back on published.

12          MR. FRIEDMAN:  We're going to go back to this in a

13   moment.

14          THE COURT:  So Ms. Manca just is wanting to parade

15   back and forth.

16          MR. FRIEDMAN:  Exercise.

17   Q.    (By Mr. Friedman)  Do you recognize Exhibit 210?

18   A.    Yes.

19   Q.    What is Exhibit 210?

20   A.    It is a tally of those log events.  Like I said, they were

21   quite numerous, and this is a tally of a number of requests and

22   the time durations for those requests for all the different

23   buckets that were accessed or attempted to be accessed.

24   Q.    During this two-day window?

25   A.    Right.

1   Q.   You said this is a tally.  Would the actual logs be

2   voluminous?

3   A.   Yeah.  I think there were millions of rows.

4   Q.   Okay.  So it would be a multimillion-row spreadsheet?

5   A.   Yes.

6          MR. FRIEDMAN:  The government offers Exhibit 210.

7          MR. HAMOUDI:  No objection.

8          THE COURT:  210 is admitted.

9               (Government Exhibit 210 admitted.)

10  Q.   (By Mr. Friedman)  Mr. Fisk, is it fair to say there are

11  four tabs in this exhibit?

12  A.   Well, I see three.

13  Q.   There you go.

14       So I'm going to start with one that says, "Successful list

15  objects requests."

16       What is a list object request?

17  A.   It just enumerates the objects or files in a bucket; sort

18  of like looking at a folder on your computer and seeing what the

19  names are.

20  Q.   Is this related to the activity we saw in the CloudTrail

21  event logs, the previous exhibit?

22  A.   Yes.

23  Q.   Okay.  And can you tell how many -- in general terms,

24  what's the volume of successful requests to list objects during

25  that two-day time?

1    A.    Yeah, I mean, basically, if you're looking at the first

2    column and adding it up, I think it's in the thousands of

3    successful requests.

4    Q.    Okay.  And then if we look at the second column, is that a

5    measure of the volume of data for those requests?

6    A.    For the requests.  This is just -- this is the link of all

7    the file names put together sort of thing.

8    Q.    And if we go to the "successful get-objects requests" tab,

9    what's the difference between that and the "list objects" tab?

10   A.    So "list objects" is just sort of showing you that list of

11   files in the directory.  "GetObject" is actually downloading a

12   copy of a file object.

13   Q.    Can you tell the volume of successful requests here?

14   A.    I recall, if you total it all up, it was between two and

15   three million, I think.

16   Q.    So two or three million files or folders or whatever the

17   objects were?

18   A.    Yes.

19   Q.    There are also two tabs that say "failed list objects" and

20   "failed get-object requests."  What are those?

21   A.    Those were similar requests but ones that were unsuccessful

22   due to access controls.

23   Q.    When you say "access controls," what do you mean in this

24   context?

25   A.    So the role credential that we've been discussing, the

1    ISRM-WAF-Role, did have access to some customer data in this

2    account, but it didn't have access to all of the files, so many

3    of these requests were denied.

4    Q.   So a mix; some succeeded, some failed?

5    A.   Correct.

6    Q.   And this spreadsheet talks about GetObject and list object

7    requests.

8    A.   Yes.

9    Q.   Is that the command that Ms. Thompson would have typed in

10   order to generate this, or would she have typed a different

11   command?

12   A.   She could have done it either way, but there is a sync

13   command that would do that that we saw in one of the gists.

14   Q.   Do you infer anything from the fact that there are millions

15   of these?

16   A.   Probably not something you type by hand.

17   Q.   And the sync command, let's go to Exhibit 204, page 47.

18        This looks like a comment by Paige Adele Thompson; is that

19   correct?

20   A.   Yes.

21   Q.   And what do you see at the end of that comment?

22   A.   An AWS sync command.

23   Q.   Is that a command that would have generated the get-object

24   and list-object commands that we just saw reflected in the logs?

25   A.   Yes.

1  Q.   So Capital One observed data exfiltration on two days; is

2  that correct?

3  A.   The 22nd and 23rd.

4  Q.   Of March?

5  A.   Yes.

6  Q.   Did it observe other activity after that?

7  A.   Yes, not exfiltration, but other activity.

8  Q.   And if we could go back to Exhibit 207.

9        MR. FRIEDMAN:  Special Agent, can we highlight lines

10  15 to 38?

11  Q.   (By Mr. Friedman)  Do you see activity on a particular date

12  here?

13  A.   Yes, the April 19th.

14  Q.   Okay.  And when we go over to the column "event name,"

15  towards the right --

16  A.   Uh-huh.

17  Q.   -- that starts with a new command that we haven't talked

18  about, "create keypair."

19  A.   Yeah.

20  Q.   What is a keypair?

21  A.   A keypair is a set of credentials that let you log-in to a

22  computer resource in AWS.

23  Q.   And why is it called a keypair?

24  A.   It uses a form of cryptography called "public private

25  keys," where you -- there are two keys; one is a secret key that

1   is held by the user of the key, and then a corresponding public

2   key that is put on the server that you would access, and the

3   server uses the public key to identify that the person making

4   the request holds the secret key.

5   Q.   And so it allows access?

6   A.   Yes.

7   Q.   Is it a type of credential, even?

8   A.   Yes.

9   Q.   Have you ever heard the term "back door"?

10   A.   Yes.

11   Q.   And what is a back door to you?

12   A.   A back door is something an intruder will create to provide

13   an alternate and longer-lasting form of access should their

14   initial way that they got in stop working or potentially be too

15   noisy and too likely to be detected.

16   Q.   Is creating a keypair a way of creating a back door?

17   A.   Yes.

18   Q.   Are you aware of whether these commands were successful?

19   A.   I believe they were not.

20   Q.   Okay.  And let's go to the right and look at the output.

21        What was returned when these commands were entered?

22   A.   "You are not authorized to perform this action."

23   Q.   And that would have been a message sent to Ms. Thompson?

24   A.   Should have been, yes.

25   Q.   And then if we look under there, it looks like "create

Michael Fisk - Direct continued by Mr. Friedman

1    keypairs," then there are five commands that say "describe

2    keypairs."  What does that command do?

3    A.   Well, "create" will create new ones, and "describe" will

4    describe any that already exist.

5    Q.   Why would keypairs already exist?

6    A.   So a company that's using AWS compute service may create

7    keypairs so the company itself can internally log-in to those

8    virtual servers.

9    Q.   Would the company have authorization or ask Capital One to

10   do that?

11   A.   Well, you're referring --

12   Q.   Oh, sorry --

13   A.   -- for ourselves -- and, yes, if they existed, it would be

14   meant for internal use by the company.

15   Q.   And does Capital One just generally authorize members of

16   the public to create keypairs?

17   A.   No, not all.

18   Q.   Or if there are existing keypairs, to use those to access

19   its computers?

20   A.   No, not at all.

21   Q.   Did the commands to describe keypairs, did those succeed?

22   A.   No.

23   Q.   I assume you tell us that based on the right-hand column?

24   A.   Yes.

25   Q.   Would the message in the right-hand column here also have

1  gone to Ms. Thompson?

2  A.    Yes.

3  Q.    There are also, apart from the create keypair and describe

4  keypair commands, there are four at the bottom, I believe.  I'm

5  not seeing them.

6       I'm sorry.  The next four commands, if we can look at

7  those.  Those are also April 19th, so lines 39 to 42?

8  A.    Yes.

9  Q.    So those are four more events that took place on April

10  19th?

11  A.    Yes.

12  Q.    What command was issued for those four events?

13  A.    "List-buckets."

14  Q.    And did that command succeed?

15  A.    I believe it did.  If you scroll to the right, there would

16  be no error message.  Yeah.

17  Q.    I'm sorry.  I misdescribed the date for these.  There are

18  two dates that these actually took place, correct?

19  A.    Can we scroll back to the left?  I think these four are all

20  on the 19th.

21  Q.    Okay.  And then let's go down because there will be two, I

22  believe, on April 21st.  Do you see two on April 21st?

23  A.    Yes.

24  Q.    Are those also list-bucket commands?

25  A.    Yes.

1    Q.    And were those successful?

2    A.    Yes.

3    Q.    Now, is April 21st a date that you've already seen in this

4    case?

5    A.    Yes.

6    Q.    What is that date?

7    A.    The gist that showed commands being executed, I believe,

8    was the 21st.

9    Q.    And so would one of these commands be the command that

10   resulted in the creation of the April 21st gist?

11   A.    Or vice versa, depending on -- yes, I believe they are

12   linked.

13   Q.    Why do you say "vice versa"?

14   A.    Well, the commands that we see in the gist would have

15   executed the events that were then placed in these logs.

16   Q.    Okay.  But they're associated?

17   A.    They're one-for-one, yes.

18   Q.    The same commands has resulted in both traces?

19   A.    Yes.

20   Q.    Fair enough.

21         And then if we just turn to the last line of the

22   spreadsheet, what is the last date for an event that you see

23   linked to Ms. Thompson?

24   A.    May 26th.

25   Q.    Is that the last date of activity, that Capital One is

1   aware of, in connection with this breach?

2   A.   Yes.

3   Q.   In hindsight, has Capital One looked back and seen whether

4   there were any warnings or alerts triggered during this breach?

5   A.   Yes.

6   Q.   And what did you find when you do that?

7   A.   There were two cases opened and investigated by our

8   operations center.

9   Q.   When was the first case?

10  A.   On the 22nd, I believe.

11  Q.   Of March?

12  A.   Of March, yes.

13  Q.   The date of the exfiltrations?

14  A.   Yes.

15  Q.   And what caused that event or what triggered that?

16  A.   It was an alert on failed get-object requests.

17  Q.   Can you say what you mean by that?

18  A.   So our monitoring and detection program looks at event

19  logs, and for certain kinds of events will create a case for

20  investigation, and one that we had a rule for and created a case

21  for was multiple failed attempts to get -- to do a get-object

22  command.

23  Q.   And when you say "multiple failed attempts," how does that

24  relate to what we've just talked about?

25  A.   So in the spreadsheet with the four tabs, you know, one of

1    which was a "failed to get-objects request," essentially, all of

2    the log entries represented in that tab were related to a case

3    that was opened.

4    Q.    Okay.  So the successful request did not trigger a case,

5    but the failed ones did?

6    A.    Correct.

7    Q.    What happens when a case is triggered?

8    A.    Someone in our operations center investigates it.

9    Q.    And did someone do that in this case?

10   A.    Yes.

11   Q.    And what happened when they looked at and investigated?

12   A.    They saw failed requests.  They did not identify anything

13   that, to them, looked like successful activity, and they closed

14   the case.

15   Q.    Okay.  What was the second alert or warning in hindsight?

16   A.    Later on, there was a second credential exfiltration alert.

17   Q.    Okay.  When did that happen?

18   A.    I don't actually recall the precise date.  I think it was

19   in April.

20   Q.    Was it in hindsight?  Does it appear to have been triggered

21   or linked by commands reflected in the CloudTrail log we just

22   looked at?

23   A.    Yes.

24   Q.    And so when you say "credential exfiltration," what,

25   specifically, was it?

1    A.    So we use the AWS GuardDuty service, and credential

2    exfiltration is the term that the GuardDuty service uses for

3    this alert.

4          But, basically, it is looking for one of our credentials

5    being used from outside of our environment, not from one of our

6    resources.  So it's an indicator that a credential has been

7    stolen.

8    Q.    In this case, is it the ISRM-WAF-Role being used in an

9    external IP address?

10   A.    Yes.

11   Q.    And was an analyst assigned to that one?

12   A.    Yes.

13   Q.    And what did the analyst find?

14   A.    They, again, failed to identify anything that looked like a

15   successful data exfiltration or anything on that day and closed

16   the case and moved on.

17   Q.    Okay.  Did they leave a note in the file about anything for

18   the future?

19   A.    Yeah.  Basically, they said they didn't think that the

20   traffic was necessarily, you know, something that we should --

21   it's called "whitelist," but, basically, not alert on, and to

22   keep an eye out if it happened again.

23   Q.    Are you aware of a handwritten note relating to -- that

24   came up in the course of this investigation?

25   A.    Yes.

1  Q.    Okay.  And would you take a look at Exhibit 952 and tell me

2  if you recognize that?

3  A.    Yes.

4  Q.    Is that the note?

5  A.    Yes.

6  Q.    Did that note come to Capital One?

7  A.    Yes.

8  Q.    And when did that happen?

9  A.    I believe it was in May.

10 Q.    So how does that relate in time to when the data had been

11 stolen from the company?

12 A.    It was well after the date it had been stolen.

13 Q.    A couple months?

14 A.    Yes.

15 Q.    Okay.  There is an IP address in the middle of that.  What

16 is that IP address?

17 A.    That is the same IP address we saw before, which was the

18 WAF and web server that Ms. Thompson exploited.

19 Q.    Okay.  And there's a reference above that or there's a line

20 above that that says "open SOCKS proxy"?

21 A.    Yes.

22 Q.    What is a SOCKS proxy?

23 A.    A SOCKS proxy is a different kind of proxy, most commonly

24 used to get out of a corporate network and get to the Internet.

25 It has its own SOCKS protocol and port.

1    Q.    Okay.  Do you know what port number that is?

2    A.    I believe it's 1080.

3    Q.    Not 443?

4    A.    No.

5    Q.    Does this describe the misconfiguration that Ms. Thompson

6    used to get access to Capital One data?

7    A.    No.

8    Q.    And why do you say that?

9    A.    Because there was not a SOCKS proxy, much less an open

10   SOCKS proxy.

11   Q.    When you say "there was not a SOCKS proxy," does every port

12   not have each proxy?

13   A.    So a SOCKS proxy is a piece of software that you have to

14   install and run, and there was no software that would act as a

15   SOCKS proxy on the machine in question.

16   Q.    Okay.  So Capital One hadn't even installed the software

17   this refers to?

18   A.    Right.

19   Q.    Was this note originally provided -- do you know the source

20   of this note?

21   A.    Capital One received it from AWS.

22   Q.    Do you have any further knowledge beyond that?

23   A.    No.

24   Q.    And Capital One, I guess, investigated, you said?

25   A.    Yes.  In May, when this was received, a team -- like I

1  said, the first step is to try to understand the veracity and

2  can you reproduce the alleged vulnerability, and so the team

3  attempted to and could not.

4  Q.    And when the team was unable to produce or see this

5  vulnerability, what did it do?

6  A.    Closed the investigation.

7  Q.    Are you aware of the volume of records or data that were

8  taken during this breach?

9  A.    Yes, in general terms.

10  Q.    In general, how many people's data was taken?

11  A.    It was about 98 million U.S. persons' data, and another six

12  million Canadian persons' data.

13  Q.    Did Capital One prepare an exhibit that summarizes the

14  number of people's data?

15  A.    Yes.

16  Q.    Would you look at Exhibit 715 and tell me if you recognize

17  that?

18  A.    Yes.

19  Q.    Is that the summary that Capital One prepared?

20  A.    Yes.

21          MR. FRIEDMAN:  The government offers 715.

22          THE COURT:  715 is a summary exhibit.  Are you okay

23  admitting it into evidence?

24          MR. HAMOUDI:  I do have a little objection because it

25  is a hearsay objection, but, also, I don't think -- I think

1    there is another witness that can put this particular exhibit

2    in.

3                THE COURT:  Okay.  I'll allow it to be displayed to

4    the jury, but not admit it into evidence right now.

5                MR. HAMOUDI:  Thank you, Your Honor.

6    Q.   (By Mr. Friedman)  Does this relate to all of the

7    individuals whose information was taken, or just some?

8    A.   All.

9    Q.   Were there also Canadian citizens?

10   A.   Yes.  I'm sorry.  This is the United States table.  There

11   is also a Canadian table with smaller numbers.

12   Q.   But this is all U.S. citizens?

13   A.   Yes.

14   Q.   And how many U.S. citizens' data was taken?

15   A.   Nearly 98 million in total.

16   Q.   And was it the same data for each of those people?

17   A.   No.  There were a variety of different files that had

18   different combinations of information, and so there is different

19   tallies for different kinds of information for those

20   individuals.

21   Q.   And so it looks like, for most of the individuals, their

22   name, their date of birth, and their self-reported income was

23   taken?

24   A.   Yes.

25   Q.   What about addresses, say, mailing addresses?

1    A.    Yeah.   That was about 20 million of the individuals had

2    mailing addresses, I think, exposed.

3    Q.    How many people's Social Security numbers?

4    A.    It was 117,000.

5    Q.    What about bank accounts?

6    A.    Almost 78,000.

7    Q.    This was prepared a couple of years ago; is that correct?

8    A.    Yes.

9    Q.    Does Capital One still believe those are the correct

10   numbers?

11   A.    Yes.

12   Q.    Mr. Fisk, are you aware that a search warrant was executed

13   at Ms. Thompson's residence?

14   A.    Yes.

15   Q.    Did the government subsequently provide Capital One with

16   data retrieved from Ms. Thompson's computer?

17   A.    Yes.

18   Q.    Have you looked at portions of that data?

19   A.    Yes.

20   Q.    I'm going to ask you to look at Exhibit 711.  Tell me if

21   you recognize that.

22   A.    Yes.

23   Q.    Is this a file structure or a list of files for that data

24   that was provided to Capital One?

25   A.    Yes.

1    MR. FRIEDMAN:  Government offers Exhibit 711.

2    MR. HAMOUDI:  No objection.

3    THE COURT:  711 is admitted into evidence.

4    (Government Exhibit 711 admitted.)

5  Q.  (By Mr. Friedman)  Mr. Fisk, do you recognize the files

6  listed there, or buckets listed there?

7  A.  Yes.  All the things in the right-hand column are Capital

8  One bucket names.

9  Q.  Have you also looked at individual files or parts of

10  individual files?

11  A.  Yes.

12  Q.  Would you take a look at Exhibit 712 and tell me if you

13  recognize that?

14  A.  Yes.

15  Q.  In general terms, what is this?

16  A.  Well, the lower right-hand corner, the one being

17  highlighted, that is data from a file in a Capital One bucket

18  that was stolen during this incident.

19    MR. FRIEDMAN:  Government offers Exhibit 712.

20    MR. HAMOUDI:  I object, Your Honor.  I don't think he

21  generated this data.  I don't think he analyzed this data.

22    THE COURT:  Well, do you want to ask any more

23  questions about that?

24    MR. FRIEDMAN:  Yes.

25    MR. HAMOUDI:  That would be great, Your Honor.

1    Q.   (By Mr. Friedman)  Did you compare this data to data in

2    Capital One's possession that you received from Capital One?

3    A.   Yes.

4         MR. HAMOUDI:  Objection withdrawn.

5         THE COURT:  Thank you.  I'll admit Exhibit 712 into

6    evidence.

7              (Government Exhibit 712 admitted.)

8    Q.   (By Mr. Friedman)  Part of this screen is data, correct?

9    A.   Yes, the lower-right quadrant.

10   Q.   Do you have a general understanding of what the screen is

11   overall?

12   A.   Based on the title, it appears to be a forensics tool.

13   Q.   And does it list a number of files or directories on the

14   left-hand side?

15   A.   Yes.

16   Q.   Do you recognize those?

17   A.   Yes.  Those are Capital One buckets and directories.

18   Q.   And then one that is highlighted, is it your understanding

19   that the data shown in the bottom right comes from that file?

20   A.   Yes.

21   Q.   Did you compare it to that file retrieved from Capital One?

22   A.   Yes.

23   Q.   And what did you find?

24   A.   We found these precise records on the screen in that file

25   to verify the complete match.

1    Q.    So what did you conclude based on that?

2    A.    This was the same file that originated from us and was

3    taken in the breach.  We also saw the file name, specifically,

4    in the event logs.

5    Q.    And zooming in on the data, what type of data is this?

6    A.    So this is, you know, data stored for use by computer

7    programs but relating to credit card offers.  You'll see

8    statements, a sort of form-letter-looking formatting that says,

9    "You are preapproved for this Capital One starter card offer,"

10   for example, and then contains the personal information of the

11   customers or potential customers that that offer would be made

12   to.

13   Q.    And what personal information do you see for each customer?

14   Do you see a name?

15   A.    Yes.  I see a first name; a middle name, or at least an

16   initial; and last name.

17   Q.    Do you see, towards the right, something that says, "addr

18   line one"?

19   A.    Yes.

20   Q.    What is that?  What type of information would that be?

21   A.    That's the first line of a mailing address for the person's

22   postal address.

23   Q.    And we're just seeing gray here in the Capital One version?

24   A.    Yeah, I've seen the actual address, yeah.

25   Q.    And in the version the FBI provided you, was the actual

1    address there?

2    A.    Yes.

3    Q.    So it's just been redacted for public display?

4    A.    I presume.

5    Q.    Do you also see, towards the left, date of birth as some of

6    the information?

7    A.    Yes.

8    Q.    Did this file contain people's complete dates of birth?

9    A.    Yes.

10   Q.    And do you see "last four SSN" to the right?

11   A.    Yes.

12   Q.    What does "last four SSN" mean to you?

13   A.    The last four digits of the person's Social Security

14   number.

15   Q.    And so this file contained that information?

16   A.    Yes.

17   Q.    If you would look at Exhibit 713.  Is that also data

18   provided to you by the government that you reviewed?

19   A.    Yes.

20   Q.    And did you compare that to Capital One data?

21   A.    Yes.

22            MR. FRIEDMAN:  Government offers Exhibit 713.

23            MR. HAMOUDI:  No objection to this, Your Honor.

24            THE COURT:  713 is admitted into evidence.

25                 (Government Exhibit 713 admitted.)

1    Q.    (By Mr. Friedman)  Now, this is in a file format that's

2    hard to see, correct?

3    A.    Yes.

4    Q.    The exhibit has very long lines, correct?

5    A.    Yes, it does.

6    Q.    If we effectively scroll to the right to the fourth page of

7    it, and let's zoom in on some of the data.

8          What type of information does this file contain?

9    A.    You can see here it has address lines; again, it has last

10   names; and I think, before we zoomed in, I could see first names

11   as well.

12   Q.    So it contained people's names and addresses?

13   A.    Yes.

14   Q.    And if we move one screen to the right, do you see there

15   the types of information this file contained for the customers

16   whose names were on the last screen?

17   A.    Yes, date of birth and Social Security number.

18   Q.    And did you compare this to the file that you got from

19   Capital One?

20   A.    Yes.

21   Q.    And what did you find?

22   A.    It matched exactly.

23   Q.    Did you reach a conclusion based on that?

24   A.    Yeah.  It was our file that had been taken and then

25   recovered by the FBI.

1    Q.    Okay.  And then I'm going to ask you to go back to

2    Exhibit 712, which is the first piece of data that you compared.

3    And if we could go to the second page of this exhibit.

4         Is this an additional portion of that file that you

5    compared Capital One's data to the FBI's data?

6    A.    Yes, this is additional data we compared.

7    Q.    Okay.  We'll zoom in on a few rows.

8         So what types of information in this case was in the data

9    taken by Ms. Thompson from Capital One?

10   A.    It has many of the same elements: date of birth, last four

11   of Social Security number, full names, address, and then also

12   some email addresses.

13   Q.    Okay.  And here, this is 712, it says "last four SSN"?

14   A.    Yes.

15   Q.    When we looked at 713, was that the four, or was that the

16   full Social Security numbers?

17   A.    I'd have to look again.  We've seen examples of both, I

18   think.

19   Q.    Go back to 713, page 5, please.

20   A.    Yeah, these were full numbers, I believe.

21   Q.    Okay.  Some of the 100,000 or so individuals whose full

22   Social Security numbers were taken?

23   A.    Correct.

24   Q.    Thank you.

25        Mr. Fisk, is Capital One regulated by any government

1    entity?

2    A.    Yes, multiple.

3    Q.    Is there a particular primary regulator?

4    A.    Well, I think all of our regulators think they are primary,

5    but the Office of the Comptroller of the Currency, in

6    particular, regulates us.

7    Q.    Is this a government entity that regulates banks or a

8    portion of banks?

9    A.    Yes.

10   Q.    Do they show up every year to look at Capital One, or do

11   they have people on-site permanently?  How does that work?

12   A.    They have what's called "resident examiners," people who,

13   or at least pre-COVID times, would sit in the building but who

14   we interact with regularly, and then they also schedule periodic

15   exams.

16   Q.    How regularly do they do the periodic examinations?

17   A.    There're multiple annual cycles, so we see them more than

18   once a year, but you can think of them as annual exams.

19   Q.    As part of their examination, did they look at Capital

20   One's cyber security following this breach?

21   A.    Following the breach?  Yes.

22   Q.    And did they make any findings regarding Capital One's

23   Cyber Security Organization and cyber security, I guess?

24   A.    Yes, there was a consent order issued.

25   Q.    Would you look at Exhibit 953?  Do you recognize that?

1  A.    Yes.

2  Q.    What is that?

3  A.    That is the consent order from the OCC.

4  Q.    Okay.  Did this reflect what the OCC classified as

5  findings -- some findings they made?

6  A.    Yes.

7  Q.    Are those shown on the second page?

8  A.    I believe so.

9  Q.    If we could go to the second page.  There is a section,

10  Article II, it says, "The Comptroller finds, and the bank

11  neither admits or denies," do you see three findings after that?

12  A.    Yes.

13  Q.    What did the comptroller find?

14  A.    To summarize concerns with the risk-management process

15  around information technology and NAC operations, is what the

16  first one describes.

17  Q.    So the first one, would you just read the first sentence of

18  the first one?

19  A.    "In or around 2015, the Bank failed to establish effective

20  risk assessment processes prior to migrating its information

21  technology operations to the cloud operating environment."

22  Q.    What was the second finding?

23  A.    That our internal audit team at the bank had not identified

24  some of the gaps and weaknesses.

25  Q.    And what was the third finding?

1  A.    That the Board had not driven sufficient action around

2  issues.

3  Q.    Were these findings general findings, or did they relate to

4  specific events?

5  A.    They're fairly broad and reflect, I believe, the OCC's

6  perspective over examining us over an extended period.

7  Q.    Did this whole consent order include a financial penalty

8  for Capital One?

9  A.    Yes, it did.

10 Q.    And how much was that penalty?

11 A.    $80 million.

12 Q.    Was there also a separate consent order that talked about

13 procedures and going forward?

14 A.    Yes.

15 Q.    And in general terms, without going to it specifically, do

16 you understand, generally, what that provided?

17 A.    There were a bunch of enhancements to our security program

18 at the bank that we planned to make and that they would

19 supervise the execution of.

20 Q.    Do either of those orders refer specifically to this breach

21 or the events of this breach?

22 A.    No.

23 Q.    Were they all more general and procedural?

24 A.    Yes, and much broader.

25 Q.    Did either of them refer to Ms. Thompson?

1    A.    No.

2    Q.    Did either of them make any findings about whether Capital

3    One had authorized or permitted Ms. Thompson to do anything?

4    A.    No.

5    Q.    Was there any reference at all to this breach in those

6    orders?

7    A.    No, not to my knowledge.

8    Q.    Has Capital One one also conducted its own evaluation of

9    what happened?

10   A.    Yes.

11   Q.    And did you participate in that evaluation?

12   A.    Yeah.  Actually, very early on, I was asked to lead that

13   investigation.

14   Q.    And what did you find, in general terms?

15   A.    You know, the most -- the primary things we identified were

16   the things we've discussed around the misconfiguration of the

17   WAF, the fact that WAF role had, additionally, been given overly

18   broad access to data that it didn't need under principle of

19   least privilege.

20   Q.    Those all sound like technical findings about what

21   happened.

22   A.    Yes.

23   Q.    Were there also broader findings about Capital One as an

24   entity?

25   A.    Yes.  There were some procedural things; for example, much

1   of the reason that Social Security numbers were in the data that

2   was stolen.  Well, the examples we saw here, I think, looked

3   like individuals.  In many cases, they were associated with

4   small-business cards, and a small-business owner has a tax ID

5   number that may be a company tax ID number, but personal

6   proprietorship may be an individual's Social Security number

7   used as a tax ID number.  And so, for example, there were some

8   gaps in our software developers understanding that a

9   small-business tax ID number needed to be protected the same

10  that we protect a Social Security number in our standards, for

11  example.

12  Q.   Okay.  Were there also findings about Capital One's overall

13  Cyber Organization structure and company structure, things like

14  that?

15  A.   Yeah.  There were some statements around, sort of,

16  ambiguities in people's roles.

17  Q.   Did Capital One -- I think you've described this breach as

18  resulting from a misconfiguration and other configurations and

19  things like that.  Is it fair to say "a mistake" or "mistakes"?

20  A.   Yes.

21  Q.   Did Capital One ever intend for the data that Ms. Thompson

22  took to be available to the public?

23  A.   No, never.

24  Q.   Does Capital One intend for its banking data to be

25  available to the public, ever?

Michael Fisk - Direct continued by Mr. Friedman

1   A.   No.

2   Q.   Would it be legal for Capital One to make that data just

3   generally, publically available?

4   A.   No.  The Gramm-Leach-Bliley Act, amongst others, I think

5   protects consumers and says their information needs to be kept

6   private.

7   Q.   Did Capital One intend for Ms. Thompson to be able to

8   assume the role that she assumed?

9   A.   No.

10  Q.   Did it intend for Ms. Thompson to be able to access any

11  data?

12  A.   Not unless she was a customer and accessing only her

13  specific -- data of her own, but not the data she accessed.

14  Q.   Did Capital One ever do anything that you view as

15  authorizing or allowing her to do that?

16  A.   No.

17  Q.   So how did you explain what happened here?

18  A.   Capital One, we had made some errors and mistakes in

19  configuring things, and that made it -- created a vulnerability

20  that she was able to find and exploit.

21       MR. FRIEDMAN:  Thank you very much.

22       THE COURT:  Okay.  We'll take our mid-morning break

23  now, and then come back with cross-examination of Mr. Fisk.

24       So leave your notepads and pens on your chairs, and please

25  stay in your seats in the audience until the jury has an

1    opportunity to be taken downstairs by the courtroom deputy.

2
                    (Court in recess 10:30 a.m. to 10:50 a.m.)
3
                    THE FOLLOWING PROCEEDINGS WERE HELD
4                   IN THE PRESENCE OF THE JURY:

5                   THE COURT:  We will now do cross-examination of

6    Mr. Fisk by Mr. Hamoudi.

7                   MR. HAMOUDI:  Good afternoon, Mr. Fisk.

8                   THE COURT:  Or good morning.

9                   MR. HAMOUDI:  Good morning, Mr. Fisk.

10                   THE WITNESS:  Good day.

11                               CROSS-EXAMINATION

12   BY MR. HAMOUDI:

13   Q.    Capital One has represented that this incident involved the

14   granting of overly permissive access to its web access firewall

15   roles; correct?

16   A.    I think it -- I think you're mixing two statements.  Overly

17   permissive permissions with respect to the S3 buckets was a

18   factor; and then secondly, a misconfiguration of the WAF.

19   Q.    Okay.  And when you say misconfiguration of the WAF, you

20   mean configuration; correct?

21   A.    Yes.

22   Q.    Okay.  And so the incident really involved a gap in access

23   management by Capital One; correct?

24   A.    I believe that was a secondary factor, with the WAF

25   configuration being the primary.

1   Q.    Ms. Thompson was able to access your AWS storage from

2   outside the Capital One network because of a lapse in access

3   management; correct?

4   A.    Primarily because she stole the credential.

5   Q.    Okay.  Did you previously testify in a proceeding under

6   oath?

7   A.    I've been deposed under oath, I guess.

8   Q.    Okay.  And do you remember being asked whether Ms. Thompson

9   received access to the Instance Metadata Service?  Do you recall

10  being asked that question?

11  A.    Uhm, it's been a while, so, no, not precisely, but...

12  Q.    Okay.  Do you remember saying that she didn't take the

13  credentials, I wouldn't say that, she got access to the metadata

14  service which provides the credential?

15  A.    I may have said that, sure.

16  Q.    Okay.  Would it help refresh your recollection if I show

17  you the portion of your testimony that you gave under oath?

18  A.    Yes.

19  Q.    Okay.

20           MR. HAMOUDI:  Can you bring up CONE1903, please?

21           THE COURT:  This is just going to be shown to the

22  witness, not to the jury.

23  Q.    (By Mr. Hamoudi)  And this is your deposition.

24           MR. HAMOUDI:  Can you go down to page 88, CONE1903.

25      And up there at the top.

1    Q.   (By Mr. Hamoudi)  And you were asked a question, Once she

2    was able to get into the metadata service, she took the

3    credential and that allowed her to gain access to the card prod

4    account and the 7 to 800 S3 buckets.

5         And what is your answer to that?

6    A.   So I was saying that she utilized the metadata service, not

7    that she broke into the metadata service.

8    Q.   Can you -- but can you answer what you said under oath?

9              THE COURT:  Just read the answer.

10   A.   Just read the answer?

11   Q.   (By Mr. Hamoudi)  Yes.

12   A.   I wouldn't say that -- sorry, I wouldn't say that she got

13   into the metadata service, she essentially got access to the

14   metadata service, which provides the credentials, which, as you

15   said, then provided access to the -- to data.

16   Q.   Okay.  Thank you.

17        Now, I want to go back and ask you, Capital One configured

18   the web access firewall -- you can take that off the screen --

19   Capital One configured the web access firewall to allow external

20   computers to retrieve credentials from Capital One's Instance

21   Metadata Service, didn't it?

22   A.   That may have been the effect, but an employee of Capital

23   One enabled proxying on the WAF, and Ms. Thompson discovered

24   that that would allow her access to the Instance Metadata

25   Service, but that was never an intent of the company.

1  Q.   So Capital One configured the web access firewall?

2  A.   Yes.

3  Q.   Okay.  And Capital One could have configured the web access

4  firewall to deny external requests; correct?

5  A.   Yes.

6  Q.   And Capital One could have configured the web access

7  firewall to deny external requests from iPredator?

8  A.   Yes.

9  Q.   From TOR?

10  A.   That would be difficult since TOR uses IP addresses all

11  over the Internet.

12  Q.   But it could have?

13  A.   At the risk of disenfranchising our customers and

14  potentially breaking the law in terms of not allowing them to

15  have access.

16  Q.   So you agree that some of your customers may use TOR to

17  access your services?

18  A.   I guess they might.

19  Q.   Okay.  And the permissions on AWS servers are set by the

20  user, Capital One; correct?

21  A.   Yes.

22  Q.   And AWS servers are zero permission by default; correct?

23  A.   Essentially.

24  Q.   And so Ms. Thompson only had permission to access Capital

25  One's web access firewall because Capital One granted her such

1    permissions; isn't that correct?

2    A.    So the web application firewall was configured by Capital

3    One to be Internet facing, because that was its purpose, to

4    serve customers on the Internet.

5    Q.    So I'm going to ask the question again, and say "yes" or

6    "no."  So Ms. Thompson only had permission to access Capital

7    One's web access firewall because Capital One granted her such

8    permissions?

9    A.    Yes.

10        MR. HAMOUDI:   Okay.  If we could go to Exhibit 205,

11   please, which has been previously admitted.

12        Down at the bottom, if you could blow it up, it says

13   HTP200, okay?

14   Q.    (By Mr. Hamoudi)  You provided some testimony on this part

15   of the April 19, '21 gist log.  Do you recall that?

16   A.    I think it was April 21st of 2019, but, yes.

17   Q.    My apologies, April 21st, 2019.

18        Wasn't Capital One's servers responsible -- wasn't Capital

19   One's server's response to Ms. Thompson's CURL command here

20   "okay"?

21   A.    I think this response actually came from the instance --

22   AWS Instance Metadata Service.

23   Q.    And Capital One configures the Instance Metadata Service;

24   correct?

25   A.    The Instance Metadata Service is not very configurable by

Mike Fisk - Cross by Mr. Hamoudi

1    the AWS customer.

2    Q.    So I'm going to ask the question again.  "Yes" or "no,"

3    wasn't Capital One's server's response to Ms. Thompson's curl

4    command "okay"?

5    A.    She received an "okay" response, yes.

6    Q.    Okay.  And that's from the server; correct?

7    A.    AWS Instance Metadata Service.

8    Q.    And it could have responded forbidden or unauthorized?

9    A.    Yes.

10   Q.    And if Ms. Thompson set her --

11         MR. HAMOUDI:  Let's go back to the top where -- http

12   169, yes, if you could zoom that up.

13   Q.    (By Mr. Hamoudi)  and you gave some testimony about the

14   http -- and what is http?

15   A.    It's the Hypertext Transfer Protocol.  We think of it as

16   the protocol for the web.

17   Q.    And it doesn't have an S after the P; correct?

18   A.    Correct.

19   Q.    And that distinction is important; correct?

20   A.    It can be.

21   Q.    And why is that distinction important?

22   A.    So http without the S implies that the traffic is not

23   encrypted.

24   Q.    Okay.  So if Ms. Thompson set her web browser to use

25   Capital One's web access firewall as a proxy, couldn't she have

1  just typed the http language, the URL, into her browser and

2  gotten the same credentials?

3  A.   Yes.

4  Q.   Okay.  And Port 443 is also a public port; correct?

5  A.   I don't know if the ports are inherently public or not,

6  but, yes, this firewall made 443 available to the Internet.

7  Q.   Well, it's for traffic -- for public traffic; correct?

8  A.   I mean, companies use 443 for internal private traffic as

9  well, but, yes this was an Internet-facing server.

10  Q.   So I want to talk about the CloudTrail logs and the

11  GuardDuty responses, the signals that you testified on direct.

12  Do you recall that testimony?

13  A.   Yes.

14  Q.   Okay.  So on direct, you testified --

15       MR. HAMOUDI:  You can take that down.  Thank you so

16  much.

17  Q.   (By Mr. Hamoudi)  So on direct, you testified that Capital

18  One reviewed the CloudTrail and GuardDuty logs in March 2019;

19  correct?

20  A.   I said there were GuardDuty -- there was a GuardDuty alert

21  that was reviewed in March of 2019.  The CloudTrail logs we

22  collected, the forensic analysis was done in July after

23  discovery of the breach.

24  Q.   So the GuardDuty logs were reviewed in March 2019?

25  A.   The GuardDuty -- the GuardDuty logs are collected and an

1    automated system creates cases for investigation based on some

2    of them.  And we discussed one case from a GuardDuty alert that

3    was created on March 22nd.

4    Q.    And these were Capital One analysts; right?

5    A.    Yes.

6    Q.    And trained cyber security professionals?

7    A.    Yes.

8    Q.    And they saw that an external user was accessing Capital

9    One's web access firewall; right?

10   A.    I don't recall if they noted that it was external or not on

11   that one.

12   Q.    It was coming from iPredator; correct?

13   A.    It was.  I do not recall if that was noted in the case or

14   not.

15   Q.    And they didn't block the user, did they?

16   A.    The -- blocking the ISRM-WAF user would have taken down

17   services.

18   Q.    But you could have blocked the individual user if you

19   wanted to, as a trained cyber security professional; correct?

20   A.    So Ms. Thompson was acting with the stolen identify of the

21   WAF, so blocking Ms. Thompson, and by identity, would have

22   blocked the legitimate WAF as well.

23   Q.    So the system was treating her as a legitimate user?

24   A.    Yes, because she was impersonating one.

25   Q.    Okay.  Well, you talk about impersonating.  You haven't met

1    my client; correct?

2    A.    Not -- not closer than today.

3    Q.    Okay.  And you've never sat down and had a conversation

4    with her, have you?

5    A.    Correct.

6    Q.    So when I ask questions about the system, if you could

7    focus on what technologically happened, I would greatly

8    appreciate it.

9          I want to follow up, you used the term on direct

10   "whitelisted."  What does whitelisted mean?

11   A.    It is enumerating a set of things to allow, or in that

12   context to not alert on.

13   Q.    What about blacklisted?

14   A.    It is a term to enumerate a set of things to not allow.

15   Q.    Okay.  And despite Capital One's review of its GuardDuty

16   logs from March 2019, Capital One's analyst did not blacklist

17   the IP address, which is attributed to my client, to it, did it?

18   A.    Correct.

19   Q.    Okay.  I want to talk about data a little bit.

20         MR. HAMOUDI:  Have Exhibit 715, please.

21   Q.    (By Mr. Hamoudi)  How old was this data?

22   A.    Much of it went back, you know, a number -- several years.

23   I don't recall the precise direction, but it's collected over a

24   long period of time.

25   Q.    And Capital One didn't encrypt the data; right?

1   A.   It was all encrypted as it was stored.  And additionally, a

2   lot of the information is further tokenized or encrypted.  But

3   what was taken was taken in decrypted form.

4   Q.   So the data that was taken, before it was taken, it was not

5   encrypted; correct?

6   A.   No.  It was encrypted and stored encrypted in S3.

7   Q.   Okay.  But the data, the content, the substance of the data

8   was not encrypted; correct?

9   A.   No, it was encrypted.

10  Q.   Which data was encrypted?

11  A.   All of it.

12  Q.   Okay.  Are you dis- -- is there a distinction between

13  tokenized and encrypted?

14  A.   Yes.

15  Q.   Okay.  You're not aware that Ms. Thompson ever used or

16  shared Capital One's data with anybody; correct?

17  A.   I'm not aware of that, that she did, no.

18  Q.   Okay.  And if Capital One learned of that, they would have

19  immediately informed regulators; correct?

20  A.   Correct.

21  Q.   And she didn't have to decrypt the data as she took it;

22  correct?

23  A.   S3 decrypted it for her because she had the credential.

24  Q.   Okay.  And you're not -- strike that.

25       I want to go back and talk about the data, since we're on

1    that.

2         No credit card account numbers or login credentials were

3    compromised; correct?

4    A.   Correct.

5    Q.   And over 99 percent of the Social Security numbers were not

6    compromised; correct?

7    A.   Correct.

8    Q.   And the largest category of information was routinely

9    collected information; correct?

10   A.   I'm not sure what you're referring to by "routinely

11   collected."

12   Q.   Routinely collected in the course of business, name,

13   address, phone number, date of birth; correct?

14   A.   Yeah.  I mean, I would say all of this information was

15   collected in the course of business.

16   Q.   Okay.  And then when we talk about data, the total number

17   of data was -- it was upwards of 1.7 terabyte; correct?

18   A.   Yes, something -- it was large, yeah.

19   Q.   Okay.  So when we're talking about data, the 1.7 terabyte,

20   how much of that data was the data that is represented on

21   Exhibit 715?

22   A.   In terms of storage space, it was probably a relatively

23   small fraction.  Some of the individuals -- you know, an

24   individual's name, for example, may have occurred multiple times

25   in multiple files, so this is a unique count per person.

1   Q.   Okay.  And in terms of understanding how long it would take

2   to go through 1.7 terabytes of data, can you give us a sense of

3   how long it would take for someone to go through 1.7 terabytes

4   of data given your experience with data?

5   A.   I mean, if I wanted to, you know, look for Social Security

6   number, for example, I can, you know, issue a command that

7   searches for the right sort of pattern.  And it would probably

8   take at least hours, depends a little bit on if you're just

9   doing it on your laptop or if you're -- you know, have a big

10  server in the cloud or how you're doing it.

11  Q.   Okay.  I want to talk about the web access firewall.

12       Who was the -- who was the -- who's Houston Hopkins?

13  A.   Houston Hopkins was a member of the security team at

14  Capital One.

15  Q.   Did -- was he supervised by you?

16  A.   No.

17  Q.   Did he report to you?

18  A.   No.

19  Q.   And were you colleagues?

20  A.   We were both members of the same organization.

21  Q.   Okay.

22  A.   Worked with him.

23       MR. HAMOUDI:  May I approach, Your Honor?

24       THE COURT:  Sure.

25       THE CLERK:  Do you want me to mark this, Counsel?

1      MR. HAMOUDI:  I'm not going to admit it, I'm just

2  going to talk to him, unless the Court would like me to.

3      THE COURT:  I think we should put an exhibit number on

4  it, yeah.

5      MR. HAMOUDI:  Okay.  What's next?

6          (Off the record.)

7      MR. HAMOUDI:  1202.

8      THE COURT:  Okay.  Exhibit 1202 is marked for

9  identification.

10  Q.   (By Mr. Hamoudi)  Take a moment to review that.  And let me

11  know when you're finished.

12  A.   Okay.

13  Q.   Okay.  And help me understand, what is the platform, this

14  messaging, that you and Mr. Hopkins are having together?

15  A.   I suspected it was from Slack, which is a chat system that

16  we use.

17  Q.   And what is Slack?

18  A.   It's a commercially available chat service that companies

19  use.

20  Q.   And you're having this discussion internally between you

21  and Mr. Hopkins?

22  A.   Yes.

23  Q.   And this is a private conversation; correct?

24  A.   Yes.

25  Q.   Okay.  And in this conversation, he, as your colleague,

1  security colleague, takes the position that we should stay away

2  from the term "misconfiguration," which looks like we have

3  mostly done; is that correct?

4  A.   He says that, yes.

5  Q.   And he also says that the web -- the mod_proxy set to the

6  Proxy Requests on was also purposeful; correct?

7  A.   He states that as his opinion.

8  Q.   That's his opinion; correct?

9  A.   Yeah.

10  Q.   And he memorializes that opinion in this private Slack chat

11  channel with yourself; correct?

12  A.   I'm not sure if there's a legal meaning to memorialize, but

13  he said it.

14        THE COURT:  It's not a proper question.

15        MR. HAMOUDI:  I apologize.  I strike that, Your Honor.

16        THE COURT:  Sure.

17  Q.   (By Mr. Hamoudi)  But he put it -- he was sending his

18  thoughts to you; correct?

19  A.   Yeah, in a conversation with me, he said this.

20  Q.   Yeah.

21        And you disagree with that opinion, you had a -- you

22  differ.  You didn't believe that that was purposeful; correct?

23  A.   I disagreed the configuring that way was the right

24  configuration.

25  Q.   Okay.  Was the right configuration.

1    A.    Yeah.

2    Q.    So -- and as two security professionals, you just had a

3    disagreement of opinion; correct?

4    A.    Essentially.

5            MR. HAMOUDI:  Okay.  All right.  I want to mark for

6    identification 12 -- 1012.

7            THE CLERK:  That was already marked, Counsel.  Can we

8    use --

9            THE COURT:  Just the next number you want?

10                       (Off the record.)

11           MR. HAMOUDI:  Oh, that one was 1015?

12           THE COURT:  No, this is 12 --

13           MR. HAMOUDI:  1015.

14           THE COURT:  Okay.

15                       (Off the record.)

16           MR. HAMOUDI:  I apologize, Your Honor.  We premarked

17   this as 1012.  I think I just used -- jumped.

18           THE COURT:  So you want to show it to Victoria and see

19   if it is 1012 in her book or if it needs a new number?

20           MR. HAMOUDI:  Yes.

21           THE CLERK:  We had already marked Ms. Valentine's

22   LinkedIn profile as 1012, so can I just change it to 1013?

23           MR. HAMOUDI:  Yes.  I apologize.

24           THE COURT:  That's marked as 1013 now.

25           MR. HAMOUDI:  Oh, can I have a copy back, please?

1          THE COURT:  Yeah.

2     Q.   (By Mr. Hamoudi)  Mr. Fisk, let me know when you finish

3     reviewing 1013.

4     A.   Okay.

5     Q.   This is an email that was sent from an individual named

6     Robert McLean; correct?

7     A.   Yes.

8     Q.   And Robert McLean, who is he?

9     A.   He works in the Capital One cyber security organization on

10    threat intelligence.

11    Q.   Do you supervise him or are you colleagues?

12    A.   I do not supervise him, but we're both in the same

13    organization.

14    Q.   Okay.  And this email was sent at or near the time the

15    incident happened?

16    A.   It was sent on August 2nd of 2019.

17    Q.   Yeah.

18         And this email is kept in the course of Capital One's

19    regularly conducted business activities?

20    A.   I'm not sure.  Can you restate the question, or I'm not

21    sure what you mean.

22    Q.   Yeah.

23         Do you regularly send emails as part of your business

24    practice internally within Capital One to --

25    A.   Yes.

1    Q.    -- your fellow colleagues?

2    A.    Yes.

3    Q.    And this email represents that?

4    A.    Yes.

5          MR. HAMOUDI:  Okay.  And at this time, Your Honor, I'd

6    like to move to admit Exhibit 1013 under the business records

7    exception.

8          MR. FRIEDMAN:  Objection.  I don't think it qualifies.

9          MR. HAMOUDI:  The alternative, non-hearsay purposes,

10   Your Honor, that Capital One was on notice as to the substance

11   of this email.  And I will link it back through the Special

12   Agent Martini when he testifies about whether or not he was

13   given this information when he initially started the

14   investigation.

15         THE COURT:  Well, I'm not going to admit the exhibit

16   into evidence, but, again, if you want to ask Mr. Fisk questions

17   about its content, that's fine.

18         MR. HAMOUDI:  Okay.

19   Q.    (By Mr. Hamoudi)  So let me ask you this, this is an email

20   from Mr. McLean to yourself; correct?

21   A.    I'm copied on it, yeah.

22   Q.    Yes.

23         And in this email, Mr. McLean is expressing a, we are

24   confident in that individual, Lila Ghosh's discovery; correct?

25   A.    Yes.

1   Q.   And here they're talking about the note that was previously

2   admitted; correct?

3   A.   They don't state it, but I believe that is probably the

4   case.

5   Q.   That's the case.

6        And the assessment of the cyber security team at Capital

7   One was that either Ms. Thompson or her associate Neoice was the

8   source of that note; correct?

9             MR. FRIEDMAN:  Objection.  He's effectively reading

10   the contents of the note.

11            THE COURT:  I'll allow the question.

12        You can answer.

13   A.   Sorry, could you restate the question?

14   Q.   (By Mr. Hamoudi)  Yeah.  And the assessment here is that

15   either Ms. Thompson or her associate Neoice was the source of

16   that note; correct?

17   A.   It was our threat intel team and Bob's team's assessment.

18   Yeah, they had confidence in their theory that the note may have

19   been passed at a Sheraton down the street from the conference.

20   Q.   All right.  Thank you.

21        Just continue on there.

22        Marked next in order, Defendant's Exhibit 1014.

23   A.   Okay.

24   Q.   Have you seen this email before?

25   A.   Not that I recall.

1    Q.    Not that you recall.

2          Were you aware that Capital One employees believed that Ms.

3    Thompson's activity on May 26th accessing Capital One's servers

4    was presumably to check to see if the credential system would

5    grant access after passing the note.  Were you aware that

6    Capital One employees believed that?

7    A.    We certainly believed that the attempt was to see if the

8    access still existed.  I wasn't aware of this -- yeah, this

9    theory that it was specifically after passing a note.

10   Q.    Okay.  Were you also -- were you aware that Capital One

11   employees believed that the April 19th access that you discussed

12   on direct examination was a confession scan or a loud and proud

13   scan?

14   A.    I did not.

15   Q.    You did not?

16   A.    I had not seen or heard that phrase before, no.

17   Q.    And what is a confession scan?

18   A.    It's not a term I've heard before, so I could speculate on

19   what it means, but I --

20         THE COURT:  You don't need to speculate.

21   Q.    (By Mr. Hamoudi)  Okay.  Isn't it true that Capital One

22   configured the role so that the role had permission to access

23   the sensitive data that was downloaded by Ms. Thompson; correct?

24   A.    Correct.

25   Q.    And isn't it true that Ms. Thompson's actions caused

1    Capital One to change this configuration so that it was no

2    longer available or -- to anyone; correct?

3    A.    Our discovery of the actions, yeah.

4    Q.    Okay.  And so between March 12th, when I believe the first

5    access was -- you testified to on a log, until July, other than

6    Ms. -- other -- was there anybody else that let Capital One know

7    that its servers were accessible?

8    A.    No.  The only notice we received was that note.

9    Q.    Okay.

10   A.    Sorry, the responsible -- the email note from Kat Valentine

11   I'm referring to.

12   Q.    Ms. Thompson could not see the data before she downloaded

13   it; right?

14   A.    She could see file names, she could not see what was in the

15   file.

16   Q.    And Ms. Thompson did not -- okay, that's fine.  Let me move

17   to the next.

18         The gist file, do you remember looking at the gist file?

19   A.    Yes.

20   Q.    You mentioned personally reviewing the gist Ms. Thompson

21   posted onto GitHub; correct?

22   A.    Yes.

23   Q.    And it was easy for Capital One to reproduce the

24   vulnerability with the information Ms. Thompson provided on

25   GitHub; right?

1   A.    Yes.

2   Q.    And indeed, in your experience, isn't it true that

3   sometimes people make information about vulnerabilities public

4   to get them fixed; correct?

5   A.    Yes.

6          MR. HAMOUDI:  Can you bring Exhibit 207 up, please?

7   Is this the special file?  Oh, it is.

8          MS. MANCA:  Victoria, would you mind turning off

9   the...

10                         (Off the record.)

11         MR. HAMOUDI:  If you could go to the right where it

12  says you are not authorized, Agent.

13       Yeah.

14  Q.    (By Mr. Hamoudi)  On direct, you testified that at times

15  Ms. Thompson received a, you're not authorized response from

16  Capital One servers.  Do you recall that?

17  A.    I said that AWS provides this error message intended to be

18  delivered to the user initiating the request.

19  Q.    But when you say "servers," these are servers that Capital

20  One is leasing; correct?  From AWS?

21  A.    No.  I would not describe it that way.  The public APIs,

22  interfaces that Amazon has, are on servers that we don't, you

23  know, lease or contract for specifically.

24  Q.    Okay.  So at the times that there was no error, the servers

25  did authorize Ms. Thompson's access; correct?

1    A.    No.  They responded to the requester who had stolen and was

2    using a Capital One credential.

3    Q.    Okay.  If a certain computer allows a user to run commands

4    on it, isn't it a reasonable conclusion for that person to

5    believe they're authorized to do so?

6    A.    No.

7    Q.    Okay.  You also testified that Capital One would have been

8    interested in learning about external access to its security

9    credentials; right?

10   A.    Yes.

11   Q.    The public wouldn't have known that in 2019; correct?

12   A.    Sorry, could you restate the question?

13   Q.    Yeah.

14         The public wouldn't have known that in 2019; correct?

15   A.    Wouldn't have known what?  Sorry.

16   Q.    You testified that Capital One would have been interested

17   in learning about external access to its security credentials;

18   right?

19   A.    Yes.

20   Q.    The public would not have known that in 2000 --

21   A.    Would not have known that there was public access, or that

22   we would have been interested, or I'm not sure what you're

23   asking.

24   Q.    Yeah.  The latter.

25   A.    Would the public have known that we would be interested?

1        I --

2   Q.   No, that it was accessible --

3   A.   Would the public have known that there was -- that there

4   was a vulnerability where someone could get the credentials, is

5   that what you're asking?

6   Q.   Yes.

7   A.   Sorry.  Don't mean to be obtuse.

8   Q.   You're not being obtuse.  I think I'm just not asking a

9   very clear question.

10  A.   I will grant that.

11  Q.   I will take responsibility for that.

12       All right.  You discussed the keypair on direct.  Do you

13  remember that?

14  A.   Yes.

15  Q.   Okay.  The keypair does nothing without permission from the

16  server; right?

17  A.   Creating a keypair is creating a permission.

18  Q.   But the server does that; correct?

19  A.   The server will execute a keypair creation request if an

20  authorized user presents a credential that allows them to do so.

21  Q.   I guess the computer doesn't make a distinction between

22  authorized and unauthorized, it doesn't assess motive; correct?

23  A.   Correct; it just assesses, do you have the credential --

24  Q.   And then if you have them, it will give them to you?

25  A.   If you have a credential that has permission to create a

1   keypair, it will create the keypair.

2   Q.   And I want to make sure this is clear because the

3   permissions are configured by -- is configured by Capital One;

4   correct?

5   A.   The permission of whether or not the role is able to create

6   a keypair is configured by Capital One.

7   Q.   Okay.

8   A.   And it was denied because we had not granted that

9   permission.

10  Q.   But you did -- permission was granted on March 22nd when

11  the data was downloaded; correct?

12  A.   The permission to read data had been granted to the

13  ISRM-WAF-Role.

14  Q.   You talked about the OCC, which is short for the Office of

15  the Controller of Currency; correct?

16  A.   Yes.

17          MR. HAMOUDI:  All right.  Mark Exhibit 1009.

18       Offer 1009.

19          MR. FRIEDMAN:  No objection.

20          THE COURT:  1009 is admitted into evidence.

21              (Defense Exhibit 1009 admitted.)

22          MR. HAMOUDI:  Publish 1009, please.

23                  (Off the record.)

24  Q.   (By Mr. Hamoudi)  As part of Capital One's business

25  activities, they issue annual reports to the public; correct?

1  A.    Correct.

2  Q.    And in 2020, do you recognize this document, this is an

3  annual report issued by Capital One?

4  A.    Yes.

5  Q.    Okay.  I want to turn your attention to a term on the next

6  page up top.  And in that report, it describes a cyber security

7  incident; correct?

8  A.    Yes.

9  Q.    And what does it say?

10  A.    It says Cyber Security Incident:  The unauthorized access

11  by an outside individual who obtained certain types of personal

12  information relating to people who had applied for our credit

13  card products and to our credit card customers that we announced

14  on July 29th, 2019.

15  Q.    Okay.  And then if you go to the next page, and in the

16  yellow, if you can read that out loud, the two paragraphs?

17  A.    Yes.  Sorry.  Governmental Inquiries, sort of a heading

18  font.  We have received inquiries and requests for information

19  relating to the cyber security incident from Congress, federal

20  regulators, relevant Canadian regulators, the Department of

21  Justice, and the offices of approximately 14 state Attorneys

22  General.  We are cooperating with these offices and responding

23  to their inquiries.

24        The second paragraph says, In August 2020, we entered into

25  consent orders with the Federal Reserve and the OCC resulting

1  from regulatory reviews of the cyber security incident and

2  relating to ongoing enhancements of our cyber security and

3  operational risk management processes.  We paid an $80 million

4  penalty to the U.S. Treasury as part of the OCC agreement.  The

5  Federal Reserve agreement did not contain a monetary penalty.

6          MR. HAMOUDI:  Okay.  And then mark next Exhibit 1008.

7      Offer 1008.

8          MR. FRIEDMAN:  Your Honor, I think we've already

9  offered that same document this morning.

10         THE COURT:  I don't know that you actually offered it.

11 You used it, but you didn't, so...

12         MR. FRIEDMAN:  We certainly have no objection.

13         THE COURT:  It's the content; right?

14         MR. HAMOUDI:  Yes, yes.

15         THE COURT:  1008 will be admitted into evidence, sure.

16             (Defense Exhibit 1008 admitted.)

17 Q.  (By Mr. Hamoudi)  And if you go to the second page, the

18 annual report referenced a consent decree.  Do you recall the

19 $80 million penalty?

20         THE COURT:  Yeah.  We just heard that.

21         MR. HAMOUDI:  Oh, yes.  Okay.

22 Q.  (By Mr. Hamoudi)  And go -- just reread the first

23 paragraph, please, Article II, number 1.

24 A.  Right.  Under the part where it says, The bank neither

25 admits or denies the following?

1    Q.    Yes.

2    A.    One, in or around 2015, the bank failed to establish

3    effective risk assessment processes prior to migrating its

4    information technology operations to the cloud environment.  The

5    bank also failed to establish appropriate risk management for

6    the cloud operating environment, including appropriate design

7    and implementation of certain network security controls,

8    adequate data loss prevention controls, and effective

9    dispositioning of alerts.

10   Q.    And if you could go down to the second one as well?

11   A.    Two, the bank's internal audit failed to identify numerous

12   control weaknesses and gaps in the cloud operating environment.

13   Internal audit also did not effectively report on and highlight

14   identified weaknesses and gaps to the audit committee.

15   Q.    And then the last one?

16   A.    Three, for certain concerns raised by internal audit, the

17   board failed to take effective actions to hold management

18   accountable, particularly in addressing concerns regarding

19   certain internal control gaps and weaknesses.

20   Q.    And then if you go to the second page, please?

21         THE COURT:  Third page.

22   Q.    (By Mr. Hamoudi)  The third page, please, and then Article

23   III, section 1

24   A.    Read it?

25   Q.    Yes, please.

1    A.    The bank shall make payment of a civil money penalty in the

2    total amount of $80 million, which shall be paid upon the

3    execution of this order.

4    Q.    Okay.  And so fair to say that one of the interests in a

5    bank is to reduce its exposure to penalties by regulators that

6    are imposed, such as this penalty?

7    A.    Yes.

8              MR. HAMOUDI:  Okay.  No further questions.

9              THE COURT:  Okay.  Any redirect, Mr. Friedman?

10             MR. FRIEDMAN:  Briefly, Your Honor.

11             MR. HAMOUDI:  Your Honor, I made a mistake, apparently

12   my colleague had some questions for me to ask and I did not ask

13   them.

14             THE COURT:  Well, I'll let you do it after Mr.

15   Friedman.

16             MR. HAMOUDI:  Okay.  Thank you, Your Honor.

17             THE COURT:  Sure.  That way you can get straight what

18   Mr. Klein is trying to get you to say.

19             MR. HAMOUDI:  I apologize.

20             THE COURT:  Okay.  No problem.

21                         REDIRECT EXAMINATION

22   BY MR. FRIEDMAN:

23   Q.    Good morning again, Mr. Fisk.

24   A.    Good morning.

25   Q.    You were asked some questions about the data that was

1  downloaded in this case?

2  A.    Yes.

3  Q.    And the volume of that data?

4  A.    Yeah.

5  Q.    And I think you used the phrase "a lot of data"?

6  A.    Probably.

7  Q.    Are you aware of how long it took for that download to take

8  place?

9  A.    I believe it was the better part of a day, many hours.

10 Q.    You were asked about a -- I think you were shown a document

11 marked as Exhibit 1013, which would be in front of you.  It was

12 about what some Capital One employees might have believed?

13 A.    Yes, regarding the conference?

14 Q.    Yeah.

15       As an initial matter, was this a unanimous opinion at

16 Capital One?

17 A.    I would describe it as a working theory.

18 Q.    Okay.  Are there a lot of employees at Capital One?

19 A.    There are.

20 Q.    Do they -- some of them have different opinions about some

21 things?

22 A.    Of course.

23 Q.    Okay.  And does this email show some of the information on

24 which this particular person's opinion was based?

25 A.    Yes.

1   Q.    Okay.  Is it based on the assumption that this note was

2   passed at a conference in Bellevue, Washington?

3   A.    Yes.

4   Q.    Is it based on the assumption that it was passed between

5   April 29th of May -- April 29th and May 2nd of 2019?

6   A.    Or thereabouts.  It says those are the dates of the summit

7   and --

8   Q.    Okay.  But those are --

9   A.    -- summit, so...

10  Q.    Fair to say those are --

11          THE COURT REPORTER:  I'm sorry, one at a time.

12          THE COURT:  One at a time.

13          MR. FRIEDMAN:  Sorry.

14  Q.    (By Mr. Friedman)  Is it fair to say that those are

15  assumptions that lead to whatever this person believed or

16  concluded?

17  A.    Yeah.  I mean, it's stating the fact that a conference

18  happened and the hypothesis that the note was passed and

19  relating to a Sheraton hotel down the street.

20  Q.    Okay.  And is that a factor in whatever conclusions this

21  person draws about who may have passed that note?

22  A.    I mean, it's a fact that there's a Sheraton down the

23  street, but that the note that we discussed earlier was passed,

24  you know, near that Sheraton or at the time of this event is

25  what I would describe as a working theory.

1    Q.    Okay.  But my question is, are those facts factors in this

2    person reaching that opinion, is that part --

3            THE COURT:  You know, we're asking a lot of questions

4    that really are not pertinent here.  So let's move on, Mr.

5    Friedman.

6    Q.    (By Mr. Friedman)  You were asked questions -- I think a

7    question, that is the reason -- to the effect of, is the reason

8    that Ms. Thompson was able to download this because Capital One

9    had given her permission to do that.  Do you recall that?

10   A.    Roughly.

11   Q.    Okay.  Do you recall saying that she was able to do what

12   she had done because she had been given permission to do that by

13   Capital One?

14   A.    No.

15   Q.    Okay.  Would that be -- any time someone was able to breach

16   a company using credentials, would that be because that person

17   had used those credentials?

18           MR. HAMOUDI:  I'm going to object to that, Your Honor.

19           THE COURT:  Yeah.  I think we're getting out into the

20   ionosphere.  The jury understands what's going on and the

21   difference between getting somewhere and having permission to

22   get somewhere, so let's move on.

23           MR. FRIEDMAN:  Okay.

24   Q.    (By Mr. Friedman)  Did Capital One intend for Ms. Thompson

25   to be able to assume the role that she assumed?

1   A.    No.

2           MR. HAMOUDI:   That's an ultimate issue, Your Honor.

3   I'm going to object.

4           THE COURT:   I'm going to overrule the objection.

5       You can -- the answer to that question was?

6   A.    Was no.

7           THE COURT:   All right.

8   Q.    (By Mr. Friedman)   And did Capital One intend for Ms.

9   Thompson to be able to take that data?

10  A.    No.

11  Q.    If Capital One intended for that data to be publicly

12  available, how might it have gone about making that data

13  publicly available?

14  A.    I mean, it's sort of a contrived question, given the nature

15  of the data, but we have an open API system with documentation,

16  so where we want to provide some, you know, technical access to

17  a service, it's done through that, or for individual users, it's

18  done through a web application or an app on your phone that you

19  get an account for, and you log in using your credentials and

20  get the access that we give you using your credentials.

21  Q.    But it wouldn't require assuming a role from the Instance

22  Metadata Service?

23  A.    Right.  It would not require using the WAF-Role.

24  Q.    Okay.  Did the method by which Ms. Thompson obtained that

25  data, did it make that data available to anyone who didn't have

1    a high degree of technical computer sophistication?

2    A.    It took a lot of sophistication to identify that

3    vulnerability and exploit it.  It was not a well-known

4    vulnerability.

5    Q.    Okay.  Are you aware of any conversations about -- at

6    Capital One about making this data publicly available only to

7    people with a high degree of technical ability?

8    A.    No.

9          MR. FRIEDMAN:  Okay.  Thank you.  I have no further

10   questions.

11         THE COURT:  All right.  Mr. Hamoudi, you can ask the

12   other questions and any other follow-up from what Mr. Friedman

13   did.

14         MR. HAMOUDI:  Can I have a moment, Your Honor?

15         THE COURT:  Yeah, sure.

16         MR. HAMOUDI:  Thank you.

17                     RECROSS-EXAMINATION

18   BY MR. HAMOUDI:

19   Q.    There was some discussion about that email.  I just want to

20   be clear, the email, which is Exhibit 1013, about the assessment

21   about the note, it says in there, "we are confident," the

22   assessment says that "we are confident"; correct?

23   A.    Yes.

24   Q.    And "we" is not just an individual, there's a collective

25   "we"; correct?

1    A.    So the sentence before that says, I enlisted the team.  I

2    believe "we" is referring to the team.  And that is

3    Robert's threat --

4    Q.    Okay.

5    A.    -- team.

6    Q.    So Michael Johnson, who is he?

7    A.    He was the chief information security officer at the time.

8    Q.    Who is Jill Vaughan?

9    A.    She was a deputy chief information security officer for

10   governance and risk.

11   Q.    Devon Rollins?

12   A.    Bob McLean reported to him.  He led our threat intelligence

13   function.

14   Q.    And who is Nicole Washburn?

15   A.    She was also a manager in our operations and intelligence

16   organization.

17   Q.    And Mr. Friedman just asked you questions about data

18   availability, public availability.  Capital One did make the

19   data publicly available, did it not?

20   A.    No.

21   Q.    Well, it was accessed through an http, correct, and it

22   wasn't secure?

23   A.    No, that's not correct.

24   Q.    Well, I think we covered this in the exhibits.

25          MR. HAMOUDI:  Can you bring up the gist file?

1                         (Off the record.)

2             MR. HAMOUDI:  204, please.  Or 205.

3        Go up top, please.

4    Q.   (By Mr. Hamoudi)  Right there it says http.  Do you

5    remember your testimony about that?

6    A.   Yes.

7    Q.   So any user who set their web browser up as a proxy could

8    have punched that into their web browser and executed this

9    command; correct?

10   A.   Yes.

11            MR. HAMOUDI:  Okay.  No further questions.  Thank you.

12            THE COURT:  All right.  Can Mr. Fisk be allowed to

13   escape?

14            MR. FRIEDMAN:  Almost, Your Honor.

15                      REDIRECT EXAMINATION

16   BY MR. FRIEDMAN:

17   Q.   You were just asked a question about how Ms. Thompson

18   ultimately accessed the data?

19   A.   Yes.

20   Q.   And would you take a look at Exhibit 108?  Does that

21   reflect how she actually accessed the data?

22   A.   Yes.

23   Q.   How is that that she did that?

24   A.   So after stealing the credential, the role credential, she

25   then used that directly to talk to the S3 service, not going

1    through a Capital One service, and download the data from S3.

2    Q.    So not -- over the AWS command line interface?

3    A.    Right.

4    Q.    The gateway into the data?

5    A.    Yes.

6              MR. FRIEDMAN:  Thank you.

7         And, Your Honor, we would actually offer Defense Exhibit

8    1013.

9              THE COURT:  I agree.  Let's put it into evidence.

10   We've had enough conversation about the -- 1013, okay?

11                   (Defense Exhibit 1013 admitted.)

12             MR. HAMOUDI:  Thank you, Your Honor.

13             THE COURT:  Yep.  I'm not doing it because Mr.

14   Friedman said so, I'm looking back to Mr. Hamoudi offering it

15   and saying, yeah, why should we deny the jury the opportunity to

16   see it.

17        So you'll see it and you can draw your own conclusions

18   about what happened, okay?

19             MR. FRIEDMAN:  No further questions, Your Honor.

20             THE COURT:  Nothing else, Mr. Hamoudi?

21             MR. HAMOUDI:  I just -- if we could publish 1013 for

22   the jury to just look at for a moment.

23             THE COURT:  But we do not need Mr. Fisk on the witness

24   stand.

25             MR. HAMOUDI:  No, we do not need Mr. Fisk on the

1  witness stand.

2          THE COURT:  Flee.

3          MR. HAMOUDI:  Thank you, Mr. Fisk.

4          THE COURT:  All right.  And go ahead and publish 1013.

5      Just leave those there, we'll take care of them, thanks.

6          MR. HAMOUDI:  I just learned it's not public, Your

7  Honor, but I can put it on there.

8          THE COURT:  Yeah.

9      Okay.  That's good enough.  Take a moment to look at it.

10     Okay.  Everybody have a chance to look at it?

11     Great.  Thank you.

12     All right.  We have about 15 minutes, but shall we use it

13  for the next witness?

14         MS. MANCA:  Sure.

15         THE COURT:  Great.

16         MS. MANCA:  Your Honor, the government calls Zach

17  Hansen from the FBI.

18         THE COURT:  Agent Hansen, come on into the open area

19  of the courtroom here and we'll swear you in.

20     Please raise your right hand.

21                     ZACHAREY HANSEN,
       having been first duly sworn, testified as follows:

22

23         THE CLERK:  Please have a seat.

24     If you could please state your first and last names, and

25  spell your last name for the record.

Zacharey Hansen - Direct by Ms. Manca

1        THE COURT:  You can take your mask off if you want

2   while you're testifying.  It's totally up to you.

3        THE WITNESS:  Thank you, sir.

4     Zacharey Hansen.  Last name is H-a-n-s-e-n and first name

5   is Z-a-c-h-a-r-e-y.

6        THE COURT:  E-y, okay.

7        THE WITNESS:  A-r-e-y.

8        THE COURT:  Okay.  Ms. Manca.

9        MS. MANCA:  Thank you.

10                    DIRECT EXAMINATION

11  BY MS. MANCA:

12  Q.   Where do you work?

13  A.   I work at the Seattle FBI; the FBI in Seattle.

14  Q.   Okay.  And what's your role within FBI?

15  A.   I am a tactical specialist, which is a fancy way of saying

16  a tactical intelligence analyst.

17  Q.   And which divisions of the FBI do you support in that role?

18  A.   Primarily, I support the Cyber Squad in Seattle.

19  Q.   And what is a tactical specialist?

20  A.   It's a fancy way of saying a tactical intelligence analyst.

21  Primarily, I do desk work where I analyze or collect data in

22  support of investigative activity conducted by agents that is

23  primarily composed of doing open-source research, looking

24  through databases that we already have information contained

25  within, and analyzing data collected from legal process.

Zacharey Hansen - Direct by Ms. Manca

1    Q.    What is open-source research?

2    A.    Open-source research is accessing any data that is obtained

3    from any sort of public space that anyone can freely access.

4          The best example would be from the Internet, such as going

5    to Google and doing a search there.

6    Q.    So does open source include areas of the Internet or social

7    media that are protected by passwords or other privacy?

8    A.    No.  Open source would only apply to areas that anyone can

9    freely access.  So if there is some sort of password

10   restriction, that's not open source anymore.

11   Q.    What if looking into open source requires you to create an

12   account in a certain social media like, say, Facebook?

13   A.    If anyone is able to make an account freely at any time,

14   then that is considered open source still, even if the

15   information on the account is not accurate to who you are

16   specifically.

17   Q.    Okay.  What are some of the procedures for if you want to

18   create a fictitious account in order to access open-source

19   information?

20   A.    FBI has internal policy restrictions on when we can and

21   cannot do that.

22         In this case, specifically, you have to have a certain

23   standard to -- of the investigation has to have reached a

24   certain point past the most basic, where we have an idea that

25   there is some sort of activity going on, which means

1  investigative activity, at which point I can create a fictitious

2  online account, as we'd call it, an FOA, in order to conduct any

3  sort of investigative activity online.

4  Q.    How do you decide what name to use for your fictitious

5  identity?

6  A.    Generally, I try to go with popular enough names that it

7  blends in fairly well.  And I try not to use anything that would

8  tie back to any real person.

9  Q.    Did you create a fictitious identity for your investigation

10  in this case?

11  A.    Yes.

12  Q.    What was the name that you used?

13  A.    The primary name I used for most activity conducted here

14  would have been Blanche Waller.

15  Q.    How do you spell that?

16  A.    B-l-a-n-c-h-e, and then last name would be W-a-l-l-e-r.

17  Q.    And you conducted open-source research for this case; is

18  that right?

19  A.    That's true.

20  Q.    And can you tell us what sites you reviewed in the course

21  of your open-source research?

22  A.    Many.  The main ones I recall would be GitHub and GitLab,

23  Twitter, Facebook, Meetup.com.  I also viewed the Slack

24  channel -- a Slack channel, I should say at this point.  And

25  those are the primary ones I recollect at this moment.

1  Q.    I'm going to ask you about Twitter.

2       Can you tell me what Twitter account specifically you

3  looked at?

4  A.    I looked at -- the main Twitter account that came up in

5  this account would be -- I don't remember the exact handle of

6  the Twitter account, but it is something along the lines of

7  0xA3A, and then it continues past there.  It coincides with a

8  PGP key hash that was provided to us from -- from Paige

9  Thompson.

10           MS. MANCA:  Okay.  And, Agent, could you show Exhibit

11  437?

12  Q.    (By Ms. Manca)  Do you recognize that as the -- a tweet

13  from the Twitter account that you're referring to?

14  A.    Yes, I do.

15  Q.    Okay.  And what is the handle?

16  A.    The handle is the word Erratic with the actual Twitter user

17  name, being @0xA3A97B6C.

18  Q.    And do you recognize this as one of the tweets that you

19  reviewed?

20  A.    It is.

21  Q.    How did you document this open-source media as you were

22  reviewing it?

23  A.    I collected screenshots of any relevant items I found in

24  open source, and then documented them into an FBI case file as a

25  1A in the case file.

1    Q.    Do you -- and you recognize Exhibit 437 as one of your

2    screenshots?

3    A.    I do.

4              MS. MANCA:   The government offers Exhibit 437.

5              THE COURT:   Mr. Klein, any objection to 437?

6              MR. KLEIN:   No objection, Your Honor.

7              THE COURT:   437 is admitted into evidence.

8                 (Government Exhibit 437 admitted.)

9              MS. MANCA:   And can we publish?

10   Q.    (By Ms. Manca)   And can you read -- well, for people who

11   aren't familiar with Twitter, is this referred to as a retweet?

12   A.    This is a response to a tweet.  So in this case the user,

13   Ryan Stalets, made a tweet in reply to another user, and the

14   user Erratic responded to the tweet by Ryan Stalets.

15   Q.    And what was her response?

16   A.    Oh, if you only knew, friend, if you only knew.

17   Q.    And what was the date of that tweet?

18   A.    July 18th, 2019, it should be.

19             MS. MANCA:   Okay.  Okay.  We can take that down.

20   Q.    (By Ms. Manca)   I'm going to ask you now some questions

21   about Slack.  I believe that you said that you reviewed Slack?

22   A.    I did.

23   Q.    Can you tell us what Slack is?

24   A.    Slack is a messaging platform primarily used by businesses,

25   but can be used by pretty much anyone who sets up a Slack

Zacharey Hansen - Direct by Ms. Manca

1    server.  And you can have group channels that you can have

2    conversations on different topics, as well as it supports

3    private messaging between users.

4    Q.    And did you review a Slack channel related to Ms. Thompson?

5    A.    I did.  It was titled Netcrave.

6    Q.    And how did you locate that Slack channel and connect it to

7    Ms. Thompson?

8    A.    When I was going through the open-source review for this

9    case, one of the websites I came across was a Meetup.com event

10   where the Netcrave Slack was linked to, by an account associated

11   with Paige Thompson.

12   Q.    And I previously reviewed with you Exhibits 402, 404, 406,

13   408, 410, 411, 413, 414, 416, 418, and 419.  Did you recognize

14   those as Slack communications that you reviewed?

15   A.    If they're the ones that we reviewed together, then, yes, I

16   reviewed all those.

17   Q.    And are those screenshots that you personally took?

18   A.    Yes.

19   Q.    And do they fairly and accurately describe the contents of

20   those Slack communications?

21   A.    Yes.

22          MS. MANCA:  Okay.  Your Honor, we offer those exhibits

23   that I just listed.

24          THE COURT:  Counsel?

25          MR. KLEIN:  Your Honor, I would object under

1  foundation terms of when he took these screenshots and when he

2  looked at them.  They haven't clarified the timing of this.  I

3  would ask for some more information there for foundation.

4         THE COURT:  All right.  Ms. Manca, ask a little bit

5  more about the foundation.

6  Q.   (By Ms. Manca)  So when you were looking through the Slack

7  communication, can you tell me what date that would have been?

8  A.   I can't say the specific date off the top of my head.  It

9  would have been recorded in the 1A, but it occurred

10 approximately within the 10 days prior to the arrest around --

11 around late July.

12 Q.   And as you looked at the Slack communications, how are you

13 documenting what you look at?

14 A.   So when I access the Slack channel, it allows you to go

15 back prior to when you first joined and see historical messages

16 that were included on the Slack channel.

17        And so when I went through, I read through them all, and I

18 documented in screenshots containing some level of context,

19 including my user name at the time and what channel I was in and

20 what users were posting.  I documented in screenshots any

21 sections of chats which seemed relevant to the case at hand

22 based on the information we had.

23 Q.   Okay.  And so those screenshots are simultaneous as you're

24 reviewing the information online?

25 A.   Could you rephrase that, please?

1    Q.   The screenshots are -- you're taking them as you're

2    reviewing the information?

3    A.   Yes.

4    Q.   And they fairly and accurately show what you're seeing on

5    the screen?

6            MS. MANCA:  Your Honor, once again, I offer those

7    exhibits.

8            THE COURT:  Yeah.

9            MR. KLEIN:  No objection, Your Honor.

10           THE COURT:  All right.  I don't have the numbers right

11   now, but if Victoria has them, we'll admit them all into

12   evidence and you can display them.

13           (Government Exhibits 402, 404, 406, 408, 410, 411,
                413, 414, 416, 418, and 419 admitted.)
14           MS. MANCA:  Thank you.

15       And, Your Honor, we're going to address those, so that will

16   allow us some time.

17           THE COURT:  Okay.  You're not going to -- you're just

18   putting them in evidence right now.

19           MS. MANCA:  That's correct.

20           THE COURT:  Got it.

21           MS. MANCA:  Thank you.

22   Q.   (By Ms. Manca)  The last genre of communications we're

23   going to talk about is IRC chats.  Are you familiar with that?

24   A.   Yes.

25   Q.   What is an IRC chat?

1    A.    IRC stands for Internet Relay Chat.

2    Q.    So it's probably not IRC chat, it's -- yeah.

3    A.    And IRC is a platform.  It's one of the older communication

4    platforms for private messaging between individuals and group

5    communication.  It functions very similarly to Slack.  Slack has

6    an additional user interface added and some details are

7    different, but IRC functions as a way for people to communicate

8    individually with one another or in group chats that are set up

9    based on topic or anything else somebody sets up.

10   Q.    And did you review Internet Relay Chats in this case?

11   A.    I did.

12   Q.    And where did you find the Internet Relay Chats that you

13   reviewed?

14   A.    Those ones were provided to me via a collection obtained

15   after -- during the search.

16         And then our forensic team collected information off of the

17   devices that were obtained during the search and provided me

18   with the chats for review.

19   Q.    Okay.  So can you identify who within the FBI specifically

20   provided you the chats that you reviewed?

21   A.    Computer scientist Waymon Ho provided me with the copies

22   that were collected.

23   Q.    And what was the format in which you reviewed them?

24   A.    I reviewed a directory system that mirrored what was found

25   on the -- as a working copy of the originals, and the log files

1    that were inside of them contained the chats.  The log files

2    were reviewed with a Notepad-like program called Notepad++.

3    Q.    And have you reviewed related to this case Exhibits 450

4    through 462?

5    A.    If those are the ones we reviewed together which contain

6    the IRC communications, then, yes.

7    Q.    Okay.  Are these fair and accurate copies of IRC chats that

8    you reviewed that were provided to you by Waymon Ho?

9    A.    Yes.

10           MS. MANCA:  Your Honor, we offer Exhibits 450 to 462.

11           MR. KLEIN:  One second, Your Honor, just looking

12   through.

13           THE COURT:  Okay.

14           MR. KLEIN:  Your Honor?

15           THE COURT:  Yes.

16           MR. KLEIN:  We don't have an objection, but there may

17   be some rule of completeness issues to raise on cross.

18           THE COURT:  Okay.  Thanks.

19       450 through 462 are admitted into evidence.

20              (Government Exhibits 450-462 admitted.)

21           MS. MANCA:  Thank you, Your Honor.

22       May we publish Exhibit 450?

23           THE COURT:  Sure.

24   Q.   (By Ms. Manca)  So, Mr. Hansen, each of these exhibits has

25   a few pages, and I'm taking an example, Exhibit 450.  What are

1    we seeing on the first page of this exhibit?

2    A.    On this exhibit, this is the log file within context as I

3    viewed it, which I paired when I provided this with a screenshot

4    showing the actual contents of log files that were obtained that

5    were deemed relevant.  And you can see in the top bar that is

6    the directory for the computer and the beginning -- the

7    beginning part of the file path, where it says IRC chats from

8    1B52, that is FBI's internal evidentiary location for this.  And

9    then later on when you start to get to the references to Z and C

10   mod data log, these are all subdirectories of one another that

11   mimic what was on the device that was imaged at the search

12   location, which contain different chat logs that were on Paige

13   Thompson's device.

14   Q.    And what about this number 2019-04-05, what does that

15   relate to?

16   A.    That is the date of the log file that it was -- that it is

17   from.  And you can see where it was obtained from or what chat

18   it was obtained from as well by looking in the URL bar.

19         In this case, it would be a communication with a user using

20   the name Rachel that was -- occurred on 2019-04-05 as the date.

21   Q.    Okay.  Thank you.

22         And I am actually going to provide some context with Slack.

23            MS. MANCA:  Agent, can you put up Exhibit 402?

24   Q.    (By Ms. Manca)  Okay.  And would you mind zooming up on

25   that upper right-hand corner?  Or, I'm sorry, upper left-hand,

1    left and right, tough.

2        Is that the name that you were using to access the Slack

3    channel?

4    A.   Yes, it is.

5    Q.   Okay.  And then what kinds of screen names are we going to

6    see in the Slack communications when we address these with other

7    witnesses?

8    A.   Screen names I recall that were used by -- that appear to

9    be used by Paige Thompson in this case would be Paige Adele,

10   Paige Adele Thompson, Erratic, Sucky-sucky, and those are the

11   ones that I can recall at the moment.  I do believe there are

12   others that I don't recall.

13                      (Off the record.)

14        MS. MANCA:  No further questions.  Thank you, Mr.

15   Hansen.

16        THE COURT:  Okay.  So, Agent, could you be back,

17   please, at 1:15?

18        THE WITNESS:  Sure.

19        THE COURT:  And we'll do cross-examination then.

20        We'll take our lunch break now.

21        As I indicated, I have a judges' meeting that I want to get

22   to that starts at noon, so leave your pads and pens on your

23   chair.

24        We'll be reporting to Judge Pechman's courtroom, please, at

25   1:15, and we'll get started about 1:20, okay?

Zacharey Hansen - Cross by Mr. Klein

1     Great.

2          THE CLERK:  Please rise.

3               (Court in recess 11:58 a.m. to 1:21 p.m.)

4               THE FOLLOWING PROCEEDINGS WERE HELD
                 IN THE PRESENCE OF THE JURY:

5

6          THE COURT:  We'll continue with the now

7     cross-examination of Agent Hansen.  You're still under oath.

8                         CROSS-EXAMINATION

9     BY MR. KLEIN:

10    Q.    Good afternoon.

11    A.    Good afternoon.

12    Q.    So you do open-source research for the FBI?

13    A.    That is one aspect of my job, yes.

14    Q.    So one part of your job is to do open-source research?

15    A.    Yes.

16    Q.    And as part of that, do you use common search engines, like

17    Google?

18    A.    I use common search engines like Google, and then a number

19    of tools and resources online.

20    Q.    Do you ever use data from network scanners, like Shodan?

21    A.    I have in the past, but not as typically as one might

22    think, and not in this case.

23    Q.    But you have used data from network scanners in the past?

24    A.    I've used data from Shodan specifically.

25    Q.    Any other network scanners?

1   A.    Not that I recall.

2   Q.    And do you ever find things, when you do your open-source

3   research, things that are -- that someone has posted publicly

4   that surprise you?

5   A.    Could you rephrase that?

6   Q.    Sure.

7         Do you ever find things, when you're doing your open-source

8   research, that you're surprised that someone would choose to

9   post publicly?

10  A.    I have learned that people post a lot of stuff online.  I'm

11  not so surprised by most things anymore online.

12  Q.    So people do post some crazy stuff online?

13  A.    People do post a wide range of things online, yes.

14  Q.    I want to talk to you for a moment about GitHub.

15        Do you know what GitHub is?

16  A.    Yes.

17  Q.    What is it?

18  A.    GitHub is a website used by people to post excerpts or

19  whole sections of code in order to, very often, share in public

20  repoze, is what they're called, repositories, or sometimes in

21  private ones or ones dedicated to certain groups.

22        Many companies keep their own sections that they can share

23  between them, and many individual users will keep their own

24  accounts, where they can contribute to different groups of code

25  or can write stuff themselves for their own projects.

1    Q.    So this is a well-respected place for people to post code

2    or different engineering types of projects?

3    A.    GitHub is well known, well respected.

4    Q.    Microsoft owns it?

5    A.    Yes, Microsoft does own it.

6    Q.    When did you access Ms. Thompson's gists?

7    A.    That would have been sometime in the ten days prior to the

8    arrest.

9    Q.    And how did you access them?

10   A.    With the Internet, on a computer.

11         Is there something more specific?

12   Q.    Did you have to use a password?

13   A.    No.

14   Q.    You were just able, through your open-source public

15   research, to access her gists?

16   A.    The initial links to the gist that Paige Thompson had were

17   a link that was not -- I should step back here.

18         When you make a repository on GitHub, you can make it

19   public and you can make it private.  Paige Thompson's GitHub was

20   publicly accessible.  She may have had some stuff that was

21   private that I could not access or see, but there is another

22   type of data, which is unlisted, which means that you're able to

23   access it if you have a link to it, and anyone can access this

24   link and view the information at it.

25         The stuff I viewed on Paige Thompson's GitHub were unlisted

1    items and public items, but I was not able to see any private

2    data that was posted by Paige Thompson.

3    Q.    You're only aware of data you saw, correct?

4    A.    Yes.

5    Q.    And so you saw stuff that was either publicly posted or for

6    which you had a link you could access?

7    A.    Yes.

8    Q.    As part of open-source research, you're aware that people

9    use -- do you know what a "handle" is?

10   A.    Yes.

11   Q.    What is a handle?

12   A.    A handle is another name for a user name, a moniker that

13   you go by.

14   Q.    And do people use handles often that are not their own

15   name, like something that's funny or interesting or descriptive?

16   A.    I've rarely have seen somebody use their own name as a

17   handle, except in a business or a professional setting.

18   Q.    Okay.  Let's talk for a moment about the tweets that you

19   found.

20   A.    Okay.

21   Q.    When did you access Ms. Thompson's Twitter account?

22   A.    Sometime within the ten days prior to the arrest.

23   Q.    And her Twitter account was public?

24   A.    Yes, it was, or at least any resources that I contributed

25   that I affirmed were all public.

1   Q.   So the exhibits that you talk about, that were shown by the

2   prosecutor, those were publicly available?

3   A.   Yes.

4   Q.   And that means anyone in the public can view them; you

5   don't have to have a Twitter account, even, right?

6   A.   Yes.

7   Q.   So you chose the name Blanche Waller, right?

8   A.   Blanche Waller, that I used specifically on Slack.

9   Q.   And for this case?

10  A.   For this case -- I used Blache Waller on Slack.  I don't

11  recall all the -- if I used any other specific user names for

12  Twitter.  I don't believe I even made an account.  But this was

13  also three years ago, but I don't believe I made one for

14  Twitter.

15  Q.   Okay.  But it was a name you chose to disguise the fact

16  that you're with the FBI?

17  A.   Blanche Waller?  Yes.

18  Q.   And let's talk about Ms. Thompson's Slack or the Netcrave

19  group you talked about, right?

20  A.   Yes.

21  Q.   Called NetCrave, I think, her Slack channel?

22  A.   Netcrave Communications, I believe, was the name of the

23  Slack channel.

24  Q.   And when did you access that, again?

25  A.   Sometime within ten days prior to the arrest.

1  Q.  And so before her arrest, you accessed her Slack or

2  Netcrave.  How did you access it?

3  A.  I accessed it via a link that was posted in order to go to

4  the Slack channel for Netcrave Communications, and I had to

5  create a name on there, which was Blanche Waller, and then that

6  gave me access to the Slack.

7  Q.  So that link was publicly available?

8  A.  Yes.

9  Q.  And then you just created a name and went on her Slack?

10  A.  Yes.

11  Q.  And that's where you found the exhibits the prosecutor

12  talked to you about?

13  A.  Yes.

14  Q.  So your research included accessing -- and the exhibits we

15  were all shown -- included her publicly available tweets, right?

16  A.  Yes.

17  Q.  And her publicly available Slack communications?

18  A.  Yes.

19  Q.  The IRC communications you were shown by the prosecutor?

20  A.  Yeah.

21  Q.  What is IRC, again?

22  A.  IRC stands for Internet Relay Chat, and it is a form of

23  communication, an instant-message system where you can create

24  channels to communicate as groups, but usually based on topic of

25  some sort, or you can have one-on-one instant messages.

1   Q.   And this is used often by people?

2   A.   Very widely.  It's one of the earlier instant-message

3   communication protocols.

4   Q.   So it's an earlier version of a lot of things we use now,

5   like Slack or other ways to communicate?

6   A.   Yes.

7   Q.   And was the IRC chats publicly available, too?

8   A.   Not to my knowledge.  It may have been, but I did not

9   access those in a publicly available way.  Those were --

10  Q.   Were you aware that there was a bridge between the Slack

11  and the IRC?

12  A.   When I was reviewing the chats on one of the devices -- of

13  the chat logs, there was an instance where -- and this was, I

14  believe, in the IRC where Paige Thompson synced them, so someone

15  posts from one directly into the other, but other than that, I

16  was not aware of any direct connection between them.

17  Q.   But there was a bridge between the Slack, which was

18  publicly available, to the IRC that Ms. Thompson had posted?

19  A.   You might have to define what you mean by "bridge" more for

20  me.

21  Q.   A link that could connect the two, so if you clicked on it,

22  you could access the IRC.

23  A.   I'm not aware of that existing.  It could be there, but I

24  have no knowledge of that specifically.

25  Q.   So it could be there?

1    A.    I don't know.

2    Q.    Well, it could be.  You don't know, but it could be, right?

3                THE COURT:  Why would you ask somebody if it could be?

4    Aren't we here for facts?

5                MR. KLEIN:  We are, Your Honor.

6                THE COURT:  If he doesn't know, he doesn't know.

7                MR. KLEIN:  Yes, Your Honor.  One more second here.

8         Thank you very much.

9                THE COURT:  Okay.  Thanks.

10        Any redirect?

11               MS. MANCA:  I do, Your Honor.

12               THE COURT:  All right.  Ms. Manca?

13                        REDIRECT EXAMINATION

14   BY MS. MANCA:

15   Q.    When you reviewed IRC chats, were there different -- how --

16   were they all in one area of the computer, or were there

17   different folders and files in the computer?

18   A.    They are different folders and files.  Some IRC chats, the

19   logs were on the desktop device, and some of the logs were on

20   the laptop device, and then when they fall into the subfolders,

21   as seen in the exhibit shown earlier, there are different

22   channels that are, like, different chat rooms, that each contain

23   different logs that have different users in them.  And then

24   there are also individual one-on-one communications as well.

25   And these are contained, in this case, at least across two

1  different devices that I reviewed.

2  Q.    And did you see the hashtag Netcrave channel as one of the

3  many channels that you reviewed?

4  A.    Yes, I did.

5  Q.    You mentioned, in your direct testimony, that Ms. Thompson

6  used both the screen names Paige Adele and Erratic?

7  A.    Yes.

8  Q.    Did you see both of those names in the open-source material

9  that you reviewed on Slack?

10 A.    Yes, I did.

11 Q.    Do you know how a user would rotate between those screen

12 names within one Slack channel?

13 A.    So in Slack, it is possible to change your user names.  In

14 this case, one of the connections to the Slack channel was in

15 the -- across the totality of open-source information that I

16 reviewed associated with Paige Thompson, I saw these user names,

17 which provided -- and connected to accounts that provided a link

18 to the Slack channel as well.

19          MS. MANCA:  No further questions.  Thank you.

20          THE COURT:  Anything else, Mr. Klein?

21          MR. KLEIN:  Nothing further, Your Honor.

22          THE COURT:  Thank you very much.  You're excused.

23 Thanks so much for coming in.

24     And the government's next witness is Agent Martini?

25          MR. FRIEDMAN:  Yes, Your Honor.

1    THE COURT:  Agent, please come forward.  You know the

2    routine.  You've seen it many times.

3

4                            JOEL MARTINI,
          having been first duly sworn, testified as follows:
5

6    THE CLERK:  Please state your full name for the

7    record, and spell your full name for the court reporter.

8    THE WITNESS:  Joel Martini; last name, M-a-r-t-i-n-i.

9    THE COURT:  Go ahead, Mr. Friedman.

10   MR. FRIEDMAN:  Thank you, Your Honor.

11                       DIRECT EXAMINATION

12   BY MR. FRIEDMAN:

13   Q.   Good afternoon, Special Agent.

14   A.   Good afternoon.

15   Q.   Where do you work?

16   A.   I work for the FBI.

17   Q.   And I think the title gave it away, but what is your job at

18   the FBI?

19   A.   I am a special agent.

20   Q.   What does a special agent do?

21   A.   A special agent is just an investigator.

22   Q.   How long have you been a special agent at the FBI?

23   A.   I've been an agent for about five years now.

24   Q.   What did you do before that?

25   A.   Before that, I was also with the FBI, but I was working as

1  a computer forensic examiner, so that just means I analyzed

2  digital data.

3  Q.   Are you assigned to a particular squad at the FBI?

4  A.   I am.

5  Q.   To what squad are you assigned?

6  A.   I'm on the Cyber Squad.

7  Q.   What does the Cyber Squad do?

8  A.   Cyber Squad investigates high-technology crimes; that can

9  be computer hacking or things that involve computers generally.

10 Q.   Are you the case agent for this case, the investigation of

11 Paige Thompson?

12 A.   I am.

13 Q.   What does a case agent do?

14 A.   The case agent, I would liken to the quarterback of the

15 team.  So, obviously, there is a lot of people that are involved

16 in an investigation, but the case agent kind of just tries to

17 organize and make sure that everything is moving forward.

18        THE COURT:  I'm just thinking the quarterback gets

19 blamed if the team loses, too.

20 Q.   (By Mr. Friedman)  When did law enforcement first open what

21 became this case?

22 A.   I opened this case on July 22nd of 2019.

23 Q.   That was a Monday?

24 A.   It was.

25 Q.   Were you the first person in law enforcement to receive

Joel Martini - Direct by Mr. Friedman

1  information about this, or had it bounced somewhere first?

2  A.    No.  My understanding is that our FBI office in New York

3  got the initial information just a couple of days before that.

4  Q.    Over the weekend?

5  A.    Correct.

6  Q.    And then was the case referred to Seattle?

7  A.    It was.

8  Q.    And you were assigned as the case agent?

9  A.    Yes.

10  Q.    How serious or how high priority a case was it when it came

11  into your office?

12  A.    It was very -- it was top priority at the time.

13  Q.    Okay.  And why is that?

14  A.    Because our understanding, based on the information that we

15  received initially, was there was a lot of PII, or personal

16  identifying information, that was at risk, and we wanted to do

17  everything we could to mitigate that potentially being

18  disseminated or being further disseminated, and just close that

19  loop as fast as we could.

20  Q.    Did that affect how the rest of your week went?

21  A.    It did.

22  Q.    Did you form a plan of what the goal was?

23  A.    The goal was to be able to identify where the data was, who

24  may be responsible, and then action that as fast as we possibly

25  could.

1    Q.   And what steps did you take during those first few days to

2    identify the things you wanted to identify?

3    A.   We did everything, from interviews to the open-source

4    research that was discussed, as well as eventually initiating

5    some surveillance; just trying to use as much of the toolbox

6    that we possible could throughout that week.

7    Q.   And did you learn additional information through that

8    investigation?

9    A.   We did.

10   Q.   And did you form an action plan?

11   A.   Yes.  We obtained a search warrant on Friday of that week.

12   Q.   For what was that search warrant?

13   A.   The search warrant was a residential search warrant for a

14   house down in south -- south of Seattle.

15   Q.   Is four to five days from getting a case to having a search

16   warrant quick or slow for your squad?

17   A.   It was pretty unprecedented to go from no case to search

18   warrant in about four days.

19   Q.   When was that search warrant executed?

20   A.   We executed that on the 29th of July, so exactly one week

21   after opening.

22   Q.   And were you one of the people who participated in

23   executing that warrant?

24   A.   Yes.

25   Q.   Where did you execute that warrant?

1    A.    As I said, it was a residence down in South Seattle.

2    Q.    Would you take look at Exhibit 301 and tell me if you

3    recognize that?

4    A.    I do.

5    Q.    What is that?

6    A.    This is the front door of the residence we searched that

7    day.

8          MR. FRIEDMAN:  The government offers Exhibit 301.

9          MR. HAMOUDI:  No objection.

10         THE COURT:  301 is admitted.

11         (Government Exhibit 301 admitted.)

12   Q.    (By Mr. Friedman)  Who lived at that residence?

13   A.    There was a number of people, to include Paige Thompson.

14   Q.    When agents arrived at the house, what did they do?

15   A.    As is our standard practice, we clear the residence for

16   safety; make sure there is nothing in there that's going to hurt

17   anyone, and that includes taking the residents of the house

18   outside of the house while we do that so that we can secure

19   everything before we begin the search.

20   Q.    Okay.  After you had taken the residents outside of the

21   house, were they in the neighborhood?  In the yard?  Where were

22   they?

23   A.    Yes, they were right in front of house.

24   Q.    And then did agents begin searching the house?

25   A.    Yes.

Joel Martini - Direct by Mr. Friedman

1  Q.   Would you take a look at Exhibit 302 and tell me if you

2  recognize that?

3  A.   I do.

4  Q.   What is that?

5  A.   This is a sketch that was made of the residence.

6            MR. FRIEDMAN:  The government offers Exhibit 302.

7            MR. HAMOUDI:  No objection.

8            THE COURT:  302 is admitted.

9                 (Government Exhibit 302 admitted.)

10 Q.   (By Mr. Friedman)  Can you tell us, in general, what this

11 sketch shows?

12 A.   The sketch just shows the different rooms in the house,

13 primarily.  There's a living room; that's Room A, for example.

14 And Room C would be Paige Thompson's bedroom.

15 Q.   And would you take a look at Exhibit 303 and tell me if you

16 recognize that?

17 A.   I do.

18 Q.   What is that?

19 A.   That's Room A, or that living room.

20            MR. FRIEDMAN:  Government offers Exhibit 303.

21            MR. HAMOUDI:  No objection.

22            THE COURT:  303 is admitted.

23                 (Government Exhibit 303 admitted.)

24 Q.   (By Mr. Friedman)  And would you also look at Exhibit 304

25 and tell me if you recognize that?

1   A.    Yes.  That's the Room C that I just referenced.

2   Q.    Paige Thompson's room?

3   A.    Correct.

4           MR. FRIEDMAN:  Government offers Exhibit 304.

5           MR. HAMOUDI:  No objection.

6           THE COURT:  304 is admitted.

7              (Government Exhibit 304 admitted.)

8   Q.    (By Mr. Friedman)  Would you take a look at Exhibit 305 and

9   tell me if you recognize that?

10  A.    I do.

11  Q.    What is that?

12  A.    So this is a computer that we found, as you can see, right

13  inside the door of that Room C.

14          MR. FRIEDMAN:  Government offers Exhibit 305.

15          MR. HAMOUDI:  No objection.

16          THE COURT:  305 is admitted.

17             (Government Exhibit 305 admitted.)

18  Q.    (By Mr. Friedman)  Would you describe for the jury what

19  you're calling "the computer"?

20  A.    Yes.  The large box, if you will, that's kind of propped

21  there behind the door that has the blue cable running out of it,

22  that is a pretty large custom-built computer.

23  Q.    And if you could look at Exhibit 306.

24  A.    Yes.  This is a photo of that same computer, the back side

25  of that computer.

1    MR. FRIEDMAN:  Government offers Exhibit 306.

2    MR. HAMOUDI:  No objection.

3    THE COURT:  306 is admitted.

4    (Government Exhibit 306 admitted.)

5  Q.  (By Mr. Friedman)  In what state was the computer when you

6  found it?

7  A.  It was in Seattle, so that would be Washington State.

8  Q.  Sorry.  Wrong question.

9    Was the computer on or off?

10    THE COURT:  That's being literal.  I like it.

11  A.  My mistake.  It was on.

12  Q.  (By Mr. Friedman)  And so what did you and others -- and/or

13  others do when you found that computer?

14  A.  The first thing we typically do is perform a RAM capture.

15  So that is just creating a copy of the running memory that's on

16  the computer so that we don't lose that.

17    And then we do a cursory review of the computer, because we

18  don't know what's going to happen with it over time, so we want

19  to capture as much as we can right off the bat.

20  Q.  Did you observe anything on the computer that was

21  happening?

22  A.  I did.

23  Q.  What did you see?

24  A.  We found a mounted folder that was named "aws_dumps."

25  Q.  Did you have an understanding of what "aws" meant?

1    A.    Yes.  I understood that to mean "Amazon Web Services."

2    Q.    And what about the word "dumps"?

3    A.    That typically means files that have been downloaded, or

4    copies.

5    Q.    Would you take a look at Exhibit 408 and tell me if you

6    recognize that?

7    A.    I do.

8    Q.    And what is Exhibit 408?

9    A.    This is a screenshot from the Netcrave Slack channel that

10   we discussed, and this particular highlighted portion shows,

11   basically, a directory file listing of various files that are in

12   a specific folder.

13   Q.    Okay.  And did those relate to what you saw on the

14   computer?

15   A.    Yes, they did match.

16   Q.    And how is that?  I think you just answered.

17   A.    The files here were the same files that we found in that

18   aws_dumps folder.

19   Q.    Would take a look at Exhibit 308 and tell me if you

20   recognize that?

21   A.    I do.

22   Q.    What is that?

23   A.    It is a laptop that we found in that same room.

24         MR. FRIEDMAN:  Government offers Exhibit 308.

25         MR. HAMOUDI:  No objection.

1    THE COURT:  308 is admitted.

2         (Government Exhibit 308 admitted.)

3    Q.   (By Mr. Friedman)  And would you look at Exhibit 309 and

4    tell me if you recognize that?

5    A.   Yes.  This is an iPhone cell phone also found in that same

6    room.

7         MR. FRIEDMAN:  Government offers Exhibit 309.

8         MR. HAMOUDI:  No objection.

9         THE COURT:  309 is admitted.

10        (Government Exhibit 309 admitted.)

11   Q.   (By Mr. Friedman)  The phone is a little northwest of the

12   picture?

13   A.   Yes.

14   Q.   Does the FBI have a system that it uses to track evidence

15   that it seizes during search warrants?

16   A.   Yes.

17   Q.   In general terms, what is that system?

18   A.   It's just a cataloging system that gives unique numbers to

19   each evidence item so they can be tracked.

20   Q.   What's the first number, usually?

21   A.   One.

22   Q.   Is it a little more complicated than one?  I mean, are

23   there several digits?

24   A.   Our naming convention is 1B for these type of items.  So it

25   would be 1B-1 for the first item, and then so on.

1  Q.   Do you recall what number was assigned to the large

2  computer found in this room?

3  A.   I believe it was 1B-56.

4  Q.   Could it be 1B-2?

5  A.   1B-2 would be the laptop.

6  Q.   And then what number was assigned to the iPhone?

7  A.   1B-3.

8  Q.   And then would you take a look at Exhibit 310 -- it is a

9  three-page exhibit -- and tell me if you recognize that?

10 A.   I do.

11 Q.   What is that?

12 A.   These appear to be e-gift card receipts.  So you can go

13 online and get a gift card that is -- not a -- not physical gift

14 card, but one you can spend online.

15         MR. FRIEDMAN:  Government offers Exhibit 310.

16         MR. HAMOUDI:  No objection.

17         THE COURT:  310 admitted.

18             (Government Exhibit 310 admitted.)

19 Q.   (By Mr. Friedman)  Special Agent Martini, what does the

20 first page of Exhibit 310 show?

21 A.   This first page just shows two copies of what appear to be

22 two $100 e-gift cards.

23 Q.   One copy of two gift cards?

24 A.   Yes, correct.

25 Q.   And then what's on the second page?

1    A.    Just more of the same.

2    Q.    And then the third page has one more?

3    A.    Just another one, yes.

4    Q.    So did the FBI find a total of five of those gift cards?

5    A.    Yes.

6         MR. FRIEDMAN:  May I have a moment, Your Honor?

7         THE COURT:  Sure.  Take a moment.

8    Q.    (By Mr. Friedman)  Special Agent Martini, would you also

9    look at Exhibit 307?

10   A.    Yes.

11   Q.    Do you recognize that?

12   A.    Yes.  This is a photograph, just taken from a standard

13   camera, of the screen of that large computer that we saw behind

14   the door, and this is the aws_dumps folder.

15        MR. FRIEDMAN:  Government offers Exhibit 307.

16        MR. HAMOUDI:  No objection.

17        THE COURT:  307 is admitted.

18             (Government Exhibit 307 admitted.)

19   Q.    (By Mr. Friedman)  Where do you see the folder name on this

20   exhibit?

21   A.    At the very top, you can see "aws_dumps."

22   Q.    And then you said this matched data you had seen somewhere

23   else?

24   A.    Right.  If you compare these file names in the running

25   lists, they match the one that was uploaded to Slack.

1    Q.    Okay.  And from what you've learned since the

2    investigation, what do those files represent?

3    A.    These are archived copies of data that was taken from

4    Amazon Web Services accounts.

5    Q.    Okay.  And is each file a particular unit or division?  How

6    does that work?

7    A.    For the most part, each one of these files is a different

8    entity or different account, but there are some that appear to

9    be related, such as Apperian and Apperian 2.

10   Q.    Thank you.

11         Was Ms. Thompson interviewed on the morning of July 29th?

12   A.    Yes.

13   Q.    Was she advised of her Miranda rights before that

14   interview?

15   A.    Yes.

16   Q.    And what are Miranda right?

17   A.    Miranda rights are things that you -- you may be familiar

18   with your right to remain silent.  There's several of those

19   rights.  But they're what we provide to anyone that we're --

20   before we're conducting a custodial interview.

21   Q.    Were those provided orally, or in writing?

22   A.    Yes, actually, both.  So we ask somebody that we're

23   interviewing to sign a piece of paper that has all those rights

24   written on it, but we also go over it verbally.

25   Q.    And did Ms. Thompson subsequently indicate that she wanted

1    to speak with agents?

2    A.    Yes.

3    Q.    So who participated in interviewing Ms. Thompson?

4    A.    It was primarily myself and Zach Hansen, who we just heard

5    from.

6    Q.    At the beginning of the interview, did you ask Ms. Thompson

7    questions about iPredator and TOR?

8    A.    I did.

9    Q.    And what did Ms. Thompson respond?

10   A.    She originally stated that she did not use either of those

11   services.

12   Q.    And based upon evidence you knew at the time, did you

13   believe that to be true or false?

14   A.    I believed that to be false.

15   Q.    And what evidence led you to believe that was false?

16   A.    The postings and communications that we'd already reviewed.

17   Q.    Would you look at Exhibit 406?  Do you recognize that?

18   A.    Yes.  This is a Netcrave Communications post, and, as you

19   can see, it does reference iPredators as well as TOR.

20   Q.    And where do you see that reference?

21   A.    Right in the middle there where it states, "I'm like

22   iPredator and then TOR and then S3."

23   Q.    Did Ms. Thompson say anything about the scanning tool?

24   A.    She did.

25   Q.    What did she say?

Joel Martini - Direct by Mr. Friedman

1  A.    She said that she had developed a scanning tool specific

2  for Amazon Web Services that was designed to look for

3  misconfigurations and be able to hit the Instance Metadata

4  Service.

5  Q.    Did she use the word "misconfigurations" or

6  "misconfigured"?

7  A.    I believe so.

8  Q.    Did Ms. Thompson say whether she had downloaded information

9  from any of those servers?

10  A.    She said she didn't remember if she had downloaded any such

11  information.

12  Q.    Was that consistent with other evidence you had already

13  seen at that time?

14  A.    It was not consistent, no.

15  Q.    Why do you say that?

16  A.    Again, just based on the postings that we had previously

17  reviewed.

18  Q.    And would you look at Exhibit 203, the third page?

19  A.    Yes.

20  Q.    Is that one of those postings?

21  A.    Yes.

22  Q.    And what do you see there that's inconsistent with what

23  Ms. Thompson told you?

24  A.    Just the three terabytes of S3 buckets indicates to me that

25  there was downloading happening.

Joel Martini - Direct by Mr. Friedman

1   Q.   Did Ms. Thompson say what had happened to any data that she

2   might have downloaded?

3   A.   She originally stated that she had not -- not looked at any

4   data, even if it had been downloaded.

5   Q.   Did she say anything about whether she had deleted any

6   data?

7   A.   She did say that if there had been data that was

8   downloaded, it probably was deleted as well.

9   Q.   Did you believe that the statement that data had been

10  deleted was true or false, based on what you knew at the time?

11  A.   I believed that to be false.

12  Q.   And why is that?

13  A.   Again, statements that had been made, but also, just

14  shortly before that, we had found aws_dumps folder on the

15  computer.

16  Q.   As the interview progressed, did Ms. Thompson change what

17  she said about some of these subjects?

18  A.   Yes.

19  Q.   And, specifically, did she change what she said about

20  iPredator and TOR?

21  A.   Yes.

22  Q.   What did she say later on about those?

23  A.   Later on, she said that she did actually use those

24  services.

25  Q.   Did she say for what she used the services?

1    A.    I don't recall.

2    Q.    Did Ms. Thompson say anything about downloading Capital One

3    data?

4    A.    She said that she had downloaded Capital One data, yes.

5    Q.    Did Ms. Thompson correct her earlier statement about

6    looking or not looking at the data?

7    A.    No.

8    Q.    Sorry.  My question was complicated.

9          What was the earlier statement?

10   A.    She -- she -- I'm sorry.  Can you rephrase?

11   Q.    What was the first statement about looking at data?

12   A.    Originally stated that she had not looked at any data that

13   had been downloaded.

14   Q.    And so did Ms. Thompson change that statement?

15   A.    The statement was not changed.

16   Q.    Did Ms. Thompson subsequently provide investigators with

17   information about her computer?

18   A.    Yes.

19   Q.    What did she provide?

20   A.    She provided us with a password, as well as an encryption

21   key for the computer, as well as a cell phone.

22   Q.    Did Ms. Thompson say anything about who she had told or not

23   told about her activity?

24   A.    She stated that she had talked about the vulnerability or

25   the issue with one former Amazon co-worker.

Joel Martini - Direct by Mr. Friedman

1   Q.   Did she identify that co-worker?

2   A.   She did.

3   A.   What did she say?

4   A.   Simply, that she had had a conversation with this

5   individual.

6   Q.   Oh, but did she provide a name for that individual?

7   A.   Oh, yes.

8   Q.   What was that name?

9   A.   Robert Long.

10  Q.   Did Ms. Thompson say anything about having tried to report

11  this vulnerability to anyone?

12  A.   No.

13  Q.   Did she say anything about having tried to report it to any

14  of the companies whose data she had downloaded?

15  A.   No.

16  Q.   After the day of the search, did you serve search warrants

17  on a number of companies to gather records in this case?

18  A.   I did.

19  Q.   Was one of those companies GitHub?

20  A.   Yes.

21  Q.   And would you take a look at Exhibits 251 and 252 -- I

22  guess I should say have you looked at Exhibits 251 and 252 in

23  preparation?

24  A.   I have.

25  Q.   Were those documents that you obtained from GitHub?

1    A.    Yes.

2              MR. FRIEDMAN:  Government offers Exhibits 251 and 252.

3              MR. HAMOUDI:  No objection.

4              THE COURT:  251 and 252 are admitted.

5              (Government Exhibits 251 and 252 admitted.)

6    Q.    (By Mr. Friedman)  So we're about to look at Exhibit 251,

7    Special Agent.  What is Exhibit 251?

8    A.    This is kind of the identifiers of the GitHub account.

9    Q.    Is it subscriber information?

10   A.    Yes, that's fair.

11   Q.    Whose account was this?

12   A.    Paige Adele Thompson's.

13   Q.    And you see that in the top line, I take it?

14   A.    Yes.

15   Q.    And would you take a look at Exhibit 252?  This is another

16   document you received from GitHub?

17   A.    Yes.

18   Q.    For this account?

19   A.    Yes.

20   Q.    What is this document?

21   A.    This is a copy of something we've already seen before, the

22   April 21st file, or a specific post that was made to that

23   account.

24   Q.    Okay.  Special Agent Martini, did you also serve a search

25   warrant on Slack?

Joel Martini - Direct by Mr. Friedman

1   A.   Yes.

2   Q.   Were you seeking records relating to a particular account

3   or channel there?

4   A.   Yes, the Netcrave channel that we've discussed.

5   Q.   And did you obtain records from Slack in response to that?

6   A.   Yes.

7   Q.   I think I said "subpoena," but I assume it was a search

8   warrant.

9   A.   It was a search warrant, yes.

10  Q.   Are Exhibits 401, 403, 405, 407, 409, 412, 415, 417 and 420

11  all part of the records you received from Slack?

12  A.   Yes.

13            MR. FRIEDMAN:  The government offers that list of

14  exhibits.

15            MR. HAMOUDI:  No objection.

16            THE COURT:  Those exhibits are admitted into evidence.

17            (Government Exhibits 401, 403, 405, 407, 409,

18                 412, 415, 417 and 420 admitted.)

19  Q.   (By Mr. Friedman)  Let's look at Exhibit 401.  What is it?

20  A.   It is a subscriber record for the Slack channel.

21  Q.   And who does this show was the subscriber or owner of that

22  channel?

23  A.   Paige Thompson.

24  Q.   And then if we could turn to Exhibit 409 --

25            MR. FRIEDMAN:  Oh, I'll wait a moment.

Joel Martini - Direct by Mr. Friedman

1   Q.   (By Mr. Friedman)  Special Agent, where do you see a

2   subscriber on these records?

3   A.   There's several places, but the one that I'm immediately

4   drawn to is the real name, which says "Paige Thompson."

5   Q.   Okay.  And then if we could turn to Exhibit 409.  What is

6   Exhibit 409?

7   A.   It's a listing of those same file names that we've seen

8   several other places.

9   Q.   The ones that were on the computer screen during the

10  search?

11  A.   That's right.

12  Q.   And previously posted on Slack?

13  A.   That's right.

14  Q.   Would you take a look at Exhibit 413 and tell me if you

15  recognize that?

16  A.   I do.

17  Q.   What is Exhibit 413?

18  A.   More communications from the Netcrave channel.

19  Q.   And if we could highlight, perhaps, the bottom three posts.

20  Would you read the long sentence in the middle of the bottom

21  post?

22  A.   The one that begins, "I mean"?

23  Q.   The one right below that that begins, "It's weird."

24  A.   "It's weird what the world has come to and yet despite how

25  important security is for some, I can still log in to so much

Joel Martini - Direct by Mr. Friedman

1    with admin/admin."

2    Q.    Do you have an understanding of what logging into something

3    with admin/admin means?

4    A.    Yes.  Admin/admin is often a default user name and password

5    for a lot of things.  So logging into admin/admin would indicate

6    to me that you're just trying default credentials in order to

7    hope that somebody hasn't changed them, and you can get in to

8    something.

9    Q.    I assume you do some sophisticated cases?

10   A.    Yes.

11   Q.    Do you see cases where the hack is -- the owner had not

12   changed the password, and someone hacked in by typing

13   "admin/admin"?

14   A.    Absolutely.

15   Q.    Is there anything in this series of posts or tweets where

16   Ms. Thompson suggests that's actually authorized?

17   A.    No.

18            MR. HAMOUDI:  I object to that last answer, Your

19   Honor.

20            THE COURT:  Well, the exhibit speaks for itself, so

21   I'll sustain the objection.

22   Q.    (By Mr. Friedman)  Did you also obtain records from

23   Twitter?

24   A.    Yes.

25   Q.    Did you serve a search warrant on Twitter to gather those?

1    A.    I did.

2    Q.    Are Exhibits 431, 433, 434, 435, 436, 438, and 439 part of

3    the records you received from Twitter?

4    A.    Yes.

5              MR. FRIEDMAN:  The government offers that list of

6    exhibits.

7              MR. HAMOUDI:  No objection.

8              THE COURT:  That list of exhibits is admitted.

9                    (Government Exhibits 431, 433, 434,

10                     435, 436, 438 and 439 admitted.)

11   Q.    (By Mr. Friedman)  If we can look at Exhibit 431.  What is

12   Exhibit 431?

13   A.    The subscriber information for the Twitter account.

14   Q.    Do you see something called a screen name there?

15   A.    Yes.

16   Q.    What is a screen name?

17   A.    Screen name is the handle or identifier for the account.

18   Q.    Okay.  Is that a screen name that you've seen previously in

19   this case?

20   A.    It is.

21   Q.    Where have you seen that?

22   A.    That was one of the -- that was the Twitter account that we

23   looked at through open source.

24   Q.    And do you see an email address for the subscriber?

25   A.    Yes.

1    Q.    What is that email address?

2    A.    paigeadele2019@gmail.com.

3    Q.    Do you know, from your investigation, to whom that email

4    account, the paigeadele2019 account, belongs?

5    A.    Yes.  We obtained Google records that tied that to Paige

6    Thompson as well.

7    Q.    Do you see an account number for this Twitter account?

8    A.    I do.

9    Q.    And is an easy way to refer to that just the last four

10   digits of that account?

11   A.    Sure.

12   Q.    What are the last four digits of that account?

13   A.    2768.

14   Q.    Would you take a look at Exhibit 438 and tell me if you

15   recognize that?

16   A.    I do.

17   Q.    That was a record you received from Twitter?

18   A.    Yes.

19   Q.    And what is that?

20   A.    That is a copy -- a picture, rather, of the computer that

21   we recovered in this case.

22   Q.    And would you take a look at Exhibit 435?

23   A.    Yes.

24   Q.    What is Exhibit 435?

25   A.    These are direct messages or private messages from that

Joel Martini - Direct by Mr. Friedman

1    same Twitter account.

2    Q.    When you say "direct message" or "private message," what

3    does that mean?

4    A.    Twitter has a function where you can DM or privately

5    message somebody, and this is a copy of some of those messages.

6    Q.    Okay.  If we could zoom in on the fourth message, can you

7    see who sent this message?

8    A.    I can.

9    Q.    And where do you see that?

10   A.    If you see the field, "sender ID," it has that same number

11   that we just talked about ending in 2768.

12   Q.    So this was sent by the owner of this account?

13   A.    That's right.

14   Q.    And what does that message say?

15   A.    It reads, "Yeah, this data that I stole, straight outta S3

16   because I'm just so incompetent, wouldn't have happened if this

17   person had just left me alone."

18   Q.    The reference to "straight outta S3," what do you

19   understand that to mean?

20   A.    Well, it says, "stole straight outta S3," so I believe that

21   to mean that data was exfiltrated or taken out of S3, which is

22   the Amazon storage solution.

23   Q.    And did you see an explanation here of what Ms. Thompson's

24   motive was for doing that?

25          MR. HAMOUDI:  Objection as to motive.  This exhibit

1   speaks for itself.

2            MR. FRIEDMAN:  I can go on, Your Honor.

3            THE COURT:  Okay.  Go ahead.

4   Q.   (By Mr. Friedman)  Would you look at the first message on

5   this page?  Is that also sent by the owner of this account?

6   A.   Yes.

7   Q.   Does that say what Ms. Thompson intends to do with this

8   information?

9   A.   It appears to, yes.

10  Q.   What does it say?

11  A.   It says, "I'm gonna give it to worse people, too.  I'm

12  gonna give it to an avid scammer, a Chinaman who will find a

13  good permanent home for it on the black market, sealed with a

14  story behind it."

15  Q.   Special Agent Martini, did you also obtain records from

16  Google in response to a search warrant?

17  A.   Yes.

18  Q.   Are Exhibits 521 through 525 some of the records that you

19  obtained from Google?

20  A.   Yes.

21  Q.   And, in general, to how many different accounts do those

22  records apply?

23  A.   Several.

24  Q.   Okay.  Do you recall the names of those email accounts, or

25  would it be helpful to look at the records?

1  A.    It would be helpful.

2  Q.    If we could look at Exhibit 521, can you tell what this

3  account is?

4  A.    This is subscriber information for one of the accounts.  As

5  you can see here, the email address for the records here is

6  paigeadele@gmail.com, but you can also see a recovery email down

7  below with paige.adele.thompson@gmail.com.

8  Q.    What is a recovery email?

9  A.    It's a way, if you lose your password to your account, you

10  can have a recovery email associated with it so that that email

11  address can have an email sent to it with a recovery token or

12  password so you can get back into your original account.

13  Q.    Okay.  If we could look at Exhibit 523, for what email

14  account were these records?

15  A.    This one is for paige.adele.thompson@gmail.com.

16  Q.    That's the recovery address on the last account we looked

17  at?

18  A.    Yes.

19  Q.    And if we can look at Exhibit 525?

20  A.    Yeah, this one is for paigeadele2019@gmail.

21  Q.    Did you conclude that all three of these accounts were

22  accounts belonging to Ms. Thompson?

23  A.    Yes, we were able to connect all of them.

24  Q.    And if we could go back to Exhibit 521, do you see a

25  nickname at the top of the subscriber information that connects

1    this to other accounts that you'd seen in this case?

2    A.    Are you referring to the nickname "Erratic"?

3    Q.    Yes.

4    A.    Yes.

5    Q.    Have you seen that elsewhere in the case?

6    A.    Yes.

7    Q.    Did the records also include something called "Internet

8    history"?

9    A.    Yes.

10   Q.    If we can look at Exhibit 522?

11          MR. FRIEDMAN:  I apologize, Your Honor.  I have not

12   offered Exhibits 521 to 525, so I'd offer them now.

13          THE COURT:  Any objection?

14          MR. HAMOUDI:  No, Your Honor.

15          THE COURT:  521 to 525 are admitted.

16          (Government Exhibits 521 to 525 admitted.)

17   Q.    (By Mr. Friedman)  Special Agent, let's not go back through

18   the other subscriber records, but on 521, this account, can you

19   just show us where you see the subscriber's name, email, and

20   nickname?

21   A.    Sure.  At the top, you see the name, "Paige Thompson,"

22   email, "paigeadele@gmail," and then towards the bottom there,

23   the nickname "Erratic," as well as a recovery email,

24   paige.adele.thompson@gmail.com, kind of in the middle of the

25   screen.

Joel Martini - Direct by Mr. Friedman

1    Q.    Thank you.

2         And if we could go to Exhibit 522, is this the first page

3    of an Internet history for one of these accounts?

4    A.    Yes.

5    Q.    What is Internet history?

6    A.    Internet history is just a running list of places that you

7    visited on the Internet.  So if you use Google, for example, it

8    keeps track of the web pages that you go to, and this is a

9    listing of what those would be.

10   Q.    Does it also show what you did at some of those pages?

11   A.    It can.

12   Q.    In this case, does it?

13   A.    It -- yeah, it -- well, it -- this one -- it shows things

14   that you've searched for, and gives you recommendations as well.

15   Q.    Okay.  Special Agent Martini, you heard testimony from

16   Zacharey Hansen a few moments ago about something called

17   Internet Relay Chat, or IRC?

18   A.    Yes.

19   Q.    Have you reviewed the IRCs in this case?

20   A.    I have.

21   Q.    If you will look at Exhibit 453, the second page, do you

22   see discussion here about data that Ms. Thompson had taken from

23   various entities in this case?

24   A.    Yes.

25   Q.    The first line, do you understand that to refer to a

1  particular company?

2  A.    Yes.

3  Q.    Which company is that, and why?

4  A.    Well, the link is a GitHub gist, if that's what you're

5  referring to.

6  Q.    Yes.  And is that a gist that you've seen before in this

7  case?

8  A.    I believe so.

9  Q.    Which gist is that?

10  A.    I believe this is the same gist that contains that

11  April 21st Capital-One-related file.

12  Q.    Okay.  So do you understand this to be related to the

13  Capital One data?

14  A.    I do.

15  Q.    As we go down through this, do you see a reference to a

16  different company?

17  A.    Yes.

18  Q.    And I believe it's at 23:22:11.  What does that line say?

19  A.    Yes.  On line 10, it says, "not nearly as good as that but

20  Vodafone."

21  Q.    And does Ms. Thompson explain how she had gotten data

22  relating to Vodafone?

23  A.    By -- according to line 12, it says, "by virtue of their

24  payment gateway."

25  Q.    And I should have asked you the question, the lead-in to,

1    "not nearly as good as that, but Vodafone"?

2    A.    What line?

3              MR. HAMOUDI:  Objection, Your Honor.  I think these

4    messages sort of speak for themselves.  Mr. Martini was not

5    present when these messages were entered.  We don't know what

6    was happening surrounding them.  And if there is somebody

7    present for these circumstances, they can offer that witness,

8    but for him to sit there, on and on, I object.

9              THE COURT:  It's like asking somebody, "could

10   something have happened" when they didn't have anything to do

11   with it.

12             MR. HAMOUDI:  Yes.

13             THE COURT:  Sustained.

14             MR. FRIEDMAN:  Your Honor, I was going to ask what Mr.

15   Martini did relating to this as the next question.

16             THE COURT:  Okay.  Ask that one first.

17   Q.    (By Mr. Friedman)  What did you do based on the references

18   to Vodafone in this case?

19   A.    We contacted them about them potentially being part of this

20   case.

21   Q.    What is Vodafone?

22   A.    It is a telecommunications conglomerate out of the United

23   Kingdom.

24   Q.    And what data does Ms. Thompson say he or she has of

25   Vodafone's?

Joel Martini - Direct by Mr. Friedman

1    A.    Line 14 references that she has their certs.

2    Q.    Do you have an understanding of what a cert is?

3    A.    My understanding, in this context, is they are

4    certificates, which potentially could be used to access --

5              MR. HAMOUDI:  I object, Your Honor.

6              THE COURT:  Well, it's his understanding, so I'll --

7              MR. HAMOUDI:  But I would --

8              THE COURT:  -- let him finish.  Go ahead.

9    A.    My understanding is they are certificates that may be used

10   to access other data.

11   Q.    (By Mr. Friedman)  Did you see a reference to Vodafone in

12   another IRC?

13   A.    Yes.

14   Q.    If we could look at page 2 of 462.

15         What does Ms. Thompson say about Vodafone data here?

16   A.    Well, on line 9, it says, "I've got a mirror of all their

17   S3 buckets," referring to Vodafone, which is in line 8.

18   Q.    And what is a mirror?

19   A.    "A mirror" is a common word to refer to a full copy.

20   Q.    And does Ms. Thompson say anything about her possession of

21   that data in the following line?

22   A.    The following line reads, "How am I not" --

23             MR. HAMOUDI:  Same objection.

24             THE COURT:  Aren't you going to ask him about this,

25   too?

1    MR. HAMOUDI:  Well, I don't think so, Your Honor.

2    THE COURT:  Okay.  If you're not going to, then the

3    exhibit speaks for itself.

4    MR. FRIEDMAN:  Yes, Your Honor.

5    Q.   (By Mr. Friedman)  Did Ms. Thompson say what she intended

6    to do with some of this data in another IRC?

7    A.   Yes.

8    Q.   Would you take a look at Exhibit 454, page 2, and if you'd

9    look at the line 21.

10   A.   Okay.

11   Q.   What does Ms. Thompson say she's going to do with certain

12   data?

13   A.   This appears to be a message to another user.  It says

14   that -- it says, "makes me want to leak these TSA S3 buckets."

15   Q.   Do you have an understanding of what "TSA" means in this

16   context?

17   A.   Yes.  The folks at the airport.

18   Q.   Transportation Security Administration?

19   A.   That's right.

20   Q.   And have you seen TSA data in this case?

21   A.   Yes, we recovered it from one of the archives.

22   Q.   From which archive did you recover that?

23   A.   It was called Apperian.

24   Q.   Special Agent Martini, did you look at the cell phone that

25   was seized from Ms. Thompson's residence?

1    A.    I did.

2    Q.    Were you the primary person who did that?

3    A.    Yes.

4         MR. FRIEDMAN:  Your Honor, at this point, we have a

5    stipulation that we'd like to read, with the agreement of the

6    defense, or I could hand it to the Court, if the Court would

7    rather.

8         THE COURT:  No.  You can read it, as long as Mr.

9    Hamoudi is okay with it.

10        MR. HAMOUDI:  No objection.

11        MR. FRIEDMAN:  Your Honor, the parties stipulate or

12   agree to the following:

13        "No. 1, the FBI seized an Apple iPhone Model A1905, and

14   iPhone 8, from Paige Thompson's bedroom on July 29th of 2019,

15   and assigned the item Evidence No. 1B-3.

16        "No. 2, John Powers works for the FBI analyzing cellular

17   telephones.  Using forensic software, Powers processed the Apple

18   iPhone 8, 1B-3, and provided a true and correct image of the

19   phone's contents to FBI Special Agent Joel Martini for his

20   review.

21        "The parties stipulate and agree that no further testimony

22   is necessary to prove that the image of Evidence No. 1B-3 that

23   Special Agent Martini received is a true and correct image of

24   what was recovered from a phone seized by the FBI from

25   Ms. Thompson's bedroom.

1    "To be clear, this stipulation means only that the image is

2   an accurate representation of the phone's contents.  There is no

3   agreement as to the truth of the content of any statements in

4   Evidence No. 1B-3, or the weight to be given them.

5    "This stipulation shall be read to the jury in lieu of

6   having a witness testify as to the source and validity of the

7   exhibit, and may then be admitted into evidence and provided to

8   the jury."

9    THE COURT:  Does the stipulation have an exhibit

10   number now?

11    MR. FRIEDMAN:  It does not, but we will provide one

12   and file it that way, Your Honor.

13    THE COURT:  And it will be admitted into evidence.

14    And when the parties stipulate to certain facts, you should

15   treat those facts as established when you decide the case.

16   Okay?

17   Q.   (By Mr. Friedman)  Special Agent Martini, how did you

18   examine that cell phone?

19   A.   I examined it with common forensic software.

20   Q.   And what does that forensic software allow you to do, in

21   general terms?

22   A.   Essentially, it takes a copy of the phone and parses it.

23   It creates little buckets, if you will.  So for web history, for

24   contacts, for phone calls, it just puts everything in a nice,

25   little specific area so you can navigate it better.

1    Q.   Are Exhibits 501 through 506 some of the data that you

2    seized from the cell phone?

3    A.   Yes.

4         MR. FRIEDMAN:  The government offers Exhibits 501

5    through 506 into evidence.

6         THE COURT:  501 through 506 are admitted.

7         (Government Exhibits 501 through 506 admitted.)

8    Q.   (By Mr. Friedman)  Special Agent Martini, would you look at

9    Exhibit 501?  What are the items shown on this page?

10   A.   These are text messages, or SMS, from the phone.

11   Q.   What does the first one say?

12   A.   "I, however, hijacked more aws accounts."

13   Q.   And if we could go down to the bottom messages -- I

14   apologize.  We should go to the next page, page 2, please.

15        Do you see one message on that page?

16   A.   Yes.

17   Q.   Could you read, starting halfway through the second

18   sentence of that message, and just through the word "overlooked"

19   from there, would you read that out loud?

20   A.   From the word "overlooked"?

21   Q.   Beginning "I have," and then down to "overlooked."  So "I

22   have" in the middle of the second line.

23   A.   "I have my own dilemmas, as you well know.  Actually, I'm

24   not so sure you do.  Try having root IAM credentials for some

25   pretty large companies in your pocket because some minor thing

1   was overlooked."

2   Q.   Are you able to see the phone number of the phone that sent

3   this message?

4   A.   Yes.

5   Q.   And where is that phone number?

6   A.   It appears to be right above the message.

7   Q.   And what is that phone number?

8   A.   In this case, it is area code (206) 602-9923.

9   Q.   Did you see anything in any of the text messages that you

10  seized in which Ms. Thompson stated that companies had given her

11  permission to take this data?

12  A.   No.

13  Q.   Did the information that you obtained from the phone also

14  include Internet history?

15  A.   It did.

16  Q.   And would you look at Exhibit 504 and tell me if you

17  recognize that?

18          MS. MANCA:  I'm sorry?

19          MR. FRIEDMAN:  504.

20          MS. MANCA:  We're going to have to come back to that

21  one.  I'm sorry.

22  Q.   (By Mr. Friedman)  Special Agent Martini, did you review

23  the Internet history on the phone?

24  A.   I did.

25  Q.   Did you read all of it?

A.    Yes.

Q.    I don't have any specific questions for you about it, but let's look at Exhibit 506.

      I see the words "extraction report" up top, and then "autofill" is the next word?

A.    That's right.

Q.    What is autofill?

A.    Autofill is a feature that you find on a lot of digital devices.  If you get tired of filling in your name or your address, you know, as you're constantly going to different websites or signing up for things, you can have your browser or the tool remember what that is so it just automatically puts it in, you don't have to keep retyping.

Q.    Is that why, if you're not careful, autofill sometimes puts someone other than you intended?

A.    It can.

Q.    Where do phones get the data they use to autofill?

A.    You have to enter it at some point and tell the device to save that data.

Q.    Do you tell the device to save the data, or can the device do it by itself?

A.    I suppose both are technically possible.

Q.    What is this autofill document?

A.    It is a list of information that appears to have been saved in the autofill feature.

1  Q.    If we look at lines 3, 4, 5, and 6, what do you see there

2  as being saved?

3  A.    A user name, but, specifically, "Joseph Baleda."

4  Q.    Does that suggest that this name was entered once or more

5  than once, or can you not tell that?

6  A.    It's hard to tell.

7  Q.    Can you tell anything from this about the purpose for which

8  that name was entered?

9             MR. HAMOUDI:  I'm going to object to that.

10            THE COURT:  Well, just a "yes" or "no" answer.

11  A.    No.

12  Q.    (By Mr. Friedman)  And then under the "Joseph Baleda," do

13  you see a slight variant on that for two more lines?

14  A.    Yes.

15  Q.    And what is that variant?

16  A.    Joseph.Baleda.

17  Q.    Okay.  And can you tell for what purpose that was entered

18  into the phone?

19  A.    No.

20  Q.    Below that, what do you see?  What are the next two

21  entries?

22  A.    Another iteration that appears to be of the same name,

23  "Joey Baleda."

24  Q.    I'm sorry.  I meant the two entries above that.

25  A.    Oh, I'm sorry.

Joel Martini - Direct by Mr. Friedman

1        Yes, it's an answer autofill with the entry "pizza."

2    Q.   And then two more of "Joey Baleda"?

3    A.   Yes.

4    Q.   What do you mean by an "answer autofill"?

5    A.   Just to differentiate from user name, which is how the

6    Joseph Baleda, Joseph.Baleda, and Joey Baleda are tagged.

7    Q.   Does that suggest the word "pizza" was entered as an answer

8    to something?

9    A.   That's right, a different type of field, yes.

10   Q.   As opposed to name and someone entered "pizza," in which

11   we'd see user name "pizza"?

12   A.   Yes.

13   Q.   And then we see "DOB day."  What do you see there?

14   A.   Yes, the answer to that is -- the saved answer to that is

15   "21."

16   Q.   And down further to the bottom half of the page, do you see

17   several answers to "DOB year"?

18   A.   Yes.

19   Q.   And what do you see there?

20   A.   The entry "1991."

21   Q.   Okay?  Do you see -- three and four lines from the bottom,

22   do you see autofill answers for an email address?

23   A.   Yes.

24   Q.   What do you see there?

25   A.   Entries for the email address josephbaleda@mailinator.com.

1    MR. FRIEDMAN:  May I have a moment, Your Honor?

2    THE COURT:  Sure.

3    MR. FRIEDMAN:  Thank you.

4   Q.   (By Mr. Friedman)  And then if we could go to the second

5   page of this document, do you see an autofill for "DOB month"?

6   A.   I do.

7   Q.   And what is that?

8   A.   The entry of "10."

9   Q.   So between these three things, we've had a DOB for day,

10  month, and year?

11  A.   Yes.

12  Q.   Have you put those together in your mind?

13  A.   Yes.

14  Q.   And what day and month and year do those add up to?

15  A.   It would be October -- I'm sorry, I don't remember the

16  day -- of 1991.

17  Q.   Okay.  Let's go back to the previous page.

18  A.   Twenty-first.

19  Q.   Okay.  So October 21st, 1991?

20  A.   Yes.

21  Q.   Are you aware of an individual named Joseph Baleda who has

22  a connection to this case?

23  A.   Yes.

24  Q.   Are you aware of his birthday?

25  A.   Yes.

Joel Martini - Direct by Mr. Friedman

1  Q.   What is his birthday?  Is it the date you just said?

2  A.   October 21st, 1991.

3  Q.   Do you see a mailing address listed here?

4  A.   I do.

5  Q.   What is that mailing address?

6  A.   901 Dexter Avenue North.

7  Q.   And do you see a phone number autofilled in three

8  increments?

9  A.   Yes.

10  Q.   What is that phone number?

11  A.   It appears to be area (425), with a prefix 882, and the

12  suffix 8080.

13  Q.   Let's go back to the previous page for a minute, if we can,

14  and at the bottom, the third and fourth lines from the bottom.

15       You talked a moment ago about the email

16  josephbaleda@mailinator.com.

17       Are you familiar with something called Mailinator?

18  A.   Yes.  Mailinator is an anonymous email service, one that's

19  designed to be disposable.

20  Q.   Okay.  Is Mailinator a service provider from which law

21  enforcement can obtain records?

22  A.   Not that I'm aware of, no.

23  Q.   Did you try or inquire?

24  A.   Yes, yes.

25  Q.   Were you able to obtain any records?

Joel Martini - Direct by Mr. Friedman

1    A.   No records.

2    Q.   Based on what you see on this, can you tell any purpose for

3    which the name Joseph Baleda was used?

4          MR. HAMOUDI:  Objection.

5          THE COURT:  Just a "yes" or "no."

6    A.   No.

7    Q.   (By Mr. Friedman)  Okay.  You see the data here, but you

8    can't say for what it was used?

9    A.   That's right.  The data was entered, but I don't know

10   ultimately for what purpose.

11   Q.   Okay.  Special Agent Martini, you've been talking about the

12   cell phone that you examined.  Are you aware of the phone number

13   that was associated with this cell phone?

14   A.   I believe it was the one that was listed at the beginning

15   of the text messages that we had observed.

16         MR. FRIEDMAN:  May I have one moment, Your Honor?

17         THE COURT:  Sure.

18   Q.   (By Mr. Friedman)  Special Agent Martini, I assume -- did

19   you look through all of the available data on this phone --

20   A.   I did.

21   Q.   -- that you were authorized to?

22   A.   I did.

23   Q.   Did you see any evidence that anyone other than Paige

24   Thompson was a user of this phone?

25   A.   No.

Joel Martini - Direct by Mr. Friedman

1    Q.   Special Agent Martini, have you worked with some of the

2    companies whose data was taken during the course of your

3    investigation of this case?

4    A.   Many of them, yes.

5    Q.   Have you provided them any information to help their

6    investigation or things they need to do?

7    A.   Many of them, yes.

8    Q.   And why is that?

9    A.   It's important that the companies understand how they were

10   impacted, so whatever we can do, whatever we can share, based on

11   the information that we've come into possession of, especially

12   in things like the aws_dumps folder, we want to share that back

13   to the company so that they can mitigate it appropriately.

14   Q.   Did you provide each company all of the data taken, or did

15   you sometimes provide more limited information?

16            MR. HAMOUDI:  Objection; relevance.

17            THE COURT:  It's interesting.  Go ahead.  You can

18   answer.

19   A.   It was kind of a tiered process, so we'd often provide them

20   with limited information at first, in order for them to verify

21   that it was, indeed, their data, and then we'd often follow that

22   up with a more full copy of the information.

23   Q.   (By Mr. Friedman)  Was one of the companies to which you

24   provided information a company named Apperian, or later,

25   Digital.ai?

1    A.    Yes.

2    Q.    And are Exhibits 720 and 721 data or information that you

3    provided to Apperian?

4    A.    Yes.

5              MR. FRIEDMAN:  The government offers Exhibits 720 and

6    721.

7              MR. HAMOUDI:  I'm going to object.  I'd like to hear

8    from the Apperian people, if they're going to testify.

9              THE COURT:  Well, this question is did he provide it

10   to them.

11             MR. HAMOUDI:  Yeah, that's fine, Your Honor.

12             THE COURT:  So the objection is withdrawn.  You

13   answered the question "yes"?

14             THE WITNESS:  Yes.

15   Q.    (By Mr. Friedman)  Did you provide information to other

16   companies from which data had been taken?

17   A.    Yes.

18   Q.    And did those include 42Lines, a company that was once

19   named Survox and is now Enghouse, a company named Bitglass, and

20   Vodafone?

21   A.    All of those, yes.

22   Q.    And are Exhibits 730, 731, 740, 741, 750, 751, 752 and 760

23   data that you provided, in each case, to one of those companies?

24   A.    That's right.

25             MR. FRIEDMAN:  Government offers that list of

Joel Martini - Direct by Mr. Friedman

1  exhibits.

2          MR. HAMOUDI:  Objection; subject to the same.

3          THE COURT:  Okay.  I'll take that up outside -- you're

4  not going to ask him about the data, are you?

5          MR. FRIEDMAN:  Only in one case, Your Honor.  In the

6  other case, it's too late for basis of witnesses who will

7  testify.

8          THE COURT:  I'll take it under advisement, but you can

9  ask him about the one you want to ask him about.

10 Q.  (By Mr. Friedman)  Special Agent Martini, did you look at

11 data that you found in folders that had suggested it had been

12 taken from Vodafone?

13 A.   Yes.

14 Q.   And did you look inside that data?

15 A.   Yes.

16 Q.   Can you describe, generally, the volume of data that had

17 been taken from Vodafone?

18 A.   I believe the archive was roughly about 17 gigabytes in

19 size.  It was pretty large.

20 Q.   And what type of data did you see in there when you looked?

21 A.   There was a variety of information, but files that

22 indicated that they were some sort of --

23          MR. HAMOUDI:  Objection, Your Honor, as to content.

24          THE COURT:  Overruled.  You can answer.

25 A.   Files that indicated that they were some sort of

1  certificate type of file.

2  Q.   (By Mr. Friedman)  And why did you consider that

3  significant?

4  A.   It matched what we understood the Vodafone data to be.

5  Q.   And from where did you get your understanding of what the

6  Vodafone data was?

7  A.   Vodafone themselves.

8           MR. HAMOUDI:  Objection; hearsay.

9           THE COURT:  I think Mr. Friedman is asking about

10  postings by Paige Thompson.

11  A.   Yes, there were postings online that we observed that

12  indicated that that's what it was.

13  Q.   (By Mr. Friedman)  Do you recall how Ms. Thompson had

14  described that data in her posts?

15  A.   As "certs," or certificates.

16  Q.   And is that what you saw as part of the data that you

17  examined?

18  A.   That's right.

19  Q.   Special Agent Martini, are you aware of an investigation

20  that was opened by the Department of Justice?

21  A.   In general terms, yes.

22  Q.   Okay.  And the U.S. Attorney's Office here is actually part

23  of the Department of Justice, correct?

24  A.   That's right.

25  Q.   Is this a different part that we're talking about?

1  A.   Yes.

2  Q.   And, specifically, what part?

3  A.   My understanding is it's Main Justice, so back East.

4  Q.   Did you have an understanding -- I'll show you Exhibit 952.

5  Did you have an understanding about what was the subject of that

6  investigation?

7  A.   Yeah.  My understanding is that investigation centered

8  around this note.

9  Q.   Did you have an understanding of how extensive that

10  investigation was?

11  A.   My understanding is there was --

12       MR. HAMOUDI:  I object to this.

13       THE COURT:  Yeah, I don't really know where this is

14  going, so I'd rather hear about it outside the presence of the

15  jury.

16       MR. FRIEDMAN:  That's fine, Your Honor.

17       THE COURT:  And since Agent Martini is here, we can

18  always recall him.

19       MR. FRIEDMAN:  Would you like me to keep going?

20       THE COURT:  In another area, yeah.

21  Q.   (By Mr. Friedman)  Special Agent Martini, have you reviewed

22  Paige Thompson's entire Internet search history both from the

23  computer and from the cell phone?

24  A.   As much as we recovered, yes.

25  Q.   Did you see information in there that related to credit

1    card or possible credit card fraud?

2    A.    Yes.

3    Q.    And would you take a look at Exhibit 522, page 23?

4          Did you see information that related to cryptocurrency

5    money?

6    A.    I did.

7    Q.    And would you take a look at Exhibit 524, page 2?  Is that

8    some of that information?

9    A.    It is.

10   Q.    And why do you say that?

11   A.    These are visited web pages for Nanopool, which is a

12   cryptocurrency pool, as well as the bottom -- or, rather,

13   Nanopool endpoints, and the beginning of the Nanopool Ethereum

14   web page.

15   Q.    And what type of information did you see that related to

16   credit card fraud?

17   A.    A variety --

18              MR. HAMOUDI:  Objection, Your Honor.

19              MR. FRIEDMAN:  Your Honor, this would be --

20              THE COURT:  Well, just an objection?

21              MR. HAMOUDI:  Yeah, objection.  These are questions in

22   a way trying to extract.

23              THE COURT:  The objection is overruled.  You can

24   answer.  Go ahead.

25   A.    Generally, things -- here we go.

1    Searches such as credit card number based on location,

2  anatomy of a credit card, carding forums, dark web,

3  marketplaces, things of that nature.

4  Q.   (By Mr. Friedman)  Did you see anything in either of the

5  Internet search histories about responsible disclosure?

6  A.   I did not.

7  Q.   Did you see any searches for responsible disclosure

8  websites?

9  A.   I did not.

10  Q.   Have you also looked at Ms. Thompson's social media

11  communications, messagings, postings?

12  A.   Yes.

13  Q.   Did you see either of those things -- did you see

14  communications about responsible disclosure in any of those?

15  A.   Not that I observed.

16    MR. FRIEDMAN:  Thank you.  I have no further

17  questions.

18    THE COURT:  How's everybody doing?  Can you go a

19  little longer without a break?

20    Okay.  Mr. Hamoudi, we'll do cross-examination of

21  Agent Martini.

22    CROSS-EXAMINATION

23  BY MR. HAMOUDI:

24  Q.   When you looked at Ms. Thompson's web searches, you found

25  17,000 web searches, correct?

1    A.    There was many, yes.

2    Q.    And a lot of the web searches were over a matter of seconds

3    or minutes, correct?

4    A.    I don't know the exact time frames.

5    Q.    The exhibits speak for themselves.  Can we bring some of

6    them up?  506.  So let's look at the time period of this.

7    A.    Sure.

8    Q.    This Chrome fill.  Up top, please, it's March 28 at 2:58

9    a.m., right?

10   A.    That's right.

11   Q.    And then let's go down to the bottom to the -- it looks

12   like 2:54 a.m.?

13   A.    That's right.

14   Q.    But you don't know the circumstances of what's going on

15   when a human being is in front of a device and what they're

16   doing, correct?

17   A.    I don't.

18   Q.    And you don't know what their mental state is?

19   A.    No.

20   Q.    You don't know whether if they're on medication?

21   A.    No.

22   Q.    You don't know if they're not feeling well?

23   A.    No.

24   Q.    And you did testify, I believe it was in June of 2021,

25   before a grand jury; do you recall that?

1   A.   That sounds right, yes.

2   Q.   Yes?

3   A.   Yes.

4   Q.   And a grand juror asked you a very direct question.  They

5   asked you a question about if the data in this case was used by

6   anybody else.  Do you remember that?

7   A.   Generally, yes.

8   Q.   I can bring up the transcript.

9   A.   Yeah, if you have it, please.

10  Q.   Yeah, I can bring it up.

11       I can't bring it up, but do you recall being asked by a

12  grand juror if the data in this case was being used by anybody

13  else?

14  A.   Not specifically.

15       MR. HAMOUDI:  Go to 82.  All right.  We can't find it.

16       THE COURT:  I'll take a break, if it would make it

17  easier for you.

18       MR. HAMOUDI:  It would.

19       THE COURT:  Victoria will take you downstairs, and

20  we'll get started again, really promptly, please, at five of

21  3:00, because at 3:45, we're going to break early because I have

22  a swearing-in of the magistrate judge.

23       Please go down to Judge Pechman's courtroom, and we'll

24  bring you back at five of.

25

```
 1                  THE FOLLOWING PROCEEDINGS WERE HELD
                    OUTSIDE THE PRESENCE OF THE JURY:
 2

 3           MS. MANCA:  Your Honor, can we address the scheduling

 4    matter?

 5           THE COURT:  We can do it now, yes.

 6           MS. MANCA:  I don't know how much longer we have with

 7    Agent Martini.  We have one more very brief witness.  And then

 8    our next witness, if we started with a new witness this

 9    afternoon, would be a very lengthy witness.  So our preference

10    would be to break this afternoon after the witness that's coming

11    after Agent Martini, and that way we can start with our

12    out-of-town witnesses early in the morning tomorrow.

13           THE COURT:  That's fine to do it that way.

14        Why don't we put the quick witness up now, if you don't

15    mind just interrupting.

16           MR. HAMOUDI:  I don't mind, Your Honor.

17           THE COURT:  Because he's going to be here.

18           MS. MANCA:  That's fine.  I think we can get them

19    both.

20           THE COURT:  We don't know how long Mr. Hamoudi is

21    going to be on cross.

22           MS. MANCA:  I'm worried about the situation --

23           THE COURT:  If you get done, don't worry about it.

24        And while we're talking about scheduling things, Monday

25    morning I need to start a little bit later, so we'll start at
```

1    10:30 on Monday, and we'll just kind of plow through things.

2    But, sure, that's fine.  Don't worry about that.

3         But if you want to get your other witness on, you know,

4    we're all waiting with bated breath to get Ms. Culbertson to do

5    something.

6         MS. MANCA:  You will get that opportunity.  I just

7    didn't want to start with this really long witness right this

8    afternoon.

9         THE COURT:  We're adjourned until five of.

10        MR. FRIEDMAN:  Your Honor, could we address, quickly,

11   the question that the court had said we should put that off?

12   Would you rather not do that?

13        THE COURT:  Go ahead.  We're back on the record.

14        MR. FRIEDMAN:  I was just going to bring out, quickly,

15   that there was this brief investigation at Main Justice.  It was

16   closed.

17        The defense made a big point about the OCC investigation

18   and others, and so I was assuming that we're going to hear a lot

19   about the Department of Justice conducted this investigation of

20   Capital One.

21        THE COURT:  What was DOJ investigating about the note?

22        MR. FRIEDMAN:  We're not deeply privy to it, but they

23   were focused on what Capital One -- this is the thing where we

24   obtained 600 pages of discovery that were produced a few months

25   ago --

1    THE COURT:  Are you guys going to bring it up?

2    MR. HAMOUDI:  No.

3    THE COURT:  Let's just drop it.

4    MR. FRIEDMAN:  Thank you.

5    THE COURT:  And this was the old DOJ, right?

6    MR. FRIEDMAN:  Well, the one in D.C., if that's --

7    yeah.

8    THE COURT:  No.  I mean, the Barr DOJ.

9    MR. FRIEDMAN:  Yes.

10    (Court in recess 2:45 p.m. to 2:58 p.m.)

11    THE COURT:  Please be seated.  And we will continue

12    with cross-examination of Agent Martini.

13    Q.    (By Mr. Hamoudi)  So, Agent Martini, you went through an

14    extensive amount of evidence that you obtained as a result of

15    search warrants you issued to variety of social media companies;

16    correct?

17    A.    That's right.

18    Q.    GitLab, yes?

19    A.    I don't remember if we did GitLab, but definitely GitHub.

20    Q.    GitHub.

21    And Twitter?

22    A.    Yes.

23    Q.    Gmail?

24    A.    Yes.

25    Q.    And Netcrave?

1  A.    Yes.

2  Q.    And Google?

3  A.    Google's included, yes.

4  Q.    Yes.

5        And then -- and you did a thorough search of all of that

6  evidence; correct?

7  A.    That's right.

8  Q.    And there's no evidence that Ms. Thompson ever shared

9  Capital One's data with anyone; correct?

10  A.    Not that I found.

11  Q.    And no evidence that she shared anyone's data with anyone;

12  correct?

13  A.    Not that I found.

14  Q.    Okay.  No evidence that she ever sold it; correct?

15  A.    Not that I found.

16  Q.    Publicly disclosed it?

17  A.    Not that I found.

18  Q.    Any evidence that she tried to blackmail anyone?

19  A.    Not that I found.

20  Q.    No evidence that she ever leaked any of the data?

21  A.    No.

22  Q.    Okay.  And we were talking about web histories.

23        MR. HAMOUDI:  And let's go to 522-03, please.  It's

24  previously admitted.

25  Q.    (By Mr. Hamoudi)  Isn't it true that only four Google

1    searches related to credit card fraud?

2    A.    I believe there was more than just this one page.

3    Q.    Okay.  Which page is it on?

4    A.    I don't know off the top of my head.

5    Q.    Okay.  Isn't it true that all of these searches that you

6    testified to occurred within a 30-minute time span?

7    A.    Approximately, that appears true.

8    Q.    And her search history revealed no downloads of embossers

9    or actually visiting any of these credit card web forums, do

10   they?

11   A.    Not that I recall.

12   Q.    Okay.

13        And I want to go back to the circumstances of the search

14   warrant.

15   A.    Sure.

16   Q.    So just for educational purposes, a search warrant is -- it

17   gives you permission to go somewhere; correct?

18   A.    That's right.

19   Q.    And without a search warrant, you can't -- you don't have

20   permission to go to that place; correct?

21   A.    In a law enforcement capacity, exactly.

22   Q.    Right.

23        So before you could go to Ms. Thompson's home or where she

24   was living, you had to go to a judge and you had to get

25   permission to go over there; correct?

1   A.   That's right.

2   Q.   And so you went and obtained this warrant.  And the warrant

3   gave you authority to seize items at the residence; correct?

4   A.   That's right.

5   Q.   And the warrant was fairly broad, it allowed you to seize

6   all computers, notebook computers, laptop computers, electronic

7   storage media, and components; correct?

8   A.   Yes.

9        MR. HAMOUDI:  And can you bring up discovery 551?

10  Q.   (By Mr. Hamoudi)  And subsection 12B, one of the provisions

11  that gave you authority to seize items, can you read that out

12  loud?

13  A.   12B, you said?

14  Q.   Yes.

15  A.   Yes.

16        Any digital devices or other electronic storage media used

17  to facilitate the transmission, creation, display, encoding, or

18  storage of data, including word processing equipment, modems,

19  docking stations, monitors, cameras, printers, plotters,

20  encryption devisors -- sorry, encryption devices, and optical

21  scanners.

22  Q.   And then so when you executed the search warrant at Ms.

23  Thompson's residence, there were surveillance cameras that were

24  destroyed by the FBI; correct?

25  A.   I believe that is true.

1  Q.    And that was to prevent the tactical -- so somebody knows

2  the tactics that you use to execute a search warrant?

3  A.    That's right.

4  Q.    All right.  But if we take the warrant at its terms, it

5  didn't give you permission to destroy the cameras; correct?

6  A.    I -- I mean, based on this, I don't see anything having to

7  do with destroy.  But I would also say that there's a difference

8  between the data storage and the camera itself.  I mean, the

9  camera is just a camera that links to some other place.

10 Q.    Well, it says cameras on there, correct, on 12B?

11 A.    True, yes.

12 Q.    Okay.  So just by its written terms, you didn't have

13 authority to destroy those cameras; correct?

14 A.    Based -- it doesn't -- this specific 12B doesn't reference

15 anything having to do with that.

16 Q.    But the warrant gave you permission to be there, the

17 warrant didn't give you permission to destroy things?

18 A.    Based on this specific part of the warrant, that's true.

19 But I don't know what else might be in the warrant.

20 Q.    Okay.  And when the search was executed -- there were

21 roughly 30 to 40 agents when the search was executed; correct?

22 A.    I don't know the exact number, but that's probably close.

23 Q.    And there was a SWAT team used?

24 A.    That's right.

25 Q.    And they wore fatigues?

1   A.   They did.

2   Q.   And they were armed with assault rifles?

3   A.   That's right.

4   Q.   And they were armed with a battering ram?

5   A.   I believe they had one, yes.

6   Q.   Okay.  And -- and so they started to bang and to get -- and

7   what were they saying if -- what do you normally say when

8   they're doing that?

9          THE COURT:  Well, are -- you're assuming they're using

10  the battering ram at the very beginning, so --

11         MR. HAMOUDI:  Yes.

12         THE COURT:  -- why don't you ask him whether they ever

13  had to use it or they just --

14  Q.   (By Mr. Hamoudi)  Did they ever have to use the battering

15  ram?

16  A.   I wasn't there at that time, but I don't believe so.

17  Q.   Okay.  And then so --

18         THE COURT:  You weren't part of the entry team?

19         THE WITNESS:  I was not.

20  Q.   (By Mr. Hamoudi)  Okay.  Ms. Thompson is -- agree, is a

21  physically slight woman; correct?

22  A.   Potentially.

23  Q.   All right.  You learned that her birth name was Trevor

24  Thompson; right?

25  A.   That's correct.

1    Q.   And so you learned that she was transgender; correct?

2    A.   Yes.

3    Q.   And when -- and when --

4         MR. HAMOUDI:   Can you bring up Exhibit 304?

5    Q.   (By Mr. Hamoudi)   Do you recall what time of day -- do you

6    recall when it was that the search warrant was executed?

7    A.   I think it was approximately 6:00 in the morning.

8    Q.   Okay.  And you agree with me that here, this room, seems to

9    be in quite a disarray?

10   A.   Yes.

11   Q.   Yeah.

12        And you did not seize items of significant value from this

13   room, other than the computer; correct?

14   A.   In accordance to the search warrant, that's right.

15   Q.   All right.  And you didn't see any designer clothes in the

16   room, did you?

17   A.   Not that I personally observed.

18   Q.   No.  Okay.

19        I want to talk to you about -- about the manner in which

20   information was shared with you at the outset of the

21   investigation by Capital One.

22   A.   Okay.

23   Q.   Okay.  All right.  You were involved -- you were not

24   communicating directly with a Capital One employee, but you were

25   speaking to lawyers that represented Capital One; correct?

1  A.    For the most part, that's correct.

2  Q.    And these lawyers were a New York-based law firm; correct?

3  A.    That is my understanding.

4  Q.    And so you relied on them to provide you information that

5  you requested to inform your investigation; correct?

6  A.    They originally provided us with a referral that had kind

7  of a baseline.  And then we went and independently verified as

8  much as we possibly could from that referral.

9  Q.    And at the same time, they were asking you for information

10  in return; correct?

11  A.    As we went forward, yes.

12  Q.    Okay.  So like in -- can you bring up 156-64.

13        And this is an email between yourself and an individual

14  named Nicole Washburn.  Do you see this?

15  A.    Yes.

16  Q.    And Ms. Washburn asks you that the OCC regulators asked

17  today if the FBI would be providing us with a copy of their

18  forensic report.  And you responded that that -- you wouldn't --

19  you wouldn't normally do that; correct?

20  A.    That's right.

21  Q.    And you did say you would share some other information,

22  which is a threat alert documentation based on your analysis

23  to-date; correct?

24  A.    That's right.

25  Q.    And was that ever shared with Capital One?

1    A.    I don't know off the top of my head.

2    Q.    Okay.  And I also saw that -- if you go down to the next

3    page, you also assisted in getting them their data back;

4    correct?

5    A.    That's right.

6    Q.    And she offhandedly makes a comment, I owe you a drink

7    sometime.  Do you see that down there?

8    A.    I do.

9    Q.    And is it normal for somebody to offer an FBI agent a drink

10   sometime?

11   A.    I don't know.  I mean, that's not something that I guess we

12   typically deal with or communicate about.

13   Q.    And you're a trained professional, you know that you can't

14   go have a drink with somebody --

15   A.    That's right.

16   Q.    -- right, but -- okay.

17         And you also -- I want to talk to you about the note that's

18   been admitted.

19              MR. HAMOUDI:  What exhibit is that?

20                        (Off the record.)

21   Q.    (By Mr. Hamoudi)  1100, when did you get a copy of this

22   note?

23   A.    I don't know off the top of my head, to be honest.

24   Q.    You talked to Capital One's employees and a lot of times

25   throughout this investigation; correct?

1    A.    That's correct.

2    Q.    And every time they talked to you, they had outside counsel

3    present; correct?

4    A.    That's correct.

5    Q.    Okay.  And at any time did they provide you this note?

6    A.    We did eventually get a copy of this note, yes.

7    Q.    Okay.  And -- you don't know the date, though; correct?

8    A.    I don't.

9    Q.    Would January 24th, 2022 sound about right?

10   A.    That's possible.

11   Q.    Yeah.

12         MR. HAMOUDI:  Why don't you bring up 141-55.

13   Q.    (By Mr. Hamoudi)  These are your handwritten notes?

14   A.    They are.

15   Q.    And it seems like this is an interview of Thomas Hall, says

16   Tom.  Do you know who he is?

17   A.    I do.  It would not have been an interview of him, although

18   it may have been just a collective group of people.

19   Q.    Okay.  But this is the first time that the note is brought

20   to your attention, do you believe?

21   A.    Again, I don't know the exact date.

22   Q.    Okay.  But it wasn't provided to you early on in the

23   investigation, was it?

24   A.    I did not see it for quite some time --

25   Q.    Okay.  All right.  How about let's go to 155-77?

1    THE COURT:  So these numbers that Mr. Hamoudi is using

2    are sort of Bates numbers on discovery.  It has nothing to do

3    with the trial.  They're not exhibits or anything like that.

4    And you won't be seeing them unless they're separately marked as

5    exhibits and admitted into evidence.

6    Q.   (By Mr. Hamoudi)  So this is an example of you -- Nicole

7    Washburn, she's sending you an email and she references the

8    note.  And she doesn't provide you the note; right?  And Nicole

9    Washburn also works for Capital One.

10    THE COURT:  Well, there's like three questions in

11    there.

12    MR. HAMOUDI:  I apologize.

13    Q.   (By Mr. Hamoudi)  This is an email from Nicole Washburn;

14    correct

15    A.   It is.

16    Q.   And she works for Capital One?

17    A.   Yes.

18    Q.   And she references the note, but then -- and you just ask

19    what note/conference is that, do you recall?

20    A.   Yes.  I didn't have any context for that -- for the

21    sentence.

22    Q.   And she never followed up to then respond to that answer,

23    your question you asked, what note/conference is that, she never

24    followed up and provided you a response, did she?

25    A.   Not to my recollection.

Joel Martini - Cross by Mr. Hamoudi

1    Q.   And nobody -- none of the attorneys who represented Capital

2    One ever followed up and provided you any information, did they?

3    A.   Not to this email string.

4    Q.   Okay.  Thank you.

5                        (Off the record.)

6         MR. HAMOUDI:  Can you bring up 1002?  But do not

7    publish, please.

8         Go to the second page.

9         No, go to the first page.

10   Q.   (By Mr. Hamoudi)  Agent Martini, did Capital One ever

11   provide you with a memorandum written by Rob Alexander to the

12   Risk Committee, dated December 13th, 2019?

13   A.   I personally don't believe I've seen this document.

14   Q.   Okay.  Go to the second page.

15        Did Capital One or its representatives ever tell you that

16   the web access firewall role had been granted overly permissive

17   access and the attacker was able to access our AWS storage from

18   outside the Capital One network?

19   A.   Sorry, can you point me to where that is?

20   Q.   Yeah, B.

21   A.   That does generally describe our understanding.

22   Q.   Okay.  But they never -- did they ever share this document

23   with you in December -- after December of 2019?

24   A.   Not with me personally.

25   Q.   Okay.  Okay.  Thank you.

1       And you can take that down.

2       And were you -- were you aware -- I guess, what knowledge

3  did you have about Capital One being investigated by the OCC,

4  other than to request for the reports which Ms. Washburn had

5  asked you?

6  A.   It was completely separate from my investigation, so,

7  limited.

8  Q.   Okay.  All right.  All right.

9                         (Off the record.)

10 Q.   (By Mr. Hamoudi)  Did you ever see trail logs, Amazon trail

11 logs, for any of the companies in this case?

12 A.   A handful of the companies did provide some of the trail

13 logs, yes.

14 Q.   Okay.  And did you -- do you use TOR?

15 A.   I've used it a couple times, more of an experiment, but

16 that's about it.

17 Q.   And you use a Virtual Private Network?

18 A.   On occasion.

19 Q.   And have you ever attended DEF CON?

20 A.   I have not.

21 Q.   No?

22      What is DEF CON?

23 A.   DEF CON is a security information security hacking type of

24 conference, usually held down in Las Vegas.

25 Q.   Have you ever attended any other such conferences, hacking

Joel Martini - Cross by Mr. Hamoudi

1    conferences?

2    A.    Not specifically hacking conferences, no.

3    Q.    Okay.

4            MR. HAMOUDI:  No more questions, Your Honor.

5            THE COURT:  How about Comic-Con?

6            THE WITNESS:  Unfortunately, no.

7            THE COURT:  That's the only one I know.  I've never

8    been there.

9        Mr. Friedman, any --

10           MR. FRIEDMAN:  May I have a moment, Your Honor?

11           THE COURT:  Sure.

12                         (Off the record.)

13           MR. FRIEDMAN:  No questions, Your Honor.

14           THE COURT:  Okay.  And so the defense is going to look

15   at 720, 721, 730, 731, 740, 741, 750, through 752, and 760.

16   Just let me know tomorrow, okay?

17           MR. HAMOUDI:  Yes.  I do have one small matter.  The

18   matter we addressed off the record, if Your Honor could just

19   instruct the jury to disregard the initial information that was

20   testified to.

21           THE COURT:  About the investigation?

22           MR. HAMOUDI:  Yes.

23           THE COURT:  Yeah.  You know, there was a reference to

24   a DOJ investigation, and I said I'll take that up outside the

25   presence.  And both sides agreed they weren't going to go there.

 1    So just ignore any of that testimony about DOJ investigation.

 2         Thanks, Mr. Hamoudi.

 3              MR. HAMOUDI:  Thank you, Your Honor.

 4              THE COURT:  You can step down, Agent.

 5         They evicted you from your chair, but Ms. Manca will give

 6    it back to you.

 7              MS. MANCA:  I will.

 8              THE COURT:  And the next witness of the day?

 9              MS. CULBERTSON:  Yes, Your Honor.  The government

10    calls Joseph Baleda.

11              THE COURT:  So for those of you who are wondering what

12    Ms. Culbertson was doing, now you know, she's going to do this

13    witness.

14         Mr. Baleda, come into the well of the courtroom, which is

15    this open area here.

16         And once you get a little bit closer -- please stop there.

17         Raise your right hand and my clerk will administer an oath

18    to you.

19                        JOSEPH ADAM BALEDA,
      having been first duly sworn, testified as follows:
20

21              THE COURT:  Have a seat up here, Mr. Baleda.

22         And if you want to take -- leave your mask on, that's fine.

23    If you want to take it off while you're answering questions,

24    that's what most people have been doing, so it's totally up to

25    you.

1    THE CLERK:  If you could please state your first and

2  last names, and spell your last name for the record.

3    THE WITNESS:  Joseph Adam Baleda.  It's B-a-l-e-d-a.

4    THE COURT:  Okay.  So you pronounce it Baleda.

5    THE WITNESS:  Yes.

6    THE COURT:  Great.  Thank you.

7    Go ahead, Ms. Culbertson.

8    MS. CULBERTSON:  Good afternoon Mr. Baleda.

9              DIRECT EXAMINATION

10 BY MS. CULBERTSON:

11 Q.   Where do you currently live?

12 A.   Detroit, Michigan.

13 Q.   And what you do you for a living?

14 A.   I'm a 3-D artist.

15 Q.   Any particular kind of 3-D artist?

16 A.   Environment art for games.

17 Q.   Okay.  By "games," do you mean video games?

18 A.   Yes.

19 Q.   Where were you living in 2019?

20 A.   In Seattle.

21 Q.   Have you ever applied for a Capital One credit card?

22 A.   Yes.

23 Q.   Do you remember about when that might have been?

24 A.   Like later -- late 2019.

25 Q.   Okay.  Is there a possibility it might have been in early

Joseph Baleda - Direct by Ms. Culbertson

1   2019?

2   A.    Yeah, early, late --

3   Q.    Sometime in 2019?

4   A.    -- sometime in 2019.

5   Q.    Okay.  Do you remember if your application was approved?

6   A.    Yes.

7   Q.    Okay.  And do you still have an account with Capital One?

8   A.    Yes.

9   Q.    How did you first learn that you were involved in this

10  case?

11  A.    I was reached out to by Special Agent Joel Martini.

12  Q.    Was that a phone call from Special Agent Martini?

13  A.    Yes.

14  Q.    And what did you learn on that phone call?

15  A.    That some of my data had been stolen from me and, uhm, some

16  of my information had been compromised.

17  Q.    Okay.  And do you know if -- where that information came

18  from that was compromised?

19  A.    From -- from what I understand, a Capital One breach.

20  Q.    Capital One breach, okay.

21        Do you have any reason to think that your credit has been

22  impacted by your information being taken from Capital One?

23  A.    Not that I'm aware of.

24             MS. CULBERTSON:  Your Honor, I'm planning to show Mr.

25  Baleda a document that's been marked as Exhibit 782.  It's a

Joseph Baleda - Direct by Ms. Culbertson

1  document that we're going to offer through our computer

2  scientist, Mr. Waymon Ho.  It's a document that he found on the

3  defendant's computer.  But may I provisionally offer it now,

4  show it to the jury, and ask this witness to answer questions

5  about it?

6          THE COURT:  I don't know what it is just yet, so don't

7  show it to the jury just yet, but show it to him and me.

8          MS. CULBERTSON:  Special agent, if you can call up

9  Exhibit 782.

10                    (Off the record.)

11          MS. CULBERTSON:  There we go.

12          THE COURT:  So, Mr. Hamoudi, do you have an objection

13  to this exhibit?

14          MR. KLEIN:  Your Honor, I do object to foundation.  I

15  don't think this witness has ever seen this document.

16          THE COURT:  No, he hasn't.  And they're not offering

17  it through him, but to -- they're going to ask him to identify

18  something on there.

19      Do you have a problem with it later --

20          MR. KLEIN:  I guess I don't have a problem with

21  limited questions, Your Honor, but, from what I know, this isn't

22  a document he's ever seen before.

23          THE COURT:  Yeah, drop the questions, she's going to

24  ask the questions, the question is, do you have a problem

25  showing it to the jury right now?

1      MR. KLEIN:  I don't, Your Honor.

2      THE COURT:  Okay.  So we're not admitting it just yet,

3  but it's going to come -- if it comes in, it will be through Mr.

4  Ho's testimony, but Mr. Baleda will have a chance to just see

5  what's there and tell you.

6      Go ahead, Counsel.

7      MS. CULBERTSON:  Great.

8      And if you could go ahead and publish that document to the

9  jury.

10 Q.  (By Ms. Culbertson)  Mr. Baleda, I'm showing you a document

11 that has been marked as Exhibit 782.  Are you able to see that?

12 A.  Yes.

13 Q.  Do you see that -- this part that's blown up, sort of it

14 looks like two portions of content, there's a line break between

15 the first and the second portion.  Do you see that?

16 A.  Yes.

17 Q.  Okay.  The first part of the document, does that look like

18 some kind of printout of data?

19 A.  Yes.

20 Q.  Okay.  And then there's a line break and the second part

21 has an email address, some words and a phone number.  Do you see

22 that?

23 A.  Yes.

24 Q.  Okay.  Looking at the top part of the document, do you see

25 your name in there?

1    A.    Yes, I do.

2    Q.    Also, in that top part of the document, do you see a Dexter

3    Avenue address there?

4    A.    Yes.

5    Q.    Do you recognize that address?

6    A.    Yes.  That's the address I was living at when I applied for

7    the Capital One account.

8    Q.    When you were living in Seattle?

9    A.    Yes.

10   Q.    Okay.  And again, still in that top part of the

11   information, do you see an email address joeybaleda@gmail.com?

12   A.    I see a gmail.com.  Some of the document has been blurred

13   out for me.

14   Q.    Has been redacted, okay.

15         Do you see in the top part of that document the words

16   "lastFourSSN," followed by a blacked-out --

17   A.    Yes.

18   Q.    -- gray square?

19         Okay.  Still in this top portion, do you see a date of

20   birth on here?

21   A.    I do.

22   Q.    Okay.  Can you tell me the year of the date of birth that

23   you see?

24   A.    1991.

25   Q.    Okay.  And Mr. Baleda, can you tell me what your birthday

1   is?

2   A.   October 21st, 1991.

3   Q.   Okay.  Turning now to the information in the bottom portion

4   of this document, do you see an email address on there?

5   A.   Yes.

6   Q.   What is that email address?

7   A.   Josephbaleda@mailinator.com.

8   Q.   Is that an email address that you set up?

9   A.   No.

10  Q.   Have you ever used that email address?

11  A.   No.

12  Q.   Do you then see under that email address "crakka442C"?

13  A.   Yes.

14  Q.   Is that a phrase that means anything to you?

15  A.   No.  I'm unfamiliar with this.

16  Q.   Is it a phrase that you've ever used as a password?

17  A.   No.

18  Q.   Is it a phrase that you've ever used as the answer to a

19  security question?

20  A.   I don't believe so.

21       MR. KLEIN:  Objection.  He already said he was

22  unfamiliar with it.

23       THE COURT:  Right.

24       MS. CULBERTSON:  I'll move on.

25  Q.   (By Ms. Culbertson)  Mr. Baleda, do you know Paige

1    Thompson, the defendant in this case?

2    A.    No.

3    Q.    Did you ever authorize Paige Thompson to open up a

4    Mailinator account using your name?

5    A.    No.

6    Q.    Did you ever authorize Paige Thompson to use any of your

7    personal information for any purpose?

8    A.    No.

9              MS. CULBERTSON:  Okay.  Thank you.

10             THE COURT:  Is your favorite food pizza?

11             THE WITNESS:  I do like pizza.

12             THE COURT:  Yeah, me, too.

13        All right.  Go ahead, Mr. Klein.

14             MR. KLEIN:  This will be quick.

15                      CROSS-EXAMINATION

16   BY MR. KLEIN:

17   Q.    Do you know if Ms. Thompson ever set up a Mailinator

18   account in your name?

19   A.    Not that I'm aware of.

20             MR. KLEIN:  Nothing further, Your Honor.

21             THE COURT:  So thank you very much for coming in.

22        Hope you didn't get too nervous.

23             THE WITNESS:  No.

24             THE COURT:  Yeah.  Good deal.

25        All right.  You are excused.  Thank you so much.

1             THE WITNESS:  Thank you, Judge.

2             THE COURT:  Okay.  So I tell you, I've got this thing

3    at -- where I got to get up there, so this is a good time for us

4    to take a break in the action and let you get home a little bit

5    early.

6         Please tomorrow, same time, 8:45, so we can get started

7    promptly at 9:00.  We'll put in a full day on Friday.

8         Monday, actually, we're going to start a little later, so

9    you won't need to be here 'til about 10:15 on Monday morning,

10   okay?

11        And stay healthy, stay well.

12        Don't do any research on the case.

13        We planted in your minds the idea that maybe you want to

14   have pizza tonight and maybe a martini with it, and that's

15   perfectly okay.

16        You are excused.  Thank you so much.

17                  THE FOLLOWING PROCEEDINGS WERE HELD
                    OUTSIDE THE PRESENCE OF THE JURY:
18

19             THE COURT:  Okay.  Thanks.  Please be seated.

20        So I got an email from Mr. Klein saying, per the judge's

21   request, here are the defense team cross-examiners for tomorrow,

22   and for Joey Baleda it says Hamoudi.

23             MR. HAMOUDI:  It was.

24        Your Honor, I'll tell you what happened.

25             THE COURT:  Yeah.  Oh, good, you're not going to make

1    me guess.  Thank you.

2              MR. HAMOUDI:  I realized that I got Mike Fisk and

3    Agent Martini, and then I had a son at home, and I got little

4    overwhelmed.  And I forgot to follow up and send the

5    corrections.  That's my responsibility.  I apologize.

6              THE COURT:  All right.  And could we get tomorrow's.

7              MR. KLEIN:  Yes, Your Honor.  We will -- we're not

8    exactly sure who they are, but we'll confer with the government

9    and send you a list that will be dead-on right.

10              THE COURT:  Okay.  I mean, I totally -- it's okay to

11    revise it, just let me know that you've revised it.

12              MR. KLEIN:  We had forgotten it was later.

13              THE COURT:  I mean, you asked one question, it's no

14    big deal, it's just when you suddenly did an objection, I was

15    like, why is he doing it rather than Mr. Hamoudi.

16              MR. KLEIN:  Yes, Your Honor.

17              THE COURT:  Okay.  All right.  So anything the

18    government wants to bring to my attention about scheduling or

19    anything?

20              MR. FRIEDMAN:  No, Your Honor.  Thank you.

21              THE COURT:  Okay.  So we'll see you tomorrow.

22              MR. KLEIN:  Yes.

23              THE COURT:  We're good.

24         All right.  Start up again at 9:00 tomorrow.  Thanks.

25                    (Court adjourned at 3:29 p.m.)

# C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 9th day of June 2022.

/S/  Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter