THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 19-159-RSL |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | PAIGE THOMPSON'S SENTENCING |
| | ) | MEMORANDUM |
| PAIGE A. THOMPSON, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................... 1

II.     DISCUSSION ................................................................................. 3

A. Sentencing Framework ..................................................................... 3

B. Paige Thompson's Personal History and Characteristics ................................. 5

    1. Ms. Thompson's Upbringing, Schooling and Work History ....................... 5

    2. Supportive Testimonials: Paige's Community Support ........................... 10

C. The Remaining 18 U.S.C.(a) Factors Support a Sentence of Time Served.... 11

    1. The Nature and Circumstances of the Offense............................................ 12

    2. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense.................................................................... 14

    3. Adequate Deterrence to Criminal Conduct ................................................. 21

4. Protection of the Public from Further Crimes ............................................ 22

D. This Court Should Sustain Ms. Thompson's Objections to the PSR and Strike the Uncharged Allegations re Cryptojacking ........................................ 23

1. Ms. Thompson is Eligible for a Two-Level Acceptance of Responsibility Adjustment ................................................................................................ 23

2. There is No Clear and Convincing Evidence Present to Warrant a 22 Level Increase Under USSG § 2B1.1(b)(1)(L) .................................................... 26

3. The Government's Newfound Allegations Regarding Crypto Transfers are Impermissibly Unreliable ........................................................................... 28

III.     CONCLUSION ......................................................................................... 31

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - ii

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

## I.   INTRODUCTION

Based on my extensive clinical experience with autistic adults including those who are transgender, [Paige] Thompson has experienced an exceptionally high level of stress and traumatic experiences as far back as her early childhood. In my opinion, she is a very vulnerable person who continues to be at high risk of being victimized.

(Ex. 1, Grace Iarocci, Ph.D., R. Psych, Confidential Assessment (under seal).)[1]

Paige Thompson respectfully requests this Court sentence her to time-served (she has served approximately 100 days in jail), followed by 3 years of supervised release with conditions that offer her continued mental health treatment.  Despite calculating a very high advisory sentencing guidelines range of 210 to 262 months, the Probation Office recognizes many factors that merit a significant variance when it recommends a sentence of 24 months of custody to be followed by three years of supervised release, or alternatively, time served and five years of probation to include 36 months of home incarceration.  Although Ms. Thompson believes this recommendation is too steep, particularly in light of the more than two years Ms. Thompson has spent on restrictive pretrial release, the Probation Office's consideration of the unique nature of this case and Ms. Thompson is to be commended.  The government has requested a significantly higher sentence of 84 months, (Dkt. 377), which is not merited when all the 18 U.S.C. § 3553(a) sentencing factors are fairly considered.[2]

Ms. Thompson has a gifted mind and an aptitude for programming and computers, but she has also had to face a great deal of personal, physical, emotional,

---

[1] Though the Probation Office received information regarding Ms. Thompson's diagnosis, it did not have the benefit of Dr. Iarocci's complete assessment because it was not finished.  The complete assessment is being filed under seal as Ex. 1.

[2] The defense will address the government's arguments in detail at the sentencing.

MS. THOMPSON'S SENTENCING MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 1

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

socioeconomic, and cognitive instability and trauma in her life.  She has had to wrestle with her deeply felt internal and individual experience of gender, which does not correspond with the sex she was assigned at birth, in a society that is often cruel and unforgiving to persons who identify as transgender.  She experienced abandonment, abuse, and instability growing up in her family of origin, and this led to further abuse and exploitation from romantic partners as Ms. Thompson matured and attempted to explore her gender and sexual identity.  She attempted to escape that world by pursuing her dream of a career involving computers.  Sadly, for the most part, that new world also was dominated by people who did not understand or embrace her.  As Dr. Iarocci explains, she has suffered from undiagnosed Autism Spectrum Disorder ("ASD") most of her life in addition to diagnosed attention deficit hyperactivity disorder ("ADHD") and depression.  Ms. Thompson was never given a fair shot to do what every one of us wants—a fair opportunity to thrive both personally and professionally.

It is rare that interaction with the criminal legal system actually serves people to get the help they need, but that is exactly what happened in this case.  Ms. Thompson did not get the healthy boundaries and therapy she so desperately needed growing up, but she did when this Court granted her pretrial release.  Since then, Ms. Thompson has gradually begun to build a stable life for herself.  She can function productively in the community and does not pose a risk of engaging in computer-related offenses or any other criminal activity.  With the continued support of those around her, including those who provided letters to this Court, and this Court and the Probation Office, there is every indication that Ms. Thompson can continue to thrive, learn to deal with her various challenges, and use her passion for computing and programming for lawful and productive ends.  Lastly, it bears noting that following her arrest and at a time of significant emotional distress, Ms. Thompson voluntarily met with the government and

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 2

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1  provided a detailed technical explanation of how she was able to obtain the data she did
2  through companies' web application firewalls.

3    Standing before this Court at sentencing is a much different woman than the
4  woman who was arraigned on these charges; this is a woman who believes that you
5  should "Never Give Up on Your Dreams,"[3] which is a far cry from the woman who
6  made erratic social media statements near the time of the events which led to this case.
7  Ms. Thompson deeply regrets some of those statements, but any further custodial term
8  here will only serve to significantly hamper Ms. Thompson's growth and aspirations
9  and put in serious jeopardy her chances of being a contributing member of society.
10  Additionally, because Ms. Thompson is a transgender person diagnosed with ASD, a
11  further custodial term could result in significant damage to her body and mind,
12  particularly if she is housed in a facility with males.  Unfortunately, the federal
13  corrections system poses significant risks to transgender inmates that can potentially
14  subject them to horrific and unique dangers not faced by straight or even gay inmates.

15    A further term of imprisonment does not promote the § 3553 sentencing factors
16  here and a sentence of time served (just over three months' imprisonment) and three
17  years of supervised release is "sufficient, but not greater than necessary" to comply
18  with § 3553.

19  **II. DISCUSSION**

20    **A. Sentencing Framework**

21    The advisory sentencing guidelines are merely "one factor among the § 3553(a)
22  factors that are to be taken into account in arriving at an appropriate sentence." *United*
23  *States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  "[T]he history and characteristics of
24  the defendant" are considered alongside "the nature and circumstances of the offense."

25

26  [3] Tr., June 16, 2022 at 89.

18 U.S.C. § 3553(a)(1).  "The overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; [and] to protect the public[.]"  *Carty*, 520 F.3d at 991.

The Presentence Investigation Report ("PSR") has calculated an advisory sentencing guidelines total offense level of 37, resulting in a sentencing range of 210 to 262 months.  The Probation Office, however, recognizes that the advisory sentencing guidelines range is too high and has recommended this Court impose a sentence of 24 months of custody to be followed by three years of supervised release, (PSR Rec. at 1), or alternatively, to time served and five years of approbation to include 36 months of home incarceration.  (PSR Rec. at 9.)  Based on Ms. Thompson's objections to the PSR's calculation of the advisory sentencing guidelines, as more fully detailed in Section D below, the correct offense level computation is as follows:

| | |
|---|---|
| Base Offense Level: | 7 |
| Sophisticated means under USSG § 2B1.1(b)(10): | 2 |
| Number of victims under USSG § 2B1.1(b)(2)(A): | 2 |
| Convicted of an offense under 18 U.S.C. § 1030(a)(5)(A): | 4 |
| Acceptance of responsibility under USSG §3E1.1: | -2 |
| Total Offense Level: | 13 |
| Sentencing Guidelines: | 12-18 months |

A thorough and fair consideration of all the § 3553(a) factors shows that Ms. Thompson's recommendation of time served (over three months imprisonment) and three years of supervised release is merited here.  And this is so even if this Court accepts the PSR's advisory sentencing guidelines calculation.

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 4

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1

2
**B.      Paige Thompson's Personal History and Characteristics[4]**

3
    Under § 3553(a)(1), in arriving at a sentence that is "sufficient but not greater

4
than necessary" to comply with the purposes of federal sentencing, this Court "should

5
consider the nature and circumstances of the offense and *the history and characteristics*

6
*of the defendant*."  (Emphasis added.)  These considerations are addressed below by,

7
first, a brief overview of Ms. Thompson's life; and second, the words and voices of the

8
people who have come forward to write this Court letters on behalf of Ms. Thompson.

9
            **1.   *Ms. Thompson's Upbringing, Schooling, and Work History***

10
    Ms. Thompson was, unfortunately, abandoned repeatedly during her formative

11
years.  "Abandonment is an intensive traumatic event for children"[5] and it certainly left

12
its mark on her life.

13
    Ms. Thompson was born Trevor Allen Thompson and assigned the sex of male

14
at birth in Kansas City, Missouri.  It never quite fit, even from a young age.  Ms.

15
Thompson's mother and father separated when she was very young and she quickly lost

16
contact with her father.  Ms. Thompson's relationship with her mother was fraught and

17
her mother abandoned Ms. Thompson and left her in the care of her grandparents to

18
join the military after Ms. Thompson lost her father.  Ms. Thompson was sent to live

19
with her grandparents, which were more stable though they often believed in the "spare

20
the rod, spoil the child" theory of child rearing.  However, this arrangement was short

21
lived, and Ms. Thompson ultimately returned to her mother when she returned from

22
military service.

23

24

25
[4] The following facts are derived from the PSR.  (PSR ¶¶ 70-86.)

26
[5] *Complex Trauma of Abandoned Children and Adoption as a Healing Process*,
Muntean, Ana, et al., Procedia-Social and Behavioral Sciences, Vol. 46, 2012, Pgs.
273-276 (available at https://doi.org/10.1016/j.sbspro.2012.05.105).

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 5

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

At just six years of age, Ms. Thompson found herself in a house filled with emotional and physical abuse.  Her mother, having returned to the United States, married a new man who used his new position as Ms. Thompson's stepfather to "toughen her up" by hitting her and emotionally abusing her.  In addition to abandonment issues, the long-term consequences of abuse and neglect during Ms. Thompson's formative years cannot be understated.  Such abuse leads to systemic and long-term problems such as low self-esteem, substance abuse, developmental issues, domestic violence, and poverty—all problems Ms. Thompson has experienced in her life.[6]  It is thus no small wonder that Ms. Thompson struggled with depression and in academic environments, even starting as early as the age of seven.

Someone—anyone—stepping in at that age might have helped Ms. Thompson, but unfortunately, between the formative ages of six and 16, she experienced near-continuous instability as her mother moved her from state to state and continuously exposed Ms. Thompson to caretakers who abused drugs and alcohol.  The constant shifting made it almost impossible for her to succeed as an adult.[7]

Yet, despite feeling abandoned, displaced, and traumatized, Ms. Thompson made the brave choice to come out as gay at the age of 14 in the middle of Arkansas, a part of the country which at the time (and perhaps even now) is not the most welcoming of differences in sexuality and gender expression.  Ms. Thompson was bullied and attacked for how she looked and the clothing she wore.  Already traumatized by her family, Ms. Thompson was then further traumatized by her community; an experience

---

[6] United States Department of Health & Human Services, Child Welfare Information Gateway, Long-Term Consequences of Child Abuse and Neglect, Fact Sheet, April 2019. https://www.childwelfare.gov/pubpdfs/long_term_consequences.pdf

[7] *Moving Repeatedly in Childhood Associated with Poorer Quality of Life Years Later,* American Psychological Association, 2010, https://www.apa.org/news/press/releases/2010/06/moving-well-being

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 6

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

that led to psychological and emotional challenges (suicidal ideation and attempts, depression, low self-esteem), behavioral challenges (physical aggression, body image, isolation), and poor academic performance.[8]  There was literally no safe space for Ms. Thompson growing up and she ultimately dropped out of school rather than face daily torment.

Ms. Thompson's only escape from this torment was to play with a computer that she had been given.  She took it apart, put it together, programmed it, and made it her own.  The computer made sense to her in a way that the world did not.  It was logical and predictable, not erratic and constantly shifting like the humans in Ms. Thompson's life.  Unfortunately, but not surprisingly, Ms. Thompson's family did not support this passion and she often had to beg to use the Internet.  Ms. Thompson remained undeterred, however, having found something—anything— that sparked joy.  At the age of 13, she started Netcrave Communications and made herself the owner and Chief Executive Officer of a hosting company.

Ms. Thompson was seeking independence and freedom, but she did not yet have the skills and maturity to know what to do with it.  As Dr. van der Kolk writes in his book, *The Body Keeps the Score*, "[t]rauma, by definition, is unbearable and intolerable."  He goes on to explain that:

> As human beings we belong to an extremely resilient species.  Since time immemorial we have rebounded from our relentless wars, countless disasters (both natural and man-made), and the violence and betrayal in our own lives. But traumatic experiences do leave traces, whether on a large scale (on our histories and cultures) or close to home, on our families, with dark secrets being imperceptibly passed down through generations.  They also leave traces on our minds and emotions, on our

---

[8] Cyberbullying and LGBTQ Youth: A Systematic Literature Review and Recommendations for Prevention and Intervention, Journal of Child & Adolescent Trauma, July 24, 2017, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7163911/

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 7

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

capacity for joy and intimacy, and even on our biology and immune systems.

van der Kolk M.D., Bessel, *The Body Keeps the Score*, Viking Publications, 2014, Prologue.  Although she is resilient, Ms. Thompson has carried traces of her early traumatic experiences into her adulthood, including into her professional and personal relationships.  Ms. Thompson has worked hard, without any guideposts as to what normal behavior or boundaries look like, to find her place in the community, but lasting stability has proved elusive and challenging until now.

After dropping out of high school, Ms. Thompson initially made the same mistakes as her family of origin—she was itinerant, moving from Nevada to California to Washington—and she found herself becoming dependent on older men who would support her financially though often in exchange for a romantic relationship.  Thankfully, one of these individuals was supportive of her passion for computers and encouraged her to reenroll in educational classes and apply for jobs in the industry.  However, Ms. Thompson still struggled because she was not medicating her ADHD at the time, had not had her ASD diagnosed as of yet, and was on the precipice of realizing she was not gay but transgendered.

Ms. Thompson began taking feminizing hormones she obtained from the Internet in 2008, but even though she felt she was a woman, she did not feel free to present at such in her daily life.  Again, Ms. Thompson felt the safe spaces shrink around her.  To say that the world was an unsafe space for transgender people in 2008 is an understatement.  The Civil Rights Act outlawed employment discrimination in 1964 but it did not protect persons like Ms. Thompson until 2020.  *See Bostock v. Clayton Cty.*, –—— U.S. ——, 140 S. Ct. 1731, 1741–43 (2020).  Even today, transgender people find their very existence politicized, challenged, and questioned.  They cannot even utilize a bathroom without being likened to child molesters.  As Dr. Matt Goldenberg observes, transgender persons experience unemployment at twice the rate of the general

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 8

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

population and many report workplace harassment, mistreatment, or discrimination. (Ex. 2, Goldenberg Supp.)

Thus, Ms. Thompson once again had to "hide" who she was to please her community, a community that scolded her when she presented as the least bit female by painting her nails. Ms. Thompson eventually retreated into freelance work, which left her more able to express herself, and when she felt some measure of stability in her personal and professional life, she sought and gained employment at Amazon Web Services ("AWS") in 2015. This was an exciting time for her personally and Ms. Thompson was able to get her own apartment for the very first time. But, AWS was not a safe space for her, either, and a coworker singled her out for mistreatment. Unfortunately, Ms. Thompson knew no other way to handle bullying and mistreatment than to run away, like she did as a child, and she quit AWS rather than report this person's behavior. This is a decision she now regrets, but it is a decision that is understandable given her history and characteristics.

After Ms. Thompson quit AWS, she was unable to obtain other work and started running out of money; she became more and more isolated. She lost the apartment she had been able to get for herself and had to move in with a person she found on Craigslist, who let her sleep on the floor in a small room in a dilapidated house:

1

2

3

4

5

6

7

8

9

10

11

12



13  (Gov't Trial Exh. 304.)  Ms. Thompson spiraled into depression, retreated into the

14  online community and spent her days believing that no one cared about her.  This is the

15  place she was at the time of the offenses for which she is now before this Court.

16                      2.  *Supportive Testimonials: Paige's Community Support*

17          As Ms. Thompson's partner explains, life has dramatically changed for her in the

18  last two years:

19          Paige has lived with me for almost two years, and there have been many
20          challenges to overcome while she adjusted to living under the microscope
            of the justice system. Regardless of what has been asked of her however,
21          she has been able to find a pathway through the obstacles with the help
            and support of the people around her. When we first started seeing each
22          other, she was living in a single room apartment with a bed precariously
23          balanced between the three remaining bedframe legs and a small stack of
            bricks, and would often tearfully reminisce about her beloved cat, Millie,
24          who had passed away.

25          Giving her a stable place to heal, and grow, has opened Paige's heart and
26          allowed for her to bring context into her life that was not previously

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 10

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

within her grasp. In our time together, Paige has been able to slowly reduce the spin of her fall back to earth, while knowing that no matter how she lands, there will be people ready to pick her up, and dust her off. She has hopes and dreams for the future now, and provides such amazing love and diligent care for her new cat, Panda.

(Ex. 3, p. 1.)  Her friend Tim Carstens explains:

- She is currently living in a stable home with upstanding roommates.

- She has re-established contact with old friends, who have helped her grow and recalibrate through this experience.

- She has made new friends, whose healthy approach to life provides a consistent, positive example and an opportunity to begin a new chapter.

(*Id.*, pp. 4-5.)

As Mr. Falcon Momot notes for this Court "[s]he's formed several lasting connections with members of the Seattle information security community," and overall she has improved a great deal over the last three years.  (*Id.*, p. 10.) Maintaining the status quo is the just thing to do for Ms. Thompson.

## C.    The Remaining 18 U.S.C. § 3553(a) Factors Support a Sentence of Time Served.

In arriving at a sentence, that is "sufficient but not greater than necessary" to comply with the purposes of federal sentencing, this Court needs to consider a number of other factors, including: (1) the nature and circumstances of the offense; and (2) the need for the sentence imposed (a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (b) to afford adequate deterrence to criminal conduct, and (c) to protect the public from further crimes of the defendant.  18 U.S.C. § 3553(a).  The following is a discussion of how

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 11

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

those factors, the most relevant ones here other than her personal history and characteristics discussed above, support a sentence of time served.

### 1. *The Nature and Circumstances of the Offense*

The nature and circumstances of the offense weigh strongly in favor of a sentence of time served.[9]  Ms. Thompson created scripts that accessed open forward proxies on AWS web application firewalls and then copied the data such proxies were allowed to access to Ms. Thompson's computer.  As the trial made clear, Ms. Thompson had no way of knowing who was operating those open forward proxies at the time she accessed them and she had no way of knowing what kind of data it was that she was downloading until after she downloaded it.  The Web Access Firewall (WAF) configuration involved in this vulnerability was that proxy requests were enabled, a specific technical configuration option in the Apache Mod Sec software, called forward proxy, which allowed an outside request to be directed to an internal destination. (Ex. 4, Michael Fisk, Depo. Tr. (under seal))

Ms. Thompson also had no way of knowing *why* those open forward proxies were left open (because that was not how AWS designed them).  As the PSR makes clear, she did not monetize or further distribute a single bit of the data she copied though she had multiple months to do so before the was arrested.  (PSR Rec. at 5.)

Additionally, there was evidence at trial that Ms. Thompson tried to notify AWS of the open forward proxy issue on or about May 20, 2019 through a note passed to an AWS employee at a conference in Seattle[10] and that she ran additional scripts on the open forward proxies to "flag" the issue to the operators.[11]  Ms. Thompson's behavior

---

[9] Ms. Thompson is not waiving any of her appellate rights on the counts of conviction and is not conceding wrongdoing on those counts in connection with her sentencing.

[10] Defense Trial Ex. 1100.

[11] Defense Trial Ex.1014 (unadmitted).

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 12

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

was not that of a malicious, profit-motivated hacker, who would have (and could have) sold the data or held Capital One (and others) ransom for its return, or stolen people's identities or trade secrets for nefarious purposes. Indeed, Capital One officials, themselves, did not initially believe that this was an "intrusion,"[12] and initially characterized Ms. Thompson as a "researcher,"[13] a "fellow female hacker,"[14] who was "technically inclined but not criminally minded."[15]

Importantly, after her arrest, when the government reached out to Ms. Thompson's defense team to better understand how Ms. Thompson was able to access the victims' open forward proxies to better secure against future cybersecurity events, Ms. Thompson agreed to meet with the government and provide such information. Ms. Thompson ultimately gave the government a multi-hour technical debrief and full access to her Github account and her laptop, both of which contained the written code she used to access the open forward proxies. (Dkt. 15.) The defense understands that

---

[12] Dkt. 368, Ex. 1 (under seal).

[13] Dkt. 368, Ex. 2 (under seal).

[14] Dkt. 368, Ex. 5 (under seal).

[15] Dkt. 368, Ex. 3 (under seal).   It was not until the federal government and Capital One's own customers began to hold Capital One accountable for its failures to protect consumer data since 2015, (Defense Trial Ex. 1008), that Capital One really began portraying Ms. Thompson as a malicious actor.  In so doing, Capital One provided a dossier to the government that contianed some but not all the information they possessed with respect to Ms. Thompson and the breach, a dossier that was relied on to arrest her.  (Ex. 5, Dossier.)  That Capital One did so may be understandable given the fact that Capital One, itself, was under criminal investigation.  (Ex. 6, Capital One e-mail.); *see also* (Dkt. 231, Order granting motion for a *Brady* order.)

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 13

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

the government provided information gleaned from this technical debrief to AWS so that it could help its customers with their cybersecurity efforts.

This was not an offense that Ms. Thompson committed with any "vicious will." *See Ruan v. United States*, 142 S. Ct. 2370, 2376 (2022).  Additionally, outside of Capital One, it was not an offense that caused much in the way of damage to any entity. In fact, one of the victims, 42 Lines, told the government that "The truth is that there was zero impact on 42 lines from the intrusion in question, and the only negative impact on us has been through my time spent on the trial and the negative publicity from being associated with the trial[.]"  (Ex. 7, 42 Lines e-mail.)

Ms. Thompson was curious about the data she copied and she did spend time researching that data on the Internet, but ultimately, she did not steal anyone's identity with malicious intent (as the jury found), did not harm a single Capital One customer financially with so much as a negative credit hit, did not distribute any of the copied data, and did not monetize it for her financial benefit.  At the end of the day, the only demonstrable monetization Ms. Thompson achieved from her use of the open forward proxies was cryptomining in an amount of around $10,000.  The damage that could have occurred to Capital One and the other victim companies given the gaping cybersecurity hole they left in their AWS web application firewalls could have been far worse and exploited to a far greater extent by a criminally-minded and malicious person. Ms. Thompson was *not* that person and the help she provided to the government after her arrest in helping to close that gaping hole weighs in favor of a sentence of time served.

### 2. *The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense*

While Ms. Thompson understands the Probation Office's concern that this Court fashion a sentence which "signal[s]" to the community that the United States

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 14

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

government successfully investigates and prosecutes [hacking] crimes and such "defendants experience significant consequences," (PSR Rec. at 8), this Court must also look at Ms. Thompson individually.  As a transgender person who has both ASD and ADHD, Ms. Thompson spending almost 100 days in custody and 30 days in a halfway house, and thereafter trying to cobble together a life while on highly restrictive pretrial conditions adequately reflected the seriousness of the offense, promoted respect for the law, and provided just punishment for the offense.  Overall, this has been a tremendous hardship that this Court should factor into its sentence.

When she was released to Pretrial Services supervision on November 4, 2019, Ms. Thompson was placed on severe and very limiting restrictions including placement at a halfway house with restricted privileges.  Subsequently, on December 4, 2019, she was released to an apartment on an ankle monitor with restrictions on movement, computer access, and travel.

More recently, following her convictions at trial, this Court has loosened her conditions, which was greatly appreciated and has allowed her to dream again of gaining viable employment in the computing space.  The ability to use computers in a healthy way is critical to Ms. Thompson.  When she was not permitted any computer or Internet access, she was not only separated from the only safe space she has ever known, but it was impossible for her to get employment in her chosen avocation.

Further, although a time served sentence of over three months, or 100 days, in addition to 30 more days at a halfway house, could be considered low in numbers considering the advisory guidelines calculation here (whether the PSR's or the defense's), such time served for a transgender inmate is incredibly hard time.  Indeed, following her initial appearance in this case, Ms. Thompson was placed on suicide watch in a male prison and had a male guard watch her 24 hours per day while she was

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 15

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

clad only in a smock.  To say that Ms. Thompson's time in custody to date has been grueling would be to understate the matter significantly.

Historically, transgender inmates have been "automatically house[d]" in gendered "facilities based on their genital characteristics or the gender they were thought to be at birth – often putting them at extremely high risk of violence and abuse."[16]  As of January 2022, a policy change to the Transgender Offender Manual outlines that initial federal prison designations will be determined by the Transgender Executive Council ("TEC") and "the agency shall consider on a case-by-case basis" whether a transgender inmate will be placed in a facility for male or female inmates.[17] The TEC is comprised "of senior level staff members (GS-14 and above) from the Women and Special Populations Branch, the Psychology Services Branch, Health Services Division, and the Designation and Sentence Computation Center (DSCC)."[18] While it may be possible for Ms. Thompson to be placed in a female detention facility, there is still a significant possibility that she would be housed with men. Such custodial housing would be significantly detrimental to Ms. Thompson's health and well-being and would impose custodial conditions that far exceed the magnitude of her crimes.

To give this Court but one example, the Federal Bureau of Prisons ("BOP") recently "repeatedly denied" the requests of Christina Iglesias, a transgender female serving a custodial sentence in a federal male prison, "for transfer to a female facility even though transfer would make her safer and is part of her treatment for gender dysphoria." *Iglesias v. Fed. Bureau of Prisons*, Case No. 19-CV-415-NJR, 2021 WL

---

[16] *LGBTQ People Behind Bars*, Nat'l Ctr. Transgender Equal., at 5, (Oct. 2018), https://transequality.org/sites/default/files/docs/resources/TransgenderPeopleBehindBars.pdf.

[17] *Transgender Offender Manual*, U.S. Dep't Just., at 5-6 (Jan. 2022), https://www.bop.gov/policy/progstat/5200-08-cn-1.pdf.

[18] *Id.* at 4.

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 16

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

6112790, 1-2 (S.D. Ill 2021), *modified by,* 2022 WL 1136629 (S.D. Ill. 2022). Iglesias repeatedly "reported sexual abuse and harassment" and "has been on suicide watch multiple times while in BOP custody" due to her gender dysphoria and treatment while incarcerated in a male facility. *Id.* Only after Iglesias filed a motion for a preliminary injunction did the TEC recommend her transfer from a male facility to a female facility. *Id.* The treatment of Ms. Iglesias and the lack of action by the TEC does not provide great confidence that Ms. Thompson would be placed within a female facility if serving a custodial sentence. Ms. Thompson's identity and physical appearance as a transgender woman would likely make her a target for physical, sexual, and verbal victimization in prison.

This Court need look no further than Ms. Thompson's incarceration in this case, where she was held in a male unit at the Seattle Federal Detention Center ("FDC"). (Dkts. 32, 35.) Part of the reason this Court released Ms. Thompson on bond pending trial on November 4, 2019, was due to concerns for her safety and mental health while incarcerated with men. (Dkts. 49, 69.) While at the FDC, she was hit on and ask for sexual favors by male inmates. As Mr. Falcon Momot writes:

> In a letter of October 26th, 2019, she indicated that the primary hardship of being in prison was the gender dysphoric experience of being treated by Bureau of Prisons as a man. In an undated letter postmarked October 29th, 2019, she writes "at this point I have to take what I can get, even if it's from a dude who is in prison", "A lot of people flirt", and "there comes a time in every man's life where he must ask himself: are traps gay? Except in prison, it doesn't matter." Other letters describe exchanges in which other inmates tell Paige to expect, once out of pretrial detention, she can expect to be forced into the special housing unit – that is, solitary confinement – with all the other transgender people in prison. The implication is clear.
>
> There is no act which deserves such retribution. To finish the work of turning her life around, Paige doesn't need prison boyfriends, solitary confinement, and contact with members of groups like the Aryan Brotherhood. She needs what she says she now wants: a decent job, her

MS. THOMPSON'S SENTENCING MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 17

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

friends, and meaningful relationships that make her feel accepted. That's how we can make sure she doesn't act out.

(Ex. 3, p. 10.) An individual's potential for experiencing abuse while incarcerated should be a factor this Court considers in addressing—or departing from—the guidelines. *See, e.g., Koon v. United States*, 518 U.S. 81, 111-12 (1996); *United States v. Parish*, 308 F. 3d 1025, 1031 (9th Cir. 2002); *United States v. Lara*, 905 F.2d 599, 603 (2nd Cir. 1990).

Sexual assault towards incarcerated transgender individuals was addressed by the Supreme Court in *Farmer v. Brennan*, 511 U.S. 825 (1994). There, a transgender female held in a male federal prison was "beaten and raped by another inmate" who had HIV. *Id.* at 830. Since that case was decided, courts have continuously found that incarcerated transgender females are particularly vulnerable to abuse and victimization, especially when housed with incarcerated males. For example, in *Green v. Bowles*, 361 F.3d 290, 293-94 (6th Cir. 2004), a transgender female in a male prison was found to be "vulnerable, not just to sexual assaults, but also to physical assaults from her fellow inmates." Additionally, in *R.W. v. U.S.*, 958 A. 2d 259, 261-62, 267 (D.C. 2008), the lengthy sentence of a correctional officer who sexually assaulted an incarcerated transgender female was upheld as it reflected the victim's "particular vulnerability as a transgender inmate in an all-male prison unit."

Transgender persons who are incarcerated, especially transwomen who are placed in male prisons, are exposed to disturbingly high rates of sexual assault. In the 2015 Transgender Survey, 20.00% of incarcerated respondents were sexually assaulted by other inmates or staff.[19] In comparison, the rate of sexual assault by prison staff or fellow inmates is 4.00% for the cisgender population.[20] The National Transgender

---

[19] Herman et al., *supra*, at 191.
[20] *Id.*

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 18

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Discrimination Survey finds similar rates of sexual assault, with 15.00% of the 6,450 transgender and gender non-conforming respondents who had been incarcerated reporting experiences of sexual assault.[21]

The Bureau of Justice found similarly shocking statistics in their 2011-12 National Inmate Survey ("NIS-3"). Out of cisgender state and federal prisoners, "an estimated 1.20% reported being sexually victimized by another inmate, and 2.10% reported being victimized by staff."[22]  Incarcerated transgender persons in state and federal prison reported that 33.20% have experienced "sexual victimization" from another inmate and 15.20% reported assault from prison staff, or 15-30 times more victimization.[23]

Male prisons are a "hypermasculine context" in which incarcerated transgender persons that show feminine or female like qualities are not viewed as equals by others, experience disrespect, and are generally exposed to violence.[24]  One study interviewed trans women in custody with men, finding that incarcerated transgender persons experienced "grabbing," "groping," and "fondling" on a weekly basis as well as "brutal rape."[25]  There were also instances where transgender women participated in unwanted

---

[21] Grant, J. et al., *Injustice at Every Turn: A Report of the National Transgender Discrimination Survey*, Nat'l Ctr. Transgender Equal., at 2, 158 (2011), https://transequality.org/sites/default/files/docs/resources/NTDS_Report.pdf.

[22] Beck, A. et al., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12*, U.S. Dep't Just., at 18 (May 2013), https://www.bjs.gov/content/pub/pdf/svpjri1112.pdf.

[23] Beck, A., *Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates*, U.S. Dep't of Just., at 2 (Dec. 2014), https://bjs.ojp.gov/content/pub/pdf/svpjri1112_st.pdf.

[24] Jenness, V. et al., *Sexual Victimization Against Transgender Women in Prison: Consent and Coercion in Context*, 57 Criminology 603, 609 (Nov. 2019).

[25] *Id.* at 619.

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 19

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

sex for the "promise of protection [from] other – presumably more threatening – prisoners."[26]  One transgender woman reported having oral sex with another incarcerated person "so he would take care of me."[27]  Other transgender incarcerated person reported being pimped out against their will to "sexually service" gang members "or face being harmed in more immediately life-threatening ways."[28]

Sexual violence is just one form of violence that Ms. Thompson could be subjected to while incarcerated.  Trans women held with male prisoners are often seen as outcasts and can experience physical and verbal abuse as well.  One study interviewed members from the cisgender male prison population, reporting that incarcerated transgender persons often find asylum with other LGBTQ+ inmates and "social undesirables, including many types of sex offenders ('pedophiles,' 'molesters,' and 'rapists' among them), mentally ill prisoners, and snitches."[29]  When asked about incarcerated transgender females, one cisgender male incarcerated person stated that they should be treated "[l]ike someone with a mental disease" and that "[we should] open a big old oven and burn them."[30]  Other forms of verbal abuse include being called "faggot, punk, and bitch" as well as occasionally "cum-buckets."[31]  It is not surprising, then, that studies have found that 15-23% of trans women in male prisons

---

[26] *Id.* at 622.

[27] *Id.* at 620.

[28] *Id.* at 619.

[29] Sumner, J. & Sexton, L., *Same Difference: The "Dilemma of Difference" and the Incarceration of Transgender Prisoners*, 41 Law & Soc. Inquiry 616, 630 (2016).

[30] *Id.*

[31] Jenness et al., *supra*, at 617.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

experienced physical assault.[32]  The National Transgender Discrimination Study reported a similar statistic, with 16.00% of incarcerated respondents experiencing physical assault.[33]

Purely because of who she is, Ms. Thompson is at serious risk of verbal, emotional, sexual, and physical victimization if she is incarcerated, a risk that non-transgender inmates *can* face, but which Ms. Thompson will *almost certainly* face. While there is no constitutional requirement for "comfortable prisons," incarcerated people should not be "violently assaulted" as penance for their crimes.  *Farmer*, 511 U.S. at 834 (citing *Rhodes v. Chapman*, 452 U.S. 337, 347, 349 (1981).  Ms. Thompson's actions were serious.  However, her time in custody to date and her significantly restrictive pretrial conditions have met the level of serious and just punishment required by § 3553.

### 3.  *Adequate Deterrence to Criminal Conduct*

Considering everything that has happened, as discussed above, a sentence of time served is more than adequate deterrence for a number of reasons.  This includes, as was just discussed, the fact that Ms. Thompson has already been in federal custody for almost 100 days or living much of the time on pretrial release under severely restrictive conditions that removed her from the spaces in which she felt most safe and left her unable to seek employment in her chosen avocation.  Lastly, Ms. Thompson's status as a felon as a result of her convictions will have significant collateral consequences that will ripple throughout her life.  A sentence of time served and an additional three years of supervised release makes her road going forward very much uphill, but not insurmountable.  Any further custodial sentence would likely make it impossible for Ms. Thompson to overcome both her past and her present toward a better future.

---

[32] Herman et al., *supra*, at 191; Grant et al., *supra*, at 158.

[33] Grant et al., *supra*, at 158.

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 21

1

2        **4.  *Protection of the Public from Further Crimes***

3        Neither imprisonment nor other forms of custody are needed to protect the

4 public from future crimes by Ms. Thompson.  Based on her lack of criminal history and

5 her performance on highly restrictive pretrial conditions, Ms. Thompson poses a low

6 risk of recidivism.  More importantly, she is a person who has finally obtained the help

7 and support she needs to thrive and create safe spaces and boundaries for herself going

8 forward.  As such, Ms. Thompson presents a low recidivism risk and any additional

9 custody is wholly unnecessary to protect the public.

10       Ms. Thompson believes that the government will use her traveling to DEFCON

11 (sanctioned by Pretrial Services) and discussions Agent Waymon Ho overheard while

12 on the same flight with her (sitting so close to her to overhear her conversations

13 supposedly by pure happenstance) to argue that she poses an unacceptable danger to the

14 public, but such arguments would not be well-founded and do not support the

15 egregiously high sentence requested by the government.

16       First and foremost, Ms. Thompson has been permitted to use the Internet for

17 employment-related reasons since at least July 2022.  Her defense counsel reached out

18 to the pretrial services to request that she be allowed computer access generally because

19 the restriction was too onerous and the jury had acquitted her of identity theft and

20 access device fraud.  As to the latter, the restrictive ban as to computer usage was put

21 into place early on because the government needed time "to confirm [Ms.] Thompson's

22 claim that she did not disseminate information else or to others." (Dkt. 15 at 2.)  She

23 never disseminated the information, the claim was confirmed.  Rather than come to the

24 Court, a compromise was reached to allow her to use computers in connection with

25 seeking employment or actual employment.

26

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 22

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Networking and discussing technical issues with fellow programmers is part and parcel of finding *any* job, including one in the computer industry. Discussions of technical issues and programming on communication platforms such as IRC ("Internet Relay Chat") can be precursors to finding friends in the industry and job openings just as discussions over Discord (a chat program usually associated with the gaming industry) and "teamspeak" can serve as job networking platforms. Playing video games is also a means by which programmers socialize and talk about work.

Second, Pretrial Services was made aware of this situation and elected not to file any notice of violation. The government's attempt to use this allegation (an allegation only made possible by having Agent Ho follow Ms. Thompson well after trial was over), and the crypto transfer allegations discussed below, reflect just how little evidence there is about Ms. Thompson's malicious nature. Ms. Thompson is curious and she is committed to reestablishing her life, reputation, and profession; there is no need to protect the public from her, and to the extent there is, three years of supervised release more than adequately does so.

**D.    This Court Should Sustain Ms. Thompson's Objections to the PSR and Strike the Uncharged Allegations Regarding Cryptojacking.**

Ms. Thompson believes this Court should reconsider the following objections to the PSR: (a) the lack of a two-level adjustment for acceptance of responsibility; and (b) the 22 Level Increase under USSG § 2B1.1(b)(1)(L). Additionally, this Court should strike the government's attempt to provide so-called newfound cryptojacking evidence as impermissibly unreliable. Even if this Court disagrees with these points, this should not change this Court's sentence. As this Court is aware, calculating the advisory sentencing guidelines is the starting point for sentencing, not the end point.

**1.   *Ms. Thompson is Eligible for a Two-Level Acceptance of Responsibility Adjustment.***

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 23

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    The Probation Office does not dispute that conviction after trial "does not

2    automatically preclude a defendant from consideration" for a two-point acceptance of

3    responsibility reduction.  USSG § 3E1.1, cmt. n. 2; *see United States v. Doe*, 778 F.3d

4    814, 826 (9th Cir. 2015).  The Probation Office also does not dispute that Ms.

5    Thompson was "truthful" in her presentence interview.  (PSR ¶ 49.)  In "rare

6    situations," a "defendant may clearly demonstrate an acceptance of responsibility for

7    [her] criminal conduct even though [s]he exercises [her] constitutional right to a trial."

8    USSG § 3E1.1, cmt. n. 2.  These "rare situations" include going to trial "to assert and

9    preserve issues" such as constitutional challenges "to the applicability of a statute to

10   [her] conduct." USSG § 3E1.1, cmt. n. 2.  In these "rare situations," the determination

11   that a defendant "has accepted responsibility will be based primarily upon pre-trial

12   statements and conduct." USSG § 3E1.1, cmt. n. 2.

13   Here, both the Probation Office and the government fail to fully address that Ms.

14   Thompson voluntarily met with the government following her arrest (and at a time of

15   her life when she was in significant mental distress) and provided a detailed technical

16   explanation of how she was able to obtain the data she did through the victim

17   companies' web application firewalls.  (*See* PSR at ¶ 39.)  The government shared this

18   information with at least some of the companies involved, including AWS, and this

19   information was utilized to help AWS and the other companies prevent further

20   unwanted access to their web application firewalls.  The government's response to Ms.

21   Thompson's objection on this point wholly fails to address that she, pre-trial, both

22   admitted to the behavior of which she was later convicted and tried to help the

23   companies forestall any future breaches.  In some ways, that behavior is far more

24   "sincere contrition" and "acceptance of responsibility" than a self-serving plea

25   agreement.

26

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1    The government's citation to Ms. Thompson's boastful statements[34] on social

2    media, which occurred at a time that the PSR correctly notes Ms. Thompson was

3    having mental health challenges, do not preclude her from receiving acceptance of

4    responsibility points, especially considering her assistance to the government after her

5    arrest and the fact that she did not contest the facts of what transpired at trial, only that

6    such behavior did not run afoul of the Computer Fraud and Abuse Act ("CFAA").[35]  In

7    other words, her legal team presented an argument solely as "to the applicability of [the

8    CFAA] to [her] conduct." USSG § 3E1.1, cmt. n. 2.  Ms. Thompson never presented

9    herself as a full-fledged "white hat hacker" or "security researcher," but argued instead

10   that the government's interpretation of the CFAA here (a) did not provide white hat

11   hackers/security researchers and individuals like Ms. Thompson with notice that their

12   actions may be criminal; and (b) had the potential to chill white hat hackers/security

13   researchers from providing the exceptionally important cybersecurity service that they

14   do in this day and age.

15   In other words, Ms. Thompson's legal team used her trial to preserve

16   constitutional arguments regarding due process and speech, which is exactly the kind of

17   "rare situation" the sentencing guidelines permit the award of acceptance of

18   responsibility, even after a fulsome trial.  This Court itself has acknowledged "CFAA

19   caselaw is murky and evolving," (Dkt. 370, p. 6), and has acknowledged that there were

20   "some legal issues" in this case for Ms. Thompson to "appeal." (Trial Tr. 6/17/22 at

21   7:4-5.)  This Court should thus award Ms. Thompson two points for acceptance of

22   responsibility.

---

23
24   [34] The government's argument that Ms. Thompson liquidated cryptocurrency while on
     pretrial release—a factually unsupported attack on Ms. Thompson—is more fully
25   addressed below.

26   [35] As the wire fraud count was based on the CFAA violations, this defense applied to
     those charges and the wire fraud counts.

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 25

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

2. *There is No Clear and Convincing Evidence Present to Warrant a 22 Level Increase Under USSG § 2B1.1(b)(1)(L).*

The Probation Office, the government, and Ms. Thompson all agree that the government is required to prove the adjustment for loss amount pursuant to USSG §2B1.1(b)(1) by clear and convincing evidence given that the offense level sought by the government "increases the number of offense levels by more than four and more than doubles the length of the sentencing guidelines range." (PSR addendum.)  What the parties cannot agree on is what enhancement—if any—is appropriate pursuant to USSG §2B1.1(b)(1).  Ms. Thompson submits that *no* level of enhancement is warranted here because the government has failed to produce clear and convincing evidence of *any amount* of loss to victims.

As the Probation Office correctly notes, Ms. Thompson's sentence should not be enhanced by 26 levels because Capital One settled a civil class action settlement against it and AWS for $190 million.  (PSR addendum.)  By the government's own admission at trial, the $190 million settlement involved legal claims that were "distinct from those" in Ms. Thompson's indictment.  (Dkt. 313 at 7.)  Further, settlement of a class action which claimed that Capital One and Amazon—not Ms. Thompson—failed to adequately protect PII, were unjustly enriched by the use of such PII, and improperly delayed notification to impacted individuals does not qualify as a cost of "responding to an offense, conducting a damage assessment," nor "restoring the data, program, system, or information to its condition prior to the offense."  USSG § 2B1.1 cmt. n. 3(A)(v)(III). Further the amount arrived upon to settle such a lawsuit—brought by individuals years after the events that relate to the charges against Ms. Thompson—is not "reasonably foreseeable pecuniary harm that resulted from the offense."  USSG § 2B1.1 cmt. n. 3(A)(i), (iv).

In lieu of the 26-level enhancement, the Probation Office recommends a 22-level enhancement pursuant to USSG § 2B1.1(b)(1)(L) (loss amount between $25 million

1   and $65 million) to account for Capital One's "cost of responding to [the] offense,

2   conducting a damage assessment, and restoring the data, program, system, or

3   information to its condition prior to the offense[.]"  (PSR ¶ 54; PSR addendum [citing

4   USSG § 2B1.1 cmt. n. 3(A)(v)(III)].)  While Ms. Thompson agrees with the Probation

5   Office that "reasonable" costs can be utilized to adjust a defendant's offense level

6   pursuant to USSG § 2B1.1(b)(1), Capital One has failed to provide clear and

7   convincing evidence of these costs to this Court or the Probation Office.  Notably, such

8   evidence was not presented at trial where it would have been subject to cross

9   examination.  Rather, Capital One chose to file a self-serving affidavit under seal by an

10  individual who did not testify at trial containing amounts rounded to whole dollars for

11  services not explained in any detail provided by companies who were not named.  (PSR

12  ¶ 40.)  That is simply not the clear and convincing evidence that is required to enhance

13  Ms. Thompson's sentence by such a wide margin.

14          The singular bit of evidence Capital One did provide in support of its costs was

15  an invoice—submitted without any evidence that it was actually paid—which contained

16  such a highly generic description of services that it would be impossible for this Court

17  to ascribe that entire amount to Ms. Thompson's actions.  Further, as with Capital

18  One's class action settlement and penalty issued by the Office of the Comptroller of the

19  Currency ("OCC"), the costs incurred by Capital One after the events that resulted in

20  Ms. Thompson's arrest were—at least partially—the result of Capital One failing to

21  establish "effective risk assessment processes," "appropriate risk management for the

22  cloud," and "identify numerous control weaknesses and gaps in the cloud[.]"  (PSR

23  Rec. at 7 [quoting OCC Consent Order].)  As the Probation Office rightly observes in

24  its recommendation, "the loss amount has the potential to significantly increase Ms.

25  Thompson's guideline range, likely to an extent that is neither fair nor reasonable."

26  (PSR Rec. at 7.)  Given such, it is fair to demand that a victim as powerful and

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 27

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

resource-laden as Capital One support its claimed losses with a bit more information than "because we said so."  Because Capital One has failed to do so, there is no clear and convincing evidence to prove *any* loss amount and thus no level increase is warranted pursuant to USSG § 2B1.1(b)(1).

### 3. *The Government's Newfound Allegations Regarding Crypto Transfers are Impermissibly Unreliable.*

Rather than allege and prove that Ms. Thompson engaged in crypto transfers following her arrest, information in the government's possession since 2019, the government provides unreliable allegations in a manner that displaces "the historic role of the jury" in our judicial system. *United States v. Haymond*, 139 S. Ct. 2369, 2384 (2019).  This Court should not allow the government to "stigmatize[]" Ms. Thompson in this manner.  *In re Winship*, 397 U.S. 358, 363 (1970).

The government's attempt to inject this information into the PSR is an attempt to attack Ms. Thompson's character, a continuation of an attack that began immediately after the verdict.  "She wanted data, she wanted money, and she wanted to brag."[36]  The government intends to rely on this information to further malign Ms. Thompson to the public, paint a narrative on appeal that she is a malicious hacker, and impacts her ability to secure a job. Ex. 2, Goldberg Supplemental.

Ms. Thompson objects to this Court considering the government's unreliable and unsubstantiated allegation that she withdrew a total of more than $40,000 from crypto wallets following her arrest and either moves for this Court to strike the allegation or to determine that it is unsubstantiated pursuant to Federal Rules of  Criminal Procedure 32(i)(3)(B).  Although 18 U.S.C. § 3661 provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person

---

[36] https://www.justice.gov/usao-wdwa/pr/former-seattle-tech-worker-convicted-wire-fraud-and-computer-intrusions

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

convicted of an offense" which this Court "may receive and consider for the purpose of imposing an appropriate sentence," any disputed "factor important to the sentencing determination" must have "sufficient indicia of reliability to support its probable accuracy."  USSG § 6A1.3(a).  The government's allegations here lack sufficient indicia of reliability and should thus be stricken from consideration.

First—the government has had the private keys to the crypto wallets in question since before trial and yet has *never* made the claim that Ms. Thompson ever received more than $10,000 in cryptojacking proceeds.  (*See* PSR ¶ 43.)  At trial, Agent Waymon Ho testified as follows:

```
24   Q.   You never found any private keys for a wallet?
25   A.   Are you talking about private keys for cryptocurrency?
```

```
Waymon Ho - Cross by Mr. Klein                    June 13, 2022      43

1   Q.   Yes.
2   A.   I have.
3   Q.   Did you ever seize any cryptocurrency?
4   A.   We did not seize cryptocurrency, but the private keys were
5   there.
6   Q.   But no cryptocurrency has been seized?
7   A.   Not to my knowledge, no.
```

(Trial Tr. 6/13/22 at 42:24-43:7.)  This Court should look particularly closely at evidence the government seeks to introduce through the "back door," that is, evidence it arguably had and could have presented at trial but chose not to subject to cross-examination.  The government's failure to present this evidence to the jury substantially lowers its indicia of reliability.

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 29

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

1       Additionally, the allegation that Ms. Thompson generated—and withdrew—

2 more than $40,000 in cryptocurrency while on pretrial release is also unreliable because

3 it directly contradicts what the government told the jury at trial.  In particular, the

4 government said during closing arguments that Ms. Thompson's cryptojacking only

5 continued until August 5, 2019:

```
9          You also heard testimony from Vincent Kenney, the computer

10    scientist from the FBI, and he linked all this activity.  He

11    looked at the transactions that went into a wallet, wallet on

12    Ms. Thompson's computer, and the deposits of the cryptocurrency

13    into them.  And if you remember, those started on March 10th of

14    2019, right as Ms. Thompson is doing her hacking, and it

15    continued until August 5th, about a week after she was arrested.

16          And if you're wondering why they continued after she was

17    arrested, it is because these machines keep running until

18    someone finds them and shuts them down.  So she was arrested on

19    July 29th, and some of her cryptojacking activity continues to

20    running for six days, running like zombies until they're

21    stopped.
```

(Trial Tr. 6/16/22 at 46.)  Yet, the "evidence" provided by the government to the

defense to substantiate these additional facts show that cryptocurrency kept flowing into

one wallet until 12/19/2019.  (*See* USA-00016216.)  So, either the government failed to

produce timely evidence sufficient to cross-examine Vincent Kenney and rebut the

government's cryptojacking allegations, or it is providing substantially unreliable

evidence to this Court in any attempt to besmirch Ms. Thompson at sentencing.  Neither

is appropriate.

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 30

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

The government has no *actual* evidence that Ms. Thompson, or someone at Ms. Thompson's direction, transferred cryptocurrency out of the crypto wallets in question. All it has is conjecture that contradicts evidence the government presented at trial and that is unsupported by any corroborating fact.  Such conjecture is insufficiently reliable for this Court to consider pursuant to USSG § 6A1.3(a) and should either be stricken from consideration or firmly decided in Ms. Thompson's favor.

## III.    CONCLUSION

Aside from the § 3553(a) discussed, Dr. Goldenberg's and Dr. Iarocci's community based treatment recommendations (which are unavailable in the Bureau of Prisons) provide Ms. Thompson with "medical care" and "correctional treatment in the most effective manner." § 3553(a)(2)(D).  As officer Benjamin Beetham observes "[s]hould [Ms. Thompson] choose and continue to address her mental health needs, [she] has demonstrated she can be a law-abiding and productive member of the community." Release Status Report at 4. He adds "Ms. Thompson is now in a safe, supportive environment, surrounded with pro-social individuals who assisted in the supervision process." *Id.*

Consistent with the factors set forth in 18 U.S.C. § 3553(a), Ms. Thompson respectfully requests that the Court impose a sentence of time served to be followed by three years of supervised release with conditions offering treatment as specifically recommended by Dr. Goldenberg and Dr. Iarocci.

Respectfully submitted this 27th day of September 2022.

s/ *Mohammad Ali Hamoudi*
s/ *Nancy Tenney*
Federal Public Defender's Office
s/ *Brian E. Klein*
s/ *Melissa A. Meister*
Waymaker LLP

Attorneys for Paige Thompson

MS. THOMPSON'S SENTENCING
MEMORANDUM
(*U.S. v. Paige A. Thompson*, CR19-159-RSL) - 31

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**