Regarding Paige Thompson,

Dear Judge Lasnik,

Life seems to often wrap our most meaningful changes inside those briefest of seconds after we leap from a precipice of decision into the unknown. We find ourselves, and we start to reach for our dreams in the momentary freedom from gravity. It's the sudden, and sometimes violent, return to earth that most often results in our avoidance of taking such unfathomable leaps of faith in the future. But every so often, we are able to grab hold of something greater than ourselves, such that we may reach up into the stars and hold our destiny.

I speak from my experiences in the military, but also as someone who overcame many obstacles to now be so blessed as to have found belonging and a successful career within the Cybersecurity field.

Paige has lived with me for almost two years, and there have been many challenges to overcome while she adjusted to living under the microscope of the justice system. Regardless of what has been asked of her however, she has been able to find a pathway through the obstacles with the help and support of the people around her. When we first started seeing each other, she was living in a single room apartment with a bed precariously balanced between the three remaining bedframe legs and a small stack of bricks, and would often tearfully reminisce about her beloved cat, Millie, who had passed away.

Giving her a stable place to heal, and grow, has opened Paige's heart and allowed for her to bring context into her life that was not previously within her grasp. In our time together, Paige has been able to slowly reduce the spin of her fall back to earth, while knowing that no matter how she lands, there will be people ready to pick her up, and dust her off. She has hopes and dreams for the future now, and provides such amazing love and diligent care for her new cat, Panda.

Paige is not a criminal master mind; she has only lacked the ability to properly articulate the gift she possesses. If she had taken her life down a slightly different path in 2019, she would now be giving presentations to her peers in the security community about a major vulnerability she helped to find and fix. Nonetheless, the past is the past, and nothing can be changed about what has happened; however, I truly believe that given just a little guidance and help, she could not only take her life to incredible new heights, but also help to protect the companies and people of this nation from our cyber adversaries.

People change; Paige has changed, in very meaningful ways, and no matter what the decision about her outcome will be, her life will change even more. I can't pretend to know the future, but I can resoundingly and concretely state that placing Paige Thompson in a corrections facility

would be a tragic mistake, as well as a horribly missed opportunity to develop an extremely important voice in the fight against cyber threats.

I thank you for taking the time to read this letter, and I hope that your hands are guided by the brightest stars of destiny.

Respectfully,

-M

August 22, 2022

Hon. Robert S. Lasnik
Western District of Washington
United States Courthouse
700 Stewart Street, Suite 15128
Seattle, WA 98101-9906

Dear Judge Lasnik:

I am writing in support of Paige A. Thompson, in the matter of United States v. Paige A. Thompson, No. CR19-159 RSL. I am a professional in the information security community and have known Ms. Thompson for approximately 21 years.

As I stated in my letter to Judge Peterson (No. MJ19-0344), I have tremendous respect for the government's interest in computer and banking security, as well as the difficult position the public finds itself in with regards to information security. This remains true.

However, in that same letter, I described the Government's characterization of Ms. Thompson as "absurd and cruel." I explained,

> It is well known that Ms. Thompson does not know how to use her words to convey her emotions in a healthy way ... my experience has been that Ms. Thompson makes outrageous statements as a cry for help, quickly retracting them once someone reaches out to provide emotional support.

Over the years I have become accustomed to Ms. Thompson's idiosyncratic style. By its very nature, I would not expect most people to be prepared for her uniquely performative and outrageous patois.

I am therefore not surprised that a stranger was unsure how to react when Ms. Thompson reached out via Twitter. I am likewise not surprised that the other people she spoke to about these crimes were equally unsure how to react or what counsel to give.

But in justice, only the verdict is binary; in the sentence, your honor is assigned the unenviable task of finding appropriate measure.

To the extent that your honor may find my perspective useful, in this letter I will attempt to explain:

(i) Why I believe the damange could have been reduced, and these proceedings possibly obviated, had some of Ms. Thompson's aforementioned interactions gone differently;
(ii) My observations about how Ms. Thompson has changed since the time of her arrest.

**Missed opportunities for a better outcome.**

On the Internet, people occasionally find things that shouldn't be found. Sometimes they don't know what to do next, the gravity of the situation, or whose advice they should follow. Like many "senior" members of the information security community, in these scenarios, when I've been able to, I have helped people lawfully navigate towards a good outcome.

In this case, as there is no evidence that Ms. Thompson tried to sell or transfer the most sensitive and valuable data, I believe good outcomes were still on the table for most of the relevant timeline: several good outcomes were still possible when Ms. Thompson began reaching out to others about her crimes, and I maintain that some good outcomes were still on the table in the days leading up to her arrest. The jury's findings affirm these beliefs.

However, instead of reaching out to someone with experience and perspective, Ms. Thompson reached out to various strangers, so-called friends, and other online personas, some of whom acted in good faith, but none of whom acted in Ms. Thompson's best interest.

Why would they? What context did they have to understand her character, style, motivations, and ambitions? In these interactions, against her own best interest, Ms. Thompson decided to lean into a persona that minimized the odds of anyone seeing her as anything other than a menace.

As Kurt Vonnegut wrote in *Mother Night*: "we are what we pretend to be, so we must be careful about what we pretend to be." Now she faces incarceration, in part because of this grievous error.

**My understanding of Ms. Thompson's character and ambitions.**

That Ms. Thompson should find herself in this position saddens me greatly.

Despite her bombastic online persona and historic proclivity for characters of ill repute, Ms. Thompson's lifestyle does not portend criminal ambitions[1]: she is not deceitful or greedy, and I have never known her to desire or admire material things (except for big computers, perhaps.)

At the start of these proceedings, her friends and I offered to buy her new clothes: we proposed Nordstrom, she picked Target. When I take her out for lunch, she prefers Popeyes in Renton over sushi in Belltown. To her, flashy things are a cultural trope, a *meme*, not something to focus one's efforts towards.

Over the years Ms. Thompson has shared many goals and dreams with me: she wants a job where she gets to design and build things; she wants people to be proud of her; she wants to find a nerdy romantic partner and live happily ever after; she wants people to treat her like she's normal, with all the good and bad that entails.

She has also expressed her fears: that she's not deserving of those things; that she can't have those things because something is wrong with her; that her friends will lose their patience with her; that she's not worthy of being loved or deserving of the stability.

**Ms. Thompson's future.**

However, since her arrest, there has been cause for hope:

---

[1] At the start of these events, I don't believe Ms. Thompson knew she was going to obtain the data she eventually obtained. Why would she? Similar data breaches typically require months of persistent effort by several individuals. It is remarkable that she was able to obtain the data she did through such direct and simple means. In my opinion, the evidence suggests that she ran her scanner, realized it worked, realized it had found some serious things, then bumbled around without a clear sense of direction until finally being arrested.

It is difficult to imagine someone as intelligent and resourceful as Ms. Thompson committing to a life of computer-based financial crime without making any preparations in advance, particularly given her easy access to Park Quan, an old and experienced felon who *clearly* was not aware of the very real possibility of an impending raid by the FBI.

One can only wonder why Ms. Thompson chose to tell several people about her activities, but apparently did not seek counsel from any of her real-life confidantes, criminal or otherwise, with whom she has a long history of over-sharing. If asked to speculate, I wound question how committed she was to the criminal lifestyle.

- She is currently living in a stable home with upstanding roommates.
- She has re-established contact with old friends, who have helped her grow and recalibrate through this experience.
- She has made new friends, whose healthy approach to life provides a consistent, positive example and an opportunity to begin a new chapter.

I have visited with Ms. Thompson frequently since her release from detention. During these visits, I probed her thinking to better understand how we got here, and to help her understand how the rest of the world understands these events. Contrary to her online persona, she was neither arrogant nor boastful.

Her naivete was, however, astonishing. She understood the technical details precisely, but the connection between her online actions and the real world implications occasionally seemed tenuous or immature. This did improve over time, but given her vast technical skill I think it is important that she continue to reflect on this apposite connection.

On the telephone she was sometimes distraught, mostly about the fears I mentioned above (and occasionally about what these events will mean for her career,) though rarely to the point of being inconsolable.

While hanging out in person I found her to be pleasant, agreeable, and polite. Her attitude was generally upbeat and optimistic about the future. She often solicited feedback about ideas she has for future professional work, and advice about how to proceed once these matters have been settled. Her behavior was consistently appropriate for the activity, which was typically a coffee shop, quick lunch, or errands. Extrapolating from this I imagine she could be successful in a professional environment, though I do believe it would be helpful for her to develop better tools for managing and communicating her emotions in a healthy way, as this will help her succeed in the face of personal and workplace challenges.

In my experience, the tech sector is forward-looking and growth oriented *to the core*. In computer security specifically, many professionals got their start in not-so-professional ways: those who "got caught" understand that rehabilitation is possible (and will be looking for signs of it,) and the rest thank the grace and good will of God that they rehabilitated themselves before facing Ms. Thompson's fate. If she is able to show growth from this experience, she will be able to find a place in the professional community.

To that point, throughout this experience she has made it clear to me and others that she does not want people to make excuses for her: that she does not blame her upbringing, personal struggles, aggressive prosecutors, former employers or colleagues, the victims, any of the individuals she discussed her crimes with, or indeed anyone other than herself for her actions. She understands and accepts why she was arrested, charged, prosecuted, and convicted, that such behavior cannot be tolerated in a civil and productive society, and (in my opinion) has been showing excellent progress at discussing these difficult topics in a mature and healthy way.

I closed my letter to Judge Peterson by observing that "in the right environment, with the right support, she is able to be herself: smart, caring, loyal, and productive." I believe the last 3 years have shown this to be true and hope that Ms. Thompson will be allowed to continue on this

positive and long overdue path, in a manner consistent with the law and the findings of the jury.

Yours Faithfully,

Timothy M. Carstens

The Honorable Judge Robert S. Lasnik
Western District of Washington
United States Courthouse
700 Stewart St., Suite 15128
Seattle, WA  98101-9906

August 31st, 2022

Your honor:

I am writing this letter in support of the defendant Paige Adele Thompson in sentencing in the matter of United States v. Paige A. Thompson, case no. CR19-159 RSL.

I'm an information security professional; most of my work has been related to public cloud infrastructure, very similar to what was described in this case.

An old quote predates the professionalization of my industry by several years:

> "Yes, I am a criminal.  My crime is that of curiosity."
>
> Loyd "The Mentor" Blankenship, The Hacker Manifesto
> *Phrack* magazine, 1986

He wrote it while under indictment.  The 1986 case seems lost to time.  But everyone remembers the 1990 case: Bellsouth declared dangerous computer hackers, among them Blankenship, had stolen a $79.449 document from a computer (that's over $140,000 today, far in excess of the 18 USC 1030 threshold).[1]

It was a whole thing.  The secret service was involved.  All the computers they could find that Mr. Blankenship had touched were apparently seized and searched.  His company, passion, and livelihood were placed in the balance.  The Electronic Frontier Foundation began operations, in part, to provide a countervailing force to the indignant powers of the state who wished to make an example of these lawless hackers.

Your honor, the documents were openly for sale to the public by the phone company for $13, and the hackers just wanted to know how 911 worked under the hood so they could write it up in a magazine like *Phrack*.[2]  So much for the dangerous crackers.

The state of the law and the behavior of law enforcement continues to imperil legitimate information security researchers today, despite the field being strategically important for national security and

---

[1] https://www.nytimes.com/1990/09/09/business/the-executive-computer-can-invaders-be-stopped-but-civil-liberties-upheld.html
[2] The name *Phrack* is a portmanteau of *phreak*, one who hacks telephone networks, and *hack*, as in computers. The book *Exploding the Phone*, 2014, Phil Lapsley, ISBN 0802122280, describes these terms and what it was like to be a hacker in those days.

**Ex 3, p. 7**

critical to the protection of nearly all private enterprise.  Your honor no doubt recalls the noted 2019 case where Iowa arrested its own security contractors due to discoordination between agencies.[3]  Also in 2019, a researcher in Hungary was jailed after reporting discovered security vulnerabilities to Magyar Telekom,[4] a T-Mobile sister company under Deutsche Telekom.  The sceptre stalks even the most careful of security researchers as they attempt to report things they just stumbled upon, found interesting, and realized could be dangerous.  Sometimes it can seem even more dangerous to report responsibly than to keep quietly exploring and to keep the discoveries to yourself and close friends, even though it always feels irresponsible to conceal information you know could cause untold damage if it fell into the wrong hands.

This, I feel, speaks much to Paige's mentality up to her arrest.  It's very easy to fall into a David vs. Goliath mentality when you've literally found a small issue in the information security armor of companies worth tens of billions.  Faced with this scale, it's not difficult to imagine that a tiny harm won't be felt, or that it takes extraordinary actions to be noticed and heard.  One might easily view these vulnerabilities and the kinds of information they enabled access to as a "bomb vest".  And with no outlet to report it, being ignored because the problem is too large or because the people responsible for receiving the report chose not to pay attention, the undisciplined or frustrated researcher might well escalate their dire warnings.  One might pass notes to anyone they think could help, or create nuisances (e.g., website defacements and cryptominers) by way of demonstration.  One might issue threats to try and get the issue taken seriously.  Cassandra screams her prophesies to Troy in vain.

This escalates into criminal conduct, to be sure.  But it is qualitatively unlike the criminal conduct of a mafioso whose economic gain intentionally comes from immiserating others.  It is more like the criminal conduct of the unskilled amateur emergency responder who exceeds their training, and in their zeal to be a savior, merely worsens the situation.

Paige saw a situation where the information on which the financial system depends for its security was left utterly unguarded by its custodians.  It is her fault that she so spectacularly bungled reporting it.  It is not her fault that any random person with a computer could commit nearly limitless fraud because the consumer financial system conflates identification with authentication.  The lack of fraudulent credit account activity should weigh heavily in any judgement of her character and intentions.

A hacker is often someone who tries a door to see if it's unlocked, but who doesn't necessarily go inside or even care what's inside.  They're not doing it to burgle.  They might try a password to see if it works and to see what a control panel for some equipment looks like.  They might even, faced with what is ostensibly personally identifying information, try to use it for something in order to see if it's real data or test data.  Knowing where to draw the line is what separates professionals from criminals, but unfortunately this is a matter of art.  Your honor, even I, a noted non-burglar, have been threatened by law enforcement for trying doorknobs out of curiosity.

---

[3] https://www.cnbc.com/2019/11/12/iowa-paid-coalfire-to-pen-test-courthouse-then-arrested-employees.html
[4] https://www.bleepingcomputer.com/news/security/ethical-hacker-exposes-magyar-telekom-vulnerabilities-faces-8-years-in-jail/

I hope that my letter can give some context for what kind of person Paige is: what motivates her, what she values, and how she's grown as a person even over the lengthy course of these proceedings.

It's no surprise to me that, given the huge amounts of personally identifiable information that Paige apparently had access to, that she did not sell it on the "dark web", nor that she did not rack up hundreds of credit card bills in other peoples' names.  She could have.  To me, it's clear that this wasn't a matter of not having the time or resolve.  It's simply that this is not the kind of thing she does.

No.  Paige is a lot of things: curious, hyperbolic, attention-seeking, and occasionally upsetting on purpose.  Like many hackers, professional and otherwise, she values the freedom of information and the ability to use computers.  Her entire life is mediated via the computer, in a way that could not have existed until the dawn of the Internet age.  She at times adopts the petulant and self-aggrandizing social presentation of the Internet trolls with whom one occasionally must interact on the Internet.  She reaches out to friends over the Internet; makes deep and lasting connections with people over the Internet.

I can only imagine how difficult the past few years must have been for her, banned from the Internet by the terms of her bond.  I know she didn't enjoy it.  I know that, now more than ever, she's been trying to look on the bright side of the future that lays before her.

After the close of proceedings, Paige, myself, and some friends shared a cup of coffee.  Nearly the first thing that came out of her mouth: "I said some really stupid stuff."  Never have more truthful words been uttered; those really stupid words are the chiefest reason she will suffer the penalty of felony.  But I hope that the Court will look to the reality behind the words she said on the Internet: there is the illegal conduct of which she was convicted, but then there are all the things beyond this which she said she would do.  Terrible things that would have wrought almost unimaginable damage on innumerable victims.  Things that she said she would do – but things that she did not do.  Things that, as everyone who knows her at all will attest, she had no intention of ever doing.

The Paige of 2019 would say these things, and more, constantly, to anyone who would listen, as a means of trying to improve her social standing among Internet trolls who will also say whatever it takes to get someone fired up and paying attention, true or false, right or wrong.  She would say these things to other hackers, in the mistaken belief that skilled professionals in information security would respect her if only she had secrets that were valuable enough; access to enough computers; the ability to impact the external world enough.  The Paige of 2022 knows better.

Paige was not, and has never been, motivated by chasing unbounded material wealth.  What she wants is to be independent, to have control over her environment, and to have the esteem of her peers.  She values independence highly.  Her interest in cryptocurrency stems from the same place as her interest in peer-to-peer social media applications: their promise of the ability to control one's own destiny as far as digital assets and information are concerned.

She is also deeply motivated by the need to secure information.  The same thing that led her to test security controls in the way that led to her conviction leads her to lecture me about the need to

memorize passwords, and her operation up to her arrest of a large network of personal services – her own chat network, her own hosting provider, her own email.  She doesn't trust other people with her data.  To her, the inappropriate access she discovered was just yet another piece of evidence for *why* she doesn't trust other people with her data and why you shouldn't either.

Nevertheless, the time since her arrest has been a learning experience.  She's formed several lasting connections with members of the Seattle information security community, others of whom also plan to submit letters to this Court on the topic of her case.  She's learned that she doesn't need to make wild threats or cross the line of criminality to gain respect.  Equally, she's learned that doing those things garners only disrespect, trouble, and shunning.  Whatever the final outcome of these proceedings, it's unimaginable to me that the Court will be seeing her again.

But your honor, there's another topic I'd like to raise, though I know the Court is keenly aware already.  Paige and I exchanged a number of letters during the period where she was in pre-trial detention without bond.  The content of those letters occasionally troubled me over the years since.

The Court is doubtless aware of the exploitive nature of Paige's living situation with Park Quan *ante capias*.  I, as any human, wish such misery never to befall anyone for even a short time.  But for some reason, she was detained in the same cell as her co-arrestee and exploiter.  In a letter of October 26th, 2019, she indicated that the primary hardship of being in prison was the gender dysphoric experience of being treated by Bureau of Prisons as a man.  In an undated letter postmarked October 29th, 2019, she writes "at this point I have to take what I can get, even if it's from a dude who is in prison", "A lot of people flirt", and "there comes a time in every man's life where he must ask himself: are traps gay? Except in prison, it doesn't matter."  Other letters describe exchanges in which other inmates tell Paige to expect, once out of pretrial detention, she can expect to be forced into the special housing unit – that is, solitary confinement – with all the other transgender people in prison.

The implication is clear.  There is no act which deserves such retribution.  To finish the work of turning her life around, Paige doesn't need prison boyfriends, solitary confinement, and contact with members of groups like the Aryan Brotherhood[5].  She needs what she says she now wants: a decent job, her friends, and meaningful relationships that make her feel accepted.  That's how we can make sure she doesn't act out.

Ever and faithfully yours,

Falcon Darkstar Momot

---

[5] After contact with this "car", and men with Aryan Brotherhood and other white supremacist tattoos, she wrote to me that she maps their politics to the crowd of the website 8chan, in her generally Internet-centric way.  8chan, now 8kun, is a website established in 2013 to host white supremacist content after its founder felt the radical right website 4chan censored too much such content.  Its users have been implicated in encouraging numerous hate crimes and mass shootings.  Paige's expressed view is that 8chan users are reckless, vapid, and incoherent; may it ever so remain with her.

Your Honor

My name is Breanna Anderson, and I am an experienced software engineer and entrepreneur and a transgender woman.  Between 2007 and 2011 I worked as the Director of Enterprise Architecture at Onvia, a Seattle-area company providing business insights for companies seeking government business contracts.  During this time, I was also facilitating support groups for the Transgender community at Ingersoll Gender Center with a special emphasis on economic empowerment and workplace issues.  I met Paige Thompson through these support groups and was impressed with her intelligence and capabilities but also her lack of personal stability and self-confidence.  Around 2010 I was able to get her an internship at Onvia on a month-to-month basis to help her gain more workplace experience and build her resume.  During this internship she worked under my direct supervision, developing software tools for testing and data migration.  She was bright and capable but over time her timeliness and work attendance started to flag and got to the point where I could not justify continuing her internship.  I was sad to have to let her go but I also hoped it had been of some value to her in bolstering her confidence.

Following this internship I did maintain avenues of communication with her, mostly by text, but they were not consistent.  Over the subsequent years I received messages from her asking for help, which I sometimes responded to but more often they were more on the order of "cries for help" expressing her distress or plans to do something dramatic to resolve her distress.  These were often clearly while she was under the influence of self-administered psycho-pharmaceuticals as she was erratic and irrational.  She sometimes made claims that she was planning to create disturbances which would bring police presence and to provoke them for the purpose of ending her life.  After these stoned, sometimes abusive texting sessions she would sometimes text me to apologize for her past behavior.  After a period of time, I had to block her because I knew there was nothing I could do to rectify her situation and I needed some boundaries.  I hoped she would find a way to get her footing without hurting herself or others.

When I heard that she had got herself into legal trouble with a hacking incident, I was saddened but not surprised.  I really did not believe she was doing it for the money for out of malice towards anyone but herself.  In a way I was relieved that I did not hear about her suicide by overdose or by police.  It would not be the first time a talented young trans woman I personally knew took her life out of despair. I truly hoped that this was a checkpoint for intervention.

In 2005 I developed the Seattle Trans Economic Empowerment Project at Ingersoll to help to address the ongoing challenges of unemployment and underemployment that a result of and adding to the epidemic stress we see in the Trans community.  We focused on networking, support, and referrals but it's not an easy problem to address.  The Seattle area is comparatively a good place for Trans people but opportunities are still few and the burden of a lifetime of rejection is hard to overcome.

I hope that the court can bring to bear a restorative and rehabilitative framework to address the actions of Ms. Thompson.   I believe deeply that she was not malign in her motivations nor is she likely to repeat her offenses given proper oversight, motivation, redirection, mental health challenges and addressing her substance abuse and dependence which I believe were misguided attempts at self-medication for

her mental health.  I appreciate the opportunity to present this information about my interactions with Paige to hopefully give some context to her situation.


Very Sincerely,

Breanna Anderson