```
 1                UNITED STATES DISTRICT COURT

 2           WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3    _____
                                )
 4                              )
      UNITED STATES OF AMERICA,  ) CR19-159-RSL
 5                              )
                     Plaintiff, ) SEATTLE, WASHINGTON
 6                              )
      v.                        ) December 1, 2022
 7                              ) 9:00 a.m.
      PAIGE A. THOMPSON,         )
 8                              ) Restitution
                     Defendant. ) Hearing via Zoom
 9                              )
      _____

10
               VERBATIM REPORT OF PROCEEDINGS
11          BEFORE THE HONORABLE ROBERT S. LASNIK
                UNITED STATES DISTRICT JUDGE
12    _____

13
      APPEARANCES:
14

15     For the Plaintiff:     ANDREW C. FRIEDMAN
                              JESSICA MURPHY MANCA
16                            TANIA M. CULBERTSON
                              KRISTA KAY BUSH
17                            Assistant United States Attorneys
                              700 Stewart St., Ste. 5220
18                            Seattle, WA 98101

19
       For the Defendant:    MOHAMMAD ALI HAMOUDI
20                            Federal Defender's Office
                              1601 5th Ave., Ste. 700
21                            Seattle, WA 98101

22                            BRIAN E. KLEIN
                              MELISSA A. MEISTER
23                            Waymaker
                              515 S. Flower St., Ste. 3500
24                            Los Angeles, CA 90071

25        Proceedings stenographically reported and transcript
              produced with computer-aided technology
```

1          DECEMBER 1, 2022

2              *   *   *   *   *   *

3          THE DEPUTY CLERK:  Good morning, Your Honor.  Your

4   Honor, we are here this morning for the scheduled restitution

5   hearing in the matter of the United States versus Paige A.

6   Thompson, Cause Number CR19-159, assigned to this Court.

7      If counsel could please make your appearances for the

8   record.

9          MS. MANCA:  Good morning, Your Honor.

10          MR. HAMOUDI:  Good morning, Your Honor.  Mohammad

11   Hamoudi here on behalf of Ms. Thompson.

12          THE COURT:  Hi, Mr. Hamoudi, and I see you also have

13   Mr. Klein with you.

14          MR. KLEIN:  Hello, Your Honor.

15          THE COURT:  And Ms. Thompson is appearing on video.

16      Mr. Hamoudi, you have filed -- and Ms. Meister is there,

17   too -- you have filed a document indicating that Ms. Thompson

18   has waived an in-person hearing or having her presence at an

19   in-person hearing for this hearing; is that correct?

20          MR. HAMOUDI:  That's correct, Your Honor.

21          THE COURT:  Ms. Thompson, that's still what you want

22   to do, right?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  Do you have any questions about it?

25          THE DEFENDANT:  No, Your Honor.

1          THE COURT:  Okay, we'll proceed, then.

2     Mr. Friedman and Ms. Manca.

3          MS. MANCA:  Thank you, Your Honor.  And we also have

4     Krista Bush and Tania Culbertson on behalf of the government.

5          THE COURT:  I see both Ms. Bush and Ms. Culbertson

6     and Mr. Friedman.  Great.

7      So we are here setting the restitution as part of the

8     Judgment and Sentence in the case, and I've received

9     documents from both sides.  I think the government, as the

10    moving party, should go first, so Ms. Manca.

11         MS. MANCA:  Thank you, Your Honor.  Respectfully, the

12    defense's objection -- I'm going to start with forfeiture and

13    then move to restitution.  Respectfully, the defense's

14    objection to the entry of a specific money judgment in the

15    amount of, approximately, $10,000 is frivolous, and I don't

16    take that characterization lightly.  I'm going to explain

17    five reasons that it's true.

18     First, the defense challenges the charging period

19    supporting this forfeiture order, indicating that it ends on

20    July 17th, 2019, without acknowledging that the charging

21    period for Count 8, which is the cryptojacking count, also

22    supporting forfeiture, runs through at least August 5th,

23    2019.

24     Second, the defense challenges the details in the

25    government's proof without acknowledging that the dates in

1    the transactions that the government uses to support this

2    claim were not only in Exhibit 850 and 855, but also in

3    Vincent Kenney's testimony, Docket 342, pages 61 to 62.

4        Number three, the defense's position is inconsistent with

5    their own sentencing memoranda, filed Docket 380, at page 16,

6    indicating -- and this is a quote from that -- "At the end of

7    the day, the only demonstrable monetization Ms. Thompson

8    achieved from her use of the open forward proxies was

9    cryptomining in an amount of $10,000."

10        Number four, the defense challenges how the government

11    calculated the value of the cryptocurrency.  One of the

12    column headings in the spreadsheet, Exhibit 855, and also

13    Exhibit 2 to the government's sentencing memoranda, has a

14    column header that says "Historical Price of Ether."  Vincent

15    Kenney also testified about the historical prices of Ether

16    and how he used that to factor in his calculations; Docket

17    342, pages 73 to 75.

18        The fifth reason -- and this is probably the most

19    egregious -- is that the defense suggests that the Court

20    should calculate forfeiture based on the present-day value of

21    Ether.  The value of one Ether today is $1,268.95, so the

22    present-day value of approximately 55 Ether is around

23    $70,000.  That's not what the government is asking for.  The

24    present-day value -- or the historical value of Ether in 2019

25    was significantly lower than it is today, even with the rise

1  and fall of cryptocurrency.

2      It's also worth noting that the value of the amount that

3  Ms. Thompson withdrew from the account was actually $14,612.

4  So the government's request for forfeiture is actually the

5  least of the three values that we could have calculated for a

6  specific money judgment.  We believed it was intellectually

7  honest to take the amount and the value of the cryptocurrency

8  at the time the offense was completed.

9      So I am happy to answer any other questions the Court may

10 have in response to the defense pleading, but we believe --

11          THE COURT:  Well, Ms. Manca, what I was a little

12 unclear about -- and I'm sure it's my own difficulty with

13 cryptocurrency -- but what are we actually talking about?

14 Are we still talking about, you know, cryptocurrency?  Are we

15 talking about the cryptocurrency has been converted to

16 dollars?  What, physically, are we talking about?

17          MS. MANCA:  That's a good question.  It goes to the

18 difference in forfeiture between a judgment for a forfeiture

19 of specific property, which would involve the seizure of

20 property, and then we would be talking about fluctuating

21 values.  But what we're asking for is a Rule 32.2 specific

22 money judgment, which is for the value of ill-gotten gains

23 that are not recoverable due to actions of the defendant.

24      So in this specific case, by the time the government

25 identified the wallet, the proceeds had been drained, and

1   then, actually, were further drained while Ms. Thompson was

2   on pretrial release, so that asset is no longer available for

3   forfeiture.  There are circumstances in which it could be

4   allocated toward a specific money judgment, but what we're

5   talking about is no different than if someone embezzled

6   $10,000.  They would not be entitled to those gains, because

7   they were illegally procured, and so we're talking about a

8   specific money judgment for the value of the cryptocurrency

9   that was cryptojacked.

10      Does that answer the Court's question?

11          THE COURT:  Well, it answers my question to some

12   degree, but in your analogy, the person who embezzled

13   $10,000, if that $10,000 doesn't exist anymore, isn't that

14   captured by the restitution responsibility?

15          MS. MANCA:  I would say that it could be, but in this

16   case, first, the victims are different, but second of all,

17   we're trying to disgorge an ill-gotten gain as opposed to

18   making the victims whole, so they're two different goals of

19   sentencing.  They could, potentially, I guess, serve the same

20   function, and the Court could consider that in ordering one

21   or the other forfeitures.  Ms. Bush is here on behalf of the

22   Asset Forfeiture Unit and can speak to whether it's mandatory

23   or discretionary.  But in this case, it is sort of an

24   academic question, because the victims are different, and

25   what we are trying to avoid is a situation where someone

1  profits from criminal activity.  She is not entitled to the

2  money that she earned from cryptojacking, and so the Judgment

3  is part of the punishment for the offense, and that's one of

4  the goals of forfeiture.

5       THE COURT:  But the forfeiture would mean that that

6  $10,000 doesn't go back to the victims, it goes to the

7  Federal Government, correct?

8       MS. MANCA:  That's correct.

9       THE COURT:  Okay.

10       MS. MANCA:  And it's a way of -- the way that the

11  cases talk about it is, even if the money is spent or it no

12  longer exists, there is a sentencing value in not allowing a

13  person to profit from ill-gotten gains --

14       THE COURT:  Okay.

15       MS. MANCA:  -- is the policy position behind the

16  forfeiture.

17       THE COURT:  Thanks, Ms. Manca.

18    Ms. Bush, was there anything you wanted to add about the

19  arcane area of forfeiture?

20       MS. BUSH:  It is unusual, Your Honor.  Forfeiture and

21  restitution are different.  They can both be imposed in the

22  same case, and in fact, forfeiture is mandatory.  So it does

23  go to the government initially.  We can make a request

24  through MLARS to ask the Attorney General to apply -- it is

25  funds that we receive against the forfeiture money judgment

1  to restitution or to victims who aren't even moved in the

2  restitution.  So, in this case, where the victims are

3  different, it's particularly important, we believe, that the

4  Court impose both restitution and forfeiture.

5          THE COURT:  Okay.  Thank you, Ms. Bush.

6      Okay.  Who's doing it for the defense?  Mr. Hamoudi,

7  Mr. Klein?

8          MS. MEISTER:  That would be me, Ms. Meister.

9          THE COURT:  Ms. Meister, okay.

10          MR. HAMOUDI:  Keeping it fresh, Your Honor.

11          THE COURT:  Thank you.

12          MS. MEISTER:  Good morning, Your Honor.

13          THE COURT:  Good morning.

14          MS. MEISTER:  I think the first thing that I would

15  say is, Ms. Manca repeatedly referred to Ms. Thompson

16  withdrawing from the accounts, and Your Honor asked a

17  question about embezzlement.  If this were an embezzlement

18  case, you would expect to see some sort of tracing.  The

19  government would've traced the funds that hit the wallet and

20  would have traced Ms. Thompson actually withdrawing those

21  amounts to a bank account, to another wallet that it can

22  prove she owned, to a purchase, something.

23      Here, the only evidence the government has provided that

24  it was Ms. Thompson who withdrew that money from the accounts

25  is boastful statements that she allegedly made that don't

1   even correspond, in fact, to the amounts that were in that

2   wallet.  At best, the evidence they provided you indicates

3   that ETH was sent to that wallet, but there's no evidence of

4   who owned that wallet, who withdrew money from that wallet.

5   There's no tracing here.  The government didn't seize the

6   wallet.

7        Another thing that I take exception to is Ms. Manca

8   represented that Ms. Thompson, while on pretrial release,

9   withdrew money.  That wasn't substantiated by Mr. Beetham,

10  but beyond that, the government, allegedly, could have

11  prevented that by seizing the wallet.  They never did that.

12  So what they're really trying to do is substitute funds that

13  they can't prove Ms. Thompson ever withdrew or ever used,

14  ever used to purchase, as ill-gotten gains.  I don't think

15  the evidence the government has provided provides the

16  requisite nexus for that.

17       Ms. Manca also talked about, the victims are different.

18  It's cryptomining.  There's no victim.  The only alleged

19  victim they could potentially call out would be the resources

20  that were used by -- on Amazon Web Services, and that's not

21  what they're doing here.  So there is no victim.  I think

22  Your Honor makes a very prescient point that, here, this case

23  is really about restitution.

24       And then, the last thing I'll say -- or the last two

25  things I'll say is, I don't think it's frivolous to point out

1   that the government made a procedural error when it says it

2   could forfeit under Count 1 past July of 2019.  I don't

3   disagree with Ms. Manca that, obviously, it runs through

4   August 5th on Count 8.  That's quite clear.  I just wanted to

5   point out that the government claimed forfeiture under two

6   counts, and under Count 1, it can't claim it past July 2019.

7       And as to the historical price of Ether, you know, I think

8   the government -- the defense objection stands.  Yes, there's

9   that spreadsheet, Exhibit 855, that references the historical

10   price of Ether.  The defense's point is, the historical price

11   of Ether in a given 24-hour period can vary greatly, and so

12   it would have been helpful to know, was he using the average

13   daily price of Ether on that day, was he using the high, the

14   low.  Again, these go to the preponderance of the evidence,

15   so the defense's position is that this case is really about

16   restitution.

17       Ms. Thompson has no objection to forfeiting anything that

18   was seized from her house, the computers.  She does object to

19   the 10,000 and change, because the government hasn't carried

20   its burden with respect to the cryptomining.  Thank you.

21       THE COURT:  Thank you, Ms. Meister.

22       Ms. Manca, any response, or Ms. Bush?

23       MS. MANCA:  Your Honor, I'll rest on what I've said.

24   We stand by our argument.  Thank you.

25       THE COURT:  Ms. Bush.

1          MS. BUSH:  Yes, Your Honor.  The only thing I would

2     point out is that there are two types of forfeiture that are

3     established in the case law and in the statutes.  And for a

4     forfeiture money judgment, all the Court is required to do is

5     determine what the proceeds were, and that's the amount of

6     the forfeiture money judgment.

7          The nexus that Ms. Meister is talking about refers to

8     forfeiture of specific property, such as the computers in

9     this case.

10          THE COURT:  And when you have a case where you have a

11     large amount of restitution and also a forfeiture for a money

12     judgment rather than property, what gets priority?  If

13     Ms. Thompson were suddenly to come into some money, would it

14     be the forfeiture judgment or the restitution that would take

15     priority?

16          MS. BUSH:  Your Honor, restitution always takes

17     priority over forfeiture.

18          THE COURT:  Okay.

19          MS. BUSH:  In this case, if you impose the forfeiture

20     money judgment, we would need to come back to the Court

21     asking to identify an asset that we could apply towards that

22     and ask the Court to forfeit that as a substitute asset to

23     satisfy the forfeiture money judgment.  So it would be a

24     two-step process, whereas restitution would just be executed

25     upon.

1    THE COURT:  Okay, I've got that now.  Thank you.

2  That helped me a lot.

3    All right.  Let's move on to the restitution, then.

4    Mr. Friedman, something tells me you are going to argue

5  that one.

6    MS. MANCA:  He's missing his -- it's actually me,

7  Your Honor.

8    THE COURT:  Oh, okay.  So he's telling me --

9    MS. MANCA:  But that was a reasonable -- it was a

10  reasonable guess.

11    THE COURT:  -- you're favoring white men over women

12  and you're being a jerk.  I got it.  But he didn't want to

13  actually say it, so he stayed muted.

14    Okay.  Go ahead, Ms. Manca.

15    MS. MANCA:  As the Court is aware, the goal of

16  restitution is to restore someone to the position they

17  occupied before a particular event, and we are unable to do

18  that here, because the actual harm that Capital One suffered

19  as a result of Ms. Thompson's conduct is at least five times

20  the amount of restitution that the United States is seeking

21  in this case, likely even more than that.  Everyone agrees

22  that there are likely going to be challenges, and it is

23  unlikely that Ms. Thompson is going to be able to pay the

24  full amount of any restitution order that this Court imposes,

25  so Capital One will not be made whole.  That's just a fact.

1    THE COURT:  Ms. Manca --

2    MS. MANCA:  But they're entitled to restitution.

3    THE COURT:  Ms. Manca, did you watch the World Series

4  this year?

5    MS. MANCA:  No.  After the Mariners lost, I got too

6  sad.

7    THE COURT:  Okay.

8    MS. MANCA:  No, no, I did watch.  I did watch.

9    THE COURT:  Okay.  Did you notice that it wasn't just

10  the World Series?  It was the Capital One World Series.

11    MS. MANCA:  I did, actually.

12    THE COURT:  They actually sponsored the World Series,

13  so it's not like they don't have hundreds of billions of

14  dollars to, you know, I would say, fritter away on sponsoring

15  the World Series or paying Samuel L. Jackson to say things,

16  or whatever other stars.  You know, let's not paint Capital

17  One as the kind of victim that we're usually talking about

18  here with restitution.

19    But, definitely, they have suffered specific expenses that

20  will need to be addressed through restitution, but, you know,

21  saying to me that you're not really asking for another 200

22  million or so or 190 million from the class action doesn't

23  mean you're being judicious.  It means let's just focus on

24  the harms that were actually caused by what Ms. Thompson did

25  rather than what was caused by Capital One being frivolous

1    with security and, you know, putting much more of their money

2    into advertising than security.

3            MS. MANCA:  Well, the government submitted its

4    declaration.  We submitted the PSR regarding the amounts that

5    Capital One lost.  All of these are within both the case law

6    regarding CFAA cases and losses to companies that have

7    suffered breaches of this kind, specifically credit

8    monitoring, the cost of technological remediation, the cost

9    of identifying customers, the cost of the call center, the

10   cost of analyzing the breach, itself, and the nature of the

11   technological aspect of the breach.

12       The question is one of proximate cause, as the Court

13   knows, whether Ms. Thompson's actions were a "but for" cause

14   of the losses that Capital One suffered and whether those

15   losses were reasonably foreseeable.  Certainly, in this day

16   and age, most people would realize that downloading terabytes

17   of data would necessitate notifications to customers and

18   credit monitoring.

19       And again, Ms. Thompson is not, you know, what we might

20   consider a layperson in this area.  She's both

21   technologically proficient, a woman of great intelligence.

22   Her social media indicated she was well-versed in the areas

23   of technology.  And also, when I say "technology," not just

24   the technological aspects of the breach and technology,

25   itself, but also circumstances in which other people had

1   conducted breaches and the consequences of what those

2   breaches were, so we see that in her social media account.

3   So, even if one might say that, for general lay people, it

4   wasn't foreseeable, certainly, it was foreseeable for someone

5   of Ms. Thompson's technical expertise.

6       Given that the material is in the PSR and it is,

7   therefore, you know, a subject of sufficient reliability for

8   the Court to consider it and the Court has already found

9   those amounts to be losses attributable to Ms. Thompson's

10  conduct, we believe all of that is sufficient to support a

11  restitution order.

12      I'm happy to answer any questions that the Court has.

13          THE COURT:  And the actual number you're asking for

14  is a little above 40 million?

15          MS. MANCA:  Correct.  We've excluded all of the other

16  costs related -- you know, that might be deemed related to

17  civil settlements.  As I mentioned, there are other buckets

18  of substantial costs that we haven't asked for, since -- you

19  know, including Capital One's involvement in the prosecution,

20  the time that they spent to look through all of the data and

21  make sure they had identified exactly what was lost.

22          THE COURT:  Okay.  Thanks, Ms. Manca.

23      Ms. Meister.

24          MS. MEISTER:  Yes, Your Honor.  Well, at least

25  Ms. Manca and I can agree on one thing, which is that

1    Ms. Thompson is a woman of great intelligence.

2        A few points:  One is, I know Ms. Manca relied on the PSR.

3    I would say there's actually been a shift in the law since

4    the PSR, and that's the case that was decided yesterday by

5    the Third Circuit, and that's the *Banks* case, which, when

6    you're talking about fraud and you're talking about loss

7    amounts, I think it was unclear before *Banks* -- and I

8    understand *Banks* is the Third Circuit and it's not binding on

9    Your Honor -- but I think the Third Circuit was very clear

10   that, under the PSR, you can only count actual loss, not

11   intended loss.

12       And here, as Ms. Manca says -- and I agree with her --

13   it's reasonably-foreseeable, actual loss.  And while

14   Ms. Thompson is a woman of great intelligence, the way that

15   this happened, she couldn't see what she was copying

16   beforehand.  And the way that Capital One kept it, she

17   couldn't see a lot of it without a fair amount of

18   configuration.  And so -- and then, when she did see, you

19   know, I think the evidence was clear at trial, what she

20   actually did with it is nothing.

21       So I think, you know, there are certain things that were

22   reasonably foreseeable.  I don't think all the things

23   Mr. Watts has in his declaration -- leaving aside, you know,

24   the civil settlement, which Your Honor has already done --

25   were reasonably foreseeable.

1    I think, at page 22 and 23 of Your Honor's sentencing, you

2    asked a really good question of Mr. Friedman, which is, had

3    Ms. Thompson done exactly the same thing and then she

4    immediately alerts Capital One through the reasonable --

5    responsible disclosure program, would Capital One have

6    incurred a lot of these costs?  And Mr. Friedman, I think,

7    admitted that they would have incurred some costs, but they

8    would have been different in scale.  And I think, Your Honor,

9    the answer to that question is, they would have incurred a

10   lot of the same costs.  Some of it they may have been able to

11   do slower and internally, such as figuring out how it

12   occurred, but they probably would have, legally, had to

13   notify all the victims -- or not the victims, but the people

14   whose information got disclosed.  They likely would have had

15   to pay for credit monitoring for all of them.  They likely

16   would have had to store all of that data on AWS servers in

17   case they got sued for having, you know, all of the issues,

18   as Your Honor pointed out and as the OCC pointed out, with

19   their cloud-computing environment.

20   So I don't think Ms. Thompson was the "but for" cause.  A

21   lot of these claimed charges, even to the extent that Your

22   Honor wants to consider them, because a lot of them were

23   provided to Your Honor without much in the way of supporting

24   evidence to indicate that it was during the time period of

25   Ms. Thompson versus during the time period of the civil

1   lawsuit versus the time period of the OCC.  You know, I don't

2   think it's fair -- or I don't think, under the MVRA,

3   Ms. Thompson can be held responsible for storing data on an

4   AWS server for the purposes of providing discovery in the

5   civil lawsuit that comes years later.

6        So, really, I think what we're talking about, Your Honor,

7   is what we outlined in our memorandum, which was, you know,

8   the 120,000 to determine the root cause and the 425,000 used

9   to hire a third-party forensics firm to figure out whether

10  everything had been remediated appropriately.  I think those

11  are reasonably foreseeable.  I don't think the government

12  sustained their burden to prove that those were attributable

13  to Ms. Thompson as opposed to other factors, but I think the

14  free credit monitoring, I don't think it's reasonably

15  foreseeable.  I think Capital One would have had to do it in

16  any event.

17       The $5 million in call center expenses is a really round

18  number of a lot of different things that aren't broken out by

19  Capital One, aren't broken out by time period, and, quite

20  honestly, aren't reasonably foreseeable to somebody that

21  Capital One is going to have to go and pay overtime to call

22  center employees years down the road after a breach.  And

23  then, the 2.5 million in notifying impacted individuals,

24  again, it encapsulates a lot of information, not a lot of

25  information about the date that this happened, and Capital

1   One would have had to do that had Ms. Thompson utilized the

2   responsible disclosure.

3        I also would point out that, as Ms. Manca said,

4   Ms. Thompson lacks the ability to pay any amount in

5   restitution, and I think the Court needs to take that into

6   consideration.  And I think, you know, the Court took into

7   consideration wanting Ms. Thompson to really thrive in the

8   future and become a productive, functioning member of

9   society.  Hanging her with -- you know, even cutting it by a

10  fifth of the amount Capital One suggested -- millions of

11  dollars around her neck for the rest of her life is almost

12  the same thing as sending her to jail for a significant --

13  you know, it's like a debtor's prison.  So I think Your Honor

14  should take all of those things into consideration when

15  fashioning what the defense concedes is a required

16  restitution order under the MVRA.  Thank you.

17            THE COURT:  Thank you, Ms. Meister.

18        Ms. Manca, what about the fact that it's highly unlikely

19  that any individual in Ms. Thompson's situation will be able

20  to meet a restitution amount of such a high setting like

21  $40 million?  Does that factor in at all?

22            MS. MANCA:  Your Honor, I don't believe it does,

23  given the statutory statement that the economic circumstances

24  of the defendant are not something for the Court to consider.

25  There are, you know, numerous cases involving fraud and

1   millions of dollars where -- the harm is what it is.  If it

2   were any less, you know, this case would be different, but I

3   don't believe that the economic circumstances of Ms. Thompson

4   should be considered.

5        THE COURT:  I've discovered a few TV stations that I

6   didn't know existed -- Decades, MeTV -- that show old,

7   black-and-white shows from my childhood, like "Car 54, Where

8   Are You?" and the "Dick Van Dyke Show," things like that.

9   And one of the shows they have is "The Millionaire," which

10  was a captivating show when I was a kid.  A guy would go

11  around with a check for a million dollars to people who were

12  just average people working in average jobs.  And his boss,

13  this multi-millionaire, just decided to bestow upon those

14  people this million-dollar check.  And it didn't always work

15  out.  It was before the lotteries, but a lot of lottery

16  winners don't really end up thriving with the money, but it

17  was an interesting concept that somebody could say, you know,

18  "I feel bad for Ms. Thompson and what she went through; I

19  want to give her a million dollars," which, in 2022 dollars,

20  would be about $10 million from what it was in 1960.

21       That's kind of what we sometimes look at with restitution

22  and say, yeah, there's no way the person could actually pay

23  it, but you never know, somebody could bestow upon that

24  person a million dollars, or a relative could get money and

25  leave it to them or anything like that.  So I could see that

1    the Court should not take that into consideration, although,

2    at some point, on restitution, we're just going to be using a

3    percentage of gross income, right, and that's going to set

4    the guideposts for this.  And the sentence will run out at

5    some point, and then the restitution obligation exists as a

6    separate judgment that the United States can enforce, if it

7    so desires, going forward.  So I think that's the structure

8    here.

9        Let me go back to Ms. Manca for one more thing.  I did, in

10   the sentencing dialogue that Ms. Meister talked about,

11   wonder, some of those costs would have been put upon Capital

12   One to remedy the failure of the security, even if

13   Ms. Thompson had just brought these things to Capital One's

14   attention as a white-hat hacker.  Does that matter at all

15   here?

16        MS. MANCA:  Well, one of the important things to

17   think about in terms of this case -- and one of the things

18   the government has emphasized throughout -- is that there is

19   a chasm between the actions that Ms. Thompson actually took

20   and what would have happened, you know, had she reported it

21   at one of the initial stages.  So that chasm and the money

22   that flows from that, it's substantial.

23        I think there are likely -- I can think of at least

24   $35 million in the credit-monitoring costs and the costs of

25   the call center notifications and, essentially, even the

1    forensics firm and things like that that were directly

2    attributable to the downloading of the data, specifically.  I

3    mean, that's really what elevated the harm here and why it's

4    appropriate for the restitution order to be issued, because,

5    I mean, we can engage in hypotheticals about what kind of

6    notification obligations Capital One would have had if they

7    had had a responsible disclosure, but really, the gravamen of

8    this offense was the downloading of the data and the fact

9    that it was in someone's possession with unknown use, and

10   eventually, it was decided that it wasn't used, but -- and

11   the anxiety that that caused to millions of people.

12       So I think it's very important for that to be reflected in

13   the restitution order, and engaging in, you know,

14   counterfactuals about what might have happened had

15   Ms. Thompson acted lawfully I don't think is necessarily

16   helpful to, you know, the Court or the analysis.

17            THE COURT:  Ms. Meister, could you send to the

18   government and to the Court the Third Circuit case that you

19   mentioned?

20            MS. MEISTER:  Yes, Your Honor.

21            THE COURT:  I'll take a look at that today.

22       And if you have any response, Ms. Manca, that you want me

23   to look at, just do it in a one-page --

24            MS. MANCA:  And my understanding is that Third

25   Circuit case deals with actual versus intended loss under the

1  guidelines and not with restitution at all, but --

2         THE COURT:  Right, that's what she's saying, but I

3  just want to look at it.  I have been reversed by the Ninth

4  Circuit on that very issue, so...  Because, to me, it should

5  be intended loss, but I'm just interested in that.  You know,

6  I'm home now.  I'm going to go to the office, and I want to

7  look things over one last time and talk to my law clerk, and

8  I will make a decision about this tomorrow, okay?  All right.

9      Any other questions?  No.  All right, good.

10     Mr. Hamoudi, this might be the last hearing on this case,

11 correct?

12        MR. HAMOUDI:  Yes, Your Honor.

13        THE COURT:  Can't you stay on the case with your new

14 firm, just do it pro bono like Ms. Meister and Mr. Klein?

15        MR. HAMOUDI:  I'm coordinating an agreement to stay

16 with Paige.

17        THE COURT:  Okay, good.

18     And Mr. Klein and Ms. Meister, you don't have to answer

19 this, but have you looked at how much you would have charged

20 a paying client for your hours on this case?

21        MR. KLEIN:  We don't think about that, Your Honor,

22 but it's significant, because we do track pro bono hours at

23 our firm, and it's hundreds and hundreds and hundreds of

24 hours.

25        THE COURT:  Yeah, right, and your hourly rate is --

1    MR. KLEIN:  And it's been a real pleasure -- it's

2  been a real pleasure representing Paige.

3    THE COURT:  Yeah, and I totally get that.  I'm not

4  saying you regret it at all.  Plus, she got all that great

5  publicity of appearing before Judge Lasnik and -- well, I'll

6  set that one aside.

7    MR. KLEIN:  You said some kind things, Your Honor.

8  We appreciate that.  Thank you.

9    THE COURT:  Oh, well, it was very funny, because my

10  son, who's definitely a Reddit guy, calls me after the

11  sentencing -- doesn't call me, but texts me -- and says,

12  "Man, you're getting beat up on Reddit, Dad," you know, "What

13  were you thinking?"  "Thanks, Alex," but --

14    MR. KLEIN:  Go on social media, Your Honor.

15  That's --

16    THE COURT:  I'm not on social media at all, and I

17  will not be, but it is funny how the world looks from

18  different places, isn't it?

19    MR. KLEIN:  Yes.

20    THE COURT:  Okay.  So thank you, all.  I will get

21  this order out on restitution and forfeiture tomorrow.

22    MR. KLEIN:  Everyone have nice holidays.  Thank you,

23  Your Honor.

24    THE COURT:  Thank you.  You too.  Goodbye.

25    THE DEFENDANT:  Thank you, Your Honor.

1      THE COURT:  Good-bye, Paige.

2      MS. MANCA:  Thank you, Your Honor.

3                  (Adjourned.)

4

5

6

7

8

9

10              C E R T I F I C A T E

11

12

13    I certify that the foregoing is a correct transcript from

14    the record of proceedings in the above-entitled matter.

15

16

17

18    */s/ Sheri Schelbert*

19    SHERI SCHELBERT
      COURT REPORTER

20

21

22

23

24

25