**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-30179 |
| *Plaintiff-Appellant*, | D.C. Nos. 2:19-cr-00159-RSL-1 |
| v. | 2:19-cr-00159-RSL |
| PAIGE A. THOMPSON, | |
| *Defendant-Appellee*. | OPINION |

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted June 5, 2024
Portland, Oregon

Filed March 17, 2025

Before: Johnnie B. Rawlinson, Danielle J. Forrest, and
Jennifer Sung, Circuit Judges.

Opinion by Judge Forrest;
Dissent by Judge Sung

## SUMMARY[*]

### Criminal Law

The panel vacated Paige Thompson's sentence and remanded for resentencing in a case in which Thompson committed the second largest data breach in the United States at the time, causing tens of millions of dollars in damage and emotional and reputational harm to numerous individuals and entities.

The district court correctly calculated Thompson's sentencing range under the Federal Sentencing Guidelines to be 168 to 210 months of imprisonment.  It then granted a roughly 98% downward variance to time served (approximately 100 days) and five years of probation.

The panel held that the district court overemphasized Thompson's personal story and committed a clear error of judgment in weighing several of the factors set forth in 18 U.S.C. § 3553(a), which resulted in a substantively unreasonable sentence.

The panel held that it was clear error for the district court to conclude that Thompson's actions were not "malicious," that Thompson did not do anything "bad" before she was caught, and that Thompson was "tortured and tormented about what she did," given that these findings were not supported by the record.

Noting that the district court considered that Thompson is transgender and autistic, and has suffered prior trauma in

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

her life, the panel explained that Thompson's personal background and characteristics are proper considerations at sentencing, but they may not be the sole basis for the chosen sentence.

The panel explained that fraud crimes typically are calculated and, as a result, are particularly amenable to general deterrence. The district court's failure to give this factor meaningful weight was a clear error of judgment. As for specific deterrence, the district court's failure to consider highly relevant evidence of Thompson' risk of recidivism was an abuse of discretion.

Beyond the district court's general acknowledgment that the Guidelines help avoid sentencing disparities, nothing in the record indicates that the district court weighed the risk of unwarranted disparity in choosing the sentence. Given the district court's unsupported findings on some of the relevant facts, the panel concluded that the district court's explanation for the sentence it imposed is inadequate to justify the resulting disparity between Thompson's sentence and the sentences imposed in other cases, which is a weighty consideration given the extent of the district court's variance.

Dissenting, Judge Sung concluded that the sentence is substantively reasonable under an abuse of discretion standard. She wrote that while the majority clearly disagrees with the district judge's conclusion that consideration of the § 3553(a) factors justified a sentence of probation and believes that the circumstances presented here were insufficient to sustain such a marked deviation from the Guidelines range, it is not for the Court of Appeals to decide *de novo* whether the justification for a variance is sufficient or the sentence reasonable.

## COUNSEL

Tania M. Culbertson (argued) and Andrew C. Friedman, Assistant United States Attorneys; Jessica M. Manca, Special Assistant United States Attorney; Tessa M. Gorman, Acting United States Attorney; Office of the United States Attorney, United States Department of Justice, Seattle, Washington; for Plaintiff-Appellant.

Ann K. Wagner (argued) and Nancy Tenney, Assistant Federal Public Defenders; Vicki W.W. Lai, Chief Appellate Federal Public Defender; Office of the Federal Public Defender, Seattle, Washington; Mohammad A. Hamoudi, Stritmatter Kessler Koehler Moore, Seattle, Washington; for Defendant-Appellee.

Tyler G. Welti, Venable LLP, San Francisco, California; Matthew D. Field and Harley L. Geiger, Venable LLP, Washington, D.C.; for Amicus Curiae The Center for Cybersecurity Policy and Law.

## **OPINION**

FORREST, Circuit Judge:

Paige Thompson committed the second largest data breach in United States history at the time, causing tens of millions of dollars in damage and emotional and reputational harm to numerous individuals and entities. The district court correctly calculated Thompson's sentencing range under the Federal Sentencing Guidelines (the Guidelines) to be 168 to 210 months of imprisonment. It then granted a roughly 98% downward variance to time served (approximately 100 days) and five years of probation. Because the district court made clearly erroneous findings and did not properly weigh the 18 U.S.C. § 3553(a) sentencing factors, we conclude that the sentence it imposed is substantively unreasonable, and we vacate and remand for resentencing.

## **I.   BACKGROUND**

### **A.   The Crime**

Before the events at issue, Thompson worked as a Systems Engineer at Amazon Simple Storage Service (S3). S3 is "an object storage service" offered to businesses by Amazon Web Services (AWS). *Amazon S3*, Amazon Web Servs., https://aws.amazon.com/s3/ [https://perma.cc/L74B-8GXY] (last visited Dec. 2, 2024). Over two years after her employment at Amazon ended, Thompson began hacking AWS customers' accounts. She used a virtual private network service and The Onion Router network to anonymize her activity. Using a programming script, she scanned millions of publicly available IP addresses associated with AWS for vulnerabilities in their systems.

When Thompson found vulnerable accounts, she queried them for security credentials and saved those credentials on her computer. The credentials allowed Thompson to authenticate directly into AWS customers' cloud-computing[1] environments. Once inside, if the credentials permitted, Thompson ran a "sync" command to download data from customers' cloud storage. In total, Thompson got credentials from at least 200 entities and stole data from at least 30 of them. For example, Thompson obtained Capital One's security credentials and downloaded personally identifying information (PII) of 98 million Americans. Thompson then compressed and stored the data stolen from AWS customers on her computer, and she researched additional storage options. While Thompson did not sell or distribute any stolen information, she did research ways to profit from the data, bragged about possessing it, and encouraged others to hack vulnerable accounts. She also blamed her breaches on the companies' inadequate cybersecurity.

In addition to downloading private data, Thompson used AWS customers' computing power to mine cryptocurrency[2]—a cyberattack known as "cryptojacking."

---

[1] Cloud computing allows customers to "access technology services, such as computing power, storage, and databases, [over the internet] . . . from a cloud provider" "[i]nstead of buying, owning, and maintaining physical data centers and servers." *What is cloud computing?*, Amazon Web Servs., https://aws.amazon.com/what-is-cloud-computing/ [https://perma.cc/XJ7F-ABA8] (last visited Dec. 2, 2024).

[2] Cryptocurrency "is the general term for encrypted, decentralized digital money based on blockchain technology." *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1007 (9th Cir. 2023). Mining cryptocurrency involves a "puzzle-solving process" in which high-powered computers solve

Using the stolen security credentials, Thompson created new virtual servers in customers' cloud environments. She deployed cryptocurrency miners inside the virtual servers and mined cryptocurrency into her own virtual wallet. Cryptomining is expensive because it requires significant computer power. AWS customers were billed for the electricity used by Thompson's cryptojacking, while Thompson received the cryptocurrency payments. Thompson deleted the evidence of her cryptojacking from the companies' computer logs.

## B. Arrest and Trial

In June 2019, Thompson decided to "dox"[3] herself by sending unsolicited private Twitter messages about her data theft to cybersecurity professional Kat Valentine. The messages included links to the data and threats to distribute it. Valentine reported the data breach to Capital One. Capital One confirmed that its customers' data had been stolen, and it contacted the FBI. Less than two weeks later, the FBI searched Thompson's house and arrested her.

The Government charged Thompson with one count of wire fraud, seven counts of computer fraud and abuse, one count of access-device fraud, and one count of aggravated identity theft. A magistrate judge detained Thompson pending trial, finding that she "pose[d] a risk of nonappearance and a risk of physical . . . and financial and economic danger." The district judge later placed Thompson

---

"difficult mathematical puzzle[s]" to win cryptocurrency. *E. Ohman J v. NVIDIA Corp.*, 81 F.4th 918, 924 (9th Cir. 2023).

[3] "Doxing" is the act of revealing a person's private information online—often without consent.

on pretrial release. Thompson spent approximately 100 days in custody.

Thompson went to trial in June 2022. The jury convicted her on one count of wire fraud (felony) and six counts of computer fraud and abuse (four felonies and two misdemeanors). She remained on release pending sentencing.

## C. Sentencing

Before the sentencing hearing, U.S. Probation and Pretrial Services (Probation) calculated Thompson's Guideline range as 210 to 262 months, but it recommended a 24-month custody sentence. At the district judge's request, Probation outlined a potential alternative sentence of "time served and 5 years of probation, to include 36 months of home incarceration." At the sentencing hearing, the Government also argued for a substantial downward variance from the Guidelines calculation to 84-months custody followed by five years of supervised release. The Government primarily argued that a prison sentence was warranted given the seriousness of the crime, Thompson's lack of remorse and her violations of her release conditions,[4]

---

[4] The Government presented evidence that Thompson violated her release conditions by withdrawing approximately $40,000 of cryptocurrency from one of her virtual wallets and using computers for unauthorized purposes and lying about it. Even though Thompson's release violations had not previously been presented to the district court, it was properly considered at sentencing. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.") *cf. Pepper v. United States*, 562 U.S. 476, 487–93 (2011) (discussing the evidence that may be considered at

and general deterrent effect. The Government also addressed the concerns raised about the treatment of transgender women in federal prison, noting that there are "just shy of 1,500 transgender inmates in the Bureau of Prisons" (BOP) and that the BOP has substantially amended its policies and "will look at all [the] factors about an inmate" before designating a facility.

Thompson argued for a greater downward variance— time served and three years of supervised release. Through counsel, Thompson emphasized the hardships of being prosecuted and convicted; how her childhood and personal trauma contributed to her crimes; and her willingness to be rehabilitated and become a productive member of society. Defense counsel asserted that prison would be "an unsafe, unsupportive environment" that would surround Thompson with "individuals keen on objectifying and marginalizing her," and that BOP did not have "the capacity to keep [Thompson] safe, given her unique vulnerabilities."

Thompson herself also briefly addressed the court. She reported that she was recently diagnosed with autism and that she "would like to be gainfully employed again, and contribute something meaningful to the world." The district court stated that it had expected to receive an acceptance-of-responsibility letter from Thompson. Thompson's counsel explained that Thompson wanted to address the court orally,

---

sentencing); *United States v. Fitch*, 659 F.3d 788, 795 (9th Cir. 2011) (explaining that district courts may consider uncharged and acquitted conduct at sentencing). The Government discovered Thompson's additional cryptocurrency wallet shortly before trial and did not present evidence about it in its case-in-chief. And Thompson's pretrial supervisor declined to file a violation based on Thompson's unauthorized computer use because the incident occurred just two weeks before sentencing.

and, after the prompting, Thompson stated: "I am very sorry about this."

At the outset of the sentencing hearing the district court noted the significance of this case and gave the sentencing hearing a theme, stating: "[M]y theme is that, 'The arc of the moral universe is long, but it bends towards justice.'" After commenting at length about his career and the evolution of the criminal justice system, the district judge calculated Thompson's offense level as 35 and her Criminal History Category as I, resulting in a Guidelines range of 168 to 210 months. Noting that it had considered Thompson's offenses, the Guidelines, and the § 3553(a) factors, the court then imposed the requested alternative sentence offered by Probation—time-served and five years of probation, with three of those years being home detention.[5] The court also ordered Thompson to complete 50 hours of community service per year while she was on probation.[6]

The district court stated that "the question of what is justice here is a really, really hard question." It agreed with the Government that others considering the costs and benefits of committing crimes like Thompson's might decide that "if [they] can get away with credit for time served of 100 days, with the possibility of making a couple hundred million dollars . . . to take the chance." The court also found that Thompson committed "a terrible crime" but that she did "not do[] it in [a] malicious manner," such "as somebody

---

[5] The district court stated that home detention was "more of a location monitoring than home incarceration, which is a real lockdown kind of thing."

[6] At a separate hearing, the district court ordered Thompson to pay over $40 million in restitution and to forfeit money and property associated with her crimes.

who gets th[e] information and immediately turns to monetizing it." The court further found that Thompson "was tortured and tormented about what she did" and "was caught before she did anything bad, or anything good."

The district court also discussed the treatment of transgender individuals in federal prison. While it praised BOP's policy changes as evidence of "[t]he arc of the moral universe bend[ing] towards justice," it voiced concerns about transgender women who have not had reconstructive surgery being housed in women's prisons and the possibility that BOP policies might change in future presidential administrations. The court determined that Thompson's mental health and trauma provided some explanation for her behavior, and it observed that Thompson's case might be "one of those rare times when a person's involvement with the criminal justice system may have actually saved their life." The court proclaimed that it did not believe Thompson would reoffend. Indeed, the district court encouraged Thompson to take a day of reflection to "think about what you have to atone for, and what you've achieved." The Government appeals Thompson's sentence.[7]

## II. DISCUSSION

Appellate courts engage in a two-step review of criminal sentences and must ask: (1) whether the district court committed a significant procedural error, and (2) whether the district court imposed a substantively reasonable sentence. *Gall v. United States*, 552 U.S. 38, 51 (2007). Neither party raises a procedural challenge in this case.

---

[7] Thompson appealed first in October 2022, but we granted her motion to voluntarily dismiss her appeal.

Regarding the substance of the sentence, district courts must "consider . . . the [18 U.S.C.] § 3553(a) factors," *United States v Ressam*, 679 F.3d 1069, 1089 (9th Cir. 2012) (en banc), and "make an individualized determination based on the facts," *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). Section 3553(a) requires district courts to consider: (1) "the nature and circumstances of the offense"; (2) the "history and characteristics of the defendant"; (3) the need for the sentence in light of the seriousness of the offense, promoting respect for the law, and providing for just punishment; (4) the need for the sentence to afford adequate deterrence; (5) the need for the sentence to protect the public; (6) the need to avoid unwarranted sentencing disparities; and (7) the prospect for rehabilitation. *See United States v. Autery*, 555 F.3d 864, 873–78 (9th Cir. 2009). A sentence is substantively reasonable if it "is 'sufficient, but not greater than necessary' to accomplish § 3553(a)(2)'s sentencing goals." *Ressam*, 679 F.3d at 1089 (quoting *United States v. Crowe*, 563 F.3d 969, 977 n.16 (9th Cir. 2009)). "The touchstone of 'reasonableness' is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in . . . § 3553(a)." *Id.* (quoting *United States v. Tomko*, 562 F.3d 558, 568 (3d Cir. 2009) (en banc)).

The substantive reasonableness of a district court's sentence is reviewed for abuse of discretion. *Id.* We must consider "the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.* However, we may not impose a presumption that a sentence outside the Guidelines range is unreasonable. *Gall*, 552 U.S. at 51. "[W]e may reverse if, upon reviewing the record, we have a definite and firm conviction that the district court committed a clear error of judgment in the conclusion it

reached upon weighing the relevant [sentencing] factors."
*Ressam*, 679 F.3d at 1087 (quoting *United States v.
Amezcua-Vasquez*, 567 F.3d 1050, 1055 (9th Cir. 2009)).

The Government argues that the district court
erroneously focused on one sentencing factor—Thompson's
history and characteristics—to the exclusion of all other
factors. We agree that the district court overemphasized
Thompson's personal story and committed a clear error of
judgment in its weighing of several of the § 3553(a) factors,
which resulted in a substantively unreasonable sentence.[8]

## A. Nature, Circumstances, and Seriousness of Offense

District courts must consider "the nature and
circumstances of the offense" during sentencing. 18 U.S.C.
§ 3553(a)(1). Similarly, they must consider "the need for the
sentence imposed . . . to reflect the seriousness of the offense
. . . ." *Id.* § 3553(a)(2)(A). Here, the district court found that
Thompson committed "a terrible crime." But it also found
that Thompson (1) did not act "in [a] malicious manner that
you want to punish" her "to the same degree" as someone
who sells stolen data, (2) "was tortured and tormented about
what she did" and reached out for help, and (3) "was caught
before she did anything bad, or anything good."

As noted, Thompson committed one of the largest data
breaches in American history. She hacked into and stole
dozens of companies' data, including PII of nearly 100
million Americans just from Capital One. She also used the
companies' own computing power to mine cryptocurrency,

---

[8] The parties do not fully discuss each § 3553(a) factor. Accordingly, we
limit our discussion to those factors briefed by the parties, and we merge
the factors where the parties do. Of course, on remand, the district court
must consider and appropriately weigh each of the § 3553 factors.

causing their AWS bills to skyrocket while she kept the proceeds of her illegal conduct and deleted evidence of her cryptojacking from her victims' computer logs. Ultimately, Thompson caused at least $40 million in damage, and significant non-monetary harm. Her private communications demonstrate that she knew her conduct was unlawful and could result in imprisonment. In fact, Thompson specifically mused in an online chat, "[H]ow am I not in jail?" She then blamed AWS customers for failing to adequately "protect[] their assets," and she encouraged others to hack vulnerable accounts.

On this record, the district court's findings minimizing the nature, circumstances, and seriousness of Thompson's offenses are clearly erroneous. *See Ressam*, 679 F.3d at 1093–94 (explaining that the district court's finding that the defendant was a "quiet, solitary and devout man" was clearly erroneous where he "had for many years violated the laws of many nations and led a life dedicated to terrorist causes").

First, it was clear error for the district court to conclude that Thompson's actions were not "malicious." By her own words, Thompson specifically targeted AWS customers that she concluded had inadequate security and she encouraged others to do the same. She also blamed her victims' incompetency for her thefts. These actions are the definition of malicious. *E.g.*, *Malice*, Merriam-Webster, https://www.merriam-webster.com/dictionary/malice [https://perma.cc/2FHH-DBCS] (last visited Dec. 3, 2024) (defining "malice" as the "desire to cause pain, injury, or distress to another").

Second, the district court's finding that Thompson did not do anything "bad" before she was caught is clearly erroneous. While Thompson did not monetize the stolen PII

for identity theft or other separate crimes, the data breaches alone were wrong, and the scale of her criminal activity warrants a serious consequence. Moreover, Thompson's suggestion that an ultimate good has come from her crimes because the companies that she targeted have now improved their security, falls flat where she could have pointed out the security flaws that she discovered without stealing private information or using others' computing power to mine cryptocurrency.

Third, the district court's finding that Thompson was "tortured and tormented about what she did" is not supported by the record. Thompson bragged about her crimes, encouraged others to commit the same offenses, researched illicit credit card trading forums, and threatened to leak sensitive information to the public. If Thompson was distressed about her criminal conduct, she could have reported her hacking directly to the victim companies or the FBI—rather than encouraging others to engage in the same conduct and "doxing" herself on Twitter.

## B.  Thompson's History and Characteristics

Section 3553(a)(1) directs district courts to consider "the history and characteristics of the defendant" when imposing a sentence. This inquiry is "broad," *Gall*, 552 U.S. at 50 n.6, and contains no express limitation as to what history and characteristics are relevant. *See* 18 U.S.C. § 3553(a)(1).

The district court considered that Thompson is transgender, autistic, and has suffered prior trauma in her life. Thompson's personal background and characteristics are, of course, proper considerations at sentencing, but they may not be the sole basis for the chosen sentence. *See Gall*, 552 U.S. at 49–50 ([T]he district judge should . . . consider *all* of the § 3553(a) factors . . . ." (emphasis added)); *see also*

*United States v. Fitzpatrick*, 126 F.4th 348, 353 (4th Cir. 2025) (vacating as substantively unreasonable a 17-day time served custody term in a significant PII fraud and child pornography case where the district court "relied only on [the defendant's] history and personal characteristics—his autism and youth"). And the district court also speculated that recent BOP policy changes about housing transgender inmates may be undone by a future presidential administration. Such speculation regarding BOP policy is improper, especially when it apparently carried the weight it did in this sentencing. *See United States v. Ceasar*, 10 F.4th 66, 80, 82 (2d Cir. 2021) (determining that the district court erred by imposing a remarkably low sentence which was heavily influenced by "the potential creation of then-untested rehabilitation programs—which may never come into existence").[9]

## C. Deterrence

District courts must consider the need for adequate deterrence and the need to protect the public from future crimes of the defendant when fashioning a criminal sentence. 18 U.S.C. § 3553(a)(2)(B), (C). The former is aimed at general deterrence in the population, while the latter is aimed at specific deterrence of the defendant. *United States v. Edwards*, 595 F.3d 1004, 1021 (9th Cir. 2010) (Bea, J., concurring in part) (citing *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006)).

---

[9] The BOP has since changed its policies regarding the incarceration of transgender persons. *See* Exec. Order No. 14,168, § 4, 90 Fed. Reg. 8615, 8616–17 (Jan. 30, 2025). The district court may consider this non-hypothetical policy on remand, but, consistent with this opinion, it may not do so at the expense of a proper weighing of all the § 3553(a) factors.

At sentencing, the Government explained that Thompson's case garnered considerable media attention and a significant prison sentence was necessary to deter future hackers. The district court agreed that "there are some people out there who are looking at the cost-benefit analysis and saying . . . if I can get away with credit for time served of 100 days, with the possibility of making a couple hundred million dollars with this, I'm going to take the chance."

As the district court explained, hacking is "not . . . a crime of passion that [just] happens." Fraud crimes like those at issue here typically are calculated, and, as a result, are particularly amenable to general deterrence. *See Edwards*, 595 F.3d at 1016 (noting "the increased importance of general deterrence in white collar crime cases"). But, while the district court acknowledged the Government's argument that a low sentence would incentivize similar crimes, it does not appear that it gave this factor meaningful weight in selecting the sentence that it imposed. This was a clear error of judgment. *Cf. Carty*, 520 F.3d at 992–93 (noting that while district courts "need not tick off each of the § 3553(a) factors," nor "articulate in a vacuum how each § 3553(a) factor influences its determination of an appropriate sentence," district courts should offer an explanation about their weighing of a given factor in response to a nonfrivolous argument); *Fitzpatrick*, 126 F.4th at 353–54 (noting the district court's failure "to account for the need for its sentence to promote respect for the law" or to "consider[] how its sentence would deter others from committing such crimes" in reversing for substantive unreasonableness).

While the dissent is correct that probation does "substantially restrict" offenders' liberty, *Gall*, 552 U.S. at 48, and neither our precedent nor § 3553(a) imposes a categorical rule that "the goal of general deterrence be met

through a period of incarceration," *Edwards*, 595 F.3d at 1016, a purely probationary sentence in this case does not meet the deterrence goal in sentencing. The scale and potential monetary return of Thompson's crimes are a significant factor in assessing deterrence. As is that the offenses at issue can be committed from a person's home and are generally committed by people skilled in how to use computers without detection. In this context, it is unconvincing that a person inclined and having the skills to commit the scale of hacking and computer fraud at issue here would be meaningfully deterred by the risk of probation or home confinement.

As for specific deterrence, the district court explained that Thompson had evolved over the course of her case and that it was confident she would not reoffend. While district courts generally are better positioned to assess a defendant's risk of recidivism, *see Ressam*, 679 F.3d at 1086, the record here reveals that the district court may not have considered all the information relevant to this point. At sentencing, the Government presented evidence that, while awaiting trial, Thompson withdrew for her own purposes approximately $40,000 that she cryptojacked that could have been used to compensate victims and that, after she was found guilty and was awaiting sentencing, she used her computer for unauthorized purposes and lied about it. The district court did not address this evidence or the Government's arguments, nor did it make any findings regarding these incidents. *See Ceasar*, 10 F.4th at 83 (questioning the district court's assessment of the defendant's risk of recidivism where the court failed to discuss that the defendant "had already exhibited recidivist behavior while on release"); *Fitzpatrick*, 126 F.4th at 354 (vacating the district court's sentence where the district court "seemingly failed to

consider that [the defendant] immediately and continuously violated the conditions of his presentence release"). The failure to consider this highly relevant evidence to Thompson's risk of recidivism was an abuse of discretion.

## D.  Unwarranted Sentence Disparities

When imposing sentence, district courts must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). The goal of the Guidelines was to "achieve uniformity in sentencing." *United States v. Banuelos-Rodriguez*, 215 F.3d 969, 974 (9th Cir. 2000). Therefore, "in the ordinary case, the [Guidelines'] recommendation of a sentencing range 'will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)). We have noted that a significant variance from the Guidelines must be supported by a correspondingly persuasive justification "because other values reflected in § 3553(a)—such as, for example, unwarranted disparity—may figure more heavily in the balance." *Carty*, 520 F.3d at 992. Likewise, the extent of variance impacts how much explanation the district court must provide in support of its sentencing choice. *See id.* ("A within-Guidelines sentence ordinarily needs little explanation . . . . But the judge must explain why he imposes a sentence outside the Guidelines.").

Here, the district court acknowledged that the Guidelines help avoid sentencing disparities. But beyond that general recognition, nothing in the record indicates that in choosing the sentence that it imposed, the district court weighed the risk of unwarranted disparity in making its decisions. And

the Government has presented compelling data showing that the sentence imposed in this case is a notable outlier. In 2022, when Thompson was sentenced, there were 5,208 federal theft, property destruction, and fraud offenses—cases like Thompson's in which the defendant was sentenced under U.S. Sentencing Guidelines § 2B1.1. *Quick Facts: Theft, Property Destruction, and Fraud Offenses*, U.S. Sent'g                                                       Comm'n, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY22.pdf [https://perma.cc/U3QG-L8HW] (last visited Dec. 3, 2024). The median loss in these cases was \$160,737; only 17.5% of cases involved losses exceeding \$1.5 million. *Id.* Seventy percent of offenders had a Criminal History Category of I, and "[t]he average guideline minimum was 32 months." *Id.* Of the offenders that received a downward variance, the average reduction was 57.7%. *Id.* And "[t]he average sentence length was 23 months." *Id.*

Thompson caused greater financial loss than 80% of defendants in these types of cases, and her minimum Guidelines range was five times greater than the average low-end range. Nonetheless, the district court varied so far downward that Thompson received 20 months less than the *average* sentence length. We cannot ignore the magnitude of disparity between Thompson's sentence and the sentences imposed in these other cases.

Thompson did not respond to the Government's unwarranted-disparity argument or to the data that the Government presented. But the dissent does significant work for her. The dissent argues that it is improper for us to consider the Government's disparity data because it was not presented to the district court. Indeed, the dissent suggests

that we should not consider whether the district court adequately weighed the risk of unwarranted sentencing disparity at all because the Government failed to make a specific argument about this issue below.

As an initial matter, the Government did argue to the district court in making its own below-Guidelines recommendation that "[e]ven though some amount of downward variance is justified based on Thompson's history and characteristics, . . . too much consideration loses sight of the seriousness of her crimes, reduces any deterrent effect, and creates unwarranted disparity." Moreover, our general waiver rule operates differently in substantive-reasonableness challenges. The requirement that a sentence be substantively reasonable "is applicable in all sentencing decisions and is not affected by failure to object." *United States v. Blinkinsop*, 606 F.3d 1110, 1116 (9th Cir. 2010) (citing *Autery*, 555 F.3d at 871). Indeed, after the district court announced its sentence in *Blinkinsop*, it asked the parties "if they had any statements that they wanted placed on the record" challenging the court's sentence, and neither party objected to the sentence. *Id.* at 1113. Nonetheless, the defendant appealed his sentence as unreasonable, and we considered his challenge. There is logic to not rigidly imposing waiver in this context because it can be difficult to challenge something as unreasonable before it happens. And this flexibility runs both ways, to the Government and also to defendants. Additionally, in performing our obligation to ensure a defendant's sentence is substantively reasonable, we must "take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Gall*, 552 U.S. at 51.

The dissent contends that it was not an abuse of discretion for the district court not to consider data that was

not presented to it. We do not suggest that the failure to consider the specific data that the Government has presented was an abuse of discretion. Rather, the district court abused its discretion by failing to meaningfully weigh the sentencing disparity that its chosen sentence created, and we reference the statistics proffered by the Government on appeal—to which Thompson herself does not object—to illustrate the concern.

The risk of unwarranted disparity was obvious here because the district court varied so significantly from the Guidelines, which, as the district court discussed at the sentencing hearing, work to remove disparity. *See Gall*, 552 U.S. at 594; *Banuelos-Rodriguez*, 215 F.3d at 974. The district court did not need a specific argument to know this risk existed or that it was obligated to justify its extreme variance. To be clear, district courts need not in every case compare its sentence to every other similarly situated federal defendant. *See United States v. Treadwell*, 593 F.3d 990, 1012 (9th Cir. 2010) ("A district court need not, and, as a practical matter, cannot compare a proposed sentence to the sentence of every criminal defendant who has ever been sentenced before. Too many factors dictate the exercise of sound sentencing discretion in a particular case . . . ."). But it is well established that where the sentence imposed varies significantly from the Guidelines, a resulting sentencing disparity must be justified by the particularities of the case in light of the other § 3553(a) factors. *See Gall*, 552 U.S. at 50 ("We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one."); *Autery*, 555 F.3d at 867, 876 (holding that sentencing disparity and downward variance were warranted where the record demonstrated that the district judge had expressly considered the defendant's dissimilarity from other

defendants convicted of similar crimes); *see also Fitzpatrick*, 126 F.4th at 353–54 (vacating where district court imposed 99% downward variance but did "not appear to have considered how such an extreme variance might contribute to unwarranted sentencing disparities").

The district court plainly viewed Thompson as unique because of her personal vulnerabilities and because she did not sell the data that she stole. But given the district court's unsupported findings on some of the relevant facts, we conclude that the district court's explanation for the sentence it imposed is inadequate to justify the resulting disparity from other similar cases and defendants, which is a weighty consideration given the extent of the district court's variance.

\* \* \* \* \*

We do not lightly conclude that a district court's sentence is substantively unreasonable. *E.g., Ressam*, 679 F.3d at 1086 ("It is clear that we are to afford significant deference to a district court's sentencing decision."). District courts enjoy significant discretion in bringing their individual judgment to bear in crafting criminal sentences. But the court's handling of the sentencing in this case is troubling and leaves us with "a definite and firm conviction that [it] committed a clear error of judgment in the conclusion it reached." *Id.* at 1087 (quoting *Amezcua-Vasquez*, 567 F.3d at 1055).

The scope of Paige Thompson's data breaches is virtually unprecedented, and the degree of financial harm that she caused is what led to a Guidelines calculation of 168 to 210 months of imprisonment. At sentencing, the district court was seemingly as influenced by its perceptions about the evolution of the criminal-justice system as it was with

the specific facts about Thompson and her crimes. The district court's findings regarding Thompson's mindset in committing her crimes, the harmfulness of her conduct, and her likelihood of recidivism cannot be justified on the record. And while the district court acknowledged the § 3553(a) factors, it did not meaningfully weigh them. Simply put, Thompson's personal vulnerabilities do not outweigh all the other sentencing considerations or displace the district court's obligation to select a sentence that serves the federal sentencing goals, including properly reflecting the seriousness of the offense, promoting respect for the law, imposing just punishment, deterring similar criminal conduct, and protecting the public against future criminal conduct of the defendant. 18 U.S.C. § 3553(a)(2).

**SENTENCE VACATED; REMANDED FOR RESENTENCING.**

SUNG, Circuit Judge, dissenting:

The district court found that Paige Thompson committed a "terrible crime," and it recognized that fashioning an appropriate sentence was a "very difficult and challenging" task. All parties recommended a below Guidelines sentence: the Government recommended an 84-month prison sentence, the defense requested a sentence of time served, followed by three years of supervised release, and Probation recommended a 24-month prison sentence. However, "given the extenuating circumstances in this case," Probation also presented the district court with an alternative recommendation of five years of probation, including 36 months of home incarceration.[1] After considering the arguments of the parties, the record before it, and the factors enumerated in 18 U.S.C. § 3553(a), the district court adopted Probation's alternative recommendation.

We review the substantive reasonableness of a sentence for abuse of discretion. *United States v. Autery*, 555 F.3d 864, 871 (9th Cir. 2009). We "must first ensure that the district court committed no significant procedural error, such as…failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to

---

[1] The majority states that Probation provided the alternative sentence at the request of the district judge. I do not think the record is clear on this point. Probation wrote in the PSIR that while "[i]t is not generally our department's practice to provide an alternative sentencing recommendation…it appears appropriate to offer an additional option." Referencing this alternative, the district court stated at sentencing that the probation officer "did do me the favor of coming up with a potential alternative approach. And that's the one that I'm going to take." The PSIR does not state that it provided the alternative in response to a request from the district court.

adequately explain the chosen sentence." *Gall v. United States*, 552 U.S. 38, 51 (2007). "Assuming that the district court's sentencing decision is procedurally sound, [we] then consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Id.* "We give due deference to the district court because the sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case." *United States v. Edwards*, 595 F.3d 1004, 1015 (9th Cir. 2010) (cleaned up). "Reversal is appropriate only if the district court's sentence is illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Spangle*, 626 F.3d 488, 498 (9th Cir. 2010) (cleaned up).

Applying the framework set forth by the Supreme Court in *Gall*, I find no abuse of discretion in the district court's decision. The Government does not claim that the district court procedurally erred and raises only a substantive reasonableness challenge. Review for substantive reasonableness "requires deference to the district court's decision, and should not resemble a de novo review." *United States v. Cherer*, 513 F.3d 1150, 1159-60 (9th Cir. 2008). "[I]f the sentence is outside the Guidelines range, the court may not apply a presumption of unreasonableness…The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Gall*, 552 U.S. at 51. Because the majority does not faithfully apply the abuse of discretion standard to the district court's sentence, I respectfully dissent.

## I. The district court's sentence was substantively reasonable.

The majority begins by stating that the district court "granted a roughly 98% downward variance," a "characterization[] that directly flout[s] the Supreme Court's instruction that courts should not quantify variances from the Guidelines 'as a certain percentage of the maximum, minimum, or median prison sentence recommended by the [g]uidelines.'" *United States v. Ruff*, 535 F.3d 999, 1003-04 (9th Cir. 2008) (quoting *Gall*, 552 U.S. at 48). This framework is improper because it "gives no weight to the substantial restriction of freedom involved in a term of supervised release or probation." *Gall*, 552 U.S. at 48. Instead, we must examine whether the full record reflects a rational and meaningful consideration of the relevant § 3553(a) factors. *See United States v. Ressam*, 679 F.3d 1069, 1089 (9th Cir. 2012) (en banc) (describing the "touchstone of reasonableness" as "whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in . . . § 3553(a)") (internal citation and quotation marks omitted). Here, the record shows that the district court rationally and meaningfully considered each relevant § 3553(a) factor.

### A. Nature and Circumstances of the Offense

The majority claims that the district court "clearly erred" in three respects when it analyzed the nature and circumstances of Thompson's offense. I address each purported error in turn.

The majority first finds that it was "clear error for the district court to conclude that Thompson's actions were not 'malicious.'" Majority Opinion at 14. As a factual matter, the district court did not make this finding. Rather, the court

found that Thompson had not acted "in the malicious manner
that you want to punish, to the same degree as somebody
who gets that information and immediately turns to
monetizing it in some way." This finding was not clear error.
To the contrary, it is fully consistent with the Government's
sentencing memorandum, which conceded that Thompson,
unlike a person with "purely malicious motives," should
receive "[a] significant downward departure . . . to
recognize that [she] could have caused even more harm than
she did."

Next, the majority concludes that "the district court's
finding that Thompson did not do anything 'bad' before she
was caught is clearly erroneous." Majority Opinion at 14.
This again misconstrues the sentencing transcript. The
district court plainly did not find that Thompson "did not do
anything bad before she was caught"—it expressly found
that her crime was "terrible." The language cited by the
majority, read in context, refers to the fact that Thompson
"was caught before she did anything bad, or anything good"
with the data she stole. The majority acknowledges that
while Thompson researched how she could profit from the
stolen data, she did not sell or distribute any of it prior to her
arrest. On this record, the district court's finding that
Thompson "was caught before she did anything bad, or
anything good" was not clearly erroneous.

Finally, the majority claims that "the district court's
finding that Thompson was 'tortured and tormented about
what she did' is not supported by the record." Majority
Opinion at 15. While the record includes statements by
Thompson boasting about her data theft and threatening to
disseminate sensitive information, the record also supports
the district court's finding that she felt "tortured and
tormented" about her actions. For example, when security

researcher Kat Valentine asked Thompson why she was sending information about her data theft to a stranger, she replied, "Im ready to check the f*** out . . . I dont care if its jail or death. Prefer to die, and something to make it easy." She described her state of mind to Valentine as feeling as if she had "basically strapped myself with a bomb vest, f***ing dropping capitol ones dox and admitting it." After the data theft, Thompson wrote that she had "gone completely insane. theyre gonna lock me up and throw away the key. it really is for the best." The district court, which saw the evidence presented at trial, "was intimately familiar with the nature of the crime and the defendant's role in it, and "could appraise [the defendant's] sincerity first-hand, as we cannot." *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008). The record adequately supports the district court's finding that Thompson was "tortured and tormented" by her actions.

The district court never found that Thompson's actions were not malicious, never found that she did not do anything bad, and permissibly found that she was tortured and tormented by her actions. I respectfully disagree with the majority's conclusion that the district court's findings about the nature and circumstances of Thompson's offense were clearly erroneous.

## B. Thompson's History and Characteristics

The majority next faults the district court for purportedly placing too much weight on the possibility that Bureau of Prisons housing policies for transgender inmates "may be undone by a future presidential administration." The majority relies on inapposite, out of circuit caselaw to reach this conclusion, which is not supported by statute, Supreme Court precedent, or the law of this circuit.

The parties agree, and the majority does not dispute, that the fact that Thompson is a transgender woman is a relevant characteristic that the court must consider under § 3553(a)(1). The court must also consider "the need for the sentence imposed . . . to provide the defendant with needed . . . medical care" under § 3553(a)(2)(D). The defense argued that Thompson's medical and mental health needs as a transgender woman could not be adequately addressed by the Bureau of Prisons, particularly if she were to be placed in a facility designated for men. The Government conceded that "Thompson faces significant challenges and risks as a transgender woman in prison" and agreed that "[i]t is appropriate for the Court to consider those circumstances when imposing a sentence, just as it would consider any other person's medical or psychological prognosis in a prison setting." As evidence that Thompson's needs could be adequately addressed, the Government cited a 2022 Bureau of Prisons policy change that established a Transgender Executive Council and standardized policies and practices to improve conditions for transgender inmates.[2]

The district court made two findings with respect to the fact that Thompson is transgender. First, the district court found that "the time that a transgender person serves in prison is going to be difficult, for sure, under any circumstances." A district court's finding that a defendant is "particularly likely to be [a target] of abuse during their incarceration" is "just the sort of determination that must be accorded deference by the appellate courts." *Koon v. United*

---

[2] As the majority acknowledges, some of these policies are no longer in effect. *See* Majority Opinion at 16, fn. 9. ("The BOP has since changed its policies regarding the incarceration of transgender persons.").

*States*, 518 U.S. 81, 111 (1996). *See also United States v. Parish*, 308 F.3d 1025, 1031 (9th Cir. 2002) ("A defendant's unusual susceptibility to abuse by other inmates while in prison may warrant a downward departure.").

Second, the district court observed that the BOP policy cited by the Government could be subject to change. But far from carry significant weight at sentencing, as the majority claims, the district court ultimately concluded that "[w]e just don't know" what would happen in the future, and emphasized that "dealing with Paige Thompson, what she did, who she is, is the dilemma before the court today." The court properly considered Thompson's history and characteristics at sentencing.

### C. Deterrence

Next, the majority contends that the district court failed to give sufficient weight to the need for general and specific deterrence. At the sentencing hearing, the Government told the court that a Guidelines sentence was "not necessary for deterrence" and only conclusorily asserted that Probation's recommendation would not have a deterrent effect. The district court expressly considered the need for deterrence and acknowledged the possibility that someone could "[look] at the cost-benefit analysis" and commit a similar crime if they thought they could "get away with credit for time served of 100 days." As required, however, the district court considered deterrence together with *all* of the sentencing factors, noting that there were valid arguments both for and against a prison sentence and explaining that the case was a 'tough one.'" After weighing all of the factors, the district court ultimately concluded that Probation's alternative was sufficient and appropriate.

The majority asserts that the sentence imposed was insufficient because, in its view, a person skilled in the use of computers would not be deterred. This assertion is not supported by the law or the factual record. Under our precedent, § 3553(a) "does not require the goal of general deterrence be met through a period of incarceration." *Edwards*, 595 F.3d at 1016. While "custodial sentences are qualitatively more severe than probationary sentences of equivalent terms," "[o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *Gall*, 552 U.S. at 48. Here, Probation proposed the alternative sentence that the district court ultimately adopted because "[a] probationary sentence, unlike supervised release, can be retributive in nature and utilized to satisfy the punitive purpose of sentencing." Further, when the majority concludes that Thompson's sentence does not meet the deterrence goal of sentencing, the majority focuses solely on the lack of incarceration— without accounting for the deterrent effects of the sentence's other terms. The sentence imposed a total of twenty-six conditions, including ongoing monitoring and inspection of Thompson's computers, hardware, software, and Wi-Fi connections, the installation of monitoring software, quarterly polygraph testing, extensive financial disclosures to Probation, and location monitoring with radio frequency technology for three years. These are substantial restrictions on Thompson's liberty, imposed with the possibility of further incarceration if she fails to comply. Additionally, while sentencing Thompson, the district court noted that it would schedule a restitution hearing, and it ultimately ordered Thompson to pay over $40 million in restitution to Capitol One. *See Paroline v. United States*, 572 U.S. 434, 456 (2014) ("The primary goal of restitution is remedial or

compensatory, but it also serves punitive purposes.")
(internal citations omitted). The district court properly
"considered, weighed and factored into its sentence the
important goal of deterrence." *Edwards*, 595 F.3d at 1017.

The majority also contends that the district court's
sentence is insufficient to specifically deter Thompson.
Applying an abuse of discretion standard, the district court's
sentence is supported by the record. The Government argued
that Thompson's cryptojacking and violation of pretrial
release conditions "go to and suggest that her history and
characteristics are significant, and suggest a significant
sentence." The defense argued that Thompson "poses a low
risk of recidivism" due to her significant support system in
the community. The PSIR emphasized Thompson's overall
"compliance and stability on pretrial supervision," and stated
that "finding interesting, challenging, and rewarding
employment is a crucial piece in deterring Ms. Thompson
from returning to illegal conduct." The district court heard
these arguments and fashioned a sentence that, in its
considered view, would specifically deter Thompson,
allowing her to seek meaningful employment while also
facing serious consequences for probation noncompliance.
While the majority may disagree with the sentence imposed
as a policy matter, the district court did not err as a matter of
law.

### D.  Unwarranted Sentencing Disparities

Finally, the majority finds that the district court erred by
failing to consider sentences for similar crimes or similar
defendants. The Government never developed any argument
about unwarranted sentencing disparities before the district
court—it offered only one conclusory and boilerplate
statement that "too much consideration" of Thompson's

personal circumstances "creates unwarranted sentencing disparity." The majority nevertheless finds that the district court abused its discretion by "failing to meaningfully weigh the sentencing disparity that its chosen sentence created." Majority Opinion at 22. To "illustrate the concern," the majority cites a "Quick Facts" sheet issued by the United States Sentencing Commission and cited by the Government for the first time on appeal. But the Government never presented these statistics to the district court, either in its sentencing memorandum or at the sentencing hearing.**³** Despite the Government's silence below, the majority finds that the district court abused its discretion because "nothing in the record indicates that in choosing the sentence that it imposed, the district court weighed the risk of unwarranted disparity in making its decisions." Majority Opinion at 19. This is inconsistent with Supreme Court precedent, which compels the opposite conclusion: the district court "necessarily gave significant weight and consideration to the need to avoid unwarranted disparities" because it "correctly calculated and carefully reviewed the Guidelines range." *See Gall*, 552 U.S. at 54 (holding that the appellate court erred

---

³ This was not for lack of opportunity. Probation proposed the sentence that was ultimately adopted by the district court in the PSIR, which the Government reviewed prior to sentencing. The Government had notice of Probation's recommendation (as well as the recommendation of the defense) but chose not to offer any substantive argument about whether and to what extent these recommendations would result in sentencing disparities. The majority's expansive interpretation of waiver allows a party to profit from its lack of preparedness: it can offer no argument about disparity to the district court, research average sentences for comparable defendants after the sentencing hearing, and then claim on appeal that the district court abused its discretion by inadequately grappling with the disparity issue. Contrary to the majority's claim, there is no "logic" to this. Majority Opinion at 21.

when it "stated that 'the record does not show that the district court considered whether a sentence of probation would result in unwarranted disparities'"). The district court did not abuse its discretion by not considering evidence and argument that was never presented to it. *See Gall*, 552 U.S. at 53-54; *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) ("the district judge is not obliged to raise every possibly relevant issue *sua sponte*").[4]

The majority effectively faults the district court for not expressly discussing the disparity issue. That approach contravenes well-established principles of sentencing law. Procedurally, "[t]he district court "need not tick off each of

---

[4] The majority argues that a party can present a cursory and boilerplate argument about a § 3553(a) factor to the district court, then argue on appeal that the district court's sentence was substantively unreasonable because it did not reflect adequate consideration of that factor. The cases it cites undermine this novel argument. In *Autery*, the issue was whether, when a defendant does not object to overall substantive reasonableness before the district court, we review for abuse of discretion or plain error, and we held that we review for abuse of discretion. *Autery,* 555 F.3d at 871. We did not address the question presented here, which is whether a district court abuses its discretion by not considering evidence of sentencing disparity that was never presented to it. In *United States v. Blinkinsop*, 606 F.3d 1110, 1116 (9th Cir. 2010), we merely reiterated the rule that "[s]ubstantive reasonableness of a sentence, reviewed for abuse of discretion, is applicable in all sentencing decisions and is not affected by failure to object." We adopted this rule in *Autery* because "in a substantive reasonableness challenge, the parties have *already fully argued the relevant issues (usually both in their briefs and in open court)*, and the court is already apprised of the parties' positions and what sentences the parties believe are appropriate." *Autery,* 555 F.3d at 871 (emphasis added)*.* But in this case, the Government never developed an argument about unwarranted sentencing disparities before the district court. Neither *Autery* nor *Blinkinsop* suggests that a district court abuses its discretion by not considering a sentencing argument developed for the first time on appeal.

the § 3553(a) factors to show that it has considered them. We
assume that district judges know the law and understand
their obligation to consider all of the § 3553(a) factors, not
just the Guidelines." *Carty*, 520 F.3d at 992. *If* a "party raises
a specific, nonfrivolous argument tethered to a relevant
§ 3553(a) factor in support of a requested sentence, then the
judge should normally explain why he accepts or rejects the
party's position." *Id.* at 992-93. But when a party does not
specifically raise an issue, the district court does not err by
not discussing it, and here, the Government does not claim
that there was any procedural error. *See id.* at 991*; Gall*, 552
U.S. at 53-54. Indeed, in *Gall*, the Supreme Court held that
the circuit court erred when it concluded that the district
court did not adequately weigh the seriousness of an offense
involving ecstasy because "the prosecutor did not raise
ecstasy's effects at the sentencing hearing." *Id.* at 54. The
Court explained that "[h]ad the prosecutor raised the issue,
specific discussion of the point might have been in order, but
it was not incumbent on the District Judge to raise every
conceivably relevant issue on his own initiative." *Id.* Here,
as in *Gall*, the Government failed to make a specific
argument about sentencing disparities to the district court,
and the majority errs by faulting the district court for not
expressly addressing the issue.

## II. Conclusion

The majority may be "certain" that it "would have
imposed a different sentence had [it] worn the district
judge's robe," but we may not "reverse on that basis."
*Whitehead*, 532 F.3d at 993. *See also United States v. Door*,
996 F.3d 606, 623 (9th Cir. 2021) (276-month, above-
Guidelines sentence not substantively unreasonable); *United
States v. Doe*, 842 F.3d 1117, 1123 (9th Cir. 2016) (78-
month, above-Guidelines sentence not substantively

unreasonable); *United States v. Burgos-Ortega*, 777 F.3d 1047, 1057 (9th Cir. 2015) (46-month, above-Guidelines sentence not substantively unreasonable); *United States v. Rangel*, 697 F.3d 795, 806 (9th Cir. 2012) (264-month, above-Guidelines sentence not substantively unreasonable); *United States v. Burgum*, 633 F.3d 810, 814 (9th Cir. 2011) (180-month, above-Guidelines sentence not substantively unreasonable); *United States v. Lichtenberg*, 631 F.3d 1021, 1027 (9th Cir. 2011) (112-month, above-Guidelines sentence not substantively unreasonable); *United States v. Fitch*, 659 F.3d 788, 798-99 (9th Cir. 2011) (262-month, above-Guidelines sentence not substantively unreasonable); *United States v. Ellis*, 641 F.3d 411, 422-23 (9th Cir. 2011) (151-month, above-Guidelines sentence not substantively unreasonable); *Spangle*, 626 F.3d at 488 (24-month, above-Guidelines sentence not substantively unreasonable); *United States v. Hilgers*, 560 F.3d 944, 948 (9th Cir. 2009) (60-month, above-Guidelines sentence not substantively unreasonable).

While the majority "clearly disagree[s] with the District Judge's conclusion that consideration of the § 3553(a) factors justified a sentence of probation" and "believe[s] that the circumstances presented here were insufficient to sustain such a marked deviation from the Guidelines range," "it is not for the Court of Appeals to decide *de novo* whether the justification for a variance is sufficient or the sentence reasonable." *Gall*, 552 U.S. at 59. Because the district court's sentence was substantively reasonable under an abuse of discretion standard, I respectfully dissent.