THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR19-159-RSL |
| Plaintiff, | |
| v. | RESENTENCING MEMORANDUM |
| PAIGE A. THOMPSON, | |
| Defendant. | |

## I.   INTRODUCTION

Much has changed in the last six years. When Paige committed this crime, she was living in squalor, suffering from acute mental illness, staying awake all hours of the day and night, receiving no mental health treatment, and limiting herself to online contact with other humans. Now, she is working, surrounded by people who love her, and stable. She has shown genuine contrition, proven by six years of lawful conduct and overall compliance with release conditions.

Over the same period, conditions for transgender people in the United States generally and the BOP specifically have become markedly worse. Hackers continue to obtain personal information when companies leave their systems unsecured, but the largest data breaches since Paige's prosecution have been committed by overseas actors, sometimes supported by foreign governments. Six years on, there is no evidence that Paige's crime emboldened anyone to commit a hack, or that her prosecution and original sentence failed to deter anyone from hacking.

RESENTENCING MEMORANDUM
(*United States v. Thompson*, CR19-159-RSL) - 1

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

Time will tell whether the Court's initial optimism that "the arc of the moral universe bends towards justice" is justified. Still, at least in this case, the past six years have brought greater stability for Paige, continued profitability for the victims, and no apparent increase in similar, or similarly motivated, offenses. That, if nothing else, proves that the Court's sentence was "sufficient but not greater than necessary" to satisfy the purposes of sentencing.

For that reason, considering everything that has happened over the last six years, Paige respectfully asks the Court to resentence her to five years of probation, with three years of home confinement, modified to reflect the time she has already served. Although counsel believes the probationary sentence was fully warranted at the original sentencing hearing, it is even more strongly justified considering the expanded record that the Court will review at this resentencing hearing.[1]

## II.    PROCEDURAL POSTURE

A divided panel of the Ninth Circuit remanded Paige's case for resentencing because it concluded that "the record" did not support the Court's factual findings and because the panel majority was not certain that the Court had given "meaningful weight" to each of the 18 U.S.C. § 3553(a) factors. The panel majority tied that conclusion to what it perceived as an inadequate explanation for the Court's sentence. *See United States v. Thompson*, 130 F.4th 1158, 1165 (9th Cir. 2025) ("*On this record*, the district court's findings minimizing the nature, circumstances, and seriousness of Thompson's offenses are clearly erroneous.") (emphasis added); *Id*. at 1166 ("[T]he district court's finding that Thompson was 'tortured and tormented about what she did' is not supported by *the record*.") (emphasis added); *Id*. at 1167 ("[W]hile the district court acknowledged the Government's argument that a low sentence would incentivize

---

[1] This resentencing memorandum is intended to supplement, not replace, previously filed sentencing papers. The information and arguments in those filings are reincorporated here.

RESENTENCING MEMORANDUM
(*United States v. Thompson*, CR19-159-RSL) - 2

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

similar crimes, *it does not appear* that it gave this factor meaningful weight in selecting the sentence that it imposed.") (emphasis added); *Id*. at 1167 ("The district court *did not address* [evidence that Paige withdrew approximately $40,000 in cryptocurrency] or the Government's arguments, nor did it make any findings regarding these incidents.") (emphasis added); *Id*. at 1168 ("*[N]othing in the record* indicates that in choosing the sentence that it imposed, the district court weighed the risk of unwarranted disparity in making its decisions.") (emphasis added); *Id.* at 1169 ("[T]he district court abused its discretion by failing to *meaningfully weigh* the sentencing disparity that its chosen sentence created.") (emphasis added); *Id*. at 1170 ("[W]e conclude that the district court's explanation for the sentence it imposed is inadequate to justify the resulting disparity from other similar cases and defendants."); *Id.* (faulting the Court for basing a sentence on its "perceptions about the evolution of the criminal-justice system" rather than "the specific facts about Thompson and her crimes"). This focus on the Court's alleged lack of explanation mirrored the government's arguments on appeal. *See* Ex. 3 at 2 (arguing that the Court did not explain its sentence); *Id.* at 3 (arguing that the Court's discussion of Paige's status as a transgender woman showed that it did not consider any other factor); *Id.* at 4 ("The Court failed to articulate a rationale" sufficient to justify the departure from the Guideline range.). A majority of the panel therefore instructed this Court to resentence Paige, taking care to review all the § 3553(a) factors and taking into account any circumstances that had changed in the three years since Paige's sentencing hearing.

### III.    BACKGROUND

#### A.    The offense

More than six years ago, in June of 2019, Paige Thompson sent unsolicited Twitter messages to a cybersecurity professional named Kat Valentine claiming to have obtained Capital One's security credentials and used them to download the personally

RESENTENCING MEMORANDUM
(*United States v. Thompson*, CR19-159-RSL) - 3

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

identifiable information ("PII") of its customers. When Ms. Valentine asked why she was sending information about her data theft to a stranger, Paige replied, "Im ready to check the f*** out . . . I dont care if its jail or death. Prefer to die, and something to make it easy." Ex. 4 at 3.

The tone of that response was typical of Paige's online communications about the Capital One breach. In chats with friends, Paige worried about what to do with this information that she had never anticipated receiving. She said she was tempted to release it on the internet, but just as quickly said that she didn't want "to go out like that," Ex. 5 at 2, and that it seemed like a "terrible idea." *Id.* at 3. Paige repeatedly emphasized that she did not intend to distribute the information publicly. She made clear that she was not trying to be a part of any "Equifax scale disaster," referring to a data breach in September 2017 that exposed the personal information of 148 million Americans. *Id.* at 6. She told people she did not want to have the information around, had encrypted it, and was trying to find a place to safely store it. Ex. 5 at 8. Paige wondered whether she could use the fact of the download to find a job without disclosing the information she had obtained. Ex. 5 at 7. And to Kat Valentine, Paige described her possession of the information as a "suicide vest" that would destroy her. Ex. 4 at 2.

Paige also admitted in her online chats to using her access to Amazon Web Service Accounts to mine cryptocurrency.

Ms. Valentine reported Paige's confession to law enforcement, which identified the Twitter account as belonging to Paige Thompson, in part because it contained her resume. Within two weeks after Paige exposed her own misconduct, FBI agents arrested her. Paige met with law enforcement shortly after her initial appearance to disclose and explain the technical procedure by which she had obtained the personal

RESENTENCING MEMORANDUM
(*United States v. Thompson*, CR19-159-RSL) - 4

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

information. Law enforcement shared that disclosure with the victims, enabling them to protect against other incursions.

Subsequent investigation revealed that Paige had downloaded PII of 98 million Americans, undetected, approximately four months earlier, but had not disclosed or monetized the information. Investigation also confirmed that Paige had used her access to other AWS accounts to mine for about $10,000 in cryptocurrency. Paige turned over her cryptocurrency wallets and keys at the time of her arrest. Amazon reported that it spent about $115,000 in electricity costs because of the unauthorized use of AWS accounts for cryptomining, though it did not seek restitution.

Investigation (including Paige's proffer) also showed that it had been alarmingly straightforward to obtain the security credentials that permitted Paige to download information. In very broad strokes, Paige had used a publicly available document to identify clients of AWS. She then created a script that scanned those accounts to determine which clients had calibrated their proxy services to permit "reverse proxy requests." That "open" calibration allowed anyone to access to the account's metadata, which sometimes included unsecured security credentials. Another script then used those credentials to download unsecured information. Though Paige had no way of knowing it in advance, that unsecured information included the PII of nearly all Capital One's customers.[2]

Consistent with her alarmed chats, Paige did not know what she would get until she downloaded it, and she never expected to download so much private information. Ex. 1 at 1. When she began working on these scripts, Paige had never done anything like this before, and had no sense of how enormous the consequences of her actions would be. *Id*. Also, because she did not view her conduct as bypassing security

---

[2] The government argued that Paige used an anonymizing software (e.g., a VPN and The Onion Router) because she knew she was committing a crime. In fact, like any person in the cybersecurity space, Paige anonymized all her internet activity.

RESENTENCING MEMORANDUM
(*United States v. Thompson*, CR19-159-RSL) - 5

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

programs, Paige initially believed that her scripts would "stay under" the law. Nonetheless, it did not appear straightforward for Paige to simply tell Capital One of their vulnerability once it was discovered. Professor Alex Halderman testified that researchers often choose to report vulnerabilities anonymously when they are concerned that the company responsible might threaten to retaliate against the researcher to keep the problem from becoming public. Ex. 6. Furthermore, as her communication with Kat Valentine reflects, Paige realized almost immediately that she had committed a crime and that the information she had obtained could destroy her life.

Paige nonetheless elected to expose the vulnerability. The financial harm from her theft therefore was limited to Capital One's remediation efforts, Amazon's electricity costs, and reputational harm exacerbated by pretrial publicity. (The government also fined Capital One $80 million for failing to implement effective risk assessment and cybersecurity processes to protect the private information of its customers and required Capital One to submit plans to improve its security and to undergo federal oversight.)

### B. Paige Thompson

Paige Thomson is 39 years old. She stands almost six feet tall but weighs less than 130 pounds. As this Court is aware, she has a fragile appearance, with highly pronounced cheekbones, jaw line, and clavicles.

As set forth in more detail in her prior Sentencing Memorandum, Paige endured a chaotic and violent childhood, made worse by bullying, depression, ADHD, and undiagnosed autism spectrum disorder (ASD). Dkt. 380 at 5–11. *See also* PSR ¶¶ 16–17. After she left school at 16, Paige avoided homelessness by entering a series of exploitative relationships with older men. PSR ¶¶ 13–15. At age 22, she began taking feminizing hormones, first on her own and later under a doctor's supervision.

RESENTENCING MEMORANDUM
(*United States v. Thompson*, CR19-159-RSL) - 6

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

Eventually, Paige returned to school, excelling as a computer programmer, but avoided living openly as a woman while in school for fear of being harassed. *Id*.

When Paige later began living as a woman, she was forced to deal with others' reaction to her identity. At Amazon, a male coworker bullied Paige until she quit. *Id.* at 18. Paige then was unemployed for nearly three years. Ex. 1. She came to believe that, as a trans person, prospective employers saw her as a human resources headache. *Id*. She also felt that, whether at the coffee shop or at a job interview, people did not seem to take her seriously. *Id.* Paige became suicidal and, as her online moniker reflected, erratic. She felt, in her words, that she could not take the world seriously. *Id*.

### C.    Post-sentencing developments

Paige completed three years of home confinement this month. Probation Officer Keomalu reports that "[h]er performance on supervision seems to have been torn between periods of consistent instability and displaying strides of potential compliance." Because Paige continues to suffer from depression, she has remained in her home and not asked for passes. Because she has autism spectrum disorder, she can be overwhelmed in conversation and has on occasion asked counsel to mediate with U.S. Probation.

In the most important ways, however, Paige has complied with the terms of her probation. Since beginning to work last spring, she has complied with her location monitoring, performed community service work, and made restitution payments. She enjoys work and feels that it gives her a sense of purpose. Paige currently lives with her friend Maxine, Maxine's mother, and two other friends. They share chores and describe themselves as a family. Paige has taken responsibility for her past and her past conduct. Exs. 1, 2. Most importantly, the Court's prediction at Paige's first sentencing has proven true: Paige has not reoffended.

RESENTENCING MEMORANDUM
(*United States v. Thompson*, CR19-159-RSL) - 7

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

Paige's letter to the Court explains that being confined to her home during a series of personal losses has been especially punitive and trying. Ex. 1. She remains deeply remorseful for what she did in 2019. As the Court observed from her demeanor throughout trial, Paige is particularly ashamed of the statements she made online after obtaining the information.

Over the last six years, the social and political environment has grown increasingly hostile to transgender people. The federal government has insisted that trans people should not serve in the military, denied them access to necessary medical care, and described them as a threat to children. At least 36 trans people were murdered in the year prior to November 2024.[3] That number seems primed to increase. Against this backdrop, Paige began to consider a year ago that the stigma had become too dangerous to continue living as a transgender woman. Today, she has stopped taking feminizing hormones for fear of violence. However, Paige remains her legal name. She uses female pronouns at home and within her community, and ordinarily uses female pronouns outside the house.

Meanwhile, federal prisons have become more dangerous and punitive, both generally and specifically for people like Paige. Understaffing is rampant and morale is low.[4] The President's decision to dissolve the Bureau of Prison's union and threats of widescale layoffs suggest that staffing problems are unlikely to resolve.[5] The

---

[3] https://www.hrc.org/press-releases/hrcs-2024-epidemic-of-violence-report-fatal-violence-against-transgender-and-gender-non-conforming-people-continues-with-black-trans-women-comprising-nearly-half-of-the-deaths; *see also* https://www.theguardian.com/us-news/2025/sep/20/four-arrested-washington-state-hate-crime-trans-woman

[4] https://www.govexec.com/workforce/2025/10/protecting-federal-prisons-shutdown-benefits-all-us/408728/

[5] https://www.nytimes.com/2025/09/26/us/politics/federal-prisons-workers-union.html; Drew Friedman, *Days ahead of coming BOP pay cuts, some employees already*

RESENTENCING MEMORANDUM
(*United States v. Thompson*, CR19-159-RSL) - 8

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

President's DOGE Commission eliminated the PREA advisory board, so prisons no longer have access to information about how to protect inmates from sexual assault.[6] A series of internal reports have disclosed serious problems within the prison medical system.[7] Notably, the President eliminated the policies that the government previously argued would keep Paige safe.[8]

These changes put Paige at risk. She is physically and emotionally frail and would be arguably the most highly publicized transgender person in the Bureau of Prisons.

---

*resigning*, Federal News Network, March 14, 2025, https://federalnewsnetwork.com/pay/2025/03/days-ahead-of-coming-bop-pay-cuts-some-employees-already-resigning/.

[6] https://theappeal.org/trump-doj-defunds-national-prison-rape-resource-center/

[7] *E.g.*, Department of Justice, Office of Inspector General, *Inspection of the Federal Bureau of Prisons' Federal Medical Center Devens*, DOJ-OIG Report No. 25-009 (December 2024), https://oig.justice.gov/sites/default/files/reports/25-009.pdf ("OIG-Devens"); Department of Justice, Office of Inspector General, *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Tallahassee*, DOJ-OIG Report No. 24-005 (Nov. 8, 2023), https://oig.justice.gov/reports/inspection-federal-bureau-prisons-federal-correctional-institution-tallahassee ("OIG-Tallahassee"); Department of Justice, Office of Inspector General, *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Sheridan*, DOJ-OIG Report No. 24-070 (May 22, 2024), https://oig.justice.gov/reports/inspection-federal-bureau-prisons-federal-correctional-institution-sheridan ("OIG-Sheridan").

[8] On his first day in office, President Trump issued an executive order that prohibited gender-affirming care for transgender people in federal prisons. The BOP then issued a policy stating that "no Bureau of Prisons funds are to be expended for any medical procedure, treatment, or drug for the purpose of conforming an inmate's appearance to that of the opposite sex." It also prohibits clothing and commissary items it deems inconsistent with a person's assigned sex, requires all BOP staff to misgender transgender people, and instructed officials to remove any transgender women held in women's facilities and place them in men's facilities.

RESENTENCING MEMORANDUM
(*United States v. Thompson*, CR19-159-RSL) - 9

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

## IV. SENTENCING REQUEST UNDER 18 U.S.C. § 3553(A)

Paige respectfully asks the Court to reimpose a sentence of five years of probation, with a condition that she successfully complete three years of home confinement. Considering the fuller record before the Court, including Paige's expression of remorse and lawful conduct in the approximately six years since she committed her only criminal offense, a probationary sentence fully satisfies the purposes of sentencing.

### D. The nature, circumstances, and seriousness of the offense

The government and Ninth Circuit have emphasized that Paige's offense is aggravated by the number of people potentially affected, by the amount of money spent to secure the security flaw her actions exposed, and by online comments reflecting that Paige knew she had broken the law. *See Thompson*, 130 F.4th at 1165 ("Thompson committed one of the largest data breaches in American history. She hacked into and stole dozens of companies' data, including PII of nearly 100 million Americans just from Capital One . . . . Her private communications demonstrate that she knew her conduct was unlawful and could result in imprisonment."). But the size of the breach is a poor measure of Paige's culpability, because it was not anticipated or intended. Paige had no control over the number of identities left unsecured or the expense of reassuring customers when her arrest exposed the breach. As the government's Office of the Comptroller of Currency concluded when imposing sanctions, Capital One bore significant responsibility for the size of the breach by failing to keep its customers' PII private. And because Paige did not monetize or share the information, the total harm was diffuse and limited. As the government previously acknowledged in its sentencing memorandum, Paige's case fell outside the mine-run of cases precisely because she was not "a person with purely malicious motives who committed maximum harm." Dkt. 377 at 4. On a per-customer basis, Capital One's remediation costs were very small and, as

RESENTENCING MEMORANDUM
(*United States v. Thompson*, CR19-159-RSL) - 10

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

sanctions reflect, clearly necessary. Capital One itself made $5.1 billion in profit in 2019, so was able to weather a $40 million loss without suffering any meaningful impact on their profits.[9] Likewise, the harm from Paige's use of her unauthorized access to AWS accounts to mine for cryptocurrency was limited to Amazon's loss of $115,000 worth of electricity, a small sum for such a large corporation.

More salient to the seriousness of the offense than Capital One and Amazon's expenses are Paige's actions, which are generally mitigating. Paige was not looking for PII specifically and exposed her actions to someone who could notify Capital One of the issue, rather than distribute or monetize the PII she obtained. In context, her statements to Kat Valentine about the possibility of distributing the data appear calculated to provoke Ms. Valentine to report the breach. Paige then volunteered to explain to law enforcement the technical details of how she accessed unsecured PII, thereby permitting Amazon and AWS customers to promptly recalibrate their settings. Her cryptomining was limited in both duration and scope.

### E. The history and characteristics of the defendant

Paige endured violence and neglect during her youth and was sexually exploited as a teenager and young adult. PSR ¶ 12. She suffers from depression, ADHD, autism spectrum disorder, and gender dysphoria. *Id*. ¶¶ 16–17. These circumstances contributed to her long-term destitution that drove her to attempt cryptomining, her decision to write the scripts, and to her panicked response when she realized she had downloaded PII. As the Court previously recognized, Paige's mental health, physical appearance, and life challenges all mean that she experiences punishment differently — and would experience incarceration more painfully — than other offenders.

The same factors make her relative success on supervision all the more commendable. Though Paige's mental illnesses continue to pose challenges, she has

---

[9] https://www.macrotrends.net/stocks/charts/COF/capital-one-financial/net-income

RESENTENCING MEMORANDUM
(*United States v. Thompson*, CR19-159-RSL) - 11

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

maintained professional relationships with the probation officers who have supervised her, found work, and built a stable home with her chosen family. Paige's work currently involves creating a "software-defined network router" that will enable home users to create more secure computing platforms at a fraction of the price of existing technology. Paige talks excitedly about her work and its potential benefits. For those who have known Paige over the last six years, she is transformed from the floridly mentally ill person, living in squalor and isolation, who committed this offense.

### F. Need to punish, protect, deter, and treat

#### i. Punishment

It is axiomatic that "[w]here a defendant's crime is attributable to a disadvantaged background or emotional or mental problems the defendant is less culpable than one without the excuse." *Landrigan v. Schriro*, 441 F.3d 638, 648 (9th Cir. 2006). At the original sentencing, all parties and the probation officer agreed that Paige's personal circumstances and conduct dramatically reduced the need for punishment. *See*, *e.g.*, Dkt. 377 at 4 (government stating Paige's offenses were mitigated by "her mental health circumstances, trauma, and her lack of a robust support system[,]" and, as a transgender woman, that she faced "widely recognized" dangers in prison). Paige's history of trauma and acute mental illness at the time of the offense diminished her culpability. And while the potential for damage from the breach was large, Paige's conduct was relatively mitigated: she had no idea the amount of PII her scripts would download, took no steps to monetize the stolen PII, chose to expose herself to a security professional who she expected would report the breach despite the risk of imprisonment, and then walked investigators through the vulnerability soon after her arrest. At the time of the initial sentencing recommendations, Paige had performed

RESENTENCING MEMORANDUM
(*United States v. Thompson*, CR19-159-RSL) - 12

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

well on pretrial release.[10] And, perhaps most importantly, the Court's observations of her demeanor throughout the pretrial proceedings and trial made clear that she was deeply troubled by her misconduct.

By imposing five years of probation and three years of home confinement, the Court's original sentence extended Paige's confinement approximately 20 months longer than Probation had recommended and extended Court supervision by two additional years. That is: had the Court imposed the two-year prison sentence that U.S. Probation recommended, Paige would have served no more than 17 months in a prison camp. Assuming Paige received a standard six-month transitional housing placement and received no earned time credit through the First Step Act, she would have been released in September 2023, and by today would have completed eighteen months of the three years of supervised release. The Court therefore chose a penalty that arguably imposed greater punishment in terms of a longer period of confinement and inarguably imposed greater supervision than the custodial term U.S. Probation had recommended. The Court also retained the ability to impose any sentence up to the statutory maximum should Paige violate the terms of her probation.

Importantly, although three years of home confinement has proven to be significant punishment, the Court's sentence avoided exposing Paige to violence and isolation in prison. The record before the Court shows that the BOP is unable to keep transgender prisoners safe or provide them with appropriate treatment. And Paige's notoriety, mental illness, physical frailty, and transgender identity makes her far more vulnerable than other defendants. The Court reasonably concluded that any marginal

---

[10] The government's original sentencing memorandum included evidence that it argued showed that Paige might have withdrawn cryptocurrency from the wallets to which she had given the government access. Defense counsel is aware of no further investigation into those withdrawals and has received no further discovery. There appears to be no conclusive evidence that Paige took any money out of the accounts.

RESENTGING MEMORANDUM
(*United States v. Thompson*, CR19-159-RSL) - 13

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

additional benefit that a prison sentence would provide in terms of punishment or incapacitation did not warrant the significant risk she would be harmed.

Furthermore, the centerpiece of the government's previously filed sentencing memorandum and the appellate court's opinion is that they did not believe Paige had accepted responsibility. In fact, as the Court noted, Paige has always been highly distressed by her conduct. She proved her remorse initially by exposing her crime and cooperating with law enforcement, proved it again by complying with the terms of pretrial release and then the Court's sentence, and now expresses her remorse in the letter attached to this memorandum. There remains no plausible argument that Paige does not accept responsibility for her misconduct. That too diminishes the need for punishment.

### ii.    Need to promote respect for the law

"[A] sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States*, 552 U.S. 38, 54 (2007) (quotation omitted).

Here, Paige's real conduct and circumstances before and after her crime merit a probationary sentence.

### iii.    The need to protect the public

For many of the same reasons that incarceration is unnecessary for punishment, the Court's probation sentence was — and has proven to be — sufficient to protect the public. The Court's sentence removed Paige from the community for three years and extended supervision for five years. The Court reserved the ability to impose a sentence up to the statutory maximum if Paige acted unlawfully or violated the conditions of supervision in any way. And the Court required Paige to give back to the community

RESENTENCING MEMORANDUM
(*United States v. Thompson*, CR19-159-RSL) - 14

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

through community service. With no new criminal allegations throughout the last six years, the Court's sentence has adequately protected the public.

### G. The need for deterrence

A majority of the appellate court faulted this Court for not giving "meaningful weight" to specific and general deterrence, and for not making findings about her conduct on pretrial release.

First, there is no longer any doubt that the Court's sentence deterred Paige specifically. Paige had never committed a data breach before her prosecution in this case and has committed no unauthorized hacking activity since. Despite the challenges of mental illness, she has generally complied with the terms of her home detention. Particularly in the last fourteen months, she has found work, engaged in mental health treatment, performed community service and paid restitution. Her letter reflects a thoughtful consideration of the wrongfulness of her conduct.

Both the Ninth Circuit and the Supreme Court have made clear that probationary sentences can provide general deterrence. *Gall,* 552 U.S. at 54; *United States v. Edwards*, 595 F.3d 1004, 1016–17 (9th Cir. 2010) ("Section 3553(a) . . . does not require the goal of general deterrence be met through a period of incarceration. The district court explicitly considered, weighed and factored into its sentence the important goal of deterrence."). Indeed, there is substantial reason to doubt that "general deterrence," meaning the conceptually appealing notion that higher sentences create lower crime, exists. A recent metastudy published by the University of Chicago concluded, "[b]ased on a much larger meta-analysis of 116 studies, [that] the current analysis shows that custodial sanctions have no effect on reoffending or slightly increase it when compared with the effects of noncustodial sanctions such as probation . . . . Incarceration cannot be justified on the grounds it affords public safety by decreasing recidivism." Damon M. Petrich, Travis C. Pratt, Cheryl Lero Jonson, and

RESENTENCING MEMORANDUM
(*United States v. Thompson*, CR19-159-RSL) - 15

**FEDERAL PUBLIC DEFENDER**
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

Francis T. Cullen, "Custodial Sanctions and Reoffending: A Meta-Analytic Review," *Crime and Justice*, September 2021.[11] *See also* Gary Kleck, "Deterrence: Actual Versus Perceived Risk of Punishment," Encyclopedia of Criminology and Criminal Justice, November 2018[12] (Evidence shows that "public policies that are designed to reduce crime by increasing the deterrent effect of punishment are unlikely to succeed because they are not likely, in general, to increase prospective offenders' perception of the legal risks of committing crime."); "Five Things about Deterrence," *National Institute of Justice* (June 5, 2016) ("Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes."). Research shows that the certainty of being caught, not the ultimate sentence, deters misconduct. Pasternoster, R., *How Much Do We Really Know About Criminal Deterrence*, 100 J. Crim. L. & Criminology 765, 812 (2010). And, importantly, there is no evidence that Paige's sentence emboldened anyone to commit a similar crime. Thus, while the panel majority found it "unpersuasive" that a probation sentence would effectively deter others, the Court's sentence is consistent with recent history and the best available social science evidence.

Under the circumstances of this case, a prison sentence would undermine general deterrence. That is, a hacker who believes she is doomed to a long prison term even if she cooperates may risk distributing or monetizing stolen information rather than coming forward. A probation sentence here therefore serves general deterrence by communicating to would-be hackers that the only way to avoid the most painful repercussions is to avoid disclosing any stolen information, expose your crimes, and cooperate with law enforcement.

---

[11] https://www.journals.uchicago.edu/doi/abs/10.1086/715100?journalCode=cj

[12] https://link.springer.com/referenceworkentry/10.1007/978-1-4614-5690-2_408

RESENTENCING MEMORANDUM
(*United States v. Thompson*, CR19-159-RSL) - 16

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

### H. The kinds of sentences available

Congress authorized district courts to impose either a sentence of incarceration and supervised release, or a sentence of probation that reserves the right to resentence up to the statutory maximum. Either alternative is available to the Court. This flexibility is designed to allow a sentencing judge to craft a sentence that best meets the needs of a particular case, as was done here.

### I. The advisory Sentencing Guidelines and unwarranted disparity

The argument most forcefully advanced by the panel majority and government is that a probation sentence represents an unwarranted deviation from the advisory Guideline range. But while the Guideline range is ordinarily the starting point for the Court's consideration of the 18 U.S.C. § 3553(a) factors, the Court need not assume that the range bears any relation to the correct sentence when the Guideline does not reflect the Sentencing Commission's use of empirical data. Indeed, in *Kimbrough v. United States*, 552 U.S. 85, 97 (2007), the Supreme Court emphasized that where a Guideline does not result from an analysis of "empirical data and national experience," "it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." The Court further explained that a sentencing court's disagreement with a Guideline on policy grounds does not violate sentencing statute's "unwarranted sentencing disparities" provision. *Id*. at 574.[13]

Here, the guidelines are driven entirely by loss amount, which was calibrated by the sentencing commission to increase prison sentences because it felt, as a policy matter, that too many people convicted of economic crimes were receiving probation:

> When the Commission adopted the original economic crime guidelines, it did not apply the empirical approach it used in other guidelines, based on

---

[13] https://www.fd.org/news/sentencing-commission-plans-reassess-fraud-guidelines

RESENTENCING MEMORANDUM
(*United States v. Thompson*, CR19-159-RSL) - 17

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

> prior sentencing practices. Instead, the Commission determined that courts' past sentencing practices revealed a significant number of "white-collar" cases received probation, which the Commission believed was too low. So, it "intentionally crafted the initial set of guidelines to require more severe punishment, and more frequent use of imprisonment . . . ." The result was a guideline and loss table flawed from its inception because its design was based not on empirical data but on a desire to make sentences harsher under the flawed presumption that longer sentences "might deter future crime."

Statement of Daniel Dena on behalf of Fed. Defenders to the U.S. Sent'g Comm on Proposal #1: Loss, at 1 (Feb. 27, 2024). As a result, "Section 2B1.1 now 'routinely recommends arbitrary, disproportionate, and often draconian sentences' for people with no criminal history." *See* Barry Boss & Kara Kapp, How the Economic Loss Guideline Lost Its Way, and How to Save It, 18 Ohio St. J. Crim. L. 605, 605–06 (2021). Courts now impose within-Guideline sentences only about 40% of the time. They impose probation about in about a quarter of all cases.[14] Considering how infrequently courts impose Guideline sentences, USSG § 2B1.1 does not reflect a reasonable starting point for sentencing even in the "mine-run" case. Indeed, overreliance on the Guideline range would *increase* sentencing disparity.

Furthermore, this Court must consider not just "the need to avoid unwarranted disparities, but also . . . the need to avoid unwarranted *similarities*." *Gall*, 552 U.S. at 55 (emphasis in the original). And here, all parties and the probation officer agreed that this was not a mine-run case, and the Guideline range therefore had limited relevance in this highly unusual prosecution. Probation specifically pointed out that "[u]nlike most 'hacking' or device fraud cases in this district, Ms. Thompson did not sell the data, she did not make the data publicly available to anyone else. Ms. Thompson made no money off this breach, nor did she attempt to." PSR ¶ 35. Paige's personal history, her mental illness, her efforts to mitigate any harm from her breach, and her post-arrest cooperation

---

[14] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY24.pdf

RESENTENCING MEMORANDUM
(*United States v. Thompson*, CR19-159-RSL) - 18

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100

all proved that her misconduct was out of the ordinary. Even her cryptocurrency mining conduct was unusual insofar as her $10,000 gain was comparatively low.

### J. The need to provide restitution to victims of the offense

Although Paige will never be able to pay the $41 million in restitution that this Court ordered be paid to Capital One, the restitution requirement provides a meaningful additional punishment by ensuring that Paige will be living paycheck to paycheck until she reaches retirement age. *See Paroline v. United States*, 572 U.S. 434, 456 (2014) ("The primary goal of restitution is remedial or compensatory, but it also serves punitive purposes."). That is, even if Paige's regular restitution payments are irrelevant to Capital One given its overall budget and profits, the restitution judgement extends Paige's punishment for this offense.

## V. CONCLUSION

For the forgoing reasons, as well as those discussed at Paige's original sentencing, and those to be discussed at the resentencing hearing, Paige respectfully asks the Court to resentence her to five years of probation, coupled with three years of home detention under the conditions originally imposed.

DATED this 22nd day of October 2025.

Respectfully submitted,

s/ *Gregory Murphy*
s/ *Nancy Tenney*
Assistant Federal Public Defenders
Attorneys for Paige Thompson

RESENTENCING MEMORANDUM
(*United States v. Thompson*, CR19-159-RSL) - 19

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
(206) 553-1100